## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **FEDERAL ELECTION COMMISSION**, | ) ) |
| Defendant. | ) ) |

Civil Action No. 22-35-CRC

---

### JOINT APPENDIX

Stuart C. McPhail
(D.C. Bar No. 1032529)
Citizens for Responsibility and Ethics
  in Washington
1331 F Street, N.W., Suite 900
Washington, DC 20004
Phone: (202) 408-5565
Fax: (202) 588-5020
smcphail@citizensforethics.org

*Counsel for Plaintiff Citizens for
Responsibility and Ethics in Washington*

Lisa J. Stevenson
(D.C. Bar No. 457628)
Christopher H. Bell
(D.C. Bar No. 1643526)
Greg J. Mueller
(D.C. Bar No. 462840)
Blake L. Weiman
(D.C. Bar No. 1725165)
Federal Election Commission
1050 First Street, NE
Washington, DC 20463
Phone: (202) 694-1650

*Counsel for Defendant Federal
Election Commission*

## TABLE OF CONTENTS

| Tab | Document | Page(s) |
|---|---|---|

**MUR 7465 (Freedom Vote, Inc.)**

| 1 | Administrative Complaint (date-stamped Aug. 9, 2018) | AR0001–24 |
| 2 | FEC First General Counsel's Report and Factual and Legal Analysis (date-stamped July 1, 2009) | AR0060–103 |
| 3 | Certification of Commissioners' Reason to Believe vote on July 25, 2019, by the Acting Secretary and Clerk of the Commission (certification signed and dated July 29, 2019) | AR0104–05 |
| 4 | Email transmitting link to Freedom Vote, Inc's documents responsive to the Commission's Request for Production No. 4 from Charles R. Spies (dated Arp. 14, 2021) | AR0196 |
| | Freedom Vote Inc, Inc. Response to Document Request | AR0197–202 |
| | Missy Mae Walters Invoice (dated Apr. 28, 2014) | AR0291 |
| | Missy Mae Walters Invoice (dated Apr. 6, 2014) | AR0294–95 |
| | John Wasilchick llc Invoice (dated Sept. 21, 2015) | AR0422 |
| | The Tarrance Group Invoice (dated July 31, 2015) | AR0424 |
| | Letter from Unknown source to James Nathanson, Executive Director of Freedom Vote (dated Aug. 31, 2016) | AR0532 |
| | Main Street Media Group Invoice (dated June 15, 2016) | AR0568 |
| | James S. Nathanson & Associates Invoice (dated Mar. 31, 2014) | AR1034 |
| | James S. Nathanson & Associates Invoice (dated Apr. 25, 2014) | AR1036 |
| | James S. Nathanson & Associates Invoice (dated Apr. 29, 2014) | AR1038 |

1

| | | |
|---|---|---|
| | James S. Nathanson & Associates Invoice (dated May 12, 2014) | AR1040 |
| | Strategy Group Invoice (dated Jan. 20, 2014) | AR1042 |
| | Strategy Group Invoice (dated Feb. 12, 2014) | AR1044 |
| | Strategy Group Invoice (dated Feb. 26, 2014) | AR1046 |
| | Connection Strategy, LLC Invoice (dated July 31, 2014) | AR1048 |
| | Connection Strategy, LLC Invoice (dated Jan. 16, 2014) | AR1050 |
| | Connection Strategy, LLC Invoice (dated Apr. 14, 2014) | AR1092 |
| | Connection Strategy, LLC Invoice (dated May 5, 2014) | AR1095–98 |
| | Freedom Vote, FEC Form 5, Report of Independent Expenditures Made and Contributions Received (signed July 15, 2014) | AR1136–41 |
| | Ledger of 2014 Freedom Vote Receipts and Expenses | AR1310–11 |
| | Ledger of 2015 Freedom Vote Receipts and Expenses | AR1314–15 |
| | Ledger of 2016 Freedom Vote Receipts and Expenses | AR1318–22 |
| | McCarthy Hennings Whalen, Inc. Invoice (dated July 18, 2016) | AR1367 |
| | McCarthy Hennings Whalen, Inc. Invoice (dated June 21, 2016) | AR1369 |
| 5 | Portions of Deposition Transcript of James S. Nathanson (dated May 12, 2021) | AR1370-71, AR1374, AR1376–77, AR1393–95, AR1405–07, AR1426–27, AR1442–43, AR1457–61, AR1464, AR1498–1501, AR1507 |
| 6 | Memorandum to the Commission regarding Investigation Update and Intent to Serve Probable | AR1528–29 |

|   | Cause Brief from Lisa J. Stevenson, Acting General Counsel, et al. (dated Sep. 13, 2021) | |
|---|---|---|
| 7 | General Counsel's Brief (signed and dated Sept. 20, 2021) | AR1530–59 |
| 8 | Memorandum to the Commission regarding a Proposed Conciliation Agreement for Probable Cause Conciliation from Lisa J. Stevenson, Acting General Counsel, et al. (dated Oct. 15, 2021) | AR1808–09 |
| 9 | Certification of Commissioners' Probable Cause vote, vote to dismiss the allegations against Freedom Vote, Inc., and vote to close the file on November 9, 2021, by the Acting Deputy Secretary of the Commission (certification signed and dated Nov. 14, 2021) | AR1815–16 |
| 10 | Statement of Reasons of Chair Shana M. Broussard, Commissioner Steven T. Walther, and Commissioner Ellen L. Weintraub (dated Dec. 16, 2021) | AR1824–32 |
| 11 | Statement of Reasons of Chairman Allen Dickerson, Commissioner Sean J. Cooksey, and Commissioner James E. "Trey" Trainor, III (dated Mar. 7, 2022) | AR1835–45 |
| 12 | Documents responsive to the Commission's Requests for Production 1, 5, 6, 7, and 8 from Charles R. Spies (dated Apr. 9, 2021) | |
|   | Letter from Tom Whatman, Manager, Fighting for Ohio to Jim Nathanson, Executive Director, Freedom Vote (dated July 5, 2016) | AR1955 |
|   | Door Hanger advocating election of John Boehner in Republican Primary | AR1988–89 |
|   | Transcript of "Third Largest" television ad | AR1992–94 |
|   | Email from James Nathanson to Brian Walsh (dated Mar. 5, 2014) | AR1997 |
|   | Email from Brian Walsh to James Nathanson (dated Apr. 9, 2014) | AR2032–33 |
|   | Letter from James S. Nathanson, Executive Director, Freedom Vote to Unknown Recipient (dated Jan. 15, | AR2074 |

2016)

| | |
|---|---|
| Letter from Unknown Sender to Freedom Vote, c/o James Nathanson (dated Oct. 5, 2016) | AR2076 |
| Letter from James S. Nathanson, Executive Director, Freedom Vote, to Unknown Recipient (dated Apr. 8, 2021) | AR2082 |
| Email chain between James Nathanson and Unknown Recipient (dated June 23, 2016) | AR2165–67 |
| Email from James Nathanson to Unknown Recipient (dated Apr. 16, 2014) | AR2174 |
| Email chain between James Nathanson and Unknown Recipient (dated Apr. 21, 2014) | AR2203–04 |
| Email chain from James Nathanson and Unknown Recipient (dated Apr. 21, 2014) | AR2205 |
| Email chain between James Nathanson and Unknown Recipient (dated Apr. 17, 2014) | AR2206–07 |
| Email from Thomas Whatman to Unknown Recipient (dated Apr. 17, 2014) | AR2208–09 |
| Email from Unknown Sender to Thomas Whatman and James Nathanson (dated Apr. 17, 2014) | AR2210–11 |
| Email from Thomas Whatman to Unknown Recipient (dated Apr. 16, 2014) | AR2212 |

# Tab 1

Administrative Complaint (date-stamped Aug. 9, 2018) AR0001–24

OFFICE OF
GENERAL COUNSEL
FEDERAL ELECTION COMMISSION
2018 AUG -9 PM 2: 19

In the matter of:

    Freedom Vote, Inc.
    Fighting for Ohio Fund
    Christopher Marston, Treasurer, Fighting for Ohio Fund
    Unknown Respondents                 MUR 7465

## COMPLAINT

1.      Citizens for Responsibility and Ethics in Washington ("CREW") and Noah Bookbinder bring this complaint before the Federal Election Commission ("FEC" or "Commission") seeking an immediate investigation and enforcement action against Freedom Vote, Inc. ("FV"), Fighting for Ohio Fund, Christopher Marston, and Unknown Respondents for direct and serious violations of the Federal Election Campaign Act ("FECA").

2.      Freedom Vote, Inc. is ostensibly a tax-exempt social welfare organization established in Ohio in 2010. During most of its existence, however, it has acted as a political committee, spending the majority of its money on federal political activity. For example, between October 1, 2015 and September 30, 2016 – FV's fiscal year which covered much of the 2016 election cycle – about 80% of FV's spending was political. That spending included $1.7 million the group gave to a super PAC, Fighting for Ohio Fund, and at least $1.1 million for an advertisement opposing a candidate in the 2016 Ohio Senate race. FV similarly spent most of its funds on politics during the 2014 election, and the majority of FV's spending since October 2011 has been dedicated to politics.

3.      In conducting their political activity, Freedom Vote, Inc., Fighting for Ohio Fund, and one or more unknown respondents violated the FECA. Despite its heavy political spending, FV never registered as a political committee with the FEC, failed to file reports disclosing its

1

contributors, and failed to disclose its spending on the political ad it ran in the 2016 Ohio Senate race. In addition, FV, Fighting for Ohio Fund, and unknown respondents engaged in a conduit contribution scheme that kept secret the names of donors by laundering their contributions to Fighting for Ohio Fund through FV. The FEC should investigate these allegations and take appropriate action to enforce the FECA.

<div align="center">Complainants</div>

4.    Complainant CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. CREW is dedicated to empowering voters to have an influential voice in government decisions and in the governmental decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission.

5.    In furtherance of its mission, CREW seeks to expose unethical and illegal conduct of those involved in government. One way CREW does this is by educating citizens regarding the integrity of the electoral process and our system of government. Toward this end, CREW monitors the campaign finance activities of those who run for federal office and publicizes those who violate federal campaign finance laws through its website, press releases, and other methods of distribution. CREW also files complaints with the FEC when it discovers violations of the FECA. Publicizing campaign finance violators and filing complaints with the FEC serve CREW's mission of keeping the public informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance law.

6.    In order to assess whether an individual, candidate, political committee, or other regulated entity is complying with federal campaign finance law, CREW needs the information

<div align="center">2</div>

contained in receipts and disbursements reports political committees and others must file

pursuant to the FECA, 52 U.S.C. § 30104; 11 C.F.R. §§ 104.1–22, 109.10. CREW is hindered in

its programmatic activity when an individual, candidate, political committee, or other regulated

entity fails to disclose campaign finance information in reports of receipts and disbursements

required by the FECA.

       7.     CREW relies on the FEC's proper administration of the FECA's reporting

requirements because the FECA-mandated disclosure reports are the only source of information

CREW can use to determine if an individual, candidate, political committee, or other regulated

entity is complying with the FECA. The proper administration of the FECA's reporting

requirements includes mandating that all disclosure reports required by the FECA are properly

and timely filed with the FEC. CREW is hindered in its programmatic activity when the FEC

fails to properly administer the FECA's reporting requirements.

       8.     Complainant Noah Bookbinder is the executive director of Citizens for

Responsibility and Ethics in Washington. At all times relevant to the complaint, he has been and

remains a citizen of the United States and a registered voter and resident of Maryland. As a

registered voter, Mr. Bookbinder is entitled to receive information contained in disclosure reports

required by the FECA, 52 U.S.C. § 30104; 11 C.F.R. §§ 104.1–22, 109.10. Mr. Bookbinder is

harmed in exercising his right to vote when an individual, candidate, political committee, or

other regulated entity fails to report campaign finance activity as required by the FECA. *See FEC*

*v. Akins,* 524 U.S. 11, 19 (1998), *quoting Buckley v. Valeo,* 424 U.S. 1, 66-67 (1976) (political

committees must disclose contributors and disbursements help voters understand who provides

which candidates with financial support). Mr. Bookbinder is further harmed when the FEC fails

AR0003

to properly administer the FECA's reporting requirements, limiting his ability to review campaign finance information.

9.      Mr. Bookbinder also is harmed in his ability to communicate to the public and to other voters information about the source of funds used for political activities.

<u>Respondents</u>

10.     FV is a tax-exempt organization established in 2010, organized under section 501(c)(4) of the Internal Revenue Code, and based in Dayton, OH. James S. Nathanson is the executive director of FV. FV 2015 Form 990, https://bit.ly/2HdyBoH.

11.     FV was formed "with the express purpose of raising money to help pay for the type of turnout operations traditionally underwritten by the [Republican National Committee]." Jeanne Cummings, <u>State Parties Look Past RNC for Cash</u>, *Politico*, Sept. 3, 2010, http://politi.co/2FjFJj3. Tom Whatman, a former executive director of the Ohio Republican Party who advised FV when the group was formed, explained the formation of FV by saying he "understood that the lack of resources from the [Republican National Committee] was going to have a severe impact on what the parties were going to be able to do." *Id.*

12.     As of June 7, 2018, FV was not a registered political committee.

13.     Fighting for Ohio Fund is an independent-expenditure only committee ("super PAC") formed in 2015. Fighting for Ohio Fund, <u>FEC Form 1, Statement of Organization</u>, February 18, 2015.

14.     Christopher Marston is the treasurer of Fighting for Ohio Fund. *Id.*

15.     Unknown respondents are the true source or sources of funds FV transferred to Fighting for Ohio Fund, as well as the conduit or conduits, if any, through which such funds passed before being contributed to FV.

4

Factual allegations

16.    On January 1, 2011, James S. Nathanson took over as executive director of FV. FV 2010 Form 990, Part VII, Section A, https://bit.ly/2qIftsW.

17.    On its 2011 tax return, filed under penalty of perjury, FV reported spending a total of $191,416 between October 1, 2011 and September 30, 2012. FV 2011 Form 990, Part I, Line 18, https://bit.ly/2HyhQrM.

18.    On its 2012 tax return, filed under penalty of perjury, FV reported spending a total of $150,430 between October 1, 2012 and September 30, 2013. FV 2012 Form 990, Part I, Line 18, https://bit.ly/2HCYlOS.

19.    In March, April, and May 2014, FV reported to the FEC spending $174,607 on independent expenditures supporting then-Speaker of the House John Boehner (R-OH) and opposing two of his primary opponents, J.D. Winteregg and Eric Gurr. FV, FEC Form 5, 2014 April Quarterly Report, Amended, July 15, 2014; FV, FEC Form 5, 2014 July Quarterly Report, July 15, 2014. Specifically, FV paid for "door hangers," "canvassers and consulting," "iPads for canvassing," "map books for canvassing," "door-to-door literature," and "robocalls" all supporting Speaker Boehner's re-election. *Id.*

20.    On its 2013 tax return, filed under penalty of perjury, FV reported spending a total of $284,754 between October 1, 2013 and September 30, 2014. FV 2013 Form 990, Part I, Line 18, https://bit.ly/2vvIUmA. FV's political spending during that year thus amounted to 61.3% of its total spending.

21.    FV's total spending dropped significantly following the 2014 election. FV reported on its 2014 tax return spending a total of $58,578 between October 1, 2014 and September 30, 2015. FV 2014 Form 990-EZ, Part I, Line 17, https://bit.ly/2HKzYw4.

5

22.    On its 2015 tax return, filed under penalty of perjury, FV reported spending a total of $3,575,475 between October 1, 2015 and September 30, 2016. FV 2015 Form 990, Part I, Line 18.

23.    Of that total, FV reported spending $1,744,267 on "direct and indirect political campaign activities," including $1,700,000 given to an independent expenditure-only political action committee, also known as a super PAC, registered with the FEC. *Id.*, Schedule C, Part I-A, Line 2 and Part I-C, Line 5. Specifically, FV deposited or gifted $1,700,000 to Fighting for Ohio Fund between December 29, 2015 and September 21, 2016, with $1,500,000 of those occurring in 2016. *Id.*; Fighting for Ohio Fund, FEC Form 1, Statement of Organization, February 18, 2015; Fighting for Ohio Fund, FEC Form 3X, 2015 Year-End Report, Jan. 31, 2016; Fighting for Ohio Fund, FEC Form 3X, 2016 April Quarterly Report, Amended, Oct. 27, 2016; Fighting for Ohio Fund, FEC Form 3X, 2016 October Quarterly Report, Amended, Oct. 27, 2016.

24.    The super PAC reported receiving FV's funds as "contributions" – gifts or other transfers of money made "for the purpose of influencing any election or Federal office." 52 U.S.C. § 30101(8)(A)(i) (definition of contribution).

25.    Fighting for Ohio Fund also reported receiving an additional $275,000 from FV that was not included on FV's 2015 tax return since the transfer was made on Oct. 5, 2016, after the close of the fiscal year covered by FV's 2015 tax return. Fighting for Ohio Fund, FEC Form 3X, 2016 Pre-General Report, Oct. 27, 2016; FV 2015 Form 990, Schedule C, Part I-A, Line 2 and Part I-C, Line 5.

26.    FV may have solicited and received contributions with the intent that the funds would be transferred to Fighting for Ohio Fund. The two organizations employed the same

6

fundraising firm, MMM Consulting. FV 2015 Form 990, Schedule G, Part I; Fighting for Ohio

Fund, <u>FEC Form 3X, 2015 Year-End Report</u>, Jan. 31, 2016; Fighting for Ohio Fund, <u>FEC Form</u>

<u>3X, 2016 April Quarterly Report, Amended</u>, Oct. 27, 2016; Fighting for Ohio Fund, <u>FEC Form</u>

<u>3X, 2016 July Quarterly Report, Amended</u>, Oct. 27, 2016; Fighting for Ohio Fund, <u>FEC Form</u>

<u>3X, 2016 October Quarterly Report, Amended</u>, Oct. 27, 2016; Fighting for Ohio Fund, <u>FEC</u>

<u>Form 3X, 2016 Pre-General Report</u>, Oct. 27, 2016; Fighting for Ohio Fund, <u>FEC Form 3X, 2016</u>

<u>Post-General Report</u>, Dec. 6, 2016.

27.    On its 2015 tax return, FV reported that MMM Consulting raised $2,090,000 for

FV, a sum sufficient to cover all FV's transfers to Fighting for Ohio Fund during the 2016

election cycle. FV 2015 Form 990, Schedule G, Part I. MMM Consulting was paid $35,000 for

its services. *Id.*

28.    Five of the six transfers FV made to Fighting for Ohio Fund during its 2015 tax

year correspond to exact amounts FV reported receiving on its Schedule of Contributors. FV

2015 Form 990, Schedule B, Part 1, Lines 3, 8, 9, 12, and 15 (2015 return covers much of the

2016 election cycle).

29.    Specifically,

- FV reported receiving a $500,000 contribution between October 1, 2015 and September 30, 2016. *Id.*; Schedule B, Part 1, Line 12. On July 5, 2016, FV transferred $500,000 to Fighting for Ohio Fund. Fighting for Ohio Fund, <u>FEC Form 3X, 2016 October Quarterly Report, Amended</u>, Oct. 27, 2016.

- FV reported receiving two separate $250,000 contributions between October 1, 2015 and September 30, 2016. FV 2015 Form 990, Schedule B, Part 1, Lines 3 and 9. On August 25, 2016 and September 21, 2016, FV made two separate $250,000 transfers to Fighting for Ohio Fund. Fighting for Ohio Fund, <u>FEC Form 3X, 2016 October Quarterly Report, Amended</u>, Oct. 27, 2016.

7

- FV reported receiving two separate $200,000 contributions between October 1, 2015 and September 30, 2016. FV 2015 Form 990, Schedule B, Part 1, Lines 8 and 15. On December 29, 2015 and September 14, 2016, FV made two separate $200,000 transfers to Fighting for Ohio Fund. Fighting for Ohio Fund, FEC Form 3X, 2015 Year-End Report, Jan. 31, 2016; Fighting for Ohio Fund, FEC Form 3X, 2016 October Quarterly Report, Amended, Oct. 27, 2016.

30.     Fighting for Ohio Fund engaged in extensive political activity influencing a federal election in 2016. The super PAC spent more than $9.2 million on independent expenditures opposing former Gov. Ted Strickland, who was then a Democratic candidate in the Ohio Senate race. OpenSecrets.org, Fighting for Ohio Fund, Independent Expenditures, Targeted Candidates, 2016, *available at* https://bit.ly/2Hv0BHZ.

31.     Fighting for Ohio Fund's ads against Strickland all contained an economic critique of Strickland's record as governor. Specifically, Fighting for Ohio Fund posted on its YouTube page 10 anti-Strickland videos that appear to be ads. Each of these criticize Strickland because Ohio lost 350,000 jobs while he was in office. YouTube, Fighting for Ohio, Uploads, *available at* https://bit.ly/2F0R5ae.

32.     In June and July 2016, FV broadcast its own television advertisement in Ohio attacking Strickland, who was then a Democratic candidate for the Senate but had not been a government official since January 2011. A copy of the advertisement that aired on station WLWT in Cincinnati, Ohio on June 20, 2016 is included on the drive attached as Exhibit A and a transcript of the ad is available at https://bit.ly/2F4AbaM.

33.     The advertisement is titled "Third Largest." Block Communications, Inc., Political Public File, National Issue/Third-Party Federal Candidate Advertisement, Freedom Vote/MainStreet Media Group, June 16, 2016, *available at* https://bit.ly/2HdmoEL. The ad used the same economic critique of Strickland that Fighting for Ohio Fund's ads used. FV's ad begins

8

with the narrator stating, "While Ted Strickland was governor, Ohio lost jobs to Kentucky, Indiana, even Michigan. 350,000 Ohio jobs gone." While the names of Ohio cities and their population sizes scroll on the screen, the narrator adds, "How many is that? If you assembled everyone who lost their job under Strickland, you'd have Ohio's third largest city." The ad closes by referring to Strickland's Senate candidacy with the narrator stating, "Now Ted Strickland wants to bring his job-killing policies to Washington." As the narrator says this, an image of the U.S. Capitol building is shown with text stating, "Ted Strickland: Bringing Job-Killing Policies to Washington" superimposed over it. The ad concluded by advocating the defeat of Strickland's candidacy for Senate, stating "we can't afford more lost jobs" over an image of Strickland. The advertisement ends with the words "Paid for by Freedom Vote" appear at the bottom.

34.     FV did not file any independent expenditure reports with the FEC regarding the advertisement.

35.     On information and belief, FV spent more than $1 million on air time to broadcast this advertisement on television in Ohio.

36.     The exact amount FV spent on the Strickland ad is unknown since the organization did not file any independent expenditure reports with the FEC, but an analysis by CREW of ad-buying contracts on file with the Federal Communications Commission ("FCC") and collected by the Center for Responsive Politics estimated that FV spent between $1,290,605 and $1,550,935 to run the ads.[1]

---

[1] CREW downloaded and examined every ad contract collected by the Center for Responsive Politics that identified FV as the sponsor in 2016, extracting and compiling information on how much FV contracted to spend on ads in terms of both "gross" and "net" expenditures. In order to account for duplicates, CREW removed duplicate file names and duplicate spending amounts after extracting spending data from the ad contracts. However, some duplicates, amendments, or

9

37.     On its 2015 tax return, covering October 1, 2015 to September 30, 2016, FV reported spending $1,121,077 on "issue advocacy." The spending on issue advocacy, which FV reported was part of its efforts to educate "the Ohio public regarding economic policy issues, including state and local government fiscal responsibility, job growth and retention, and employment," appears to reflect FV's spending on the anti-Strickland advertisement. FV 2015 Form 990, Part III, Line 4a and Part IX, Line 24a.

38.     Between October 1, 2015 to September 30, 2016, the time period covered by FV's 2015 tax return, the group admitted spending $1,744,267 on political activity, accounting for 48.8% of its total spending.  As discussed above, $1,700,000 of that activity consisted of transfers to Fighting for Ohio Fund as well as an additional $44,267 in political activity that FV did not describe. FV did not include the amounts the organization spent on its anti-Strickland independent expenditure in its reported political activity. Including the minimum estimate of FV's spending on the anti-Strickland Ohio advertisement, the $1,121,077 FV reported to the IRS it spent on "issue advocacy," would increase FV's political spending to 80.1% of its total spending between October 1, 2015 to September 30, 2016.

39.     Since FV's fiscal year ended on September 30, 2016, it is unknown exactly how much FV spent overall or on political activity in calendar year 2016. FV spent at least an additional $275,000 on political activity before the end of the year, however, by making another gift or deposit to Fighting for Ohio Fund on October 5, 2016, just after the end of its fiscal year

---

revisions may have been inadvertently included in the CREW's analysis, rendering it an estimate rather than an exact figure. This approach found that FV spent more than $1.2 million "net" on television ads or more than $1.5 million "gross" on them. *See* CREW spreadsheet of FV FCC ad contracts, *available at* https://bit.ly/2HgSXgK.

and before the 2016 election. This gift or deposit brings FV's total transfers to the super PAC to at least $1,975,000 in 2015 and 2016.

40.    The high percentage of political spending by FV extends beyond its 2015 tax year and includes the time period covering the most recent two election cycles. From October 1, 2012 to September 30, 2016, FV reported spending a total of $4,069,237. Including the at least $1,121,077 FV appears to have spent on the anti-Strickland ads and the political spending FV acknowledged on its tax returns, more than 74.7% of FV's total spending for this period was used for political activity.

41.    The pattern of significant political spending also is consistent through Mr. Nathanson's tenure as executive director. Mr. Nathanson became executive director on January 1, 2011. Since FV does not report its spending to the IRS using the calendar year, FV's 2011 tax return, covering October 1, 2011 to September 30, 2012, is the first FV tax return to completely reflect the organization under his leadership. When the $191,416 FV reported spending between October 1, 2011 and September 30, 2012 is added to the spending detailed in paragraphs 38 and 40, above, representing all spending for periods in which Mr. Nathanson was FV's executive director for the entirety of the period, FV's total spending to influence federal elections accounts for more than 71.3% of its total expenditures.

<u>Count I</u>

42.    The television advertisement FV broadcast in June and July 2016 was an independent expenditure, but was not reported to the Commission.

43.    An "independent expenditure" is an expenditure by a person for a communication "expressly advocating the election or defeat of a clearly identified candidate" that is not coordinated with a candidate or a political party. 52 U.S.C. § 30101(17); 11 C.F.R. § 100.16(a).

11

AR0011

44.    The commission's regulations define "expressly advocating" as any communication that either use phrases such as "Smith for Congress" or "Bill McKay in '94," 11 C.F.R. § 100.22(a), or "[w]hen taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because -- (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action," 11 C.F.R. § 100.22(b).

45.    The FECA requires a person who makes independent expenditures aggregating $10,000 or more on a given election in a calendar year up to the 20th day before the date of an election to file a report describing the expenditure with the Commission within 48 hours. 52 U.S.C. § 30104(g)(2)(A). Commission regulations specify that the report must be filed not later than "11:59 p.m. Eastern Standard/Daylight Time on the second day following the date on which a communication that constitutes an independent expenditure is publicly distributed or otherwise publicly disseminated." 11 C.F.R. § 109.10(c).

46.    The FECA requires a person who makes independent expenditures aggregating $1,000 or more on a given election after the 20th day before the date of an election but more than 24 hours before the day of the election to file a report describing the expenditure with the Commission within 24 hours. 52 U.S.C. § 30104 (g)(1)(A). Commission regulations specify that the report must be filed not later than "11:59 p.m. Eastern Standard/Daylight Time on the day following the date on which a communication is publicly distributed or otherwise publicly disseminated." 11 C.F.R. § 109.10(d).

12

47.     The FECA and FEC regulations further require a person who makes independent expenditures aggregating more than $250 in a calendar year to file quarterly reports regarding the expenditures. 52 U.S.C. §§ 30104(b)(4), (b)(5)(A), (c)(2) (referencing 52 U.S.C. § 30104(a)(2)); 11 C.F.R. § 109.10(b). Those reports must describe the expenditure. 52 U.S.C. § 30104(b)(5)(A), (c)(2)(A) (referencing 52 U.S.C. § 30104(b)(6)(B)(iii)); 11 C.F.R. § 109.10(e)(1). The FECA further requires these reports to identify each person who made a contribution in excess of $200 to the person filing the report "which was made for the purpose of furthering an independent expenditure," 52 U.S.C. § 30104(c)(2)(C), and the identity of each person "who makes a contribution" to the person filing the report "whose contribution or contributions have an aggregate amount of value in excess of $200 within a calendar year," *id.* § 30104(c)(1) (incorporating by reference 52 U.S.C. § 30104(b)(3)(A)).  FEC regulations require the reports to identify each person who made a contribution in excess of $200 to the person filing the report which "was made for the purpose of furthering the reported independent expenditure." 11 C.F.R. § 109.10(e)(1)(vi).[2]

48.     The advertisement titled "Third Largest" is an independent expenditure because, taken as a whole, it could only be interpreted by a reasonable person as advocating for the defeat of a clearly identified candidate, former Gov. Strickland. The advertisement clearly identified Mr. Strickland by name, photograph, and video. The ad did not focus on any pending legislation or policy, but rather focused on Mr. Strickland's qualifications for office and past performance, exhibiting the purpose of creating a negative impression of Mr. Strickland by suggesting that his

---

[2] The FEC's interpretation fails to give full effect to the statutory provisions and conflicts with the statute.  Nevertheless, notwithstanding the limited disclosure required by the FEC regulations, those making independent expenditures are obligated by the FECA to disclose the information described by the statute.

13

AR0013

policies as governor were responsible for the loss of 350,000 jobs in Ohio during his time in office. The advertisement did not encourage viewers to contact Mr. Strickland or provide any way to contact him. The ad did refer, however, to former Gov. Strickland's candidacy, saying he "wants to bring his job-killing policies to Washington" while showing an image of the U.S. Capitol – where he would serve if elected senator. The ad then advocated the defeat of Mr. Strickland's candidacy for Senate, suggesting voters should not send Mr. Strickland to Washington as a senator representing Ohio because "[w]e can't afford more lost jobs." Though the advertisement was broadcast several months before the election, it aired after former Gov. Strickland, who had not held office since January 2011, had won the Democratic primary. The advertisement could only be reasonably interpreted as containing advocacy of the election or defeat of the candidate.

<u>Count II</u>

49.     An independent expenditure in the form of a communication transmitted through television must include a disclaimer. 52 U.S.C. § 30120(d)(2); 11 C.F.R. §§ 110.11(a)-(b), (c)(4). The communication "must clearly state the full name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication," 11 C.F.R. § 110.11(b)(3), and must include the audio statement that "[the person paying for the communication] is responsible for the content of this advertising," conveyed by a representative of the person paying for the communication either in an unobscured, full-screen view of the representative or in a voiceover, 52 U.S.C. § 30120(d)(2); 11 C.F.R. § 110.11(c)(4)(i)-(ii). The communication must also include this statement in a "clearly readable manner." 52 U.S.C. § 30120(d)(2); 11 C.F.R. § 110.11(c)(4)(iii).

14

AR0014

50.     The television advertisement broadcast in June and July 2016 and paid for by FV was an independent expenditure, but it did not include either the audio or written disclaimer stating FV is responsible for the content of the advertising. By failing to include the disclaimer, FV violated 52 U.S.C. § 30120(d)(2) and 11 C.F.R. §§ 110.11(a)-(b), (c)(4).

<u>Count III</u>

51.     FV was a political committee starting in 2014 and certainly no later than 2016, but failed to register as one with the FEC.

52.     The FECA and FEC regulations define a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5(a). An "expenditure" includes "any . . . payment, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A)(i); 11 C.F.R. § 100.111 (a). A "contribution" includes "any gift . . . or deposit of money or anything of value made by any person for the purpose of furthering any election for Federal office." 52 U.S.C. § 301010(8)(A)(i);11 C.F.R. § 100.52(a).

53.     FV made expenditures aggregating in excess of $1,000 in 2014 and again in 2016, and accepted contributions in excess of $1,000 in 2014 and again in 2016.

54.     FV spent $174,607 in 2014 on independent expenditures supporting then-Speaker Boehner in his primary election.

55.     In 2015, FV gifted to or deposited $200,000 with Fighting for Ohio Fund, which is a super PAC. In 2016, FV further gifted or deposited $1,775,000 with Fighting for Ohio Fund. As a federal super PAC, Fighting for Ohio Fund makes independent expenditures in federal

15

AR0015

races. *SpeechNow.org v. FEC*, 599 F.3d 686, 694 (D.C. Cir. 2010); *see also, e.g.*, AO 2010-11 (Commonsense Ten) (authorizing organization that "intends to make only independent expenditures"). PACs registered with the FEC are, "by definition, campaign related." *Buckley v. Valeo*, 424 U.S. 1, 79 (1976). Further, the PAC reported the transfers from FV as "contributions," meaning they were provided "for the purpose of influencing [an] election for Federal office," 52 U.S.C. § 30101(8)(A)(i); 11 C.F.R. § 100.25(a). FV's gifts to or deposits with this super PAC are payments, gifts, or deposits made for the purpose of influencing an election for federal office, and therefore are expenditures.

56.     FV also spent at least $1,121,077 in June and July 2016 on an independent expenditure advocating the defeat of Strickland. Though FV failed to report its spending on the anti-Strickland Ohio ad to the Commission as an independent expenditure, the advertisement could only be interpreted as one by a reasonable person.

57.     In addition, only organizations whose "major purpose" is the nomination or election of federal candidates can be "political committees." *Buckley*, 424 U.S. at 79. The FEC conducts a fact-intensive, case-by-case analysis of an organization to determine if its major purpose is the nomination or election of federal candidates. Federal Election Commission, Political Committee Status, Supplemental Explanation and Justification, 72 Fed. Reg. 5595, 5601 (Feb. 7, 2007) ("Supplemental E&J"). An organization can exhibit a qualifying major purpose through its organizational planning documents, *id.*, or through sufficiently extensive spending on federal campaign activity. *See FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986); Supplemental E&J, 72 Fed. Reg. at 5601. Under the FECA, an organization's political committee status is determined by viewing the activities and spending of the organization in the relevant "calendar year." 52 U.S.C. § 30101(4)(A). Accordingly, an organization's major

16

purpose must be evaluated on the same time frame. It is not proper to determine major purpose

by looking at the lifetime activities of the organization, as the purpose of an organization can

change over time. *See Citizens for Responsibility and Ethics in Washington v. FEC*, 209 F. Supp.

3d 77, 94 (D.D.C. 2016).

      58.     In 2010, an advisor to FV confirmed that FV's organizational purpose was to elect

or nominate candidates for federal office. Cummings, *Politico*, Sept. 3, 2010.

      59.     Furthermore, between October 1, 2013 and September 30, 2014, FV's

independent expenditures amounted to 61.3% of the organization's spending that year. That

spending is sufficiently "extensive" to conclude the organization's major purpose was to elect or

nominate federal candidates. Supplemental E&J, 72 Fed. Reg. at 5605 (noting group devoting at

least "50-75%" of spending to campaign activity in a calendar year qualified as political

committee).

      60.     In addition, FV's devoted at least 80.1% of its spending between October 1, 2015

and September 30, 2016 to political expenditures. FV's $1,700,000 in gifts or deposits to

Fighting for Ohio Fund – a super PAC that only engages in independent expenditures in federal

races – were made for the purpose of influencing the 2016 Ohio Senate election. FV also

disclosed spending an additional $44,267 on political activity on its 2015 tax return. That

spending alone accounted for 48.8% of FV's total spending during its 2015 fiscal year between

October 1, 2015 and September 30, 2016.[3] Adding the minimum of $1,121,077 FV appears to

have spent on the anti-Strickland ad, which was an independent expenditure, FV's political

_____

[3] This spending does not include the additional $275,000 FV transferred to Fighting for Ohio
Fund between the end of FV's 2015 fiscal year and the end of 2016.

AR0017

spending increases to at least 80.1% of its total spending.[4] Accordingly, FV's major purpose in 2016 was the election of candidates for federal office.

61.     Finally, FV's combined spending on political activity between October 1, 2012 to September 30, 2016, the time period covering the 2014 and 2016 election cycles, accounts for at least 74.7% of FV's total spending in that time period. In fact, political spending accounts for the majority of FV's total spending since Mr. Nathanson has been the organization's executive director. Adding together FV's reported spending between October 1, 2011 and September 30, 2016, FV has spent $4,260,653 in total during Mr. Nathanson's tenure as executive director. Political activity accounted for at least 71.3% of FV's total spending in that time period.

62.     FECA and FEC regulations require all political committees to register with the FEC within 10 days of becoming a political committee. 52 U.S.C. § 30103(a); 11 C.F.R. § 102.2 (d).

63.     FV is not, and has never been, registered as a political committee with the FEC.

64.     By failing to register as a political committee, FV violated 52 U.S.C. § 30103(a) and 11 C.F.R. § 102.1(d).

<u>Count IV</u>

65.     As a political committee, FV was required to file periodic reports with the FEC that, among other things: (l) identified all individuals who contributed an aggregate of more than $200 in a year to FV, the amount each individual contributed, and the date of the contribution; (2) identified all political committees that made a contribution to FV, the amount each committee

---

[4] The sums FV spent on the anti-Strickland ad count towards a finding that FV's major purpose was to nominate or elect candidates in 2016 even if the ad were not found to be an independent expenditure. *See* Supplemental E&J, 72 Fed. Reg. at 5601.

AR0018

contributed, and the date of the contribution; (3) detailed FV's outstanding debts and obligations; and (4) listed all of FV's expenditures. 52 U.S.C. § 30104(a)(4); 52 U.S.C. § 30104(b); 11 C.F.R. §§ 104.1(a), 104.8.

66.    FV failed to file any of these reports with the FEC.

67.    By failing to file these reports, FV violated 52 U.S.C. § 30104(a)(4), 52 U.S.C. § 30104(b), and 11 C.F.R. §§ 104.1(a), 104.8.

<div align="center">Count V</div>

68.    FV acted as a conduit for one or more of the contributions to Fighting for Ohio Fund for which FV was reported as the true source. Accordingly, FV permitted its name to be used for a contribution in the name of another.[5]

69.    The FECA and FEC regulations prohibit knowingly permitting one's name to be used to effect a contribution in the name of another person and knowingly helping or assisting any person in making a contribution in the name of another. 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b).

70.    FV gave $1,975,000 to Fighting for Ohio Fund, a super PAC, in 2015 and 2016. During that time period, Fighting for Ohio Fund employed the same fundraising consultant as FV, MMM Consulting. On its 2015 tax return, FV reported that MMM Consulting raised $2,090,000 for FV, a sum almost equal to and sufficient to cover all of FV's transfers to Fighting for Ohio Fund during the 2016 election cycle. Moreover, five of the six transfers FV made to Fighting for Ohio Fund during the time period covered by the organization's 2015 tax return

---

[5] Even if FV merely acted as a conduit for the 2016 contributions to Fighting for Ohio Fund, the contributions would still qualify FV as a political committee. Furthermore, FV's 2014 activity alone is sufficient to qualify it as a political committee, which status remains in effect until FV files the appropriate paperwork with the FEC to terminate its status.

<div align="center">19</div>

correspond to exact amounts FV reported receiving on its Schedule of Contributors. For example, FV received a contribution of $500,000 and in turn made a transfer of $500,000, and FV received two separate contributions of $250,000 and in turn made two separate transfers of $250,000.

71.    As a result, on multiple occasions, FV knowingly permitted its name to be used to effect the contribution and knowingly helped the undisclosed donor make the contribution, in violation of 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If FV's violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

<u>Count VI</u>

72.    The FECA and FEC regulations also prohibit knowingly accepting a contribution made by one person in the name of another. 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b). The FECA and FEC regulations further require political committees to report the identity of those who make contributions, as well as anyone who acted as a conduit for a contribution. 52 U.S.C. § 30104(b)(2); 11 C.F.R. § 104.3(a)(2), (j) (political committees must report "earmarked contributions"); *see also Instructions for FEC Form 3X and Related Schedules* at 11 (revised May 2016), https://bit.ly/2F19VxP (any political committee receiving an earmarked contribution through conduit entities must "report each conduit through which the earmarked contribution passed, including the name and address of the conduit, and whether the contribution was passed on in cash, by the contributor's check, or by the conduit's check"); 52 U.S.C. § 30107(a)(8) (FEC forms have force of law).

73.    As discussed above, Fighting for Ohio Fund employed the same fundraising consultant as FV, and five of the six transfers FV made to Fighting for Ohio Fund during the

20

time period covered by the organization's 2015 tax return correspond to exact amounts FV reported receiving on its Schedule of Contributors. As a result, Fighting for Ohio Fund by and through its treasurer, Christopher Marston, knowingly accepted a contribution made by one person in the name of another in violation of 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If Fighting for Ohio Fund and Mr. Marston's violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

74.     Fighting for Ohio Fund by and through its treasurer, Christopher Marston, failed to report the identities of the true source of contributions and the identities of each conduit for the contributions falsely attributed to FV. Accordingly, Fighting for Ohio Fund and Christopher Marston violated 52 U.S.C. § 30104(b)(2) and 11 C.F.R. § 104.3(a)(2) and (j). If Fighting for Ohio Fund and Mr. Marston's violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice.  52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

<div align="center">Count VII</div>

75.     The FECA and FEC regulations further prohibit making a contribution in the name of another person. 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b).

76.     The Unknown Respondents provided to FV the money it in turn transferred to Fighting for Ohio Fund. By making one or more contributions to Fighting for Ohio Fund in the name of FV, the Unknown Respondents violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). If the Unknown Respondent's violations were knowing and willful, they also are subject to criminal penalties and referral to the Department of Justice. 52 U.S.C. §§ 30109(a)(5)(C), (d)(1).

<div align="center">21</div>

<u>Conclusion</u>

WHEREFORE, Citizens for Responsibility and Ethics in Washington and Noah

Bookbinder request that the FEC conduct an investigation into these allegations; declare the

respondents to have violated the FECA and applicable FEC regulations; and order respondents to

correct these violations by filing the disclosure reports required for FV's 2016 independent

expenditure, filing disclosure reports for FV required of political committees that, among other

things, identify and make public each person who made contributions aggregating more than

$200, and file reports identifying the true source of and any conduits for any contributions to

Fighting for Ohio Fund improperly attributed to FV. In addition, the complainants request that

the FEC impose sanctions appropriate to these violations, and take such further action as may be

appropriate, including referring this matter to the Department of Justice for criminal prosecution.


ON BEHALF OF COMPLAINANTS
Noah Bookbinder
Executive Director
Citizens for Responsibility and Ethics
 in Washington
455 Massachusetts Ave. N.W.
Washington, D.C. 20001
(202) 408-5565 (phone)
(202) 588-5020 (fax)

22

Verification

Citizens for Responsibility and Ethics in Washington and Noah Bookbinder hereby verify that the statements made in the attached Complaint are, upon information and belief, true. Sworn pursuant to 18 U.S.C. § 1001.

_____
Noah Bookbinder

Sworn to and subscribed before me this ___8___ day of Aug , 2018

_____
Notary Public



23

# Exhibit A
# to the Administrative Complaint

**Video file contained on USB drive attached separately.**

# Tab 2

FEC First General Counsel's Report and Factual and Legal Analysis (date-stamped July 1, 2009)
AR0060–103

# FEDERAL ELECTION COMMISSION

## FIRST GENERAL COUNSEL'S REPORT

|  |  |
|---|---|
| | **MUR 7465** |
| | DATE COMPLAINT FILED:  August 9, 2018 |
| | DATE OF NOTIFICATIONS: August 13, 2018 |
| | DATE OF LAST RESPONSE:  November 26, 2018 |
| | DATE ACTIVATED:  February 13, 2019 |
| | |
| | EXPIRATION OF SOL:  May 6, 2019 (earliest)-Ongoing |
| | ELECTION CYCLES:  2014, 2016 |
| **COMPLAINANT:** | Noah Bookbinder, Citizens for Responsibility and Ethics in Washington |
| **RESPONDENTS:** | Freedom Vote, Inc. |
| | Fighting for Ohio Fund and Christopher M. Marston in his official capacity as treasurer |
| | James S. Nathanson |
| **RELEVANT STATUTES** | 52 U.S.C. § 30101(4)(A), (17) |
| **AND REGULATIONS:** | 52 U.S.C. § 30102 |
| | 52 U.S.C. § 30103 |
| | 52 U.S.C. § 30104 |
| | 52 U.S.C. § 30116(a)(8) |
| | 52 U.S.C. § 30120(a), (d) |
| | 52 U.S.C. § 30122 |
| | 11 C.F.R. § 100.5 |
| | 11 C.F.R. § 100.16 |
| | 11 C.F.R. § 100.22(b) |
| | 11 C.F.R. § 100.26 |
| | 11 C.F.R. § 104.3(j) |
| | 11 C.F.R. § 109.10 |
| | 11 C.F.R. § 110.4(b) |
| | 11 C.F.R. § 110.6 |
| | 11 C.F.R. § 110.11 |
| **INTERNAL REPORTS CHECKED:** | Disclosure Reports |
| **AGENCIES CHECKED:** | None |

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 2 of 26

1    **I.    INTRODUCTION**

2        In 2010, Freedom Vote, Inc. ("FV") established itself as a non-profit corporation whose

3    stated mission was to educate the people of Ohio on economic policy issues.  The Complaint,

4    however, alleges that FV spent most of its funds on federal political activity and failed to register

5    and report as a political committee in violation of the Federal Election Campaign Act of 1971, as

6    amended (the "Act").  In addition, the Complaint alleges that FV knowingly acted as a conduit

7    for contributions made by unknown respondents to an independent expenditure-only political

8    committee, Fighting for Ohio Fund ("FFO PAC"), and that FFO PAC knowingly accepted

9    contributions in the name of another and failed to report earmarked contributions.

10        Over the course of two election cycles beginning in 2014, the majority of FV's spending,

11    more than $3 million of the $4 million FV spent from 2013-2016, appears to reflect that FV had

12    the major purpose of nominating or electing federal candidates, including $1 million that FV

13    spent on its 2014 advertisement entitled "Third Largest."  For the reasons set forth below, we

14    recommend that the Commission:  (1) find reason to believe that FV violated

15    52 U.S.C. §§ 30102, 30103, and 30104 by failing to organize, register, and report as a political

16    committee; and (2) find reason to believe that FV violated 52 U.S.C. §§ 30104(b)(4), (b)(5)(A),

17    (g)(2), and 30120(d)(2) by failing to report an independent expenditure and include the

18    appropriate disclaimer.  In the alternative, we recommend that the Commission find reason to

19    believe that FV violated 52 U.S.C. § 30104(c) by failing to report "Third Largest" as an

20    independent expenditure under the rules applicable to organizations that are not political

21    committees.  We further recommend that the Commission authorize the use of compulsory

22    process.  In addition, we recommend that the Commission take no action at this time with respect

23    to allegations that FV, FFO PAC, and unnamed respondents engaged in a conduit contribution

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 3 of 26

scheme in violation of 52 U.S.C. § 30122.  Finally, we recommend that the Commission find no

reason to believe that FFO PAC violated 52 U.S.C. § 30104(b) by failing to properly report

earmarked contributions on the basis that the relevant statutory provision is not applicable to

independent expenditure-only political committees.

## II.    FACTUAL BACKGROUND

### A.    Respondents

FV is an Ohio non-profit social welfare organization incorporated in 2010 under section

501(c)(4) of the Internal Revenue Service ("IRS") code.[1]  From January 2011 through at least

June 2017, James S. Nathanson was FV's executive director.[2]

In filings with the IRS, FV describes its mission as "to further the common good and

general welfare of the people of Ohio."[3]  A 2010 article cited in the Complaint states that FV

was established as an entity "with the express purpose of raising money to help pay for the type

of turnout operations traditionally underwritten by the RNC."[4]  Tom Whatman, then-advisor to

FV, was reported as stating, "I understood that the lack of resources from the RNC was going to

have a severe impact on what the parties were going to be able to do."[5]

---

[1]    *See* Freedom Vote, Inc., Ohio Initial Articles of Incorporation (July 7, 2010); Form 990, 2009 Tax Return of Freedom Vote, Inc. (Aug. 12, 2011) [*hereinafter* "FV 2010 Tax Return"].

[2]    The Complaint also mentions James S. Nathanson, individually, but does not include any allegations that he violated the Act.  Compl. (Aug. 9, 2018).  Nathanson did not file a separate response.

[3]    *See, e.g.,* FV 2010 Tax Return.

[4]    Compl. ¶¶ 11, 58; Jeanne Cummings, *State Parties Look Past RNC for Cash*, POLITICO, Sept. 3, 2010, http://politi.co/2FjFJj3.

[5]    Cummings, *supra* n.4.

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 4 of 26

1    FFO PAC is an independent expenditure-only political committee that first registered

2    with the Commission in February 2015.[6]  In the 2016 election cycle, it raised $9,874,220 and

3    spent $9,808,186.54, of which $9,256,439.42 was spent on independent expenditures opposing

4    former Ohio Governor Ted Strickland, a candidate for U.S. Senate from Ohio in 2016.[7]  In 2018,

5    FFO PAC raised $25,229.28 and spent $22,454.48, none of which was reported as independent

6    expenditures.[8]

7    **B.    Spending by FV**

8    According to FV's tax returns, which use a fiscal year beginning in October and ending

9    the September of the following year, FV characterizes most of its spending since its formation as

10   having been related to issue advocacy regarding economic policy issues in Ohio.[9]  In fiscal years

11   2010 and 2011, FV also reported spending $461,742 on "voter registration efforts."[10]  In fiscal

---

[6]    FEC Form 1, FFO PAC Statement of Organization (Feb. 23, 2015).

[7]    FEC, *Fighting for Ohio Fund – Spending*, FEC.GOV, https://www.fec.gov/data/committee/C00573014/
?cycle=2016&tab=spending (last accessed July 1, 2019).

[8]    FEC, *Fighting for Ohio Fund – Spending*, FEC.GOV, https://www.fec.gov/data/committee/C00573014/
?tab=spending&cycle=2018 (last accessed July 1, 2019) [*hereinafter* "FFO PAC 2018 Funds Spent"]; FEC,
*Fighting for Ohio Fund – Raising*, FEC.GOV, https://www.fec.gov/data/committee/C00573014/?tab=raising&cycle
=2018 (last accessed July 1, 2019).  FFO PAC described its expenditures as legal services, compliance consulting,
website expenses, and two contributions totaling $9,500 to the "Fighting for Ohio Institute," a now-terminated
Virginia 501(c)(4) organization of which James Nathanson was the corporate secretary.  FFO PAC 2018 Funds
Spent; *see* Form 990, 2016 Tax Return of Fighting for Ohio Institute (Nov. 5, 2017).

[9]    FV 2010 Tax Return; Form 990, 2010 Tax Return of Freedom Vote, Inc. (Aug. 14, 2012) [*hereinafter* "FV
2011 Tax Return"]; Form 990, 2011 Tax Return of Freedom Vote, Inc. (July 17, 2013) [*hereinafter* "FV 2012 Tax
Return"]; Form 990, 2012 Tax Return of Freedom Vote, Inc. (July 30, 2014) [*hereinafter* "FV 2013 Tax Return"];
Form 990, 2013 Tax Return of Freedom Vote, Inc., (Aug. 11, 2015) [*hereinafter* "FV 2014 Tax Return"]; Form 990-
EZ, 2014 Tax Return of Freedom Vote, Inc. (Aug. 11, 2016) [*hereinafter* "FV 2015 Tax Return"]; Form 990, 2015
Tax Return of Freedom Vote, Inc. (Aug. 14, 2017) [*hereinafter* "FV 2016 Tax Return"]; Form 990-EZ, 2016 Tax
Return of Freedom Vote, Inc. (Aug. 9, 2018) [*hereinafter* "FV 2017 Tax Return"].

[10]    FV 2010 Tax Return; FV 2011 Tax Return.

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 5 of 26

1    year 2013, it stated that some of its money was also spent on "advocacy related to voting rights

2    under the Ohio and United States Constitutions."[11]

3         In fiscal year 2014, FV spent $174,607.55 in independent expenditures in support of

4    then-Speaker of the House John Boehner in the form of door hangers, canvassing, and

5    robocalls.[12]  By fiscal year 2016, FV's spending on campaign activity substantially increased in

6    that the organization reported spending $1.744 million on "political expenditures," of which $1.7

7    million consisted of contributions to FFO PAC.[13]  Additionally, in June and July 2016, FV aired

8    what appears to be its first television advertisement, "Third Largest," opposing Ted Strickland.[14]

9    The advertisement was broadcast several months before the general election, but after Strickland

10   had won the Democratic primary.[15]  The content of the advertisement was as follows:[16]

| Narration | Text on Screen | Visual |
|---|---|---|
| While Ted Strickland was governor, Ohio lost jobs to Kentucky, Indiana, even Michigan. | OHIO LOST JOBS TO KENTUCKY INDIANA MICHIGAN | Ted Strickland, speaking, on left; map of the United States with Ohio in red on right |
| 350,000 Ohio jobs gone. | 350,000 JOBS GONE | |

---

[11]    FV 2013 Tax Return.

[12]    FEC Form 5, FV Amended 2014 April Quarterly Report (Apr. 14, 2014); FEC Form 5, FV 2014 July Quarterly Report (July 15, 2014); FV 2014 Tax Return.

[13]    FV 2016 Tax Return.

[14]    Compl. ¶ 48, Ex. A ("Third Largest"); FV Resp. at 2 (Oct. 19, 2018).  In May 2016, FFO PAC uploaded a similar advertisement to its YouTube channel, titled "Spotty," which contains the same job-related claim as "Third Largest":  "350,000 jobs lost while Strickland was Governor.  Jobs lost to Kentucky, Indiana, even to Michigan." Fighting for Ohio, *Spotty*, YOUTUBE (May 6, 2016), https://youtu.be/_4eCxmIDNYQ.

[15]    Compl. ¶ 48.

[16]    *Id.* ¶ 33, Ex. A ("Third Largest"); FV Resp. at 2.

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 6 of 26

| Narration | Text on Screen | Visual |
|---|---|---|
| How many is that? If you assembled everyone who lost their job under Strickland, you'd have Ohio's third largest city. | OHIO'S LARGEST CITIES COLUMBUS 787,033 CLEVELAND 396,815 JOBS LOST UNDER STRICKLAND 350,000 CINCINNATI 296,943 TOLEDO 287,208 | Ted Strickland on right |
| And you could fill the OSU Horseshoe more than three times. | STRICKLAND LOST JOBS: COULD FILL THE HORSESHOE 3 TIMES | The Ohio Stadium of The Ohio State University |
| Now Ted Strickland wants to bring his job-killing policies to Washington. | TED STRICKLAND: BRINGING JOB-KILLING POLICIES TO WASHINGTON<br><br>PAID FOR BY FREEDOM VOTE | The United States Capitol |
| We can't afford more lost jobs. | WE CAN'T AFFORD MORE LOST JOBS<br><br>PAID FOR BY FREEDOM VOTE | Ted Strickland at podium |

1    FV continued its spending on federal elections and made an additional $275,000

2    contribution to FFO PAC on October 5, 2016, reported in FV's tax return for the fiscal year

3    ending in 2017; FV did not report additional political spending in that fiscal year.[17]  The current

4    record does not include financial information for FV for the fiscal year ending in 2018.

5        The table below summarizes information as reported by FV in its tax returns:

---

[17]    FV 2017 Tax Return; FEC Form 3X, FFO PAC 2016 Pre-General Report, sched. A at 7 (Oct. 27, 2016).

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 7 of 26

| Fiscal Year[18] | Gross Receipts | Total Expenses | Expenses: Voter Registration | Expenses: Issue-Related[19] | Expenses: Political |
|---|---|---|---|---|---|
| 2010 | $1,325,000 | $1,265,384 | $361,742 | $816,681 | $0 |
| 2011 | $1,848,061 | $1,886,457 | $100,000 | $1,548,594 | $0 |
| 2012 | $200,000 | $191,416 | $0 | $160,270 | $0 |
| 2013 | $200,000 | $150,430 | $0 | $125,347 | $0 |
| 2014 | $255,000 | $284,754 | $0 | $270,906 | $174,607 |
| 2015 | $28,000 | $58,578 | $0 | $21,839 | $0 |
| 2016 | $4,375,000 | $3,575,475 | $0 | $3,505,133 | $1,744,267 |
| 2017 | $90,000 | $721,094 | $0 | $565,056 | $275,000 |

With respect to these figures, FV appears to have counted certain expenses as both political expenses and issue advocacy expenses because, for both fiscal years 2014 and 2016, the combined totals for issue advocacy and political expenses exceed the total expenses reported in FV's tax returns.

In addition to the foregoing expenses, FV paid $180,000 in compensation in total to its Executive Director, James Nathanson, between the fiscal year ending in 2010 and that ending in 2017.  FV also paid organizations owned wholly or in part by Nathanson, including James S. Nathanson & Associates, LLC, and JSN Associates, LLC, $1,745,401 in the same time period for "fundraising;"[20] "consulting and fundraising services;"[21] and "education and grassroots

---

[18]    Information regarding FV's spending using a calendar year framework is not publicly available.

[19]    FV's tax returns generally describe these expenses as, *e.g.*, "provided education to the Ohio public regarding economic policy issues, including state and local government fiscal responsibility, job growth and retention, and employment."  FV 2012 Tax Return at 2.

[20]    FV 2011 Tax Return.

[21]    *Id.*

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 8 of 26

1    advocacy."[22]  The total $1,925,401 paid to Nathanson and his affiliated organizations represents

2    23.7% of FV's overall reported expenses between fiscal years 2010 and 2017.

3        **C.    Contributions Made by FV to FFO PAC**

4        Between December 2015 and October 2016, FV reported making $1.975 million in

5    contributions to FFO PAC, described below:[23]

| Date | Amount |
|------|--------|
| December 29, 2015 | $200,000 |
| March 31, 2016 | $300,000 |
| July 5, 2016 | $500,000 |
| August 25, 2016 | $250,000 |
| September 14, 2016 | $200,000 |
| September 21, 2016 | $250,000 |
| October 5, 2016 | $275,000 |
| **Total** | **$1,975,000** |

6        The amounts of the contributions above also match the amounts of five of the donations

7    FV reported receiving in 2015 and 2016.  FV's 990 form, however, does not indicate the dates on

8    which FV received those donations and lists a number of other donations; thus, the dates on

9    which it received the donations in the same amounts are not part of the current record.

10        In 2015 and 2016, FV and FFO PAC used the same fundraising consultant, MMM

11    Consulting.[24]  Although FFO PAC acknowledges that it used MMM Consulting, it asserts that

---

[22]    FV 2014 Tax Return.  Though the complaint does not make any allegations regarding Nathanson's receipt of FV funds, Nathanson and his affiliated companies annually received between 0.67% (2016) and 56.8% (2011) of FV's total expenditures each year from 2010 to 2017.

[23]    FEC, *Fighting for Ohio Fund – Raising*, FEC.GOV, https://www.fec.gov/data/committee/C00573014/?tab= raising&cycle=2016 (last accessed July 1, 2019).

[24]    FV 2016 Tax Return; Compl. ¶ 26; *see also, e.g.*, FEC Form 3X, FFO PAC Amended 2016 October Quarterly Report, sched. B at 28 (Oct. 27, 2016).

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 9 of 26

1    FFO PAC used "multiple fundraisers during the 2016 election," and that the "common fundraiser

2    presumably had numerous other clients during that time period."[25]

3    **III.    LEGAL ANALYSIS**

4        **A.    Political Committee Status**

5            1.    <u>The Test for Political Committee Status</u>

6        The Act and Commission regulations define a "political committee" as "any committee,

7    club, association or other group of persons which receives contributions aggregating in excess of

8    $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000

9    during a calendar year."[26]  In *Buckley v. Valeo*, the Supreme Court held that defining political

10    committee status "only in terms of the annual amount of 'contributions' and 'expenditures'"

11    might be overbroad, reaching "groups engaged purely in issue discussion."[27]  To cure that

12    infirmity, the Court concluded that the term "political committee" "need only encompass

13    organizations that are under the control of a candidate or the *major purpose of which is the*

14    *nomination or election of a candidate*."[28]  Accordingly, under the statute as thus construed, an

15    organization that is not controlled by a candidate must register as a political committee only if

16    (1) it crosses the $1,000 threshold and (2) it has as its "major purpose" the nomination or election

17    of federal candidates.

---

[25]    FFO PAC Resp. at 4 (Nov, 26, 2018).

[26]    52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5.

[27]    424 U.S. 1, 79 (1976).

[28]    *Id.* (emphasis added).

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 10 of 26

1    Although *Buckley* established the major purpose test, it provided no guidance as to the

2    proper approach to determine an organization's major purpose.[29]  In *Massachusetts Citizens for*

3    *Life v. FEC*, the Supreme Court identified an organization's independent spending as a relevant

4    factor in determining an organization's major purpose.[30]  The Court also recognized that an

5    organization's federal campaign spending may "become so extensive that the organization's

6    major purpose may be regarded as campaign activity [such that] the corporation would be

7    classified as a political committee."[31]

8        In 2007, following litigation resulting from the Commission's decision not to pursue

9    rulemaking on the subject of political committee status, the Commission issued a Supplemental

10   Explanation and Justification to further elaborate on its 2004 decision and to provide the public

11   with additional guidance as to its process for determining political committee status.[32]  The

12   Supplemental E&J explained that, in order to determine an entity's "major purpose," the

13   Commission considers a group's "overall conduct," including public statements about its

14   mission, organizational documents, government filings, the proportion of its spending related to

15   "Federal campaign activity (*i.e.,* the nomination or election of a Federal candidate)," and the

16   extent to which fundraising solicitations indicate funds raised will be used to support or oppose

---

[29]    *See, e.g.*, *Real Truth About Abortion, Inc. v. FEC* (formerly *Real Truth About Obama v. FEC*), 681 F.3d 544, 556 (4th Cir. 2012), *cert. denied*, 568 U.S. 1114 (Jan. 7, 2013) (No. 12-311) ("Although *Buckley* did create the major purpose test, it did not mandate a particular methodology for determining an organization's major purpose.").

[30]    479 U.S. 241, 249, 262-63 (1986).

[31]    *Id.* at 262.

[32]    Political Committee Status, 72 Fed. Reg. 5595 (Feb. 7, 2007) (Supplemental Explanation and Justification) [*hereinafter* "Supplemental E&J"].  The Supplemental E&J was issued following a court challenge to the Commission's decision to engage in case-by-case decision-making rather than formal rulemaking.  *See Shays v. FEC*, 424 F. Supp. 2d 100, 117 (D.D.C. 2006).

1 specific candidates.[33]  The Commission stated that it compares how much of an organization's

2 spending is for "*Federal campaign activity*" relative to "activities that [a]re not campaign

3 related."[34]

4       In 2016, the United States District Court for the District of Columbia in *Citizens for*

5 *Responsibility and Ethics in Washington v. FEC* ("*CREW I*") instructed the Commission, when

6 examining an organization's major purpose, to look beyond express advocacy and consider

7 whether other communications at issue indicate a "campaign-related purpose."[35]  The Court also

8 held that the Commission's analysis of the relevant time period for evaluating a groups' spending

9 must retain the flexibility to account for changes in an organization's major purpose over time.[36]

---

[33]     Supplemental E&J at 5597, 5605.

[34]     *Id.* at 5601, 5605 (emphasis added); *see also Shays v. FEC*, 511 F. Supp. 2d 19, 24-25, 31 (D.D.C. 2007) (upholding the Commission's case-by-case approach as an appropriate exercise of the agency's discretion); *Real Truth About Abortion, Inc.*, 681 F.3d at 556 (holding that *Buckley* "did not mandate a particular methodology for determining an organization's major purpose," and therefore the Commission was free to make that determination "either through categorical rules or through individualized adjudications").

[35]     209 F. Supp. 3d 77, 92-93 (D.D.C. 2016).  The same District Court later held that electioneering communications "*presumptively* have an election-related purpose," but the analysis by that Court in *CREW I* and its subsequent decision refers generally to all speech that is campaign-related but does not contain express advocacy. *Citizens for Responsibility & Ethics in Wash. v. FEC*, 299 F. Supp. 3d 83, 93 (D.D.C. 2018) [*hereinafter* "*CREW II*"].  The Court refrained from establishing its own bright-line rule regarding which communications inherently have a campaign-related purpose, but stated that the First Amendment does not require "the agency to exclude from its consideration all non-express advocacy in the context of disclosure." *CREW I*, 209 F. Supp. 3d at 93.

[36]     *CREW I*, 209 F. Supp. 3d at 94.  In its subsequent Factual and Legal Analysis ("F&LA"), the Commission accepted the Court's remand of the enforcement matter, found that the organization's campaign-related spending exceeded 50% of its overall spending approximately one year before the 2010 election, and found reason to believe that the organization violated 52 U.S.C. §§ 30102, 30103, and 30104 by failing to organize, register, and report as a political committee.  F&LA at 14-15, MUR 6538R (Americans for Job Security).

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 12 of 26

2.     There is Reason to Believe that FV Became a Political Committee By 2016

a.     Statutory Threshold

To assess whether an organization has made an "expenditure," the Commission analyzes whether spending on any of an organization's communications made independently of a candidate constitute express advocacy under 11 C.F.R. § 100.22.[37]  In calendar year 2014, FV reported that it spent $174,607 on independent expenditures.[38]  Thus, FV well exceeded the $1,000 statutory threshold set forth in the Act's political committee definition,[39] which FV does not dispute.[40]

b.     Major Purpose

FV's political spending beginning in 2014 indicates that its major purpose had become the nomination or election of a federal candidate, and suggests that FV became a political committee at that time.[41]  According to news reports published at the time of FV's formation, FV was alleged to have been established with political committee functions in mind:  then-advisor to FV Tom Whatman stated that, in assisting with FV's creation, he "understood that the lack of resources from the RNC was going to have a severe impact on what the parties were going to be

---

[37]     *See* Supplemental E&J at 5606.

[38]     Compl. ¶¶ 18-19; FEC Form 5, FV Amended April Quarterly Report, (July 15, 2014); FEC Form 5, FV July Quarterly Report (July 15, 2014); FV 2014 Tax Return, Part I, Line 18, (Aug. 11, 2015).

[39]     52 U.S.C. § 30101(4)(A).

[40]     *See generally* Compl.

[41]     *See Mass. Citizens for Life, Inc.*, 479 U.S. at 262 (holding that, "should [a corporation's] independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee") (citing *Buckley*, 424 U.S. at 79).

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 13 of 26

1    able to do."[42]  Over the course of its existence, FV's reported spending appears to have followed

2    a trajectory where it went from reporting no spending on federal campaign activity between

3    fiscal years 2010 and 2013 to reporting that it spent more than half of its budget on such activity

4    between fiscal years 2014 and 2016.  As FV acknowledges, in 2014, FV reportedly spent

5    $174,607 on independent expenditures supporting John Boehner,[43] which constituted more than

6    60% of FV's total expenditures ($284,754).[44]

7        In 2016, FV continued to spend millions of dollars on campaign-related activity.  In the

8    fiscal year ending in September 2016, FV reported spending $1.744 million on "political

9    campaign and lobbying activities."[45]  These expenditures included $1.7 million in contributions

10   to FFO PAC and $44,267 in funds "directly expended" by FV for "section 527 exempt function

11   activities."[46]  Though FV's tax return does not elaborate on what the $44,267 expenditures

12   consisted of, section 527 exempt function activities "include all functions that influence or

13   attempt to influence the selection, nomination, election, or appointment of any individual to any

14   federal, state, or local public office or office in a political organization, or the election of

---

42      Cummings, *supra* n.4.

43      Compl. ¶¶ 18-19; FV, FEC Form 5, FV Amended April Quarterly Report, (July 15, 2014); FEC Form 5, FV July Quarterly Report (July 15, 2014); FV 2013 Tax Return, part I, line 18.

44      Compl. ¶ 59; FV Resp. at 8 ("Granted, in one year (fiscal year 2014), FV's political spending exceeded its non-political spending.").  While the total amount at issue during this time period is comparatively less than what FV went on to spend in future years, the Commission's major purpose analysis has always focused on the proportion of an organization's spending that is campaign-related rather than its amount.

45      FV 2016 Tax Return, Schedule C.  The IRS defines "political campaign and lobbying activities" as "All activities that support or oppose candidates for elective federal, state, or local public office.  It does not matter whether the candidate is elected.  A candidate is one who offers himself or is proposed by others for public office.  Political campaign activity does not include any activity to encourage participation in the electoral process, such as voter registration or voter education, provided that the activity does not directly or indirectly support or oppose any candidate."  IRS, *Instructions for Schedule C (Form 990 or 990-EZ) (2018)* 67, IRS.GOV, https://www.irs.gov/pub/irs-pdf/i990.pdf (last accessed July 1, 2019).

46      FV 2016 Tax Return, sched. C.

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 14 of 26

1    Presidential or Vice-Presidential electors, whether or not such individual or electors are selected,

2    nominated, elected, or appointed."[47]  FV's reported spending as set forth in its fiscal year 2016

3    tax return and its Response indicates that its self-reported "political campaign intervention"[48]

4    expenses constituted at least 48.7% of its total spending during that year, though as noted above,

5    FV itself appears to consider a portion of its reported programmatic spending to also constitute

6    political spending.

7          The record, however, indicates that FV may have spent even more on federal campaign

8    activity in 2016.  First, the $275,000 contribution which FV made to FFO PAC on October 5,

9    2016, was not included in its 2016 tax return likely because the fiscal year ended in September

10   2016.  But because FV made the contribution the month before the general election in

11   November, the contribution should be included as part of FV's spending in 2016.[49]

12         Second, although FV did not report its television advertisement, "Third Largest," as an

13   independent expenditure to the Commission or a "political expenditure" in its tax return, this ad,

14   which opposed former Governor and then-Senate candidate Ted Strickland, appears to reflect a

15   campaign-related purpose using an analysis the Commission recently employed to evaluate

16   certain electioneering communications in the context of evaluating political committee status.

17   The ad, which ran during the summer following Strickland's victory in the primary election but

---

[47]     IRS, *Instructions for Schedule C (Form 990 or 990-EZ) (2018)*, IRS.GOV, https://www.irs.gov/instructions/i990sc (last accessed July 1, 2019).

[48]     This is a term FV uses in its Response, and which appears to correlate with "political campaign and lobbying activities" as defined by the IRS and reported in FV's tax returns.

[49]     We note that FV also reported over $565,000 for issue advocacy expenses during the 2017 fiscal year, but we have no information as to when FV spent money on those activities.  Thus, it is unclear as to whether any of those expenses were incurred before or after the 2016 election and should be included in FV's 2016 spending. Additional fact finding could resolve those issues.

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 15 of 26

1    four to five months before the 2016 general election and was outside the electioneering

2    communication window, refers to Strickland, who was not an officeholder when the ad was run,

3    and describes his attempts to "bring his job killing policies to Washington."[50]  That statement

4    about job-killing policies is visually accompanied by an image of the U.S. Capitol, the building

5    in which Strickland would work as a Senator if he were to prevail in the general election.[51]

6    Additionally, unless he were elected, Strickland was and would be in no position to affect federal

7    political activities, issues, or programs referenced in the ad.  Therefore, the amount FV spent on

8    "Third Largest" may be included in determining whether FV had the major purpose of

9    nominating or electing federal candidates.  By adding the amount that FV spent on "Third

10   Largest," which was approximately $1.12 million,[52] to FV's other acknowledged political

11   spending, FV appears to have dedicated $2,865,344 of its total expenditures of $3,575,475, or

12   roughly 80%, to federal campaign activities in the fiscal year ending in September 2016.[53]

13        FV argues that the advertisement could reasonably mean that Strickland might go to

14   Washington as a political nominee to the United Nations, or as part of a Washington think tank,

15   as both were positions Strickland had either been nominated for or had held prior to the

16   advertisement's broadcast.[54]  However, the phrasing in the advertisement belies such

17   interpretations by stating that Strickland "now" wants to take his policies to Washington, which

18   refers to the time when he was a candidate for federal office.  Further, the United Nations is not

---

[50]    F&LA at 13, MUR 6538R (Americans for Job Security).

[51]    Compl., Ex. A ("Third Largest") at 0:28.

[52]    FV 2016 Tax Return part IX, line 24(a).

[53]    *CREW I* instructed the Commission to consider whether non-express advocacy indicates a "campaign-related purpose."  *CREW I*, 209 F. Supp. 3d at 93.

[54]    FV Resp. at 4.

1   located in Washington, D.C., and the image of the U.S. Capitol accompanying the statement

2   about Strickland coming to Washington indicates that the ad's reference was to Strickland's

3   senatorial candidacy.

4          Though FV contends that the Commission should evaluate FV's spending solely over the

5   course of its entire lifetime, in *CREW I*, the Court found that the Commission's analysis of the

6   relevant time period for evaluating a group's spending must be flexible to account for changes in

7   an organization's major purpose over time.[55]  Here, using a calendar year approach to evaluate

8   the Complaint's claim that FV was a political committee in 2014 and certainly by 2016,[56] in

9   calendar year 2014, FV spent $174,607 on independent expenditures.  Although we do not have

10  a precise figure for FV's total calendar year spending in 2014, FV reports that it spent a total of

11  $284,754 in fiscal year 2014, which covers most of 2014 — making its campaign-related

12  spending in 2014 approximately 60% of its total expenditures.  While FV's spending in 2014

13  was comparatively less than its spending in certain earlier years, it was even lower in 2015 at less

14  than $60,000, none of which was campaign-related.  But in 2016, FV's spending substantially

---

[55]      *See CREW I,* 209 F. Supp. 3d at 94 ("The Commissioners' refusal to give any weight whatsoever to an organizations' [sic] relative spending in the most recent calendar year — particularly in the case of a fifteen-year-old organization like AJS — indicates an arbitrary 'fail[ure] to consider an important aspect of the [relevant] problem.'" (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 664, 658 (2007)); *see also FEC v. Malenick.* 310 F. Supp. 2d 230, 237 (D.D.C. 2004) ("Accordingly, because Triad and then Triad Inc.'s major purpose was the nomination or election of specific candidates *in 1996,* and because Triad received contributions aggregating more than $1,000 *in 1996,* I find that Triad and Triad, Inc. operated as a 'political committee' *in 1996.*") (emphasis added); *FEC* v. *GOPAC, Inc.*, 917 F. Supp. 851, 853 (D.D.C. 1996) (discussing major purpose only in 1989 and 1990 with respect to group formed in 1979); *see also* MUR 5492 (Freedom, Inc.) (analyzing admitted major purpose in 2004 of group formed in 1962); MURs 5577, 5620 (National Association of Realtors — 527 Fund) (analyzing 2004 spending of NAR-527 Fund registered with IRS in 2000); MUR 5755 (New Democrat Network) (analyzing 1996 group New Democrat Network's 2004 spending); MUR 5753 (League of Conservation Voters) (analyzing LCV's 2004 spending when one of LCV's funds had registered with the IRS as early as 2000); MURs 5694, 5910 (Americans for Job Security) (analyzing activity for group founded in 1997 from 2000 through 2006 in determining group's major purpose in 2006); MUR 5487 (Progress for America VF) (analyzing group's major purpose based on 2004 disbursements where group had raised $4.6 million and spent $11.2 million through 2006).

[56]      Compl. ¶ 51.

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 17 of 26

1   increased to $3,575,475, of which $2,865,344, or 80.1%, was campaign-related, as described

2   above.[57]  In 2015-2016, FV's campaign-related spending constituted 78.8% of its total expenses

3   for the 2016 election cycle.  Further, while FV reported spending nothing on campaign-related

4   expenditures from its formation through fiscal year 2013, from fiscal year 2014 through fiscal

5   year 2017, FV's campaign-related spending totaled $3,314,951 out of $4,639,901, or 71.4%.[58]

6       Based on the foregoing, FV's sustained spending indicating a major purpose of

7   nominating or electing candidates from 2014 through 2016 is sufficient to support a reasonable

8   inference that FV became a political committee during this period.  By 2016, such spending

9   constituted almost 50% of its expenses, with the record reflecting an additional roughly 30%

10  spent on the "Third Largest" ad.  Accordingly, we recommend that the Commission find reason

11  to believe that FV failed to organize, register, and report with the Commission in violation of

12  52 U.S.C. §§ 30102, 30103, and 30104.

13      **B.    Proper Disclosure of "Third Largest" Television Advertisement**

14              1.    FV Failed to Report "Third Largest" as an Independent Expenditure

15      The Complaint alleges that FV violated the Act by failing to disclose "Third Largest" as

16  an independent expenditure and to include a proper disclaimer.  An "independent expenditure" is

17  an expenditure made by any person for a communication that (1) expressly advocates for the

18  election or defeat of a clearly identified candidate, and (2) is not coordinated with the candidate,

19  her authorized committee, her agents, or a political party committee or its agents.[59]  Under the

20  Commission's regulations, a communication can expressly advocate for the election or defeat of

---

[57]    *See* FV 2015 Tax Return; FV 2016 Tax Return.

[58]    *See* FV 2014 Tax Return; FV 2015 Tax Return; FV 2016 Tax Return; FV 2017 Tax Return.

[59]    52 U.S.C. § 30101(17); 11 C.F.R. § 100.16.

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 18 of 26

1  a clearly identified federal candidate if it uses certain "magic words," such as "vote for" or

2  "elect."  A communication may also be express advocacy if it:

3      [w]hen taken as a whole and with limited reference to external events,
4      such as the proximity to the election, could only be interpreted by a
5      reasonable person as containing advocacy of the election or defeat of one
6      or more clearly identified candidate(s) because — (1) [t]he electoral
7      portion of the communication is unmistakable, unambiguous, and
8      suggestive of only one meaning; and (2) [r]easonable minds could not
9      differ as to whether it encourages actions to elect or defeat one or more
10     clearly identified candidate(s) or encourages some other kind of action.[60]

11     The Act requires both political committees and persons other than political committees to

12  report their independent expenditures.[61]  Political committees other than authorized committees

13  must disclose their independent expenditures and itemize such expenditures with information

14  including the name and address of each person who receives disbursements in connection with

15  an independent expenditure, as well as the date, amount, purpose, and identity of the candidate in

16  support of or opposition to for which the independent expenditure is made.[62]  The Act places

17  similar reporting requirements on non-political committee persons making independent

18  expenditures aggregating greater than $250 in a calendar year,[63] and such persons must identify

19  individuals who contribute over $200.[64]  A person, including a political committee, also may

---

[60]    11 C.F.R. § 100.22(b).

[61]    *See generally* 52 U.S.C. § 30104.

[62]    52 U.S.C. § 30104(b)(3)(B)(iii), (g); 11 C.F.R. § 109.10.

[63]    52 U.S.C. § 30104(c), (g); 11 C.F.R. § 109.10.

[64]    52 U.S.C. § 30104(c)(1), (2)(C); *Citizens for Responsibility & Ethics in Wash. v. FEC*, 316 F. Supp. 3d 349, 410 (D.D.C. 2018) (holding sections 30104(c)(1) and (c)(2)(C) "unambiguously require separate and complementary requirements to identify individuals who contribute over $200 to reporting non-political committees and mandate significantly more disclosure than that required by the challenged regulation, 11 C.F.R. § 109.10(e)(1)(vi).") (stay pending appeal lifted Sept. 18, 2018).

Due to considerations of fairness and lack of notice, the Commission has provided guidance stating that it would exercise prosecutorial discretion for those entities that made independent expenditures before the District

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 19 of 26

1    have to file additional disclosure reports depending on the amount and timing of an independent

2    expenditure.[65]

3           Apart from the above discussion regarding whether the ad could be considered to indicate

4    FV's major purpose of nominating or electing candidates, "Third Largest" also appears to

5    constitute an independent expenditure because it expressly advocates the defeat of Strickland

6    under 11 C.F.R. § 100.22(b).[66]  The advertisement criticizes a clearly identified Federal

7    candidate, Ted Strickland, as having lost Ohio 350,000 jobs during his time as governor.  The

8    advertisement insists that "Ohio can't afford more lost jobs," and contains an unmistakable and

9    unambiguous electoral portion by telling viewers:  "Now Ted Strickland wants to bring his job-

10   killing policies to Washington, with a visual image of the U.S. Capitol and written text stating,

11   "Ted Strickland:  Bringing Job-Killing Policies to Washington."[67]  The advertisement aired in

12   the period between when Strickland won the Democratic primary and the general election, and at

13   a time when Strickland held no office.  As such, and in contrast to the arguments FV has

---

Court issued its decision on August 3, 2018.  Press Release, FEC, FEC Provides Guidance Following U.S. District Court Decision in *CREW v. FEC,* 316 F. Supp. 3d 349 (D.D.C. 2018) (Oct. 4, 2018).

[65]    Section 30104(g) requires reports from persons making independent expenditures over certain aggregate amounts and within certain prescribed timeframes: for expenditures aggregating greater than $10,000 made at any time up to the 20th day before an election, persons must file a report describing those expenditures with the Commission within 48 hours of making or contracting to make the expenditure. 52 U.S.C. § 30104(g)(2).

[66]    Two Circuit Courts, the Fourth Circuit and the Tenth Circuit, have explicitly upheld section 100.22(b) as constitutional in recent years.  *Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012); *Free Speech v. FEC*, 720 F.3d 788 (10th Cir. 2013).  As the Commission noted in its Supplemental Explanation and Justification on political committee status, "a 'magic words' test [is] not constitutionally required."  Supplemental E&J at 5604. Indeed, Courts have held that "[a] test requiring . . . magic words . . . for a finding of express advocacy would preserve the First Amendment . . . only at the expense of eviscerating" the Act.  *FEC v. Furgatch*, 807 F.2d 857, 863 (9th Cir. 1987).

[67]    Compl. ¶ 33, Ex. A ("Third Largest") at 0:28.

1  asserted, discussed above, the advertisement is not reasonably susceptible to any interpretation

2  other than encouraging the defeat of Ted Strickland.[68]

3       Because "Third Largest" appears to have been an independent expenditure, if the

4  Commission finds reason to believe that FV is a political committee, then FV should have

5  reported the advertisement as an independent expenditure under 52 U.S.C. § 30104(b).  Further,

6  since the expenditure appears to have cost over $1 million, FV should have filed a 48-hour report

7  as required by 52 U.S.C. § 30104(g)(2).  Accordingly, we recommend that the Commission find

8  reason to believe that FV violated 52 U.S.C. § 30104(b)(4), (b)(5)(A), (g)(2).

9       In the alternative, if Commission does not find reason to believe that FV is a political

10  committee, then FV should have disclosed "Third Largest" in accordance with

11  52 U.S.C. § 30104(c) and also filed a 48-hour report under 30104(g)(2).  We therefore

12  alternatively recommend that the Commission find reason to believe that FV violated

13  52 U.S.C. § 30104(c), (g)(2).  With respect to FV's failure to report its donors in compliance

14  with the Act, however, because the public was not on notice regarding donor disclosure

15  requirements prior to a 2018 decision clarifying the requirements of the Commission's

16  regulations, we recommend that the Commission dismiss the allegation regarding violation of

---

[68]     *Mass. Citizens for Life,* 479 U.S.at 249 (holding that an exhortation to vote for "pro-life" candidates, despite containing a message "marginally less direct than 'Vote for Smith,'" has an "essential nature" of express advocacy).  The Commission's 1995 Supplemental Explanation and Justification on express advocacy notes that a "clear call to action" is not required under the Act, and that "[c]ommunications discussing or commenting on a candidate's character, qualifications, or accomplishments are considered express advocacy under new section 100.22(b) if, in context, they have no other reasonable meaning than to encourage actions to elect or defeat the candidate in question."  Express Advocacy; Independent Expenditures; Corporate Labor Organization Expenditures, 60 Fed. Reg. 35,292-01, 35,295 (July 6, 1995) (Supplemental Explanation and Justification).

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 21 of 26

1   52 U.S.C. § 30104(c)(1), (c)(2)(C) as a matter of prosecutorial discretion in accordance with the

2   Commission's expressed statement that it would do so in such circumstances.[69]

3                  2.    FV Failed to Include a Proper Disclaimer for "Third Largest"

4          The Act requires that, whenever a political committee makes a disbursement for the

5   purpose of financing a public communication,[70] or whenever any person makes a disbursement

6   for a public communication expressly advocating the election or defeat of a clearly identified

7   candidate, such communication must include a disclaimer.[71]  If the communication is not

8   authorized by a candidate or an authorized committee, then the disclaimer must clearly state the

9   name and permanent street address, telephone number, or web address of the person who paid

10  for the communication and state that the communication was not authorized by any candidate or

11  candidate's committee.[72]

12         Regardless of whether FV is a political committee, the "Third Largest" television

13  advertisement is a public communication, and the Act's disclaimer requirements apply to the

14  ad.[73]  Although "Third Largest" contains the written statement, "Paid for by Freedom Vote," this

15  disclaimer does not fully comply with the provisions of the Act.  It includes no permanent street

16  address, telephone number, or web address for Freedom Vote; it does not state whether the

17  advertisement was authorized by any candidate or candidate's committee; and it does not include

---

[69]        *See* Press Release, *supra* n.64.

[70]        A "public communication" includes any broadcast, cable, or satellite communication, including television
advertisements.  11 C.F.R. § 100.26.

[71]        52 U.S.C. § 30120(a); 11 C.F.R. § 110.11(a).

[72]        52 U.S.C. § 30120(a)(3); 11 C.F.R. § 110.11(b)(3).

[73]        *See* 52 U.S.C. § 30120(a); 11 C.F.R. § 110.11(a)(1)-(2).  Even if the Commission does not find that FV is a
political committee, because "Third Largest" appears to expressly advocate the defeat of a clearly identified federal
candidate, the ad still requires a disclaimer.  *Id.*

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 22 of 26

1   a spoken statement that Freedom Vote is responsible for the content of the advertisement.

2   Accordingly, we recommend that the Commission find reason to believe that FV violated

3   52 U.S.C. § 30120(a), (d) and 11 C.F.R. § 110.11.

4       **C.      Contributions in the Name of Another**

5           The Act prohibits a person from making a contribution in the name of another, knowingly

6   permitting one's name to be used to effect such a contribution, and knowingly accepting such

7   contributions.[74] The Commission has included in its regulations illustrations of activities that

8   constitute making a contribution in the name of another:

9           (i)     Giving money or anything of value, all or part of which was
10                  provided to the contributor by another person (the true contributor)
11                  without disclosing the source of money or the thing of value to the
12                  recipient candidate or committee at the time the contribution is
13                  made; or

14          (ii)    Making a contribution of money or anything of value and
15                  attributing as the source of the money or thing of value another
16                  person when in fact the contributor is the source.[75]

17  The requirement that a contribution be made in the name of its true source promotes Congress's

18  objective of ensuring the complete and accurate disclosure by candidates and committees of the

19  political contributions they receive.[76] Both the Act and the Commission's implementing

20  regulations provide that a person who furnishes another person with funds for the purpose of

---

[74]     52 U.S.C. § 30122; 11 C.F.R. § 110.4(b).

[75]     11 C.F.R. § 110.4(b)(2)(i)–(ii).

[76]     *United States v. O'Donnell*, 608 F.3d 546, 553 (9th Cir. 2010) ("[T]he congressional purpose behind [section 30122] — to ensure the complete and accurate disclosure of the contributors who finance federal elections — is plain."); *Mariani v. United States*, 212 F.3d 761, 775 (3d Cir. 2000) (rejecting constitutional challenge to section 30122 in light of compelling governmental interest in disclosure).

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 23 of 26

1   contributing to a candidate or committee "makes" the resulting contribution.[77]  This is true

2   whether funds are advanced to another person to make a contribution in that person's name or

3   promised as reimbursement of a solicited contribution.[78]  Because the concern of the law is the

4   true source from which a contribution to a candidate or committee originates, we look to the

5   structure of the transaction itself and the arrangement between the parties to determine who, in

6   fact, "made" a given contribution.

7        The Complaint relies on three facts to support its allegation that FV acted as a conduit for

8   contributions to FFO PAC.  *First*, FV and FFO PAC used the same fundraising consultant,

9   MMM Consulting, during 2015 and 2016.[79]  *Second*, MMM Consulting raised more than enough

10  money for FV to cover FV's subsequent contributions to FFO PAC.[80]  *Third*, five of six

11  contributions made to FFO PAC by FV in 2016 matched in amount donations that had been

12  made to FV by others.[81]  Although these facts could be considered to be suggestive, there is no

13  additional information indicating that any donor sought to funnel funds through FV for the

14  purpose of making contributions to FFO PAC.  Further, the five donations to FV which the

---

[77]     *See United States v. Boender*, 649 F.3d 650, 660 (7th Cir. 2011) (holding that to determine who made a contribution "we consider the giver to be the source of the gift, not any intermediary who simply conveys the gift from the donor to the donee."); *O'Donnell*, 608 F.3d at 550; *Goland v. United States*, 903 F.2d 1247, 1251 (9th Cir. 1990) ("The Act prohibits the use of 'conduits' to circumvent . . . [the Act's reporting] restrictions." (quoting then-section 441f)).

[78]     *O'Donnell*, 608 F.3d at 555.  Moreover, the "key issue . . . is the *source* of the funds" and, therefore, the legal status of the funds when conveyed from a conduit to the ultimate recipient is "irrelevant to a determination of who 'made' the contribution for the purposes of [section 30122]." *United States v. Whittemore*, 776 F.3d 1074, 1080 (9th Cir. 2015) (holding that defendant's "unconditional gifts" to relatives and employees, along with suggestion they contribute the funds to a specific political committee, violated section 30122 because the source of the funds remained the individual who provided them to the putative contributors).

[79]     Compl. ¶¶ 26, 70.

[80]     *Id.* ¶¶ 27, 70.

[81]     *Id.* ¶¶ 28, 70.

1    Complaint singles out as suspicious are round numbers that match certain of seventeen donations

2    FV received throughout 2016, and the record does not include dates for when FV received these

3    donations given that the IRS 990 form did not require such information.[82]  On balance, this

4    information does not raise a reasonable inference that FV made contributions to FFO PAC in the

5    name of others.

6           However, because we recommend commencing an investigation into other aspects of

7    FV's financial activities in Parts III.A and III.B, *supra*, we recommend that the Commission take

8    no action at this time with respect to the allegations that FV permitted its name to be used in

9    making contributions by another; that unknown respondents made such contributions; and that

10    FFO PAC accepted contributions made in the name of another, in violation of

11    52 U.S.C. § 30122, pending the findings of that investigation.

12           With respect to the allegations that FFO PAC failed to properly report earmarked

13    contributions, the applicable Commission regulation regarding such contributions applies only to

14    candidates and their authorized committees rather than to all political committees:  "All

15    contributions by a person made *on behalf of or to a candidate*, including contributions which are

16    in any way earmarked or otherwise directed to the candidate through an intermediary or conduit,

17    are contributions from the person to the candidate."[83]  Because FFO PAC is neither a candidate

18    nor a candidate committee, the facts as alleged would not support a finding of reason to believe

19    that the Act or Commission regulations were violated in this respect.[84]  Accordingly, we

---

[82]    FV 2016 Tax Return.

[83]    11 C.F.R. § 110.6 (emphasis added); *see also id.* § 104.3(j).

[84]    While, as the Complaint notes, the instructions for FEC Form 3X and Related Schedules indicate that non-authorized committees must report earmarked contributions, this is not supported by 11 C.F.R. §§ 104.3(j), 110.6.

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 25 of 26

1  recommend that the Commission find no reason to believe that FFO PAC accepted and failed to

2  report earmarked contributions in violation of 52 U.S.C. § 30116(a)(8).

3  **IV.   PROPOSED INVESTIGATION**

4  We plan to seek information (1) to establish the extent, nature, and cost of FV's federal

5  campaign activity and whether FV received funds that would have constituted contributions

6  triggering reporting requirements under the Act, and (2) to identify witnesses who may have

7  relevant knowledge of these facts.  We also request that the Commission authorize the use of

8  compulsory process, including the issuance of appropriate interrogatories, document subpoenas,

9  and deposition subpoenas, as necessary.  The information sought through any discovery would

10  be focused on ascertaining FV's political committee status, as well as the scope of FV's

11  reporting obligations, and would be consistent with the type of information that the Commission

12  seeks in its analysis of a group's requirements as a political committee.

13  **V.   RECOMMENDATIONS**

14  1.  Find reason to believe that Freedom Vote, Inc. violated 52 U.S.C. §§ 30102, 30103,
15     30104(a), (b), (g)(2) by failing to organize, register and report as a political
16     committee and report its independent expenditure as a political committee; in the
17     alternative, find reason to believe that Freedom Vote, Inc. violated
18     52 U.S.C. § 30104(c), (g)(2) by failing to properly report its independent expenditure
19     but dismiss as a matter of prosecutorial discretion allegations that Freedom Vote, Inc.
20     violated 52 U.S.C. § 30104(c)(1), (c)(2)(C) by failing to disclose its donors;

21  2.  Find reason to believe that Freedom Vote, Inc. violated 52 U.S.C. § 30120(a), (d) by
22     failing to include a disclaimer on "Third Largest";

23  3.  Take no action at this time with respect to allegations that Freedom Vote, Inc.,
24     Fighting for Ohio Fund and Christopher M. Marston in his official capacity as
25     treasurer, and unnamed respondents violated 52 U.S.C. § 30122 by making and
26     accepting contributions in the name of another;

27  4.  Find no reason to believe that Fighting for Ohio Fund and Christopher M. Marston in
28     his official capacity as treasurer violated 52 U.S.C. § 30104(b), 30116(a)(8) and 11
29     C.F.R. § 110.6(c)(2) by accepting and failing to report earmarked contributions;

MUR 7465 (Fighting for Ohio Fund, *et al.*)
First General Counsel's Report
Page 26 of 26

1    5.   Approve the attached Factual and Legal Analyses;

2    6.   Authorize the use of compulsory process; and

3    7.   Approve the appropriate letters.

4

5    Lisa J. Stevenson
6    Acting General Counsel

7

8

9    July 1, 2019
10   _____
11   DATE                          Charles Kitcher

12                                 Charles Kitcher
13                                 Acting Associate General Counsel for
14                                  Enforcement

15                                 Jin Lee

16   _____
17                                 Jin Lee
18                                 Acting Assistant General Counsel

19

20                                 Justine A. di Giovanni

21   _____
22                                 Justine A. di Giovanni
23                                 Attorney

24   Attachment:
25        1.    Factual and Legal Analysis

1      **FEDERAL ELECTION COMMISSION**

2      **FACTUAL AND LEGAL ANALYSIS**

3   **RESPONDENTS:**     Freedom Vote, Inc. and James S. Nathanson individually     **MUR:** 7465
4                       and in his capacity as executive director of Freedom
5                       Vote, Inc.

6   **I.     INTRODUCTION**

7           This matter was generated by a complaint filed with the Federal Election Commission

8   (the "Commission") by Noah Bookbinder, Executive Director of Citizens for Responsibility and

9   Ethics in Washington.[1]  In 2010, Freedom Vote, Inc. ("FV") established itself as a non-profit

10  corporation whose stated mission was to educate the people of Ohio on economic policy issues.

11  The Complaint, however, alleges that FV spent most of its funds on federal political activity and

12  failed to register and report as a political committee in violation of the Federal Election

13  Campaign Act of 1971, as amended (the "Act").  In addition, the Complaint alleges that FV

14  knowingly acted as a conduit for contributions made by unknown respondents to an independent

15  expenditure-only political committee, Fighting for Ohio Fund ("FFO PAC"), and that FFO PAC

16  knowingly accepted contributions in the name of another and failed to report earmarked

17  contributions.

18          Over the course of two election cycles beginning in 2014, the majority of FV's spending,

19  more than $3 million of the $4 million FV spent from 2013-2016, appears to reflect that FV had

20  the major purpose of nominating or electing federal candidates, including $1 million that FV

21  spent on its 2014 advertisement entitled "Third Largest."  For the reasons set forth below, the

22  Commission:  (1) finds reason to believe that FV violated 52 U.S.C. §§ 30102, 30103, and 30104

23  by failing to organize, register, and report as a political committee; and (2) finds reason to

---

[1]      *See* 52 U.S.C. § 30109(a)(1).

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 2 of 18

1  believe that FV violated 52 U.S.C. §§ 30104(b)(4), (b)(5)(A), (g)(2), and 30120(d)(2) by failing

2  to report an independent expenditure and include the appropriate disclaimer.

3  **II.    FACTUAL BACKGROUND**

4  **A.    Respondents**

5        FV is an Ohio non-profit social welfare organization incorporated in 2010 under section

6  501(c)(4) of the Internal Revenue Service ("IRS") code.[2]  From January 2011 through at least

7  June 2017, James S. Nathanson was FV's executive director.[3]

8        In filings with the IRS, FV describes its mission as "to further the common good and

9  general welfare of the people of Ohio."[4]  A 2010 article cited in the Complaint states that FV

10  was established as an entity "with the express purpose of raising money to help pay for the type

11  of turnout operations traditionally underwritten by the RNC."[5]  Tom Whatman, then-advisor to

12  FV, was reported as stating, "I understood that the lack of resources from the RNC was going to

13  have a severe impact on what the parties were going to be able to do."[6]

14        FFO PAC is an independent expenditure-only political committee that first registered

15  with the Commission in February 2015.[7]  In the 2016 election cycle, it raised $9,874,220 and

16  spent $9,808,186.54, of which $9,256,439.42 was spent on independent expenditures opposing

---

[2]      *See* Freedom Vote, Inc., Ohio Initial Articles of Incorporation (July 7, 2010); Form 990, 2009 Tax Return of Freedom Vote, Inc. (Aug. 12, 2011) [*hereinafter* "FV 2010 Tax Return"].

[3]      The Complaint also mentions James S. Nathanson, individually, but does not include any allegations that he violated the Act.  Compl. (Aug. 9, 2018).  Nathanson did not file a separate response.

[4]      *See, e.g.,* FV 2010 Tax Return.

[5]      Compl. ¶¶ 11, 58; Jeanne Cummings, *State Parties Look Past RNC for Cash*, POLITICO, Sept. 3, 2010, http://politi.co/2FjFJj3.

[6]      Cummings, *supra* n.5.

[7]      FEC Form 1, FFO PAC Statement of Organization (Feb. 23, 2015).

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 3 of 18

1   former Ohio Governor Ted Strickland, a candidate for U.S. Senate from Ohio in 2016.[8]  In 2018,

2   FFO PAC raised $25,229.28 and spent $22,454.48, none of which was reported as independent

3   expenditures.[9]

4       **B.      Spending by FV**

5           According to FV's tax returns, which use a fiscal year beginning in October and ending

6   the September of the following year, FV characterizes most of its spending since its formation as

7   having been related to issue advocacy regarding economic policy issues in Ohio.[10]  In fiscal

8   years 2010 and 2011, FV also reported spending $461,742 on "voter registration efforts."[11]  In

9   fiscal year 2013, it stated that some of its money was also spent on "advocacy related to voting

10  rights under the Ohio and United States Constitutions."[12]

11          In fiscal year 2014, FV spent $174,607.55 in independent expenditures in support of

12  then-Speaker of the House John Boehner in the form of door hangers, canvassing, and

---

[8]      FEC, *Fighting for Ohio Fund – Spending*, FEC.GOV, https://www.fec.gov/data/committee/C00573014/
?cycle=2016&tab=spending (last accessed July 1, 2019).

[9]      FEC, *Fighting for Ohio Fund – Spending*, FEC.GOV, https://www.fec.gov/data/committee/C00573014/
?tab=spending&cycle=2018 (last accessed July 1, 2019) [*hereinafter* "FFO PAC 2018 Funds Spent"]; FEC,
*Fighting for Ohio Fund – Raising*, FEC.GOV, https://www.fec.gov/data/committee/C00573014/?tab=raising&cycle
=2018 (last accessed July 1, 2019).  FFO PAC described its expenditures as legal services, compliance consulting,
website expenses, and two contributions totaling $9,500 to the "Fighting for Ohio Institute," a now-terminated
Virginia 501(c)(4) organization of which James Nathanson was the corporate secretary.  FFO PAC 2018 Funds
Spent; *see* Form 990, 2016 Tax Return of Fighting for Ohio Institute (Nov. 5, 2017).

[10]     FV 2010 Tax Return; Form 990, 2010 Tax Return of Freedom Vote, Inc. (Aug. 14, 2012) [*hereinafter* "FV
2011 Tax Return"]; Form 990, 2011 Tax Return of Freedom Vote, Inc. (July 17, 2013) [*hereinafter* "FV 2012 Tax
Return"]; Form 990, 2012 Tax Return of Freedom Vote, Inc. (July 30, 2014) [*hereinafter* "FV 2013 Tax Return"];
Form 990, 2013 Tax Return of Freedom Vote, Inc., (Aug. 11, 2015) [*hereinafter* "FV 2014 Tax Return"]; Form 990-
EZ, 2014 Tax Return of Freedom Vote, Inc. (Aug. 11, 2016) [*hereinafter* "FV 2015 Tax Return"]; Form 990, 2015
Tax Return of Freedom Vote, Inc. (Aug. 14, 2017) [*hereinafter* "FV 2016 Tax Return"]; Form 990-EZ, 2016 Tax
Return of Freedom Vote, Inc. (Aug. 9, 2018) [*hereinafter* "FV 2017 Tax Return"].

[11]     FV 2010 Tax Return; FV 2011 Tax Return.

[12]     FV 2013 Tax Return.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 4 of 18

1   robocalls.[13]  By fiscal year 2016, FV's spending on campaign activity substantially increased in

2   that the organization reported spending $1.744 million on "political expenditures," of which $1.7

3   million consisted of contributions to FFO PAC.[14]  Additionally, in June and July 2016, FV aired

4   what appears to be its first television advertisement, "Third Largest," opposing Ted Strickland.[15]

5   The advertisement was broadcast several months before the general election, but after Strickland

6   had won the Democratic primary.[16]  The content of the advertisement was as follows:[17]

| Narration | Text on Screen | Visual |
|---|---|---|
| While Ted Strickland was governor, Ohio lost jobs to Kentucky, Indiana, even Michigan. | OHIO LOST JOBS TO KENTUCKY INDIANA MICHIGAN | Ted Strickland, speaking, on left; map of the United States with Ohio in red on right |
| 350,000 Ohio jobs gone. | 350,000 JOBS GONE | |
| How many is that?  If you assembled everyone who lost their job under Strickland, you'd have Ohio's third largest city. | OHIO'S LARGEST CITIES COLUMBUS 787,033 CLEVELAND 396,815 JOBS LOST UNDER STRICKLAND 350,000 CINCINNATI 296,943 TOLEDO 287,208 | Ted Strickland on right |

---

[13]     FEC Form 5, FV Amended 2014 April Quarterly Report (Apr. 14, 2014); FEC Form 5, FV 2014 July Quarterly Report (July 15, 2014); FV 2014 Tax Return.

[14]     FV 2016 Tax Return.

[15]     Compl. ¶ 48, Ex. A ("Third Largest"); FV Resp. at 2 (Oct. 19, 2018).  In May 2016, FFO PAC uploaded a similar advertisement to its YouTube channel, titled "Spotty," which contains the same job-related claim as "Third Largest":  "350,000 jobs lost while Strickland was Governor.  Jobs lost to Kentucky, Indiana, even to Michigan." Fighting for Ohio, *Spotty*, YOUTUBE (May 6, 2016), https://youtu.be/_4eCxmIDNYQ.

[16]     Compl. ¶ 48.

[17]     *Id.* ¶ 33, Ex. A ("Third Largest"); FV Resp. at 2.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 5 of 18

| Narration | Text on Screen | Visual |
|---|---|---|
| And you could fill the OSU Horseshoe more than three times. | STRICKLAND LOST JOBS: COULD FILL THE HORSESHOE 3 TIMES | The Ohio Stadium of The Ohio State University |
| Now Ted Strickland wants to bring his job-killing policies to Washington. | TED STRICKLAND: BRINGING JOB-KILLING POLICIES TO WASHINGTON<br><br>PAID FOR BY FREEDOM VOTE | The United States Capitol |
| We can't afford more lost jobs. | WE CAN'T AFFORD MORE LOST JOBS<br><br>PAID FOR BY FREEDOM VOTE | Ted Strickland at podium |

1    FV continued its spending on federal elections and made an additional $275,000

2    contribution to FFO PAC on October 5, 2016, reported in FV's tax return for the fiscal year

3    ending in 2017; FV did not report additional political spending in that fiscal year.[18]  The current

4    record does not include financial information for FV for the fiscal year ending in 2018.

5    The table below summarizes information as reported by FV in its tax returns:

| Fiscal Year[19] | Gross Receipts | Total Expenses | Expenses: Voter Registration | Expenses: Issue-Related[20] | Expenses: Political |
|---|---|---|---|---|---|
| 2010 | $1,325,000 | $1,265,384 | $361,742 | $816,681 | $0 |
| 2011 | $1,848,061 | $1,886,457 | $100,000 | $1,548,594 | $0 |
| 2012 | $200,000 | $191,416 | $0 | $160,270 | $0 |
| 2013 | $200,000 | $150,430 | $0 | $125,347 | $0 |
| 2014 | $255,000 | $284,754 | $0 | $270,906 | $174,607 |
| 2015 | $28,000 | $58,578 | $0 | $21,839 | $0 |
| 2016 | $4,375,000 | $3,575,475 | $0 | $3,505,133 | $1,744,267 |
| 2017 | $90,000 | $721,094 | $0 | $565,056 | $275,000 |

---

18    FV 2017 Tax Return; FEC Form 3X, FFO PAC 2016 Pre-General Report, sched. A at 7 (Oct. 27, 2016).

19    Information regarding FV's spending using a calendar year framework is not publicly available.

20    FV's tax returns generally describe these expenses as, *e.g.*, "provided education to the Ohio public regarding economic policy issues, including state and local government fiscal responsibility, job growth and retention, and employment."  FV 2012 Tax Return at 2.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 6 of 18

1    With respect to these figures, FV appears to have counted certain expenses as both

2 political expenses and issue advocacy expenses because, for both fiscal years 2014 and 2016, the

3 combined totals for issue advocacy and political expenses exceed the total expenses reported in

4 FV's tax returns.

5    In addition to the foregoing expenses, FV paid $180,000 in compensation in total to its

6 Executive Director, James Nathanson, between the fiscal year ending in 2010 and that ending in

7 2017.  FV also paid organizations owned wholly or in part by Nathanson, including James S.

8 Nathanson & Associates, LLC, and JSN Associates, LLC, $1,745,401 in the same time period

9 for "fundraising;"[21] "consulting and fundraising services;"[22] and "education and grassroots

10 advocacy."[23]  The total $1,925,401 paid to Nathanson and his affiliated organizations represents

11 23.7% of FV's overall reported expenses between fiscal years 2010 and 2017.

12 **III.    LEGAL ANALYSIS**

13    **A.    Political Committee Status**

14       1.    The Test for Political Committee Status

15    The Act and Commission regulations define a "political committee" as "any committee,

16 club, association or other group of persons which receives contributions aggregating in excess of

17 $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000

18 during a calendar year."[24]  In *Buckley v. Valeo*, the Supreme Court held that defining political

---

[21]    FV 2011 Tax Return.

[22]    *Id.*

[23]    FV 2014 Tax Return.  Though the complaint does not make any allegations regarding Nathanson's receipt of FV funds, Nathanson and his affiliated companies annually received between 0.67% (2016) and 56.8% (2011) of FV's total expenditures each year from 2010 to 2017.

[24]    52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 7 of 18

1   committee status "only in terms of the annual amount of 'contributions' and 'expenditures'"

2   might be overbroad, reaching "groups engaged purely in issue discussion."[25]  To cure that

3   infirmity, the Court concluded that the term "political committee" "need only encompass

4   organizations that are under the control of a candidate or the *major purpose of which is the*

5   *nomination or election of a candidate*."[26]  Accordingly, under the statute as thus construed, an

6   organization that is not controlled by a candidate must register as a political committee only if

7   (1) it crosses the $1,000 threshold and (2) it has as its "major purpose" the nomination or election

8   of federal candidates.

9        Although *Buckley* established the major purpose test, it provided no guidance as to the

10  proper approach to determine an organization's major purpose.[27]  In *Massachusetts Citizens for*

11  *Life v. FEC*, the Supreme Court identified an organization's independent spending as a relevant

12  factor in determining an organization's major purpose.[28]  The Court also recognized that an

13  organization's federal campaign spending may "become so extensive that the organization's

14  major purpose may be regarded as campaign activity [such that] the corporation would be

15  classified as a political committee."[29]

16       In 2007, following litigation resulting from the Commission's decision not to pursue

17  rulemaking on the subject of political committee status, the Commission issued a Supplemental

---

[25]    424 U.S. 1, 79 (1976).

[26]    *Id.* (emphasis added).

[27]    *See, e.g.*, *Real Truth About Abortion, Inc. v. FEC* (formerly *Real Truth About Obama v. FEC*), 681 F.3d 544, 556 (4th Cir. 2012), *cert. denied*, 568 U.S. 1114 (Jan. 7, 2013) (No. 12-311) ("Although *Buckley* did create the major purpose test, it did not mandate a particular methodology for determining an organization's major purpose.").

[28]    479 U.S. 241, 249, 262-63 (1986).

[29]    *Id.* at 262.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 8 of 18

1    Explanation and Justification to further elaborate on its 2004 decision and to provide the public

2    with additional guidance as to its process for determining political committee status.[30]  The

3    Supplemental E&J explained that, in order to determine an entity's "major purpose," the

4    Commission considers a group's "overall conduct," including public statements about its

5    mission, organizational documents, government filings, the proportion of its spending related to

6    "Federal campaign activity (*i.e.,* the nomination or election of a Federal candidate)," and the

7    extent to which fundraising solicitations indicate funds raised will be used to support or oppose

8    specific candidates.[31]  The Commission stated that it compares how much of an organization's

9    spending is for "*Federal campaign activity*" relative to "activities that [a]re not campaign

10   related."[32]

11          In 2016, the United States District Court for the District of Columbia in *Citizens for*

12   *Responsibility and Ethics in Washington v. FEC* ("*CREW I*") instructed the Commission, when

13   examining an organization's major purpose, to look beyond express advocacy and consider

14   whether other communications at issue indicate a "campaign-related purpose."[33]  The Court also

---

[30]    Political Committee Status, 72 Fed. Reg. 5595 (Feb. 7, 2007) (Supplemental Explanation and Justification) [*hereinafter* "Supplemental E&J"].  The Supplemental E&J was issued following a court challenge to the Commission's decision to engage in case-by-case decision-making rather than formal rulemaking.  *See Shays v. FEC*, 424 F. Supp. 2d 100, 117 (D.D.C. 2006).

[31]    Supplemental E&J at 5597, 5605.

[32]    *Id.* at 5601, 5605 (emphasis added); *see also Shays v. FEC*, 511 F. Supp. 2d 19, 24-25, 31 (D.D.C. 2007) (upholding the Commission's case-by-case approach as an appropriate exercise of the agency's discretion); *Real Truth About Abortion, Inc.*, 681 F.3d at 556 (holding that *Buckley* "did not mandate a particular methodology for determining an organization's major purpose," and therefore the Commission was free to make that determination "either through categorical rules or through individualized adjudications").

[33]    209 F. Supp. 3d 77, 92-93 (D.D.C. 2016).  The same District Court later held that electioneering communications "*presumptively* have an election-related purpose," but the analysis by that Court in *CREW I* and its subsequent decision refers generally to all speech that is campaign-related but does not contain express advocacy. *Citizens for Responsibility & Ethics in Wash. v. FEC*, 299 F. Supp. 3d 83, 93 (D.D.C. 2018) [*hereinafter* "*CREW II*"].  The Court refrained from establishing its own bright-line rule regarding which communications inherently have a campaign-related purpose, but stated that the First Amendment does not require "the agency to exclude from its consideration all non-express advocacy in the context of disclosure." *CREW I*, 209 F. Supp. 3d at 93.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 9 of 18

1   held that the Commission's analysis of the relevant time period for evaluating a groups' spending

2   must retain the flexibility to account for changes in an organization's major purpose over time.[34]

3                         2.    <u>There is Reason to Believe that FV Became a Political Committee By</u>

4                                    <u>2016</u>

5                            a.    Statutory Threshold

6          To assess whether an organization has made an "expenditure," the Commission analyzes

7   whether spending on any of an organization's communications made independently of a

8   candidate constitute express advocacy under 11 C.F.R. § 100.22.[35]  In calendar year 2014, FV

9   reported that it spent $174,607 on independent expenditures.[36]  Thus, FV well exceeded the

10  $1,000 statutory threshold set forth in the Act's political committee definition,[37] which FV does

11  not dispute.[38]

12                           b.    Major Purpose

13         FV's political spending beginning in 2014 indicates that its major purpose had become

14  the nomination or election of a federal candidate, and suggests that FV became a political

15  committee at that time.[39]  According to news reports published at the time of FV's formation, FV

---

[34]      *CREW I*, 209 F. Supp. 3d at 94.  In its subsequent Factual and Legal Analysis ("F&LA"), the Commission accepted the Court's remand of the enforcement matter, found that the organization's campaign-related spending exceeded 50% of its overall spending approximately one year before the 2010 election, and found reason to believe that the organization violated 52 U.S.C. §§ 30102, 30103, and 30104 by failing to organize, register, and report as a political committee.  F&LA at 14-15, MUR 6538R (Americans for Job Security).

[35]      *See* Supplemental E&J at 5606.

[36]      Compl. ¶¶ 18-19; FEC Form 5, FV Amended April Quarterly Report, (July 15, 2014); FEC Form 5, FV July Quarterly Report (July 15, 2014); FV 2014 Tax Return, Part I, Line 18, (Aug. 11, 2015).

[37]      52 U.S.C. § 30101(4)(A).

[38]      *See generally* Compl.

[39]      *See Mass. Citizens for Life, Inc.*, 479 U.S. at 262 (holding that, "should [a corporation's] independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee") (citing *Buckley*, 424 U.S. at 79).

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 10 of 18

1    was alleged to have been established with political committee functions in mind:  then-advisor to

2    FV Tom Whatman stated that, in assisting with FV's creation, he "understood that the lack of

3    resources from the RNC was going to have a severe impact on what the parties were going to be

4    able to do."[40]  Over the course of its existence, FV's reported spending appears to have followed

5    a trajectory where it went from reporting no spending on federal campaign activity between

6    fiscal years 2010 and 2013 to reporting that it spent more than half of its budget on such activity

7    between fiscal years 2014 and 2016.  As FV acknowledges, in 2014, FV reportedly spent

8    $174,607 on independent expenditures supporting John Boehner,[41] which constituted more than

9    60% of FV's total expenditures ($284,754).[42]

10        In 2016, FV continued to spend millions of dollars on campaign-related activity.  In the

11    fiscal year ending in September 2016, FV reported spending $1.744 million on "political

12    campaign and lobbying activities."[43]  These expenditures included $1.7 million in contributions

13    to FFO PAC and $44,267 in funds "directly expended" by FV for "section 527 exempt function

14    activities."[44]  Though FV's tax return does not elaborate on what the $44,267 expenditures

---

[40]    Cummings, *supra* n.5.

[41]    Compl. ¶¶ 18-19; FV, FEC Form 5, FV Amended April Quarterly Report, (July 15, 2014); FEC Form 5, FV July Quarterly Report (July 15, 2014); FV 2013 Tax Return, part I, line 18.

[42]    Compl. ¶ 59; FV Resp. at 8 ("Granted, in one year (fiscal year 2014), FV's political spending exceeded its non-political spending.").  While the total amount at issue during this time period is comparatively less than what FV went on to spend in future years, the Commission's major purpose analysis has always focused on the proportion of an organization's spending that is campaign-related rather than its amount.

[43]    FV 2016 Tax Return, Schedule C.  The IRS defines "political campaign and lobbying activities" as "All activities that support or oppose candidates for elective federal, state, or local public office.  It does not matter whether the candidate is elected.  A candidate is one who offers himself or is proposed by others for public office. Political campaign activity does not include any activity to encourage participation in the electoral process, such as voter registration or voter education, provided that the activity does not directly or indirectly support or oppose any candidate."  IRS, *Instructions for Schedule C (Form 990 or 990-EZ) (2018)* 67, IRS.GOV, https://www.irs.gov/pub/irs-pdf/i990.pdf (last accessed July 1, 2019).

[44]    FV 2016 Tax Return, sched. C.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 11 of 18

1    consisted of, section 527 exempt function activities "include all functions that influence or

2    attempt to influence the selection, nomination, election, or appointment of any individual to any

3    federal, state, or local public office or office in a political organization, or the election of

4    Presidential or Vice-Presidential electors, whether or not such individual or electors are selected,

5    nominated, elected, or appointed."[45]  FV's reported spending as set forth in its fiscal year 2016

6    tax return and its Response indicates that its self-reported "political campaign intervention"[46]

7    expenses constituted at least 48.7% of its total spending during that year, though as noted above,

8    FV itself appears to consider a portion of its reported programmatic spending to also constitute

9    political spending.

10         The record, however, indicates that FV may have spent even more on federal campaign

11    activity in 2016.  First, the $275,000 contribution which FV made to FFO PAC on October 5,

12    2016, was not included in its 2016 tax return likely because the fiscal year ended in September

13    2016.  But because FV made the contribution the month before the general election in

14    November, the contribution should be included as part of FV's spending in 2016.[47]

15         Second, although FV did not report its television advertisement, "Third Largest," as an

16    independent expenditure to the Commission or a "political expenditure" in its tax return, this ad,

17    which opposed former Governor and then-Senate candidate Ted Strickland, appears to reflect a

18    campaign-related purpose using an analysis the Commission recently employed to evaluate

---

[45]    IRS, *Instructions for Schedule C (Form 990 or 990-EZ) (2018)*, IRS.GOV, https://www.irs.gov/instructions/i990sc (last accessed July 1, 2019).

[46]    This is a term FV uses in its Response, and which appears to correlate with "political campaign and lobbying activities" as defined by the IRS and reported in FV's tax returns.

[47]    The Commission notes that FV also reported over $565,000 for issue advocacy expenses during the 2017 fiscal year, but has no information as to when FV spent money on those activities.  Thus, it is unclear as to whether any of those expenses were incurred before or after the 2016 election and should be included in FV's 2016 spending. Additional fact finding could resolve those issues.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 12 of 18

1    certain electioneering communications in the context of evaluating political committee status.

2    The ad, which ran during the summer following Strickland's victory in the primary election but

3    four to five months before the 2016 general election and was outside the electioneering

4    communication window, refers to Strickland, who was not an officeholder when the ad was run,

5    and describes his attempts to "bring his job killing policies to Washington."[48]  That statement

6    about job-killing policies is visually accompanied by an image of the U.S. Capitol, the building

7    in which Strickland would work as a Senator if he were to prevail in the general election.[49]

8    Additionally, unless he were elected, Strickland was and would be in no position to affect federal

9    political activities, issues, or programs referenced in the ad.  Therefore, the amount FV spent on

10   "Third Largest" may be included in determining whether FV had the major purpose of

11   nominating or electing federal candidates.  By adding the amount that FV spent on "Third

12   Largest," which was approximately $1.12 million,[50] to FV's other acknowledged political

13   spending, FV appears to have dedicated $2,865,344 of its total expenditures of $3,575,475, or

14   roughly 80%, to federal campaign activities in the fiscal year ending in September 2016.[51]

15        FV argues that the advertisement could reasonably mean that Strickland might go to

16   Washington as a political nominee to the United Nations, or as part of a Washington think tank,

17   as both were positions Strickland had either been nominated for or had held prior to the

18   advertisement's broadcast.[52]  However, the phrasing in the advertisement belies such

---

[48]     F&LA at 13, MUR 6538R (Americans for Job Security).

[49]     Compl., Ex. A ("Third Largest") at 0:28.

[50]     FV 2016 Tax Return part IX, line 24(a).

[51]     *CREW I* instructed the Commission to consider whether non-express advocacy indicates a "campaign-related purpose."  *CREW I*, 209 F. Supp. 3d at 93.

[52]     FV Resp. at 4.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 13 of 18

1    interpretations by stating that Strickland "now" wants to take his policies to Washington, which

2    refers to the time when he was a candidate for federal office.  Further, the United Nations is not

3    located in Washington, D.C., and the image of the U.S. Capitol accompanying the statement

4    about Strickland coming to Washington indicates that the ad's reference was to Strickland's

5    senatorial candidacy.

6            Though FV contends that the Commission should evaluate FV's spending solely over the

7    course of its entire lifetime, in *CREW I*, the Court found that the Commission's analysis of the

8    relevant time period for evaluating a group's spending must be flexible to account for changes in

9    an organization's major purpose over time.[53]  Here, using a calendar year approach to evaluate

10   the Complaint's claim that FV was a political committee in 2014 and certainly by 2016,[54] in

11   calendar year 2014, FV spent $174,607 on independent expenditures.  Although the Commission

12   does not have a precise figure for FV's total calendar year spending in 2014, FV reports that it

13   spent a total of $284,754 in fiscal year 2014, which covers most of 2014 — making its

14   campaign-related spending in 2014 approximately 60% of its total expenditures.  While FV's

---

[53]      *See CREW I*, 209 F. Supp. 3d at 94 ("The Commissioners' refusal to give any weight whatsoever to an organizations' [sic] relative spending in the most recent calendar year — particularly in the case of a fifteen-year-old organization like AJS — indicates an arbitrary 'fail[ure] to consider an important aspect of the [relevant] problem.'" (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 664, 658 (2007)); *see also FEC v. Malenick.* 310 F. Supp. 2d 230, 237 (D.D.C. 2004) ("Accordingly, because Triad and then Triad Inc.'s major purpose was the nomination or election of specific candidates *in 1996*, and because Triad received contributions aggregating more than $1,000 *in 1996*, I find that Triad and Triad, Inc. operated as a 'political committee' *in 1996*.") (emphasis added); *FEC v. GOPAC, Inc.,* 917 F. Supp. 851, 853 (D.D.C. 1996) (discussing major purpose only in 1989 and 1990 with respect to group formed in 1979); *see also* MUR 5492 (Freedom, Inc.) (analyzing admitted major purpose in 2004 of group formed in 1962); MURs 5577, 5620 (National Association of Realtors — 527 Fund) (analyzing 2004 spending of NAR-527 Fund registered with IRS in 2000); MUR 5755 (New Democrat Network) (analyzing 1996 group New Democrat Network's 2004 spending); MUR 5753 (League of Conservation Voters) (analyzing LCV's 2004 spending when one of LCV's funds had registered with the IRS as early as 2000); MURs 5694, 5910 (Americans for Job Security) (analyzing activity for group founded in 1997 from 2000 through 2006 in determining group's major purpose in 2006); MUR 5487 (Progress for America VF) (analyzing group's major purpose based on 2004 disbursements where group had raised $4.6 million and spent $11.2 million through 2006).

[54]      Compl. ¶ 51.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 14 of 18

1    spending in 2014 was comparatively less than its spending in certain earlier years, it was even

2    lower in 2015 at less than $60,000, none of which was campaign-related.  But in 2016, FV's

3    spending substantially increased to $3,575,475, of which $2,865,344, or 80.1%, was campaign-

4    related, as described above.[55]  In 2015-2016, FV's campaign-related spending constituted 78.8%

5    of its total expenses for the 2016 election cycle.  Further, while FV reported spending nothing on

6    campaign-related expenditures from its formation through fiscal year 2013, from fiscal year 2014

7    through fiscal year 2017, FV's campaign-related spending totaled $3,314,951 out of $4,639,901,

8    or 71.4%.[56]

9           Based on the foregoing, FV's sustained spending indicating a major purpose of

10   nominating or electing candidates from 2014 through 2016 is sufficient to support a reasonable

11   inference that FV became a political committee during this period.  By 2016, such spending

12   constituted almost 50% of its expenses, with the record reflecting an additional roughly 30%

13   spent on the "Third Largest" ad.  Accordingly, the Commission finds reason to believe that FV

14   failed to organize, register, and report with the Commission in violation of 52 U.S.C. §§ 30102,

15   30103, and 30104.

16         **B.        Proper Disclosure of "Third Largest" Television Advertisement**

17                  1.    FV Failed to Report "Third Largest" as an Independent Expenditure

18         The Complaint alleges that FV violated the Act by failing to disclose "Third Largest" as

19   an independent expenditure and to include a proper disclaimer.  An "independent expenditure" is

20   an expenditure made by any person for a communication that (1) expressly advocates for the

21   election or defeat of a clearly identified candidate, and (2) is not coordinated with the candidate,

---

[55]        *See* FV 2015 Tax Return; FV 2016 Tax Return.

[56]        *See* FV 2014 Tax Return; FV 2015 Tax Return; FV 2016 Tax Return; FV 2017 Tax Return.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 15 of 18

1    her authorized committee, her agents, or a political party committee or its agents.[57]  Under the

2    Commission's regulations, a communication can expressly advocate for the election or defeat of

3    a clearly identified federal candidate if it uses certain "magic words," such as "vote for" or

4    "elect."  A communication may also be express advocacy if it:

5            [w]hen taken as a whole and with limited reference to external events,
6            such as the proximity to the election, could only be interpreted by a
7            reasonable person as containing advocacy of the election or defeat of one
8            or more clearly identified candidate(s) because — (1) [t]he electoral
9            portion of the communication is unmistakable, unambiguous, and
10           suggestive of only one meaning; and (2) [r]easonable minds could not
11           differ as to whether it encourages actions to elect or defeat one or more
12           clearly identified candidate(s) or encourages some other kind of action.[58]

13           The Act requires both political committees and persons other than political committees to

14   report their independent expenditures.[59]  Political committees other than authorized committees

15   must disclose their independent expenditures and itemize such expenditures with information

16   including the name and address of each person who receives disbursements in connection with

17   an independent expenditure, as well as the date, amount, purpose, and identity of the candidate in

18   support of or opposition to for which the independent expenditure is made.[60]  The Act places

19   similar reporting requirements on non-political committee persons making independent

20   expenditures aggregating greater than $250 in a calendar year,[61] and such persons must identify

21   individuals who contribute over $200.[62]  A person, including a political committee, also may

---

[57]     52 U.S.C. § 30101(17); 11 C.F.R. § 100.16.

[58]     11 C.F.R. § 100.22(b).

[59]     *See generally* 52 U.S.C. § 30104.

[60]     52 U.S.C. § 30104(b)(3)(B)(iii), (g); 11 C.F.R. § 109.10.

[61]     52 U.S.C. § 30104(c), (g); 11 C.F.R. § 109.10.

[62]     52 U.S.C. § 30104(c)(1), (2)(C); *Citizens for Responsibility & Ethics in Wash. v. FEC*, 316 F. Supp. 3d 349, 410 (D.D.C. 2018) (holding sections 30104(c)(1) and (c)(2)(C) "unambiguously require separate and

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 16 of 18

1    have to file additional disclosure reports depending on the amount and timing of an independent

2    expenditure.[63]

3         Apart from the above discussion regarding whether the ad could be considered to indicate

4    FV's major purpose of nominating or electing candidates, "Third Largest" also appears to

5    constitute an independent expenditure because it expressly advocates the defeat of Strickland

6    under 11 C.F.R. § 100.22(b).[64]  The advertisement criticizes a clearly identified Federal

7    candidate, Ted Strickland, as having lost Ohio 350,000 jobs during his time as governor.  The

8    advertisement insists that "Ohio can't afford more lost jobs," and contains an unmistakable and

9    unambiguous electoral portion by telling viewers:  "Now Ted Strickland wants to bring his job-

10   killing policies to Washington, with a visual image of the U.S. Capitol and written text stating,

11   "Ted Strickland:  Bringing Job-Killing Policies to Washington."[65]  The advertisement aired in

12   the period between when Strickland won the Democratic primary and the general election, and at

---

complementary requirements to identify individuals who contribute over $200 to reporting non-political committees and mandate significantly more disclosure than that required by the challenged regulation, 11 C.F.R. § 109.10(e)(1)(vi).") (stay pending appeal lifted Sept. 18, 2018).

    Due to considerations of fairness and lack of notice, the Commission has provided guidance stating that it would exercise prosecutorial discretion for those entities that made independent expenditures before the District Court issued its decision on August 3, 2018.  Press Release, FEC, FEC Provides Guidance Following U.S. District Court Decision in *CREW v. FEC,* 316 F. Supp. 3d 349 (D.D.C. 2018) (Oct. 4, 2018).

[63]    Section 30104(g) requires reports from persons making independent expenditures over certain aggregate amounts and within certain prescribed timeframes: for expenditures aggregating greater than $10,000 made at any time up to the 20th day before an election, persons must file a report describing those expenditures with the Commission within 48 hours of making or contracting to make the expenditure.  52 U.S.C. § 30104(g)(2).

[64]    Two Circuit Courts, the Fourth Circuit and the Tenth Circuit, have explicitly upheld section 100.22(b) as constitutional in recent years.  *Real Truth About Abortion, Inc. v. FEC,* 681 F.3d 544 (4th Cir. 2012); *Free Speech v. FEC,* 720 F.3d 788 (10th Cir. 2013).  As the Commission noted in its Supplemental Explanation and Justification on political committee status, "a 'magic words' test [is] not constitutionally required."  Supplemental E&J at 5604. Indeed, Courts have held that "[a] test requiring . . . magic words . . . for a finding of express advocacy would preserve the First Amendment . . . only at the expense of eviscerating" the Act.  *FEC v. Furgatch,* 807 F.2d 857, 863 (9th Cir. 1987).

[65]    Compl. ¶ 33, Ex. A ("Third Largest") at 0:28.

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 17 of 18

1    a time when Strickland held no office.  As such, and in contrast to the arguments FV has

2    asserted, discussed above, the advertisement is not reasonably susceptible to any interpretation

3    other than encouraging the defeat of Ted Strickland.[66]

4         Because "Third Largest" appears to have been an independent expenditure, if the

5    Commission finds reason to believe that FV is a political committee, then FV should have

6    reported the advertisement as an independent expenditure under 52 U.S.C. § 30104(b).  Further,

7    since the expenditure appears to have cost over $1 million, FV should have filed a 48-hour report

8    as required by 52 U.S.C. § 30104(g)(2).  Accordingly, the Commission finds reason to believe

9    that FV violated 52 U.S.C. § 30104(b)(4), (b)(5)(A), (g)(2).

10        2.    FV Failed to Include a Proper Disclaimer for "Third Largest"

11        The Act requires that, whenever a political committee makes a disbursement for the

12   purpose of financing a public communication,[67] or whenever any person makes a disbursement

13   for a public communication expressly advocating the election or defeat of a clearly identified

14   candidate, such communication must include a disclaimer.[68]  If the communication is not

15   authorized by a candidate or an authorized committee, then the disclaimer must clearly state the

16   name and permanent street address, telephone number, or web address of the person who paid

---

[66]    *Mass. Citizens for Life,* 479 U.S.at 249 (holding that an exhortation to vote for "pro-life" candidates, despite containing a message "marginally less direct than 'Vote for Smith,'" has an "essential nature" of express advocacy).  The Commission's 1995 Supplemental Explanation and Justification on express advocacy notes that a "clear call to action" is not required under the Act, and that "[c]ommunications discussing or commenting on a candidate's character, qualifications, or accomplishments are considered express advocacy under new section 100.22(b) if, in context, they have no other reasonable meaning than to encourage actions to elect or defeat the candidate in question."  Express Advocacy; Independent Expenditures; Corporate Labor Organization Expenditures, 60 Fed. Reg. 35,292-01, 35,295 (July 6, 1995) (Supplemental Explanation and Justification).

[67]    A "public communication" includes any broadcast, cable, or satellite communication, including television advertisements.  11 C.F.R. § 100.26.

[68]    52 U.S.C. § 30120(a); 11 C.F.R. § 110.11(a).

MUR 7465 (Freedom Vote, Inc.)
Factual and Legal Analysis
Page 18 of 18

1    for the communication and state that the communication was not authorized by any candidate or

2    candidate's committee.[69]

3            Regardless of whether FV is a political committee, the "Third Largest" television

4    advertisement is a public communication, and the Act's disclaimer requirements apply to the

5    ad.[70]  Although "Third Largest" contains the written statement, "Paid for by Freedom Vote," this

6    disclaimer does not fully comply with the provisions of the Act.  It includes no permanent street

7    address, telephone number, or web address for Freedom Vote; it does not state whether the

8    advertisement was authorized by any candidate or candidate's committee; and it does not include

9    a spoken statement that Freedom Vote is responsible for the content of the advertisement.

10   Accordingly, the Commission finds reason to believe that FV violated 52 U.S.C. § 30120(a), (d)

11   and 11 C.F.R. § 110.11.

---

[69]    52 U.S.C. § 30120(a)(3); 11 C.F.R. § 110.11(b)(3).

[70]    *See* 52 U.S.C. § 30120(a); 11 C.F.R. § 110.11(a)(1)-(2).  Even if the Commission does not find that FV is a political committee, because "Third Largest" appears to expressly advocate the defeat of a clearly identified federal candidate, the ad still requires a disclaimer.  *Id.*

# Tab 3

Certification of Commissioners' Reason to Believe vote on July 25, 2019, by the Acting Secretary and Clerk of the Commission (certification signed and dated July 29, 2019) AR0104–05

2019 JUL 30 PM 12: 12

CELA

BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| In the Matter of | ) |
| | )   MUR 7465 |
| Freedom Vote, Inc.; Fighting for Ohio | ) |
| Fund and Christopher M. Marston in his | ) |
| official capacity as treasurer; James S. | ) |
| Nathanson | ) |

## CERTIFICATION

I, Laura E. Sinram, recording secretary of the Federal Election Commission executive

session, do hereby certify that on July 25, 2019, the Commission took the following actions in

the above-captioned matter:

1. Failed by a vote of 2-2 to:

    a. Find reason to believe that Freedom Vote, Inc. violated 52 U.S.C.
       §§ 30102, 30103, 30104(a), (b), (g)(2) by failing to organize,
       register, and report as a political committee by 2014 and report
       "Third Largest" as an independent expenditure.

    b. Find reason to believe that Freedom Vote, Inc. violated 52 U.S.C.
       § 30120(a), (d) by failing to include a disclaimer on "Third
       Largest".

    c. Find reason to believe that Freedom Vote, Inc., Fighting for Ohio
       Fund and Christopher M. Marston in his official capacity as
       treasurer, and unnamed respondents violated 52 U.S.C. § 30122 by
       making and accepting contributions in the name of another.

    d. Take no action at this time as to the allegations that Fighting for
       Ohio Fund and Christopher M. Marston in his official capacity as
       treasurer violated 52 U.S.C. §§ 30116(a)(8), 30122 or 11 C.F.R. §§
       110.6(c) and 110.4(b) with respect to earmarked contributions.

AR0104

Federal Election Commission                                                      Page 2
Certification for MUR 7465
July 25, 2019

    e.  Direct the Office of General Counsel to draft a Factual and Legal
      Analysis consistent with these recommendations.

    f.  Authorize the use of compulsory process.

    g.  Approve the appropriate letters.

  Commissioners Walther and Weintraub voted affirmatively for the motion.

Commissioners Hunter and Petersen dissented.


  2.  ==Decided by a vote of 4-0 to:==

    a.  Find reason to believe that Freedom Vote, Inc. violated 52 U.S.C.
      §§ 30102, 30103, 30104(a), (b), and (g)(2) by failing to organize,
      register, and report as a political committee.

    b.  Find reason to believe that Freedom Vote, Inc. violated 52 U.S.C.
      §§ 30120(a), (d) and 11 C.F.R. § 110.11 by failing to include a
      disclaimer on "Third Largest".

    c.  Approve the Factual and Legal Analysis, as recommended in the
      First General Counsel's Report dated July 1, 2019, and last
      circulated by Vice Chairman Petersen's Office on July 25, 2019 at
      4:33 p.m. and further modified at the table.

    d.  Authorize the use of compulsory process.

    e.  ==Approve the appropriate let==ters.

  Commissioners Hunter, Petersen, Walther, and Weintraub voted affirmatively for the

decision.


         Attest:


   7/29/19
    _____     _Laura E. Sinram_ (signature)
      Date          Laura E. Sinram
            Acting Secretary and Clerk of the
            Commission

# Tab 4

Email transmitting link to Freedom Vote, Inc's documents responsive to the Commission's Request for Production No. 4 from Charles R. Spies (dated Arp. 14, 2021) AR0196

Freedom Vote Inc, Inc. Response to Document Request AR0197–202

Missy Mae Walters Invoice (dated Apr. 28, 2014) AR0291

Missy Mae Walters Invoice (dated Apr. 6, 2014) AR0294–95

John Wasilchick llc Invoice (dated Sept. 21, 2015) AR0422

The Tarrance Group Invoice (dated July 31, 2015) AR0424

Letter from Unknown source to James Nathanson, Executive Director of Freedom Vote (dated Aug. 31, 2016) AR0532

Main Street Media Group Invoice (dated June 15, 2016) AR0568

James S. Nathanson & Associates Invoice (dated Mar. 31, 2014) AR1034

James S. Nathanson & Associates Invoice (dated Apr. 25, 2014) AR1036

James S. Nathanson & Associates Invoice (dated Apr. 29, 2014) AR1038

James S. Nathanson & Associates Invoice (dated May 12, 2014) AR1040

Strategy Group Invoice (dated Jan. 20, 2014) AR1042

Strategy Group Invoice (dated Feb. 12, 2014) AR1044

Strategy Group Invoice (dated Feb. 26, 2014) AR1046

Connection Strategy, LLC Invoice (dated July 31, 2014) AR1048

Connection Strategy, LLC Invoice (dated Jan. 16, 2014) AR1050

Connection Strategy, LLC Invoice (dated Apr. 14, 2014) AR1092

Connection Strategy, LLC Invoice (dated May 5, 2014) AR1095–98

Freedom Vote, FEC Form 5, Report of Independent Expenditures Made and Contributions Received (signed July 15, 2014) AR1136–41

Ledger of 2014 Freedom Vote Receipts and Expenses AR1310–11

Ledger of 2015 Freedom Vote Receipts and Expenses AR1314–15

Ledger of 2016 Freedom Vote Receipts and Expenses AR1318–22

McCarthy Hennings Whalen, Inc. Invoice (dated July 18, 2016) AR1367

McCarthy Hennings Whalen, Inc. Invoice (dated June 21, 2016) AR1369

## Justine di Giovanni

| | |
|---|---|
| **From:** | Charles R. Spies <CSpies@dickinson-wright.com> |
| **Sent:** | Friday, April 09, 2021 4:09 PM |
| **To:** | Justine di Giovanni |
| **Cc:** | Jin Lee |
| **Subject:** | FREEDOM VOTE re: MUR 7465 |
| **Attachments:** | MUR 7465 Document Request Response DW Edits.pdf |

| | |
|---|---|
| **Importance:** | High |

Good Afternoon Justine—

We have attached Freedom Vote's response to the Commission's interrogatories and have provided documents requested for the Commission's investigation.  All documents relevant to Questions 1, 5, 6, 7, and 8 are being provided today (through SharePoint link below), and the documents relevant to Question 4 will be provided by Tuesday, April 13.  Given the volume of information we intend to provide with regards to Question 4, we need further time to review.

The password to access the sharepoint link is 

Best,

Charlie

https://langdonlawoh.sharepoint.com/:f:/g/EtitLjF245BCk1_U2h5SSPMBUaAofL5pN8SrvE1nIrgrTg?e=5%3aIk0wWX&at=9

**Charles R. Spies** Member

International Square
1825 Eye St. N.W.
Suite 900
Washington, D.C. 20006

Phone  202-466-5964
Fax     844-670-6009
Email  CSpies@dickinsonwright.com



The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail.

Neither this transmission nor any attachment shall be deemed for any purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein. Thank you.

AR0196

**Freedom Vote, Inc. Response to Document Request**
**FEC MUR 7465**

The below responses to the Commission's questions and document requests are provided as a good-faith attempt to provide the Commission with the information it has requested to conduct its investigation as to whether Freedom Vote, Inc. violated the Federal Election Campaign Act (FECA) by failing to register and report as a political committee based on its activity during the 2014 and 2016 election cycles. Given the short amount of time given to comply with this request, the substantial amount of documentation involved in this investigation, and Freedom Vote's limited resources (as it has ceased for exist for over two years), we are providing the Commission with as much information as possible to assist with its investigation. Please refer all questions and/or concerns to Charlie Spies at cspies@dickinson-wright.com.

## QUESTIONS AND DOCUMENTS REQUESTS

1. State the date of Freedom Vote, Inc.'s incorporation and whether its corporate registration is presently valid. Provide copies of all articles of incorporation and by-laws under which Freedom Vote, Inc. has operated since its inception.

    **Freedom Vote, Inc. was incorporated on July 6, 2010, and dissolved on May 28, 2019. Copies of the articles of incorporation, bylaws, amended and restated bylaws, and dissolution are attached. (FV00001 to FV00042)**

2. For the time period from January 1, 2013, to the present, identify all persons who have been directors, officers, employees, representatives, or agents of Freedom Vote, Inc.

    **From 2013 until May 28, 2019: (i) Richard Cochran, James Nathanson, and Mitch Given were each, at one point or another, the directors and officers of Freedom Vote; (ii) Freedom Vote had no employees; and (iii) David Langdon was the statutory agent on record with the Ohio Secretary of State.**

3. Provide copies of all of Freedom Vote, Inc.'s organizational charts and telephone directories from January 1, 2013, to present.

    **Freedom Vote has no such documents in its possession, custody, or control.**

4. Provide copies of all ledgers, spreadsheets, financial statements, bank statements or other documents that reflect contributions to and disbursements from Freedom Vote, Inc. from January 1, 2013, to the present.

    **Freedom Vote objects to this document request, to the extent it would require Freedom Vote to disclose its donors to the Federal Election Commission. Freedom Vote, as a 501(c)(4) organization, is not required to disclose its donors to the Federal Election Commission unless a formal determination has been made by the Commission that Freedom Vote is a political committee. Since Freedom Vote's political committee status is pending, responsive documents, with confidential information (donors) redacted, are attached at FV00043 to FV01206.**

AR0197

**Freedom Vote, Inc. Response to Document Request**
**FEC MUR 7465**

> **Certain documentation related to this request are privileged attorney-client communications. No such documents are being produced.**

5.  Identify all contributions, disbursements, and donations to any political committees or organizations made by Freedom Vote, Inc. from January 1, 2013 to the present, and specify the amount and purpose of each contribution, disbursement, and donation.

> **Freedom Vote made the following contributions from 2013 through May 28, 2019:**
>
> **(i) in Tax Year 2013, Freedom Vote donated $5,000 to a tax-exempt organization (not a 527);**
>
> **(ii) in Tax Year 2014, Freedom Vote donated $1,500 to a tax-exempt organization (not a 527);**
>
> **(iii) in Tax Year 2015, Freedom Vote donated: $1,700,000 to Fighting for Ohio Fund, a 527; $260,000 to A Public Voice, a 501(c)(4); and $75,000 to Fighting for Ohio Institute, a 501(c)(4); and**
>
> **(iv) in Tax Year 2016, Freedom Vote donated: $275,000 to Fighting for Ohio Fund, a 527; and $220,000 to Citizens for a Working America, a 501(c)(4).**
>
> **The two contributions in 2013 and 2014, as well as the contributions to Fighting for Ohio Fund, were made for the organization's general purpose, and were not earmarked for political activity.**
>
> **The grants to A Public Voice, Fighting for Ohio Institute, and Citizens for a Working America were restricted grants that could not be used to support or oppose any candidate for public office or for "political campaign intervention" as defined by the IRS.**

Produce all documents reflecting such contributions, disbursements, and donations.

> **Relevant documents related to this inquiry are attached at FV00043 to FV01206 and FV1207 to FV01301.**
>
> **Certain documentation related to this request are privileged attorney-client communications. No such documents are being produced.**

6.  For the time period from January 1, 2013, to the present, produce all communications that (i) identify or reference a candidate for federal office or a political party which nominates candidates for federal office; (ii) are distributed through any means described in 52 U.S.C. § 30101 (22) or any other media (*e.g.*, internet communications); and (iii) are

2

**Freedom Vote, Inc. Response to Document Request**
**FEC MUR 7465**

funded in whole or in party by Freedom Vote, Inc. As to each such communication, please state:

a) The costs associated with the creation, production, distribution, and transmission of the communication;

**Relevant documents related to this inquiry are attached at FV01302 to FV01358 and FV00043 to FV01206.**

b) If not paid entirely by Freedom Vote, Inc., the identity of the third party(ies) that paid a portion of the costs and how much the third party(ies) paid;

**Relevant documents related to this inquiry are attached at FV01302 to FV01358 and FV00043 to FV01206.**

c) The vendor(s) and/or outside consultants used to create, produce, distribute, and transmit the communication;

**Relevant documents related to this inquiry are attached at FV01302 to FV01358 and FV00043 to FV01206.**

d) The election(s) and/or candidate(s), federal and nonfederal, identified or referred to in the communication; and

**In 2014, Freedom Vote made independent expenditures in support of John Boehner in the Republican Primary for the United States House of Representatives in Ohio. Details concerning the independent expenditures are in the documents attached as FV01302 to FV01358.**

**In 2016, Freedom Vote produced and disseminated a television ad, which identified Ted Strickland, who at the time was a candidate for U.S. Senate in Ohio. Details concerning the advertisement are in the documents attached as FV00043 to FV01206. The television ad is not in Freedom Vote's possession, custody, or control.**

e) The date(s) on which the communication was distributed and the target audience.

**Relevant documents related to this inquiry are attached at FV01302 to FV01358 and FV00043 to FV01206.**

7. For the time period from January 1, 2013, to the present, produce all fundraising solicitations, including, but not limited to, any plans, mission statements, brochures, organizational profiles, reports provided to potential donors, and scripts or written materials provided to those making oral solicitations, funded in whole or in part by Freedom Vote, Inc., and as to each fundraising solicitation, please state:

AR0199

**Freedom Vote, Inc. Response to Document Request**
**FEC MUR 7465**

a) The costs associated with the creation, production and distribution of the communication;

   **Relevant documents related to this inquiry are attached at FV01359 to FV01385.**

b) If not paid entirely by Freedom Vote, Inc., the identity of the third party(ies) that paid a portion of the costs and how much the third party(ies) paid;

   **Relevant documents related to this inquiry are attached at FV01359 to FV01385.**

c) The amount of the funds received in response to each separate solicitation;

   **Relevant documents related to this inquiry are attached at FV01359 to FV01385.**

d) The vendor(s) and/or outside consultants used to create and distribute each separate solicitation;

   **Relevant documents related to this inquiry are attached at FV01359 to FV01385.**

e) The election(s) and/or candidate(s), federal and nonfederal, identified or referred to in the communication;

   **Relevant documents related to this inquiry are attached at FV01359 to FV01385.**

f) The date(s) on which each solicitation was distributed (orally and/or in writing) and the target audience; and

   **Freedom Vote objects to this document request, to the extent it would require Freedom Vote to disclose its donors to the Federal Election Commission. Freedom Vote, as a 501(c)(4) organization, is not required to disclose its donors to the Federal Election Commission unless a formal determination has been made by the Commission that Freedom Vote is a political committee. Since Freedom Vote's political committee status is pending, responsive documents, with confidential information (donors) redacted, are attached at FV01359 to FV01385.**

g) For written or electronic solicitations, provide the mailing or distribution list used.

AR0200

**Freedom Vote, Inc. Response to Document Request**
**FEC MUR 7465**

**Freedom Vote objects to this document request, to the extent it would require Freedom Vote to disclose its donors to the Federal Election Commission. Freedom Vote, as a 501(c)(4) organization, is not required to disclose its donors to the Federal Election Commission unless a formal determination has been made by the Commission that Freedom Vote is a political committee. Since Freedom Vote's political committee status is pending, responsive documents, with confidential information (donors) redacted, are attached at FV01359 to FV01385.**

8. For the time period from January 1, 2013 to the present, provide a copy of all communications from Freedom Vote, Inc. to its contributors, including, but not limited to, bulletins, candidate and political party endorsements and recommendations regarding contributions, and identify the following:

   a) The number of contributors to whom Freedom Vote, Inc. communicated information during each election cycle about any candidate for federal office, their authorized committees, or a political party which nominates candidates for federal office;

   **Freedom Vote objects to this document request, to the extent it would require Freedom Vote to disclose its donors to the Federal Election Commission. Freedom Vote, as a 501(c)(4) organization, is not required to disclose its donors to the Federal Election Commission unless a formal determination has been made by the Commission that Freedom Vote is a political committee. Since Freedom Vote's political committee status is pending, responsive documents, with confidential information (donors) redacted, are attached at FV01386 to FV01561.**

   b) The medium in which Freedom Vote, Inc. distributed each communication to its contributors (*e.g.*, direct mail, e-mail);

   **Relevant documents related to this inquiry are attached at FV01386 to FV01561.**

   c) The cost of duplicating and distributing each communication;

   **Relevant documents related to this inquiry are attached at FV01386 to FV01561.**

   d) The vendor(s) and/or outside consultants used to create, produce, distribute, and transmit the communication; and

   **Relevant documents related to this inquiry are attached at FV01386 to FV01561.**

AR0201

**Freedom Vote, Inc. Response to Document Request**
**FEC MUR 7465**

el The date(s) on which each communication was distributed.

**Relevant documents related to this inquiry are attached at FV01386 to FV01561.**

9.  Identify the name and address of Freedom Vote, Inc.'s records custodian, describe your document retention and destruction policies, and identify the person(s) responsible for ensuring that documents are properly retained and/or destroyed. If such policies are reflected in documents, produce those documents. If any documents that would have been responsive to this subpoena, and were previously in Freedom Vote, Inc.'s possession. custody, or control, were destroyed or transferred to any third party, identify all such documents and the persons who currently are in possession, custody, or control of the requested materials.

**Documents were maintained by Freedom Vote's former Executive Director, Jim Nathanson. Freedom Vote bad no document retention and destruction policies.**

10. Identify the following:

a)  Persons consulted by Freedom Vote, Inc. in preparing responses to this Subpoena and Order, other than its attorneys; and

**Jim Nathanson**

b)  Individual(s) with the most personal knowledge regarding the communications and activities referenced in Questions 3-8.

**Jim Nathanson**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on **this ¢ay** of **April, 02l.**

James S. Nathanson

AR0202

# Missy Mae Walters



*1129 Arbor Ave*
*Dayton, Ohio 45420*

Date: 4/28/2014
INVOICE # 37

TO: FREEDOM VOTE
131 NORTH LUDLOW STREET, STE. 315
DAYTON, OH 45402

| Days | Description | Unit Price per Day | Total Due |
|------|-------------|--------------------|-----------|
| | **Mileage Expense** | | |
| | 4/4 - DTD Effort Springfield - Greenville - Fairfield - 135 miles | | $  75.60 |
| | 4/6 - DTD Effort in West Chester - 75 miles | | $  42.00 |
| | 4/9 - Training on Second Wave - Springfield to Tippcity to Fairfield to Eaton 185 miles | | $ 103.60 |
| | 4/10 - DTD Effort in Fairfield/West Chester - 75 miles | | $  42.00 |
| | 4/11 - DTD Effort in Springfield - 40 miles | | $  22.80 |
| | 4/12 - DTD Effort in Greenville - 55 miles | | $  31.35 |
| | 4/15 - DTD Effort in West Chester - 75 miles | | $  42.75 |
| | 4/17 - DTD Effort in West Chester - 75 miles | | $  42.75 |
| | 4/19 - DTD Effort in Greenville - 55 miles | | $  31.35 |
| | 4/22 - DTD Effort in Fairfield - 85 miles | | $  48.45 |
| | 4/24 - DTD Effort in Springfield/Greenville/Fairfield - 135 miles | | $  75.60 |
| | 4/26 - DTD Effort in Greenville - 55 miles | | $  31.35 |
| | | | |
| | **Misc. Expense** | | |
| | iPad Configuration - 20 iPads | | $ 200.00 |
| | McDonald's Gift Cards for Workers (4/11) | | $ 100.00 |
| | iPad Covers - 5 covers | | $ 139.40 |
| | iPad Covers for new iPads - Rakuten.com - 22 covers | | $ 341.28 |

*(handwritten: Paid 4/20/2014 # 1166)*

| | | |
|--|--|--|
| Subtotal | $1,370.48 | |
| Sales Tax | 0.00 | |
| Total | $1,370.48 | |

| |
|--|
| $1,370.48 |
| $1,370.48 |

FV00129

AR0291

# Missy Mae Walters

*1129 Arbor Ave*
*Dayton, Ohio  45420*

# Invoice

Date: 4/6/2014
INVOICE # 34

TO: FREEDOM VOTE
131 NORTH LUDLOW STREET, STE. 315
DAYTON, OH 45402

| Days | Description | Unit Price per Day | Total Due |
|------|-------------|-------------------|-----------|
| | **Supplies** | | |
| | Surge Protector (WalMart 3/17) • | | $ 39.97 |
| | Literature Bags (Home Depot  3/22) • | | $  4.00 |
| | Best Buy            • | | $320.24 |
| | **Mileage (IRS 2014 Rate is .56/mile)** | | |
| | Darke County RWC meeting (3/17) Dayton to Greenville to Dayton (80 miles) | | $ 44.80 |
| | Preble County Lincoln Day Dinner (3/19) Dayton to Eaton to Dayton - 50 miles | | $ 28.00 |
| | DTD Efforts in Piqua (3/22) - 50 miles (28) | | $ 28.00 |
| | DTD Efforts in Piqua (3/23) - 50 miles | | $ 28.00 |
| | DTD Efforts in Troy (3/24) - 40 miles (22.4) | | $ 22.40 |
| | DTD Efforts in Troy (3/25) - 40 miles | | $ 22.40 |
| | DTD Efforts in Troy (3/26) - 40 miles | | $ 22.40 |
| | DTD Efforts in Troy (3/27) - 40 miles | | $ 22.40 |
| | DTD Efforts in Troy (3/28) - 40 miles | | $ 22.40 |
| | DTD Efforts in Troy (3/30) - 40 miles | | $ 22.40 |
| | DTD Efforts in Springfield (4/1) 60 miles (33.6) | | $ 33.60 |
| | DTD Efforts in Springfield (4/2) - 60 miles | | $ 33.60 |
| | DTD Efforts in Springfield (4/3) - 60 miles | | $ 33.60 |
| | DTD Efforts in Springfield/Tipp City/West Chester (4/4) - 150 miles (84) | | $ 84.00 |
| | DTD Efforts in Springfield/Tipp City/West Chester (4/5) | | $ 84.00 |
| | **Recruitment Expenses** | | |
| | Dayton Daily News Advertisement (Cox Media 3/27) • | | $512.00 |
| | Clarion Student Newspaper (Sinclair CC 3/11)  • | | $220.00 |
| | Craigslist Ad (4/1)  • | | $ 25.00 |
| | **Misc. Expenses** | | |
| | TimeStation Monthly Fee for April        • | | $ 59.95 |
| | TimeStation Monthly Fee for March        • | | $ 39.95 |
| | Misc. Costs Associated with iPad Configuration Process • | | $450.00 |
| | Springfield - Walker Food and Gift Card (4/5) • | | $ 27.78 |
| | Troy - Walker Food and Gift Card (4/3)  • | | $ 17.06 |
| | Subtotal | $2,247.95 | |
| | Sales Tax | 0.00 | |

| | Total | | $2,247.95 | |
|---|---|---|---|---|
| | | | | |
| | | | | $2,247.95 |
| | | | | $2,247.95 |
| | | | | |

Make all checks payable to Marissa Walters

*Thank you for your business!*

FV00133

AR0295

# John Wasilchick llc

516 Reed Street, Philadelphia, PA 19147 (215) 334 5490

September 21, 2015

TO:        Freedom Vote
          Attn: James Nathanson
          P.O. Box 1882
          Dayton, OH 45401

FROM:    John Wasilchick

INVOICE:  Kentucky 4th District
          Congressman Thomas Massie

          Deposit
          Research and consulting services:    $5,000.00

**TOTAL**      **$5,000.00**

All expenses are included.

**Please make check payable to:**

    John Wasilchick llc
    516 Reed Street
    Philadelphia, PA 19147

FV00260

AR0422

# THE TARRANCE GROUP

| | |
|---|---|
| **Contact:** | Jim Nathanson |
| **Invoice Number:** | 0011600-IN |
| **Invoice Date:** | 7/31/2015 |
| **Salesperson:** | BJ Martino |
| **Customer Number:** | FRE07 |
| **Customer P.O.:** | |
| **Terms:** | No Terms |

FREEDOM VOTE
P.O. Box 882
ATTN: Accounts Payable
Dayton, OH 45401

| Item Code | Description | Amount |
|---|---|---|
| POLITICAL | Political Revenue | 12,539.00 |

Payment is now due for the survey of Republican voter attitudes in the 4th Congressional District of Kentucky (#14793), conducted July 27-30, 2015, and should be remitted upon receipt of invoice.

*Void 8/5
# 1209*

| | |
|---|---|
| Net Invoice: | 12,539.00 |
| Freight: | 0.00 |
| Sales Tax: | 0.00 |
| **Invoice Total:** | **12,539.00** |

For Electronic Payment:

**Bank**
BB&T
1717 King St.
Alexandria, VA 22314
ABA: 051 404 260

**Account**
The Tarrance Group, Inc.
ATTN: Stuart C. Vickery
201 N. Union St., Suite 410
Alexandria, VA 22314
Account #

201 North Union St., Suite 410, Alexandria, VA 22314 (703) 684-6688
E-mail: svickery@tarrance.com www.tarrance.com

FV00262

August 31, 2016


James Nathanson
Executive Director
Freedom Vote
Talbott Tower, Suite 315
131 North Ludlow Street
Dayton, OH 45402


Dear Mr. Nathanson,

Enclosed please find a contribution check in the amount of $500,000 payable
to Freedom Vote.

Please note this is an Anonymous donation for the reelection of Rob Portman.

Should you have any questions please do not hesitate to call me at 
.


Sincerely,



FV00370

AR0532

# Main Street Media Group

INVOICE

P.O. BOX 25093
Alexandria, VA 22313
Phone: 703-485-0398  Fax: 703-672-0801

**DATE:** June 15, 2016
**INVOICE #:** FV61516

**Bill To:**
Freedom Vote
P.O. Box 882
Dayton, OH 45401

**Freedom Vote**

| DESCRIPTION | AMOUNT | |
|---|---|---|
| **Ohio: Flight 6/17-6/23/16 (7 Days)** | | |
| Television | $ | 420,234.00 |
| Cable | $ | 167,550.00 |
| Dish & DirecTV | $ | 12,210.00 |
| | | |
| **Total Gross Media** | $ | 599,994.00 |
| **FedEx/Wire Fee** | $ | 600.00 |
| **Total Due This Invoice** | $ | 600,594.00 |

Make all checks payable to **Main Street Media Group**

Wire Transfer Information:
**Main Street Media Group**
Acct. # ████████
Routing # ████████
Cardinal Bank
Alexandria, VA 22182
Phone: 703-224-4300

*Paid via WT on 6/16/2016*

**THANK YOU FOR YOUR BUSINESS!**

FV00405



## JSN
**James S. Nathanson & Associates**
Consultants in Resource Development and Campaign Management

# FREEDOM VOTE

## PROJECT MANAGEMENT (OH 8 IE0
(March, 2011)

March 31, 2014

Freedom Vote
P.O. Box 882
Dayton, OH 45401

OH 8 IE Expenditures:

| | |
|---|---|
| Field Director (March | $5,000.00 |
| Field Coordinators (March) | $9,000.00 |
| Field Team Payroll (March) | $2.500.00 |
| Payroll Expenses | $   500.00 |

**TOTAL DUE THIS INVOICE:**              **$17,000.00**

Remit To:          JSN Associates, LLC
                   131 North Ludlow Street
                   Suite 315
                   Dayton, OH 45402

Federal ID#        31-1715889

Bank Wiring
Information:       US Bank
                   Routing Number: ███
                   Account Number: ███

*Please Remit Promptly*

Talbott Tower ● 131 North Ludlow Street ● Dayton, Ohio 45402
Phone (937) 222-0131        Fax (937 223-0423)

FV00871

AR1034



**James S. Nathanson & Associates**
Consultants in Resource Development and Campaign Management

# FREEDOM VOTE

## PROJECT MANAGEMENT (OH 8 IE)
(April, 2014 – part 1)

April 25, 2014

Freedom Vote
P.O. Box 882
Dayton, OH 45401

OH 8 IE Expenditures:

| | |
|---|---|
| Field Coordinators (April) | $ 3,000.00 |
| Field Team Payroll (April - part) | $35,500.00 |
| Payroll & Staff Expenses | $ 3,000.00 |

**TOTAL DUE THIS INVOICE:**                    **$41,500.00**

Remit To:       JSN Associates, LLC
                131 North Ludlow Street
                Suite 315
                Dayton, OH 45402

Federal ID#     31-1715889

Bank Wiring
Information:    US Bank
                Routing Number: ████████
                Account Number: ████████

*Please Remit Promptly*

Paid 4/25 #1164

Talbott Tower ● 131 North Ludlow Street ● Dayton, Ohio 45402
Phone (937) 222-0131        Fax (937 223-0423)

FV00873

AR1036



**James S. Nathanson & Associates**
Consultants in Resource Development and Campaign Management

# FREEDOM VOTE

## PROJECT MANAGEMENT (OH 8 IE)
(April, 2014 – part 2)

April 29, 2014

Freedom Vote
P.O. Box 882
Dayton, OH 45401

OH 8 IE Expenditures:

| | |
|---|---|
| Field Coordinators (April) | $ |
| Field Team Payroll (April-part) | $43,800.00 |
| Payroll & Staff Expenses (April) | $ 1,500.00 |

**TOTAL DUE THIS INVOICE:**          **$45,300.00**

Remit To:      JSN Associates, LLC
               131 North Ludlow Street
               Suite 315
               Dayton, OH 45402

Federal ID#    31-1715889

Bank Wiring
Information:   US Bank
               Routing Number: ████████
               Account Number: ███████

*Please Remit Promptly*

Talbott Tower ● 131 North Ludlow Street ● Dayton, Ohio 45402
Phone (937) 222-0131      Fax (937 223-0423)

FV00875

AR1038



**JSN**  **James S. Nathanson & Associates**
Consultants in Resource Development and Campaign Management

## FREEDOM VOTE

### PROJECT MANAGEMENT (OH 8 IE)
(May, 2014 – part 2)

May 12, 2014

Freedom Vote
P.O. Box 882
Dayton, OH 45401

OH 8 IE Expenditures:

| | |
|---|---|
| Field Coordinators (April) | $ 6,000.00 |
| Field Director (Bonus) | $10,000.00 |
| Field Team Payroll (April-part) | $21,000.00 |
| Payroll & Staff Expenses (April) | $    800.00 |
| JSN Bonus | $  2,200.00 |

**TOTAL DUE THIS INVOICE:**            **$40,000.00**

Remit To:       JSN Associates, LLC
                131 North Ludlow Street
                Suite 315
                Dayton, OH 45402

Federal ID#     31-1715889

Bank Wiring
Information:    US Bank
                Routing Number: ███████
                Account Number: ███████

*Please Remit Promptly*

Talbott Tower ● 131 North Ludlow Street ● Dayton, Ohio 45402
Phone (937) 222-0131       Fax (937 223-0423

FV00877

AR1040



# Invoice

| Date | Invoice # |
|------|-----------|
| 1/20/2014 | 857 |
| Terms | Due Date |
| | 1/20/2014 |

**The Strategy Group Company**
**7669 Stagers Loop**
**Delaware, Ohio 43015**
**740.201.5500**

Bill To

Freedom Vote
Jim Nathanson
PO Box 2121
Columbus OH  43216

| | |
|---|---|
| Project | |
| Gurr and Wintergregg Best Hits Res... | |

| Quantity | Product / Service | Description | Price Each | Amount |
|----------|-------------------|-------------|-----------|--------|
| 1 | Best Hits Package | Gurr Best Hits | 1,500.00 | 1,500.00 |
| 1 | Best Hits Package | Wintergregg Best Hits | 1,500.00 | 1,500.00 |
| 1 | Expenses | Research Software Fee | 240.00 | 240.00 |

**Please Wire Payments To:**
**The Strategy Group Company**
**Huntington National Bank**
**41 South High Street**
**Columbus, OH 43215**
**ABA Routing #** ▮▮▮▮▮
**Account #** ▮▮▮▮▮

| **Total** | $3,240.00 |
|-----------|-----------|

FV00879

AR1042



# Invoice

| Date | Invoice # |
|---|---|
| 2/12/2014 | 917 |
| Terms | Due Date |
| | 2/12/2014 |

**The Strategy Group Company**
**7669 Stagers Loop**
**Delaware, Ohio 43015**
**740.201.5500**

Bill To

Freedom Vote
Jim Nathanson
PO Box 2121
Columbus OH  43216

| | Project |
|---|---|
| | Gurr and Wintergregg Best Hits Res... |

| Quantity | Product / Service | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | Best Hits Package | FINAL Gurr and Winteregg Research | 3,000.00 | 3,000.00 |

**Please Wire Payments To:**
**The Strategy Group Company**
**Huntington National Bank**
**41 South High Street**
**Columbus, OH 43215**
**ABA Routing #**
**Account #**

| **Total** | $3,000.00 |
|---|---|

FV00881

AR1044



# Invoice

| Date | Invoice # |
|---|---|
| 2/26/2014 | 948 |
| Terms | Due Date |
| | 2/26/2014 |

**The Strategy Group Company**
**7669 Stagers Loop**
**Delaware, Ohio 43015**
**740.201.5500**

Bill To

Freedom Vote
Jim Nathanson
PO Box 2121
Columbus OH  43216

| | Project |
|---|---|
| | Gurr and Wintergregg Best Hits Res... |

| Quantity | Product / Service | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | Research | Debate Taping and Analysis | 1,000.00 | 1,000.00 |

**Please Wire Payments To:**
**The Strategy Group Company**
**Huntington National Bank**
**41 South High Street**
**Columbus, OH 43215**
**ABA Routing #** ███████
**Account #** ███████

| Total | $1,000.00 |
|---|---|

FV00883

**Connection Strategy, LLC**
PO Box 2192
Arlington, VA 22202

## FINAL INVOICE

| | |
|---|---|
| Date: | 7/31/2014 |
| Invoice Number: | 077964 |
| Customer ID: | ZZZ004 |
| Project ID: | 2FVGC401 |
| Terms: | Payable Upon Receipt |
| AE : | EBLOSSER |
| Div: | 10 |

Bill To

Missy Mae Walters
Freedom Vote
PO Box 2121
Columbus, OH 43216

Date Range: 07/31/2014 - 07/31/2014

| Description | Qty | Rate | Amount |
|---|---|---|---|
| GeoConnect Monthly Support Fee | 1.00 | 250.0000 | 250.00 |

*Please reference the Invoice Number in your payment.*

| Please remit to: | Wire instructions: | Invoice Total: | $250.00 |
|---|---|---|---|
| Connection Strategy, LLC<br>PO Box 2192<br>Arlington, VA 22202 | Name of Bank: Associated Bank N.A.<br>Green Bay, WI<br>Bank Routing Num :<br>Deposit to Acct : | | |

FV00885

# PREPAY
# INVOICE

## Connection Strategy, LLC

Bill To:

Freedom Vote
Attn: Missy Mae Walters
PO Box 2121
Columbus, OH 43216

| | |
|---|---|
| Date: | 1/16/2014 |
| Invoice Number: | 902788 |
| | |
| Customer Id: | ZZZ004 |
| Terms: | Upon Receipt |
| AE: | Kevin Zabel |
| Invoice Status: | Open |
| Division: | CO |

Date Range:

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| 2FVGC401:  Geo Connect Set Up Fee | 1 | $1,500.000 | $1,500.00 |
| 1/16/2014 | | | |
| 2FVGC401:  Geo Connect Transaction Fee | 1 | $5,500.000 | $5,500.00 |
| 1/16/2014 | | | |
| | | **Invoice Total** | **$7,000.00** |

| Description | | Date Paid | Payment |
|---|---|---|---|
| | | **Payment Total** | |

Please Remit Payment via overnight carrier to:

Connection Strategy- Attn: Kevin Zabel
7300 Hudson Blvd, Suite 270
St Paul, MN 55128

**INSTRUCTIONS FOR WIRING FUNDS TO Connection Strategy**
NAME OF BANK: Associated Bank N.A.
ADDRESS: 200 N Adams St
PO Box 19006
Green Bay, WI 54307-9006
(715) 386-5511
BANK ROUTING NUMBER: █████
DEPOSIT TO ACCOUNT #: █████

| | |
|---|---|
| **Invoice Total** | **$7,000.00** |
| **Payment Total** | |
| **Balance Due** | **$7,000.00** |

**Note:  This Invoice is for prepayment purposes.  The final amount upon project completion may vary slightly and you will be
invoiced or refunded the difference.**

FV00887

AR1050

**Connection Strategy, LLC**
PO Box 2192
Arlington, VA 22202

# FINAL INVOICE

| | |
|---|---|
| Date: | 4/14/2014 |
| Invoice Number: | 075191 |
| Customer ID: | ZZZ004 |
| Project ID: | 2FVV401 |
| Terms: | Payable Upon Receipt |
| AE : | KZABEL |
| Div: | 10 |

Bill To

Jim Nathanson
Freedom Vote
PO Box 2121
Columbus, OH 43216

**Date Range: 04/09/2014 - 04/12/2014**

| Description | Qty | Rate | Amount |
|---|---|---|---|
| 2FVV401 - OH CD 08 Live ID | 20,482.00 | 0.7000 | 14,337.40 |

*Please reference the Invoice Number in your payment.*

| **Please remit to:** | **Wire instructions:** | **Invoice Total:** | **$14,337.40** |
|---|---|---|---|
| Connection Strategy, LLC<br>PO Box 2192<br>Arlington, VA 22202 | Name of Bank: Associated Bank N.A.<br>Green Bay, WI<br>Bank Routing Num : ██████<br>Deposit to Acct : ██████ | | FV00929 |

AR1092

**Connection Strategy, LLC**
PO Box 2192
Arlington, VA 22202

# FINAL INVOICE

| | |
|---:|:---|
| Date: | 5/5/2014 |
| Invoice Number: | 075844 |
| Customer ID: | ZZZ004 |
| Project ID: | 2FVR403 |
| Terms: | Payable Upon Receipt |
| AE : | EBLOSSER |
| | Div:10 |

Bill To

Jim Nathanson
Freedom Vote
PO Box 2121
Columbus, OH 43216

Date Range: 05/04/2014 - 05/04/2014

| Description | Qty | Rate | Amount |
|:---|---:|---:|---:|
| 2FVR403 - Sunday GOTV Calls - OH CD 8 | 22,717.00 | 0.0500 | 1,135.85 |

**Please reference the Invoice Number in your payment.**

| Please remit to: | Wire instructions: | Invoice Total: | $1,135.85 |
|:---|:---|:---|---:|
| Connection Strategy, LLC<br>PO Box 2192<br>Arlington, VA 22202 | Name of Bank: Associated Bank N.A.<br>Green Bay, WI<br>Bank Routing Num : ▮▮▮▮<br>Deposit to Acct : ▮▮▮▮ | | FV00932 |

AR1095

**Connection Strategy, LLC**
PO Box 2192
Arlington, VA 22202

# FINAL INVOICE

| | |
|---|---|
| Date: | **5/7/2014** |
| Invoice Number: | **075871** |
| Customer ID: | **ZZZ004** |
| Project ID: | **2FVGC401** |
| Terms: | **Payable Upon Receipt** |
| AE : | **KZABEL** |
| | Div:10 |

Bill To

Missy Mae Walters
Freedom Vote
PO Box 2121
Columbus, OH 43216

**Date Range: 05/01/2014 - 05/01/2014**

| Description | Qty | Rate | Amount |
|---|---|---|---|
| GeoConnect Monthly Support Fee | 1.00 | 250.0000 | 250.00 |

*Please reference the Invoice Number in your payment.*

| Please remit to: | Wire instructions: | Invoice Total: | $250.00 |
|---|---|---|---|
| Connection Strategy, LLC<br>PO Box 2192<br>Arlington, VA 22202 | Name of Bank: Associated Bank N.A.<br>Green Bay, WI<br>Bank Routing Num :<br>Deposit to Acct : | | |
| | | | FV00933 |

AR1096

**Connection Strategy, LLC**
PO Box 2192
Arlington, VA 22202

# FINAL INVOICE

| | |
|---:|:---|
| Date: | **5/7/2014** |
| Invoice Number: | **075874** |
| Customer ID: | **ZZZ004** |
| Project ID: | **2FVR404** |
| Terms: | **Payable Upon Receipt** |
| AE : | **EBLOSSER** |
| | Div:10 |

| Bill To |
|---|

Jim Nathanson
Freedom Vote
PO Box 2121
Columbus, OH 43216

Date Range: 05/06/2014 - 05/06/2014

| Description | Qty | Rate | Amount |
|---|---|---|---|
| 2FVR404 - Election Day GOTV - OH CD 8 | 17,384.00 | 0.0500 | 869.20 |

*Please reference the Invoice Number in your payment.*

| Please remit to: | Wire instructions: | Invoice Total: | $869.20 |
|---|---|---|---|
| Connection Strategy, LLC<br>PO Box 2192<br>Arlington, VA 22202 | Name of Bank: Associated Bank N.A.<br>Green Bay, WI<br>Bank Routing Num : ▓▓▓▓▓<br>Deposit to Acct : ▓▓▓▓▓ | | FV00934 |

AR1097

**Connection Strategy, LLC**
PO Box 2192
Arlington, VA 22202

# FINAL INVOICE

| | |
|---:|:---|
| Date: | 5/7/2014 |
| Invoice Number: | 075875 |
| Customer ID: | ZZZ004 |
| Project ID: | 2FVR405 |
| Terms: | Payable Upon Receipt |
| AE : | EBLOSSER |
| Div: | 10 |

Bill To

Jim Nathanson
Freedom Vote
PO Box 2121
Columbus, OH 43216

Date Range: 05/06/2014 - 05/06/2014

| Description | Qty | Rate | Amount |
|---|---|---|---|
| 2FVR405 - Poll Ride Calls | 5,102.00 | 0.1000 | 510.20 |

*Please reference the Invoice Number in your payment.*

| Please remit to: | Wire instructions: | Invoice Total: | $510.20 |
|---|---|---|---|
| Connection Strategy, LLC
PO Box 2192
Arlington, VA 22202 | Name of Bank: Associated Bank N.A.
Green Bay, WI
Bank Routing Num : ███████
Deposit to Acct : ███████ | | FV00935 |

AR1098

Image# 14941817967

07/15/2014 16 : 53

PAGE 1 / 3

# FEC FORM 5

## REPORT OF INDEPENDENT EXPENDITURES MADE AND CONTRIBUTIONS RECEIVED

To Be Used by Persons (Other than Political Committees)

1.  (a) Name of Individual, Organization or Corporation

FREEDOM VOTE

(b) Address (number and street)  ☐ check if different than previously reported

131 NORTH LUDLOW STREET SUITE 315

(c) City, State and ZIP Code

DAYTON                                    OH      45402

2.   Occupation and Name of Employer (for Individual Filers Only)

3. FEC Identification Number

C    C90014754

---

4.   TYPE OF REPORT (check appropriate boxes):

(a)  ☐ April 15 Quarterly Report

☒ July 15 Quarterly Report          ☐ 24-Hour Report

☐ October 15 Quarterly Report       ☐ 48-Hour Report

☐ January 31 Year-End Report

b)   Is this Report an amendment?   ☒ No   ☐ Yes, it amends the report filed on   M M / D D / Y Y Y Y

5. COVERING PERIOD:          FROM     04 / 01 / 2014

THROUGH    06 / 30 / 2014

6.  TOTAL CONTRIBUTIONS................................................................     .00

7.  TOTAL INDEPENDENT EXPENDITURES ..................................................     80023.35

Under penalty of perjury I certify that the independent expenditures reported herein were not made in cooperation, consultation, or concert with, or at the request or suggestion of, any candidate or authorized committee or agent of either, or any political party committee or its agent.

| TYPE OR PRINT NAME OF PERSON COMPLETING FORM | SIGNATURE | DATE |
|---|---|---|
| James S. Nathanson | *James S. Nathanson*  [Electronically Filed] | 07/15/2014 |

NOTE:  Submission of false, erroneous or incomplete information may subject the person signing this report to the penalties of 2 U.S.C. §437g.

For further information, contact:  Federal Election Commission, 999 E Street, N.W., Washington, D.C. 20463   Toll Free 800-424-9530,  Local 202-694-1100

FV00973

FEC **Schedule 5** (REV. 09/2013)

AR1136

Image# 14941817968

## SCHEDULE 5-E
### ITEMIZED INDEPENDENT EXPENDITURES

| PAGE | 2 | OF | 3 |
|---|---|---|---|

FOR LINE 7 OF FORM 5

**NAME OF FILER (In Full)**
FREEDOM VOTE

---

**Full Name (Last, First, Middle Initial) of Payee**
Majority Strategies

**Mailing Address** 135 Professional Drive, Suite 104

| City | State | Zip Code |
|---|---|---|
| Ponte Vedra Beach | FL | 32082 |

**Date of Public Distribution/Dissemination**
M M / D D / Y Y Y Y
04 / 16 / 2014

**Amount**
8125.00

**Transaction ID : F57.000001**

**Purpose of Expenditure**
Door hangers (also opposes J.D. Winteregg, Eric Gurr)

**Category/Type** 004

**Office Sought:** ☒ House  ☐ Senate  ☐ President
**State:** OH  **District:** 08

**Name of Federal Candidate Supported or Opposed by Expenditure:**
John Boehner

**Check One:** ☒ Support  ☐ Oppose

**Calendar Year-To-Date Per Election for Office Sought**
102709.20

**Disbursement For:** ☒ Primary  ☐ General
2014  ☐ Other (specify) ▶

---

**Full Name (Last, First, Middle Initial) of Payee**
JSN Associates

**Mailing Address** 131 North Ludlow Street, Suite 315

| City | State | Zip Code |
|---|---|---|
| Dayton | OH | 45402 |

**Date of Public Distribution/Dissemination**
M M / D D / Y Y Y Y
04 / 16 / 2014

**Amount**
30000.00

**Transaction ID : F57.000002**

**Purpose of Expenditure**
Canvassers and consulting (also opposes J.D. Winteregg, Eric Gurr)

**Category/Type** 004

**Office Sought:** ☒ House  ☐ Senate  ☐ President
**State:** OH  **District:** 08

**Name of Federal Candidate Supported or Opposed by Expenditure:**
John Boehner

**Check One:** ☒ Support  ☐ Oppose

**Calendar Year-To-Date Per Election for Office Sought**
132709.20

**Disbursement For:** ☒ Primary  ☐ General
2014  ☐ Other (specify) ▶

---

**Full Name (Last, First, Middle Initial) of Payee**
Majority Strategies

**Mailing Address** 135 Professional Drive, Suite 104

| City | State | Zip Code |
|---|---|---|
| Ponte Vedra Beach | FL | 32082 |

**Date of Public Distribution/Dissemination**
M M / D D / Y Y Y Y
05 / 02 / 2014

**Amount**
3075.00

**Transaction ID : F57.000003**

**Purpose of Expenditure**
Door-to-door literature

**Category/Type** 004

**Office Sought:** ☒ House  ☐ Senate  ☐ President
**State:** OH  **District:** 08

**Name of Federal Candidate Supported or Opposed by Expenditure:**
John Boehner

**Check One:** ☒ Support  ☐ Oppose

**Calendar Year-To-Date Per Election for Office Sought**
135784.20

**Disbursement For:** ☒ Primary  ☐ General
2014  ☐ Other (specify) ▶

---

**(a) SUBTOTAL** of Itemized Independent Expenditures........................▶ 41200.00

**(b) SUBTOTAL** of Unitemized Independent Expenditures....................▶

**(c) TOTAL** Independent Expenditures..................................................▶
(carry total from last page forward to Line 7)

FV00974

FEC **Schedule 5** (REV. 09/2013)

AR1137

Image# 14941817969

## SCHEDULE 5-E
**ITEMIZED INDEPENDENT EXPENDITURES**

| PAGE | 3 | OF | 3 |
|---|---|---|---|

FOR LINE 7 OF FORM 5

NAME OF FILER (In Full)

FREEDOM VOTE

---

**Full Name (Last, First, Middle Initial) of Payee**

JSN Associates

**Mailing Address**   131 North Ludlow Street, Suite 315

| City | State | Zip Code |
|---|---|---|
| Dayton | OH | 45402 |

**Purpose of Expenditure**
Canvassers and consulting

Category/Type  004

**Name of Federal Candidate Supported or Opposed by Expenditure:**
John Boehner

Calendar Year-To-Date Per Election for Office Sought    165784.20

**Date of Public Distribution/Dissemination**
M M 05 / D D 02 / Y Y Y Y 2014

Amount    30000.00

**Transaction ID : F57.000004**

Office Sought: ☒ House  State: OH
☐ Senate  District: 08
☐ President

Check One: ☐ Support  ☐ Oppose

Disbursement For: ☒ Primary 2014  ☐ General
☐ Other (specify) ▶

---

**Full Name (Last, First, Middle Initial) of Payee**

FLS Connect

**Mailing Address**   7300 Hudson Blvd., Ste 270

| City | State | Zip Code |
|---|---|---|
| St. Paul | MN | 55128 |

**Purpose of Expenditure**
Robocalls

Category/Type  004

**Name of Federal Candidate Supported or Opposed by Expenditure:**
John Boehner

Calendar Year-To-Date Per Election for Office Sought    166920.05

**Date of Public Distribution/Dissemination**
M M 05 / D D 04 / Y Y Y Y 2014

Amount    1135.85

**Transaction ID : F57.000005**

Office Sought: ☒ House  State: OH
☐ Senate  District: 08
☐ President

Check One: ☒ Support  ☐ Oppose

Disbursement For: ☒ Primary 2014  ☐ General
☐ Other (specify) ▶

---

**Full Name (Last, First, Middle Initial) of Payee**

JSN Associates

**Mailing Address**   131 North Ludlow Street, Suite 315

| City | State | Zip Code |
|---|---|---|
| Dayton | OH | 45402 |

**Purpose of Expenditure**
Canvassers and consulting

Category/Type  004

**Name of Federal Candidate Supported or Opposed by Expenditure:**
John Boehner

Calendar Year-To-Date Per Election for Office Sought    174607.55

**Date of Public Distribution/Dissemination**
M M 05 / D D 05 / Y Y Y Y 2014

Amount    7687.50

**Transaction ID : F57.000006**

Office Sought: ☒ House  State: OH
☐ Senate  District: 08
☐ President

Check One: ☒ Support  ☐ Oppose

Disbursement For: ☒ Primary 2014  ☐ General
☐ Other (specify) ▶

---

**(a) SUBTOTAL** of Itemized Independent Expenditures.................... ▶    38823.35

**(b) SUBTOTAL** of Unitemized Independent Expenditures................. ▶

**(c) TOTAL** Independent Expenditures..........................
(carry total from last page forward to Line 7) ▶    80023.35

FV00975

FEC **Schedule 5** (REV. 09/2013)

AR1138

Image# 14941815565

07/15/2014 16 : 26
PAGE 1 / 3

# FEC FORM 5

## REPORT OF INDEPENDENT EXPENDITURES MADE AND CONTRIBUTIONS RECEIVED
To Be Used by Persons (Other than Political Committees)

1. (a) Name of Individual, Organization or Corporation
**FREEDOM VOTE**

(b) Address (number and street)   ☐ check if different than previously reported
131 NORTH LUDLOW STREET SUITE 315

(c) City, State and ZIP Code
DAYTON                          OH      45402

3. FEC Identification Number
C  C90014754

2. Occupation and Name of Employer (for Individual Filers Only)

4. TYPE OF REPORT (check appropriate boxes):

(a) ☒ April 15 Quarterly Report

☐ July 15 Quarterly Report          ☐ 24-Hour Report

☐ October 15 Quarterly Report       ☐ 48-Hour Report

☐ January 31 Year-End Report

b) Is this Report an amendment?   ☐ No   ☒ Yes, it amends the report filed on   04 / 14 / 2014

5. COVERING PERIOD:   FROM   01  01  2014

THROUGH   03  31  2014

6. TOTAL CONTRIBUTIONS............................................................................... .00

7. TOTAL INDEPENDENT EXPENDITURES ....................................................... 94584.20

Under penalty of perjury I certify that the independent expenditures reported herein were not made in cooperation, consultation, or concert with, or at the request or suggestion of, any candidate or authorized committee or agent of either, or any political party committee or its agent.

TYPE OR PRINT NAME OF PERSON COMPLETING FORM        SIGNATURE        DATE

James S. Nathanson        *James S. Nathanson*   *[Electronically Filed]*        07/15/2014

NOTE: Submission of false, erroneous or incomplete information may subject the person signing this report to the penalties of 2 U.S.C. §437g.

For further information, contact: Federal Election Commission, 999 E Street, N.W., Washington, D.C. 20463   Toll Free 800-424-9530, Local 202-694-1100

FV00976
FEC **Schedule 5** (REV. 09/2013)

AR1139

Image# 14941815566

# SCHEDULE 5-E
## ITEMIZED INDEPENDENT EXPENDITURES

| | |
|---|---|
| | PAGE 2 OF 3 |
| | FOR LINE 7 OF FORM 5 |

NAME OF FILER (In Full)
FREEDOM VOTE

---

**Full Name (Last, First, Middle Initial) of Payee**
Majority Strategies

**Mailing Address** 135 Professional Drive, Suite 104

| City | State | Zip Code |
|---|---|---|
| Ponte Vedra Beach | FL | 32082 |

Date of Public Distribution/Dissemination
M M / D D / Y Y Y Y
03 / 22 / 2014

Amount
3050.00

**Transaction ID : F57.000001**

Purpose of Expenditure
Door hangers (also opposes J.D. Winteregg and Eric Gurr)

Category/Type 004

Office Sought: [X] House  State: OH
[ ] Senate  District: 08
[ ] President

Name of Federal Candidate Supported or Opposed by Expenditure:
John Boehner

Check One: [ ] Support  [ ] Oppose

Calendar Year-To-Date Per Election
for Office Sought  3050.00

Disbursement For: [X] Primary  [ ] General
2014
[ ] Other (specify) ▶

---

**Full Name (Last, First, Middle Initial) of Payee**
JSN Associates

**Mailing Address** 131 North Ludlow Street, Suite 315

| City | State | Zip Code |
|---|---|---|
| Dayton | OH | 45402 |

Date of Public Distribution/Dissemination
M M / D D / Y Y Y Y
03 / 22 / 2014

Amount
30898.75

**Transaction ID : F57.000002**

Purpose of Expenditure
Canvassers and consulting (also opposes J.D. Winteregg, Eric Gurr)

Category/Type 004

Office Sought: [X] House  State: OH
[ ] Senate  District: 08
[ ] President

Name of Federal Candidate Supported or Opposed by Expenditure:
John Boehner

Check One: [X] Support  [ ] Oppose

Calendar Year-To-Date Per Election
for Office Sought  33948.75

Disbursement For: [X] Primary  [ ] General
2014
[ ] Other (specify) ▶

---

**Full Name (Last, First, Middle Initial) of Payee**
CDW Direct

**Mailing Address** 200 North Milwaukee Ave.

| City | State | Zip Code |
|---|---|---|
| Vernon Hills | IL | 60061 |

Date of Public Distribution/Dissemination
M M / D D / Y Y Y Y
03 / 22 / 2014

Amount
15229.50

**Transaction ID : F57.000003**

Purpose of Expenditure
iPads for canvassing (also opposes J.D. Winteregg, Eric Gurr)

Category/Type 004

Office Sought: [X] House  State: OH
[ ] Senate  District: 08
[ ] President

Name of Federal Candidate Supported or Opposed by Expenditure:
John Boehner

Check One: [X] Support  [ ] Oppose

Calendar Year-To-Date Per Election
for Office Sought  49178.25

Disbursement For: [X] Primary  [ ] General
2014
[ ] Other (specify) ▶

---

**(a) SUBTOTAL** of Itemized Independent Expenditures..................▶  49178.25

**(b) SUBTOTAL** of Unitemized Independent Expenditures..................▶

**(c) TOTAL** Independent Expenditures..................▶
(carry total from last page forward to Line 7)

FV00977

Image# 14941815567

# SCHEDULE 5-E
## ITEMIZED INDEPENDENT EXPENDITURES

| PAGE | 3 | OF | 3 |
|------|---|----|---|

FOR LINE 7 OF FORM 5

NAME OF FILER (In Full)

FREEDOM VOTE

---

Full Name (Last, First, Middle Initial) of Payee

Connection Strategy LLC

Mailing Address    7300 Hudson Blvd., Ste 270

| City | State | Zip Code |
|------|-------|----------|
| St. Paul | MN | 55128 |

Date of Public Distribution/Dissemination

| M M | D D | Y Y Y Y |
|-----|-----|---------|
| 03 | 22 | 2014 |

Amount    10579.70

**Transaction ID : F57.000004**

| Purpose of Expenditure | Category/Type |
|------------------------|---------------|
| Map books for canvassing (also opposes J.D. Winteregg, Eric Gurr) | 004 |

Office Sought:  [X] House    State: OH
              [ ] Senate    District: 08
              [ ] President

Name of Federal Candidate Supported or Opposed by Expenditure:
John Boehner

Check One:  [X] Support    [ ] Oppose

Calendar Year-To-Date Per Election for Office Sought    59757.95

Disbursement For:  [X] Primary 2014    [ ] General
                  [ ] Other (specify) ▶

---

Full Name (Last, First, Middle Initial) of Payee

Majority Strategies

Mailing Address    135 Professional Drive, Suite 104

| City | State | Zip Code |
|------|-------|----------|
| Ponte Vedra Beach, | FL | 32082 |

Date of Public Distribution/Dissemination

| M M | D D | Y Y Y Y |
|-----|-----|---------|
| 03 | 27 | 2014 |

Amount    7225.00

**Transaction ID : F57.000005**

| Purpose of Expenditure | Category/Type |
|------------------------|---------------|
| Door hangers (also opposes J.D. Winteregg, Eric Gurr) | 004 |

Office Sought:  [X] House    State: OH
              [ ] Senate    District: 08
              [ ] President

Name of Federal Candidate Supported or Opposed by Expenditure:
John Boehner

Check One:  [X] Support    [ ] Oppose

Calendar Year-To-Date Per Election for Office Sought    66982.95

Disbursement For:  [X] Primary 2014    [ ] General
                  [ ] Other (specify) ▶

---

Full Name (Last, First, Middle Initial) of Payee

JSN Associates

Mailing Address    131 North Ludlow Street, Suite 315

| City | State | Zip Code |
|------|-------|----------|
| Dayton | OH | 45402 |

Date of Public Distribution/Dissemination

| M M | D D | Y Y Y Y |
|-----|-----|---------|
| 03 | 27 | 2014 |

Amount    27601.25

**Transaction ID : F57.000006**

| Purpose of Expenditure | Category/Type |
|------------------------|---------------|
| Canvassers and consulting (also opposes J.D. Winteregg, Eric Gurr) | 004 |

Office Sought:  [X] House    State: OH
              [ ] Senate    District: 08
              [ ] President

Name of Federal Candidate Supported or Opposed by Expenditure:
John Boehner

Check One:  [X] Support    [ ] Oppose

Calendar Year-To-Date Per Election for Office Sought    94584.20

Disbursement For:  [X] Primary 2014    [ ] General
                  [ ] Other (specify) ▶

---

(a) **SUBTOTAL** of Itemized Independent Expenditures ......................... ▶    45405.95

(b) **SUBTOTAL** of Unitemized Independent Expenditures ..................... ▶

(c) **TOTAL** Independent Expenditures ................................................. ▶    94584.20
    (carry total from last page forward to Line 7)

FV00978

FEC **Schedule 5** (REV. 09/2013)

AR1141

| BEGINNING BALANCE | | | $ | 67,261.37 | |
|---|---|---|---|---|---|
| **DEPOSITS** | DATE OF CHECK/WT | DATE OF DEPOSIT | | AMOUNT | |



| | 23-12-13 | 13-02-14 | $ | 4,500.00 | check initially mailed to wrong address |
| | 23-12-13 | 13-02-14 | $ | 500.00 | check initially mailed to wrong address |
| | 18-04-14 | 18-04-14 | $ | 100,000.00 | |
| | 12-05-14 | 12-05-14 | $ | 150,000.00 | |
| **TOTAL DEPOSITS** | | | **$** | **255,000.00** | |
| SUBTOTAL | | | $ | 322,261.37 | |

| **EXPENDITURES** | DATE OF PAYMENT | CHECK # | | AMOUNT | |
|---|---|---|---|---|---|
| Office Telephone (AT&T) | | | | | |
| January | 17-01-14 | 1140 | $ | 58.21 | |
| February | 13-02-14 | 1142 | $ | 91.04 | |
| March | 12-03-14 | 1148 | $ | 74.40 | |
| April | 03-04-14 | 1159 | $ | 85.47 | Mailed wrong check … balance adjusted on next bill |
| May | 28-04-14 | 1166 | $ | 63.47 | |
| June | 04-06-14 | 1178 | $ | 83.58 | |
| July | 02-07-14 | 1183 | $ | 79.83 | |
| August | 14-08-14 | 1188 | $ | 80.80 | |
| September | 12-09-14 | 1190 | $ | 80.40 | |
| October | 10-10-14 | 1194 | $ | 80.45 | |
| November | 13-11-14 | 1196 | $ | 89.45 | |
| December | 15-12-14 | 1197 | $ | 85.83 | |
| | | | | | |
| Bank Charges (Huntington) | | | | | |
| January | 15-01-14 | AW | $ | 2.50 | |
| February | 18-02-14 | AW | $ | 2.50 | |
| March | 17-03-14 | AW | $ | 2.50 | |
| April | 15-04-14 | AW | $ | 2.50 | |
| Wire Transfer Fee | 15-04-14 | AW | $ | 75.00 | |
| Wire Transfer Fee | 16-06-14 | AW | $ | 17.00 | |
| May | | | | | no longer being billed statement charges….on line records only. |
| June | | | | | |
| July | | | | | |
| August | | | | | |
| September | | | | | |
| October | | | | | |
| November | | | | | |
| December | | | | | |
| | | | | | |
| Office Expenses | | | | | |
| Missy Mae Walters (iPad) | 14-02-14 | 1145 (part) | $ | 320.24 | |
| Missy Mae Walters (misc. expenses, OH 8) | 07-04-14 | 1161 | $ | 2,247.95 | |
| Missy Mae Walters (misc. expenses, OH 8) | 29-04-14 | 1168 | $ | 1,370.48 | |
| Hatfield (Directors & Officers Insurance) | 23-07-14 | 1185 | $ | 1,108.00 | |
| | | | | | |
| Accounting | | | | | |
| JD Cloud (misc. and form 940) | 02-07-14 | 1182 | $ | 280.00 | |
| Clark Schaefer Hacket (Form 990) | 12-09-14 | 1192 | $ | 2,425.00 | |
| | | | | | |
| Legal | | | | | |
| Langdon Law | 18-04-14 | 1163 | $ | 5,798.25 | |
| Langdon Law | 12-05-14 | 1169 | $ | 4,621.25 | |
| Langdon Law | 18-08-14 | 1186 | $ | 3,848.75 | |
| | 13-11-14 | 1195 | $ | 763.75 | |
| | | | | | |
| Professional Services | | | | | |
| Connection Strategy, LLC (mapping) | 17-01-14 | 1141 | $ | 7,000.00 | |
| The Strategy Group Company (Research) | 14-02-14 | 1143 | $ | 3,000.00 | |
| The Strategy Group Company (Research) | 27-02-14 | 1147 | $ | 1,000.00 | |
| Connection Strategy, LLC (mapping) | 31-03-14 | 1157 | $ | 4,555.00 | |
| The Strategy Group Company (Research) | 12-05-14 | 1177 | $ | 3,240.00 | |
| Connection Strategy, LLC (monthly fee) | 18-08-14 | 1189 | $ | 250.00 | |
| | | | | | |
| Executive Director (JSN Associates) | | | | | |
| JSN Associates (January - June) | 02-07-14 | 1184 | $ | 15,000.00 | |
| JSN Associates (July - December) | 19-12-14 | 1198 | $ | 15,000.00 | |
| | | | | | |
| Project Management | | | | | |
| Missy Mae Walters (Prep work) | 14-02-14 | 1145 (part) | $ | 5,000.00 | |

| | | | | |
|---|---|---|---|---|
| JSN Associates (OH 8 Project Management) | 31-03-14 | 1158 | $ | 17,000.00 |
| JSN Associates (OH 8 Project Management) | 25-04-14 | 1164 | $ | 41,500.00 |
| JSN Associates (OH 8 Project Management) | 29-04-14 | 1165 | $ | 45,300.00 |
| JSN Associates (OH 8 Project Management) | 12-05-14 | 1175 | $ | 40,000.00 |

Consulting

| | | | | |
|---|---|---|---|---|
| Tom Whatman | 12-05-14 | 1172 | $ | 15,000.00 |

Educational Activity

| | | | | | |
|---|---|---|---|---|---|
| Advanced Micro Targeting (ID 2) | 14-02-14 | 1144 | $ | 10,000.00 | |
| CDW Direct (50 iPads) | 07-03-14 | Wire Transfer | $ | 15,229.50 | |
| Majority Strategies (door hangers) | 25-03-14 | 1150 | $ | 3,050.00 | |
| Majority Strategies (door hangers) | 27-03-14 | 1151 | $ | 7,225.00 | |
| Majority Strategies (door hangers) (wave 2) | 18-04-14 | 1162 | $ | 8,125.00 | |
| Connection Strategy (phone calls) | 12-05-14 | 1174 | $ | 20,593.23 | Refects a $975.30 refund for mapping overpayment.  Actual phone charges $21,568.53 |
| Majority Strategies (Post It Notes) (wave 3) | 12-05-14 | 1173 | $ | 3,075.00 | |

Contributions

| | | | | |
|---|---|---|---|---|
| A Guiet Voice (501c(4)) | 10-10-14 | 1193 | $ | 1,500.00 |
| 8913 Cincinnati-Dayton Road | | | | |
| West Chester, OH 45069 | | | | |

| | | | | |
|---|---|---|---|---|
| **TOTAL EXPENDITURES** | | | **$** | **305,481.33** |

**Refunds**

| | | | | |
|---|---|---|---|---|
| Missy Mae Walters (#1145 - part) | 27-03-14 | | $ | 5,000.00 |
| Missy Mae Walters (#1145 - part) | 06-04-14 | | $ | 320.24 |
| Advanced Micro Targeting (ID 2) (#1144) | 14-02-14 | | $ | 10,000.00 |

| | | | | |
|---|---|---|---|---|
| **ENDING BALANCE** | | | **$** | **32,100.28** |

FV01148

AR1311

| BEGINNING BALANCE | | | $ | 32,100.28 |
|---|---|---|---|---|

| DEPOSITS | DATE OF CHECK/WT | DATE OF DEPOSIT | | AMOUNT |
|---|---|---|---|---|
| | 13-06-15 | 19-06-15 | $ | 25,000.00 |
| | 31-07-15 | 06-08-15 | $ | 3,000.00 |
| | 19-11-15 | 20-11-15 | $ | 500,000.00 |
| | 29-12-15 | 29-12-15 | $ | 50,000.00 |
| | 30-11-15 | 30-11-15 | $ | 43.83 |
| | 31-12-15 | 31-12-15 | $ | 143.58 |
| **TOTAL DEPOSITS** | | | **$** | **578,187.41** |

| SUBTOTAL | | | $ | 610,287.69 |
|---|---|---|---|---|

| EXPENDITURES | DATE OF PAYMENT | CHECK # | | AMOUNT |
|---|---|---|---|---|
| Office Telephone (AT&T) | | | $ | - |
| January | | | $ | - |
| February | 05-03-15 | 1199 | $ | 66.59 |
| March | 17-04-15 | 1200 | $ | 57.38 |
| April | 20-05-15 | 1203 | $ | 54.84 |
| May | 23-06-15 | 1204 | $ | 54.82 |
| June | 13-07-15 | 1205 | $ | 54.82 |
| July | 05-08-15 | 1210 | $ | 58.34 |
| August | 31-08-15 | 1212 | $ | 56.84 |
| September | 27-10-15 | 1216 | $ | 59.14 |
| October | 03-11-15 | 1217 | $ | 52.79 |
| November | 08-12-15 | 1219 | $ | 53.60 |
| December | | | | |

FV01151

AR1314

Bank Charges (Huntington)


Office Expenses
Hatfield Insurance                              05-08-15        1208      $    1,208.00

Accounting
Clark Schaefer Hacket (2013 Form 990)           24-08-15        1211      $    2,000.00
Clark Schaefer Hacket (2013 Form 990 Final)     22-09-15        1214      $    1,500.00

Legal
Langdon Law                                     17-04-15        1202      $      688.75
Langdon Law                                     22-09-15        1213      $    2,950.00

Professional Services


Executive Director (JSN Associates)
JSN Associates (January - June)                 13-07-15        1206      $   12,000.00
JSN Associates (July - December)                28-12-15        1220      $   12,000.00

Project Management


Consulting


Educational Activity
Wenzel Stragegies (Butler Twp Poll)             29-07-15        1207      $    2,800.00
Tarrance Group (KY 4 Poll)                      05-08-15        1209      $   12,539.00
John Wasilchick, LLC (KY 4 Research)            22-09-15        1215      $    5,000.00

Restricted Grants
Fighting Ohio Institute                         08-12-15        1218      $   75,000.00

Unrestricted Grants
Fighting For Ohio Fund (SuperPac)               29-12-15    Wire Transfer  $  200,000.00

**TOTAL EXPENDITURES**                                                   $ 328,254.91


**Refunds**
ATT                                             **10-02-15**              **$        31.11**


**ENDING BALANCE**                                                        $ 282,063.89


FV01152

AR1315

BEGINNING BALANCE $ 282,063.89

| DEPOSITS | DATE OF CHECK/WT | DATE OF DEPOSIT | AMOUNT |
|---|---|---|---|
| | 25-01-16 | 27-01-16 | $ 250,000.00 |
| | 14-03-16 | 15-03-16 | $ 200,000.00 |
| | 16-03-16 | 21-03-16 | $ 100,000.00 |
| | 01-04-16 | 01-04-16 | $ 100,000.00 |
| | 06-05-16 | 06-05-16 | $ 200,000.00 |
| | 23-06-16 | 27-06-16 | $ 1,000,000.00 |
| | 01-07-16 | 01-07-16 | $ 200,000.00 |
| | 27-07-16 | 27-07-16 | $ 100,000.00 |
| | 18-08-16 | 19-08-16 | $ 250,000.00 |
| | 26-08-16 | 26-08-16 | $ 100,000.00 |

FV01155

AR1318

| | | | |
|---|---|---|---|
| 29-08-16 | 29-08-16 | $ | 5,000.00 |
| 01-09-16 | 02-09-16 | $ | 500,000.00 |
| 02-09-16 | 06-09-16 | $ | 100,000.00 |
| 05-09-16 | 13-09-16 | $ | 10,000.00 |
| 09-09-16 | 13-09-16 | $ | 200,000.00 |
| 16-09-16 | 21-09-16 | $ | 10,000.00 |
| 27-09-16 | 27-09-16 | $ | 500,000.00 |
| 07-10-16 | 11-10-16 | $ | 10,000.00 |
| 07-10-16 | 07-10-16 | $ | 25,000.00 |
| 08-10-16 | 11-10-16 | $ | 10,000.00 |
| 11-10-16 | 21-10-16 | $ | 10,000.00 |

FV01156

|  |  | 18-10-16 | 21-10-16 | $ | 25,000.00 |
|  |  | 24-10-16 | 04-11-16 | $ | 10,000.00 |
| Huntington Bank (interest income) |  | 29-01-16 | 29-01-16 | $ | 76.28 |
| Huntington Bank (interest income) |  | 29-02-16 | 29-02-16 | $ | 71.38 |
| Huntington Bank (interest income) |  | 31-03-16 | 31-03-16 | $ | 44.94 |
| Huntington Bank (interest income) |  | 29-04-16 | 29-04-16 | $ | 18.47 |
| Huntington Bank (interest income) |  | 31-05-16 | 31-05-16 | $ | 19.08 |
| Huntington Bank (interest income) |  | 30-06-16 | 30-06-16 | $ | 16.67 |
| Huntington Bank (interest income) |  | 29-07-16 | 29-07-16 | $ | 26.15 |
| Huntington Bank (interest income) |  | 31-08-16 | 31-08-16 | $ | 7.19 |
| Huntington Bank (interest income) |  | 9/30/201`6 | 30-09-16 | $ | 16.39 |
| Huntington Bank (interest income) |  | 31-10-16 | 31-10-16 | $ | 16.94 |
| Huntington Bank (interest income) |  | 30-11-16 | 30-11-16 | $ | 16.39 |
| Huntington Bank (interest income) |  | 30-12-16 | 30-12-16 | $ | 16.93 |

**TOTAL DEPOSITS** $ **3,915,346.81**

SUBTOTAL $ 4,197,410.70

| EXPENDITURES | DATE OF PAYMENT | CHECK # | AMOUNT |
|---|---|---|---|

Office Telephone (AT&T)

| January | 15-01-16 | 1221 | $ | 52.81 |
|---|---|---|---|---|
| February  (missed) |  |  |  |  |
| February & March | 04-03-16 | 1227 | $ | 106.68 |
| April | 25-04-16 | 1230 | $ | 117.50 |
| May | 09-05-16 | 1234 | $ | 81.00 |
| June | 03-06-16 | 1240 | $ | 93.86 |
| July | 13-07-16 | 1241 | $ | 88.56 |
| August | 01-08-16 | 1244 | $ | 87.13 |
| September | 02-09-16 | 1255 | $ | 86.59 |
| October | 07-10-16 | 1260 | $ | 86.62 |
| November | 17-11-16 | 1272 | $ | 86.47 |
| December | 05-12-16 | 1266 | $ | 86.52 |

Bank Charges (Huntington)

| January -- Savings (Dec wire transfer) | 15-01-16 | AW | $ | 45.00 |
|---|---|---|---|---|
| Wire Transfer Fee | 15-04-16 | AW | $ | 45.00 |

FV01157

AR1320

| | | | | |
|---|---|---|---|---|
| Wire Transfer fee (incoming) | 15-06-16 | AW | $ | 18.00 |
| Wire Transfer Fee (2) | 15-07-16 | AW | $ | 90.00 |
| Wire Transfer fee (incoming) | 15-08-16 | AW | $ | 18.00 |
| Wire Transfer Fee | 15-08-16 | AW | $ | 180.00 |
| Wire Transfer Fee | 15-09-16 | AW | $ | 81.00 |
| Wire Transfer Fee | 17-10-16 | AW | $ | 216.00 |
| Wire Transfer Fee | 15-11-16 | AW | $ | 63.00 |
| CD/ROM Fee | 15-11-16 | AW | $ | 57.73 |

Office Expenses

| | | | | |
|---|---|---|---|---|
| Hummel Hatfield Insurance | 09-05-16 | 1233 | $ | 1,413.00 |
| Majority Strategies (Web Site Development) | 22-08-16 | 1253 | $ | 2,500.00 |
| DLX for Business (new checks) | 19-08-16 | AW | $ | 236.95 |

Accounting

| | | | | |
|---|---|---|---|---|
| Clark Schaefer Hacket (two invoices) | 13-07-16 | 1242 | $ | 627.50 |
| Clark Schaefer Hacket (2014 Form 990 - Progres | 10-08-16 | 1248 | $ | 1,375.00 |
| Clark Schaefer Hacket (two invoices) | 02-09-16 | 1257 | $ | 2,390.00 |
| Clark Schaefer Hacket (through 10/31) | 17-11-16 | 1273 | $ | 4,042.50 |

Legal

| | | | | |
|---|---|---|---|---|
| Langdon Law (4th Qt 2015) | 29-01-16 | 1223 | $ | 500.00 |
| Langdon Law (1st Qt 2016) | 25-03-16 | 1228 | $ | 1,350.00 |
| Langdon Law (2nd Qt 2016) | 15-07-16 | 1243 | $ | 14,351.00 |
| Langdon Law (July) | 22-08-16 | 1252 | $ | 1,447.50 |
| Langdon Law (Aug & Sept) | 27-10-16 | 1265 | $ | 12,577.50 |
| Langdon Law (October) | 17-11-16 | 1274 | $ | 2,612.50 |

Professional Services

| | | | | |
|---|---|---|---|---|
| Deep Root Analytics (Media Research) | 23-05-16 | 1236 | $ | 75,000.00 |
| TargetPoint Consulting (Statewide Poll) | 01-08-16 | 1245 | $ | 34,850.00 |

Executive Director (JSN Associates)

| | | | | |
|---|---|---|---|---|
| JSN Associates (January - June) | 03-06-16 | 1237 | $ | 15,000.00 |
| JSN Associates (July - December) | 12/15/21016 | 1269 | $ | 15,000.00 |

Project Management

Consulting

| | | | | |
|---|---|---|---|---|
| Tom Whatman (January & February) | 23-01-16 | 1222 | $ | 20,000.00 |
| Tom Whatman (March) | 16-02-16 | 1225 | $ | 10,000.00 |
| MMM Consulting (February) | 04-03-16 | 1226 | $ | 5,000.00 |
| Tom Whatman (April) | 3/25/10`6 | 1229 | $ | 20,000.00 |
| MMM Consulting (March) | 18-04-16 | 1231 | $ | 5,000.00 |
| Tom Whatman (May) | 18-04-16 | 1232 | $ | 10,000.00 |
| MMM Consulting (April) | 11-05-16 | 1235 | $ | 5,000.00 |

FV01158

AR1321

| | | | | |
|---|---|---|---|---|
| MMM Consulting (May) | 03-06-16 | 1238 | $ | 5,000.00 |
| Tom Whatman (June) | 03-06-16 | 1239 | $ | 10,000.00 |
| Tom Whatman (July) | 05-07-16 | WT | $ | 10,000.00 |
| Tom Whatman (August) | 13-07-16 | WT | $ | 10,000.00 |
| MMM Consulting (June) | 01-08-16 | 1246 | $ | 5,000.00 |
| Tom Whatman (August-additional) | 10-08-16 | 1249 | $ | 10,000.00 |
| MMM Consulting (July) | 22-08-16 | 1250 | $ | 5,000.00 |
| Tom Whatman (September) | 22-08-16 | 1251 | $ | 20,000.00 |
| MMM Consulting (August) | 02-09-16 | 1256 | $ | 5,000.00 |
| Tom Whatman (October) | 19-09-16 | 1258 | $ | 20,000.00 |
| Cap Square Solutions | 29-09-16 | 1259 | $ | 80,000.00 |
| LG Consulting (May - August) | 14-10-16 | 1262 | $ | 20,000.00 |
| Tom Whatman (November) | 14-10-16 | 1263 | $ | 20,000.00 |
| MMM Consulting (September) | 14-10-16 | 1264 | $ | 5,000.00 |
| MMM Consulting (October) | 17-11-16 | 1275 | $ | 5,000.00 |
| Tom Whatman (December) | 05-12-16 | 1267 | $ | 2,500.00 |
| MMM Consulting (November) | 15-12-16 | 1268 | $ | 10,000.00 |

### Educational Activity/Issue Advertising

| | | | | |
|---|---|---|---|---|
| Main Street Media Group (media buy) | 16-06-16 | WT | $ | 600,594.00 |
| Main Street Media Group (media buy) | 13-07-16 | WT | $ | 497,668.70 |
| McCarthy Hennings Whalen (production) | 01-08-16 | 1247 (part) | $ | 14,017.68 |
| McCarthy Hennings Whalen (production) | 01-08-16 | 1247 (part) | $ | 8,796.55 |

### Restricted Grants

| | | | | |
|---|---|---|---|---|
| A Public Voice | 28-09-16 | WT | $ | 260,000.00 |
| Citizens for a Working America | 11-10-16 | 1261 | $ | 220,000.00 |

### Unrestricted Grants

| | | | | |
|---|---|---|---|---|
| Fighting For Ohio Fund (SuperPAC) | 30-03-16 | WT | $ | 300,000.00 |
| Fighting For Ohio Fund (SuperPAC) | 05-07-16 | WT | $ | 500,000.00 |
| Fighting For Ohio Fund (SuperPAC) | 25-08-16 | WT | $ | 250,000.00 |
| Fighting For Ohio Fund (SuperPAC) | 14-09-16 | WT | $ | 200,000.00 |
| Fighting For Ohio Fund (SuperPAC) | 21-09-16 | WT | $ | 250,000.00 |
| Fighting For Ohio Fund (SuperPAC) | 05-10-16 | WT | $ | 275,000.00 |

**TOTAL EXPENDITURES**     **$ 3,880,637.85**

**Refunds**

| | | | | |
|---|---|---|---|---|
| Main Street Media Group | 07-11-16 | 21-11-16 | $ | 18,363.48 |

**ENDING BALANCE**     **$ 335,136.33**

# Invoice

**McCarthy Hennings Whalen, Inc.**
1850 M Street NW
Suite 235
Washington, DC 20036-5837

| Date | Invoice # |
|------|-----------|
| 7/18/2016 | 13118 |

| Bill To |
|---------|
| Freedom Vote |

| | Terms |
|--|-------|
| | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | Freedom Vote TV Production "Third Largest" | | |
| | Editing, Graphics,  Two Audio Records, Audio Edit & Mix, Multiple Rounds of Edits | 8,796.55 | 8,796.55 |

| | | | **Total** | $8,796.55 |
|--|--|--|-----------|-----------|

FV01204

AR1367

# Invoice

**McCarthy Hennings Whalen, Inc.**
1850 M Street NW
Suite 235
Washington, DC 20036-5837

| Date | Invoice # |
|------|-----------|
| 6/21/2016 | 13117 |

| Bill To |
|---------|
| Freedom Vote |

| | Terms |
|--|-------|
| | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | TV :30 "Third Largest"<br>FV-16-TV-01H, FV-16-TV-01<br><br>Editing, Graphics, Audio Record, Edit & Mix, V/O Talent Licensing, Image & Footage Licensing, Shipping to 66 Stations | 14,017.68 | 14,017.68 |
| | | **Total** | $14,017.68 |

FV01206

# Tab 5

Portions of Deposition Transcript of James S. Nathanson (dated May 12, 2021)
AR1370-71, AR1374, AR1376–77, AR1393–95, AR1405–07, AR1426–27, AR1442-43,
AR1457–61, AR1464, AR1498–1501, AR1507

# TRANSCRIPT OF PROCEEDINGS

---

```
In the Matter of:                    )
                                     )
FREEDOM VOTE, INC.                   )   MUR 7465
                                     )
```

Deposition of:  JAMES S. NATHANSON

```
Pages:    1 through 153

Place:    Washington, D.C.

Date:     May 12, 2021
```

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

AR1370

1

BEFORE THE FEDERAL ELECTION COMMISSION

In the Matter of:              )
                               )
FREEDOM VOTE, INC.             )   MUR 7465
                               )

Deposition of:

JAMES S. NATHANSON

a witness of lawful age, taken via video conference on

behalf of the Government, pursuant to notice, at the

offices of Heritage Reporting Corporation, 1220 L Street,

N.W., Suite 206, Washington, D.C. 20005, on Wednesday,

May 12, 2021, at 10:00 a.m. before Angela Brown, Notary

Public in and for the District of Columbia, when were

present:

APPEARANCES:

On Behalf of the Government:

JUSTINE di GIOVANNI, Esquire
Federal Election Commission
Office of General Counsel
1050 First Street, N.E.
Washington, D.C.  20002
(202) 694-1574

On Behalf of the Respondent:

CHARLIE SPIES, Esquire
Dickinson Wright, PLLC
1825 I Street, N.W., Suite 900
Washington, D.C.  20006
(202) 466-5964

Heritage Reporting Corporation
(202) 628-4888

4

1                   P R O C E E D I N G S

2                                         (10:00 a.m.)

3            THE NOTARY PUBLIC:  All right.  Good

4    morning.  Can you please raise your right hand.

5            Whereupon,

6                    JAMES S. NATHANSON

7            having been duly sworn, was called as a

8    witness and was examined and testified as follows:

9            MS. DI GIOVANNI:  Well, thank you very much

10   for that, and good morning, everyone.  My name is

11   Justine di Giovanni.  I'm an attorney with the Federal

12   Election Commission, as is my colleague, Jin Lee,

13   who's also here.  We're gathering information today in

14   connection with MUR 7465, which concerns Freedom Vote,

15   Incorporated.  This deposition is being conducted

16   pursuant to a subpoena under 52 U.S.C. § 30109.

17           Although we call this a deposition, it is,

18   in fact, an investigative deposition, which is much

19   like an interview.  The major difference is that an

20   investigative deposition is conducted before a court

21   reporter, and you've taken an oath to tell the truth

22   under penalty of perjury.  The oath has the same force

23   and effect it would if we were in a courtroom before a

24   judge.

25           During the investigative deposition, I will

                  Heritage Reporting Corporation
                        (202) 628-4888

AR1374

1    or counsel for that subject.

2          The court reporter will prepare a transcript

3    for today's deposition.  You have the right to review

4    that transcript.  You may waive this right if you want

5    to.  You may request that you be allowed to obtain a

6    copy of the transcript.  If you wish to make such a

7    request, you must do so in writing, and you must send

8    the request to the Office of General Counsel here at

9    the FEC.  The office will take your request under

10   advisement, and unless there is good cause, we will

11   notify you and the court reporter in writing that you

12   may make your own arrangements with the court reporter

13   to obtain the transcript at your own expense.  No

14   transcript will be made available until you receive

15   notification.  If the office determines that there is

16   good cause to deny your request, it will inform you in

17   writing.

18         So, with that out of the way, I'm going to

19   ask a couple of introductory questions and set down

20   the ground rules if that works for you.  So, Mr.

21   Nathanson, can you please provide your full name and

22   address for the record?

23         THE WITNESS:  James S. Nathanson, 45 West

24   Babbitt Street, Dayton, Ohio 45405.

25         MS. DI GIOVANNI:  Can you please identify

1    your counsel?

2             THE WITNESS:  Freedom Vote's counsel is

3    Charlie Spies.  Do I have your last name right,

4    Charlie?

5             MR. SPIES:  Close enough.

6             THE WITNESS:  Okay.  I believe he's Freedom

7    Vote's counsel.  He may also be mine.  My counsel has

8    always been someone else.  But I think, Charlie, I

9    think you now serve as both.  Am I correct?

10            MR. SPIES:  Yes, that's correct, and we

11   submitted -- you signed a designation of counsel.

12            THE WITNESS:  Yeah.

13            MR. SPIES:  That also means our

14   conversations are privileged.

15            MS. DI GIOVANNI:  And so --

16            THE WITNESS:  So you're looking at my

17   counsel.

18            MS. DI GIOVANNI:  Excellent.  So he's

19   representing you in an official capacity today?

20            THE WITNESS:  Correct.

21          EXAMINATION BY COUNSEL FOR THE GOVERNMENT

22            BY MS. DI GIOVANNI:

23    Q    Have you ever been deposed before?

24    A    Yes.

25    Q    What was that in connection to?

AR1377

1    important impact on the health of the State of Ohio,

2    as simple as that, or the health of the immediate

3    Ohio -- we would not hesitate to be involved.

4        Q    Can you give me, I mean, just off the top of

5    your head, some examples of some issues that were

6    important to Freedom Vote?

7        A    I think very important were budgetary

8    issues.  Mostly, they were federal.  Budgetary issues

9    were very important.  In all honesty, Ohio's presence

10    and influence in D.C. so that Ohio had a good share of

11    what was -- you know, what the federal government was

12    going.  But you're asking -- I understand you wanting

13    the specificity.  We were pretty open-ended, so it's

14    very hard for me to be specific.

15        Q    That's fine.

16        A    But it often related to jobs, budget, and

17    issues like that.

18        Q    Okay.  So you mentioned sort of federal

19    budgetary issues.  Was it -- you know, when you talk

20    about Ohio's presence in D.C., how were you -- I mean,

21    what kind of work did Freedom Vote do around those

22    ideas?  How did it promote Ohio's position in the

23    federal legislature?

24        A    It depended on what issues came up and

25    whether we felt they were relevant.  You're asking for

1    a kind of specificity that really didn't exist.

2         Q    Well, I'm asking not necessarily just about

3    the organization's priorities, but I imagine that

4    while you were there they actually did some specific

5    work.  So I'm just looking for examples of some of the

6    work it did and some of the issues it advanced.  Do

7    you recall anything specifically that it did while you

8    were there?

9         A    I know we were concerned, in all honesty,

10   with some of the issues that affected Speaker Boehner

11   because we felt Speaker Boehner's role in Ohio was

12   exceptionally important.  At later times, I think we

13   were very worried about issues involving jobs and

14   economic development and economic prosperity, policies

15   at the federal level that impacted those three areas.

16              We rarely did a single specific policy

17   issue.  We weren't -- you're asking -- the reason I'm

18   being vague is we weren't focused necessarily ongoing

19   with a single issue.  They were on a set of related

20   issues that related to economic development often,

21   relating to economic development and economic health.

22        Q    Understood.  So was there any sort of

23   specific legislation that Freedom Vote advocated for

24   or anything like that?

25        A    That is a very good question.  I think we

AR1394

1    may have at some points, but I, in all honesty, cannot

2    recollect.

3        Q    Okay.  So there's -- so, to be -- so there's

4    nothing that you remember that a bill or a policy was

5    involved?

6        A    Not -- your question related to a specific

7    piece of federal legislation or a -- that, I don't

8    remember Freedom Vote being involved directly over on

9    a specific policy, you know, HR such and such.  But,

10   no, I don't recall.  There may have been some small

11   projects where we did.  I just don't recollect for

12   certain.

13       Q    Understood.  And if it seems like I'm

14   misunderstanding you or something like that, I would

15   just ask you, you are the expert on what you did for

16   Freedom Vote, so anything you can do to enlighten me

17   and teach me about what you did, I absolutely

18   appreciate that.  So that's very helpful.

19            And so you mentioned federal legislation,

20   but just to sort of tie everything up, that

21   includes -- do you recall any specific Ohio

22   legislation that you may have promoted while at

23   Freedom Vote or anything like that?

24       A    I'm having trouble answering because there

25   were certain parallels between what my firm did and

1          BY MS. DI GIOVANNI:

2     Q    Let's go back to talking about Freedom Vote

3  and how it worked.  To the best of your knowledge, how

4  did, while it was operating, Freedom Vote raise money?

5     A    Generally, it was project-specific.

6     Q    Can you explain what you mean by that?

7     A    If Freedom Vote took on a project -- again,

8  this is a general statement.  It's not an absolute

9  statement.  If Freedom Vote took on a specific

10  project, then money had to be raised for that project.

11  Freedom Vote did some generic fundraising, but very,

12  very little.

13     Q    Okay.  And when you say a "project," were

14  these projects that Freedom Vote determined to take on

15  or that someone else asked them to do?

16     A    Most of the time we were asked.  But, again,

17  exceptions.  But most of the time, we were asked.

18     Q    Sure.  Who asked you to, if you can recall

19  specifics of any instances, who asked you to take on

20  projects, and what were they?

21     A    I think there was a couple different people

22  at different times.  It wasn't just one person.

23     Q    Sure.  Go ahead.  Tell me more about them.

24     A    I know Mr. Whatman asked at times, and I

25  think there were others.

1          Q    Can you recall any of the others?

2          A    I think Brian -- a man by the name of Brian

3     Walsh asked us to do one project.

4          Q    And who was -- I was going to ask, who was

5     Mr. Walsh associated with?  What was his relationship?

6          A    He was connected with the American Action

7     Network, I believe.

8          Q    Okay.  And do you recall what the project

9     was?

10         A    That was doing some work involving some

11    issues in southwest Ohio.

12         Q    Do you recall what the issues were?

13         A    They related to positions some individuals

14    had, some generic positions that they had that we felt

15    had problems, and we talked about the issues

16    themselves.

17         Q    What sort of individuals?  Can you be

18    specific about who had these positions or what the

19    positions were?

20         A    I believe some of them involved a race in

21    the 8th Congressional District.

22         Q    And the issues that Freedom Vote was asked

23    to sort of investigate, what were those positions that

24    you were mentioning?

25         A    This was seven years ago.

1        Q    Sure, to the best of your recollection.

2        A    I'm trying to envision what we were

3    concerned about.  I believe it -- I just don't know,

4    ma'am.  I believe it probably focused a lot on jobs.

5    It may have focused on qualities and competence, but I

6    just don't remember.

7        Q    Sure.  And so, you know, these

8    organizations, do you recall for a project like this

9    one how much Freedom Vote was given to complete that

10    project?

11        A    No, it was, I believe, in the millions, but

12    maybe it was only in the hundreds of thousands.  I

13    really don't know.

14        Q    Sure, that's understandable.  And the same

15    with Mr. Whatman, what did he ask Freedom Vote to do?

16    What did that entail?

17        A    Pardon?

18        Q    When Mr. Whatman asked Freedom Vote to do

19    some projects, what were those projects?

20        A    He asked us to do one project, I think, that

21    involved the context of a Senate race.  I think he

22    asked us to do a project.  I think we were thinking

23    about doing a project in the surrounding area.  Again,

24    it's just way more than I can remember.

25        Q    I understand.  So you mentioned that it was

1    done.  It would be Langdon and/or J.D. Cloud depending

2    on however they all did that, but those would all be

3    done in some combination of those two firms.

4         Q    Okay.  And do you recall if you signed

5    Freedom Vote's FEC disclosure forms?

6         A    Once the lawyer gave me the green light and

7    asked me to sign, I signed.

8         Q    Okay.  So, just to be clear, you're not

9    aware of how Freedom Vote determined which of its

10   expenses to report as independent expenditures?

11        A    That's why I paid them the money I paid

12   them.  That was their job.

13        Q    Got it.  And you were not involved in making

14   those determinations?

15        A    You're asking, ma'am, a question for so long

16   ago.  Did one or another call me maybe with something

17   to consult or ask me?  I can't say for sure.  But,

18   technically or by and large, once the lawyers do that,

19   their job was to put all of that together.  And then,

20   when David Langdon said it was ready, that they were

21   done, they would send it to me.  They would just send

22   the signature sheet.  I'd sign the signature sheet and

23   send it back.

24        Q    Got it.  Okay.  Well, we'll move on to a

25   different payment here.  It's under this "Professional

57

 1    Services" category.  Do you see the payments to The

 2    Strategy Group Company here?

 3         A    Yes, mm-hmm.

 4         Q    Okay.  Do you recall what these payments

 5    were for?

 6         A    They were for research, I believe what we

 7    call "opposition research," but I can't remember for

 8    certain.

 9         Q    Okay.  I'm actually going to go ahead and

10    give you a document that might help out there.

11         A    Mm-hmm.

12                        (The document referred to was

13                         marked for identification as

14                         Exhibit No. 2a.)

15         BY MS. DI GIOVANNI:

16         Q    Hold just a second.  Boot up.  Here we are.

17    So do you recognize this document?  And identify what

18    it is for me.

19         A    I believe, ma'am, all you're showing me is

20    their name and my name.

21         Q    Sure.  Can you see the top --

22         A    I still can't read the project in full.

23         Q    Sure.

24         A    Please.  Yes, okay.

25         Q    Okay.  So can you read me the description

1        A    You mean the one that comes from me?

2        Q    Yes, sir.

3        A    Yes.

4        Q    Excellent.  So you wrote that this "assumes

5    maximum effort through election day."

6        A    Right.

7        Q    Can you explain what you meant by that?

8        A    No bloody idea.  It meant whatever the

9    project was we were doing.  I'm assuming that this

10   would have been the Ohio 8 project.  I don't know.

11   That we would be doing that project to the best of our

12   efforts and with maximum efforts up until the end,

13   that is what my -- it is a bylaw in my firm.  We never

14   give up.  We never slow down.  We work until election

15   day.

16       Q    Excellent.  So, looking at the date, you

17   know, this is from April 16, 2014.  So, as context,

18   would you agree that this appears to be that Ohio 8

19   project that we were discussing with the last

20   document?

21       A    I think, given the amounts paid, I mean, I'm

22   assuming that was it.  I'm assuming it was a primary

23   date, but the email itself has no -- does not ring any

24   bells.  I would do emails like that constantly.

25       Q    Sure.  So you say "maximum effort through

1   election day."  Why was election day significant for
2   this project?
3        A    If what we were concerned about were
4   economic issues affecting Ohio as they were explained
5   in election campaigns, those issues tend to die one
6   way or another once there's no longer a campaign.
7   Then it turns in to the policymakers, and with
8   policymakers, the citizens of Ohio have less to do.
9        Q    And did Freedom Vote do any work with
10  advocating for its issues with the policymakers?
11       A    I don't think we ever did, but, again,
12  ma'am, our mission was to do things that promoted the
13  welfare of the state of Ohio, and as long as it was
14  within what a (c)(4) could do, I will not rule out
15  that we did it.
16       Q    Sure.  And --
17       A    Again, I was with Freedom Vote for a good
18  number of years, so that's the best I can answer.
19       Q    Sure.  And so, here, as part of advancing
20  these economic issues --
21       A    Can you speak up a little bit, ma'am?  I
22  couldn't hear what you just said.
23       Q    Oh.  Absolutely.  Sorry.  I reset a little
24  bit with our break.  So, here, in advancing the
25  economic issues in which Freedom Vote was invested,

AR1443

1        A     This was 2016?

2        Q     Yes, sir.

3        A     We were contemplating involvement in the

4     issues being generated in that Senate race, and this

5     would have been research directed at that.  Very

6     possibly, by looking at the amounts of numbers, not

7     the full amounts, we may have just paid for add-on

8     questions or add-on activity and not the whole

9     document.

10        Q     When you say "that Senate race," what are

11     you referring to?

12        A     This would have been the -- was it

13     Strickland?  Portman Strickland?  Was that the 2016

14     Senate race?

15        Q     Okay.  And so --

16        A     It's possible that these things, which

17     affects the ability to get them, is we sometimes did

18     add-ons, not the whole thing, and add-ons, you know,

19     so we'll hire to cut them out and cut and paste.  We

20     often didn't pay for the whole poll or the whole --

21     what was the other one there -- the qualitative stuff

22     from Deep Root.  We sometimes just paid for a part of

23     what they were doing.  If a program was in the field

24     in Ohio, you piggybacked on it and saved some money.

25        Q     Sure.  So what kind of research would this

1    have been?  You mentioned qualitative.  Is that -- can

2    you go into any more detail to the best of your

3    recollection?

4        A    This is going to get really into the weeds,

5    ma'am.  By 2016, we had developed -- we meaning both

6    parties.  Both parties had the statistical tech.  One

7    of the -- what people don't understand, one of the

8    greatest breakthroughs or one of the things that have

9    changed how we do things in the world more than

10   anything else is the ability to do what we call "large

11   number crunching."  That's why you can take all the

12   Google data and all the Facebook and just, you know --

13   the ability to deal with massive numbers.

14        We have applied that to politics, and there

15   is now research models that we can use that give us

16   far more detailed information on the beliefs of people

17   in different media markets in different areas, far

18   more than traditional research can do, based on the

19   ability to just do massive numbers, a massive amount

20   of number crunching.  That media research by Deep Root

21   Analytic would have been in that neighborhood.  I

22   can't remember the specifics, but that would have been

23   in the neighborhood of what we're talking about.  It

24   would have been in anticipation of doing electronic

25   media.

1       Q    Okay.  And so, when you said "both parties,"
2    was that you referring to Deep Root and Target Point?
3    Is that what you meant when you said "both parties"
4    have developed these capabilities?
5       A    Oh, no, no.  Deep Root is one of the
6    premiere firms in doing that.  Target Point -- I think
7    Target Point also does what we call "microtargeting."
8    You asked me at the beginning of this discussion about
9    what I do recently.  Very recently, I have not been
10   working on campaigns.  I have been working on mostly
11   grassroots efforts, door-to-door efforts.
12          And so, in all honesty, the fact that I
13   can't remember and give you the bios of what Deep Root
14   is and Target Point Consulting I'm ashamed of because
15   I should.  Please don't tell my colleagues that that's
16   how bad my memory has slipped, but I believe Deep Root
17   does more of the large-number analytics, and I think
18   Target Point does more of the straightforward polling.
19      Q    Okay.  So what --
20      A    But, you know, damn if I remember correctly
21   what it is, and that has nothing to do with your
22   inquiry.  I should remember what these firms are, and
23   I just don't.
24      Q    Understood.  So, with that in mind, do you
25   sort of recall what Freedom Vote was looking for with

1    this research?  What information was it trying to

2    gather?

3         A    Well, what we would have been concerned

4    about is, you know, the economic health of Ohio.

5    Everything comes back to the economic health of Ohio,

6    what is it that impacts the economic health of Ohio

7    and how, within the concept -- constraints of what a

8    (c)(4) can do, how can we impact that debate?  How can

9    we impact those conversations in a way that we believe

10   is advantageous to the economic health of Ohio?  So,

11   one way or another, that research that we paid for

12   would have included that information.

13        Q    Okay.  So that research, would this have

14   been like what you mentioned before where you would --

15   Freedom Vote would take this research and determine

16   whether to engage in a project based on the results?

17        A    I can't remember where this came in the

18   context of the race, the timetable of the race, the

19   election calendar, as you were, whether or not that we

20   had already committed to involvement and we were

21   trying to figure out how we can appropriately message

22   in a way appropriate for a (c)(4) or whether it was to

23   see whether there were messagings that a (c)(4) could

24   effectively impact.  I just don't remember.

25        Q    Sure.  And do you recall what it was looking

AR1460

1    at?  Was it looking at the 2016 Senate race we've been

2    talking about?

3         A    Oh, I thought I made it clear.  Yes, it

4    would have been in the context of the issues raised in

5    the 2016 Senate race.

6         Q    Okay.

7         A    As I recall, it had profound impact for

8    Ohio.

9         Q    Got it.  And then this is something else

10   where we also haven't received anything in the

11   production relating to the results of this research,

12   and this is true both for Deep Root and for Target

13   Point.  So, with the understanding that you likely

14   don't have any of this, Mr. Nathanson, I am going

15   to --

16        A    Well, I know I don't there because I was

17   just simply given, you know, probably, you know, just

18   a verbal thing that, if we went forward, it would have

19   been, you know, more important for who we brought on

20   board to do the media, and I would have probably never

21   seen it other than maybe a quick verbal conversation.

22   Again, remember, I was Executive Director of this

23   organization.  I did not have -- you know, I was not

24   deeply involved in every aspect of the strategy and

25   the discussion.

94

1    a lot of money.  In today's world, it isn't.  I mean,

2    just read your newspapers.  You're at the FEC.  You

3    know what campaigns are spending.  They're spending

4    that because these kinds of tools we are now using are

5    very, very expensive.  So that looks large.  It really

6    isn't.

7         Q    Got it.  Okay.  Moving down here to the

8    bottom of the page here where we have consulting --

9         A    Mm-hmm.

10        Q    -- we see a number of payments to Mr.

11   Whatman, and if we look over, they sort of vary

12   between $20,000 and $10,000, and we see them

13   recurring.  They seem to be linked to certain months.

14        A    Yeah, I would expect so.

15        Q    Okay.  So it appears that he had an ongoing

16   engagement with Freedom Vote, is that correct?

17        A    Yes.  Correct.

18        Q    So what did Mr. Whatman do for Freedom Vote

19   in 2016?

20        A    Well, 2016, he was the person we looked to

21   for advice on what made sense for Freedom Vote to do

22   in that race.  The Senate race was our primary

23   activity in 2016.

24        Q    Sure.  And so, at that point, that

25   consulting, he was just sort of advising Freedom Vote

1          having been previously duly sworn, was

2     recalled as a witness herein and was examined and

3     testified further as follows:

4       EXAMINATION BY COUNSEL FOR THE GOVERNMENT (RESUMES)

5          BY MS. DI GIOVANNI:

6     Q    So, back to our wonderful habit of

7     screensharing here, I am introducing Exhibit No. 10,

8     and this is Bates stamped 1482 -- oh, I don't need

9     this here -- 1482 through 84, and then there's also an

10    attachment to it.  So let me zoom in for you, Mr.

11    Nathanson, can you see that this is an email that is

12    sent to you?

13                          (The document referred to was

14                          marked for identification as

15                          Exhibit No. 10.)

16          MR. SPIES:  Do you mind scrolling down to

17    the bottom so we see the context of the whole thing?

18          MS. DI GIOVANNI:  Sure, it's a bit of a long

19    one, but we can do the whole thing.

20          BY MS. DI GIOVANNI:

21    Q    So this one, I'll start at the bottom where

22    you can actually see.  This starts with an email from

23    a redacted individual, so a donor, to Mr. Nathanson.

24    It says, "I am very pleased to inform you the Freedom

25    Vote *2016 Economic Policy Education & Advocacy Efforts*

1    funding request has been approved by our funding

2    review committee in the amount of $1,000,000."  And

3    then it attaches a letter of agreement.  Mr.

4    Nathanson, does that all sound correct based on what

5    you're seeing on the screen?

6        A    There was a million-dollar contribution if I

7    remember correctly.  Correct.

8        Q    Okay.  So I just read that paragraph there

9    beginning with "James."  What can you tell me about

10   this *2016 Economic Policy Education & Advocacy Efforts*

11   funding request?

12       A    It was a request based on our standard

13   desire to promote education -- to educate the areas of

14   economic policy for Ohio.  It was our standard -- what

15   we standard -- what we do as a standard matter of

16   fact.  It's what we do.

17       Q    So this was just a general funding request?

18   It wasn't project-specific?

19       A    I'm trying to remember specifically if it

20   was.  You'd have to go back and forth.  You'd think a

21   million dollars would stick in my mind.  I know we

22   received a million dollars.  If you could, can you

23   kind of scroll up a bit?  I just need more -- let me

24   see.

25       Q    Sure.  There is not a ton of information

AR1499

1    here.  One second.  My computer is actually acting up,

2    if you'll pause with me for just a moment.  There it

3    goes.  Okay, we figured it out.  So there's some back

4    and forth about the letter of agreement.  There's

5    countersigning it.  There's not really much discussion

6    here on the actual policy or that it was funded.

7        A    We had standard letters of agreement, and

8    I'm assuming that's what this was.  I'm not sure --

9        Q    I can show you the letter as well.  So the

10   letter is down here, signed by you at the end of the

11   day.  It's a fairly generic letter, I would agree.  It

12   does appear to be standard.  So that's why I'm

13   interested sort of in what this actually entailed,

14   what the $1 million that you asked for and received --

15       A    That letter was based on a little change for

16   years or who knows what.  That was our standard letter

17   that we did as follow-up to solicitation.

18       Q    Okay.  So --

19       A    So we sent that letter.  That letter would

20   have gone to most anyone who, you know, was a

21   potential donor, who had said they would donate.

22       Q    Okay.  So this project, you think that --

23   you believe, to the best of your recollection, that

24   this may have been a general funding request, not one

25   associated with a specific project?  Is that what you

1    are saying it's for?

2         A    Given the thing, again, all I can tell you

3    is I don't know for sure.  My sense is, you know,

4    we -- I will be very honest.  The main thing we did in

5    2016 was concerned about what was happening in the

6    Senate race.  And that's a million-dollar check, so I

7    assume it was that, but that's an assumption.  I just

8    don't know for certain, but I believe it was -- I

9    mean, that was the main thing we did in 2016.

10        Q    Okay.  So this project, in terms of how

11   Freedom Vote spent this money, you believe it was

12   likely on this project that involved that

13   advertisement we talked about, which we'll refer to as

14   "Third Largest"?

15        A    It's my -- that would be my best guess.

16        Q    Okay.  And do you recall how Freedom Vote

17   would have solicited these funds?  It appears that

18   this is in response to a request?

19        A    Well, again, as we have previously

20   discussed, we had individuals who were raising money

21   from donors, and then I would do this kind of follow-

22   up with sort of, you know, the technical letters of

23   agreement.  So it would have been, I assume, no

24   different than the fundraising we were doing elsewhere

25   in 2016.

1            MS. DI GIOVANNI:  Okay.  So, Charlie -- were

2       you trying to say something?  I just saw you move.

3            THE WITNESS:  Pardon?

4            MS. DI GIOVANNI:  Well, I just thought you

5       might be saying something.  I didn't want to talk over

6       you.  Sorry about that.

7            THE WITNESS:  No, no, no.

8            MS. DI GIOVANNI:  Okay.

9            THE WITNESS:  And I'm sorry for talking over

10      you.

11           MS. DI GIOVANNI:  Oh, not at all.

12           BY MS. DI GIOVANNI:

13      Q    So can you recall what Freedom Vote would

14      have, you know, been talking about with this person

15      who, because it's redacted, we believe to be a donor?

16      A    No.  Again, I'm assuming it would have been

17      about our activities in 2016, which were primarily

18      those involved around the Senate race.  But that was

19      presumption upon presumption, which was presumption

20      squared.

21      Q    Sure, understood.  So let's go back to what

22      we read before, where the email began with Tom Whatman

23      sending this tweet talking about Strickland's image

24      doing poorly.  Do you believe that this was related to

25      asking this individual for contributions and that Tom

# Tab 6

Memorandum to the Commission regarding Investigation Update and Intent to Serve Probable Cause Brief from Lisa J. Stevenson, Acting General Counsel, et al. (dated Sep. 13, 2021) AR1528–29



# FEDERAL ELECTION COMMISSION

1 __MEMORANDUM__

3 **TO:**        The Commission

5 **FROM:**     Lisa J. Stevenson
6              Acting General Counsel

8              Charles Kitcher
9              Associate General Counsel for Enforcement

11 **DATE:**     September 13, 2021

13 **BY:**       Jin Lee
14              Acting Assistant General Counsel

16              Justine A. di Giovanni
17              Attorney

19 **SUBJECT:**  MUR 7465 (Freedom Vote, Inc.) Investigation Update and Intent to Serve
20              Probable Cause Brief

---

23      We write to inform you about the status of this matter and our intent to serve a probable
24 cause brief on Freedom Vote, Inc., ("Freedom Vote").  On July 25, 2019, the Commission found
25 reason to believe that Freedom Vote violated 52 U.S.C. §§ 30102, 30103, and 30104(a), (b), and
26 (g)(2) by failing to organize, register, and report as a political committee; and violated 52 U.S.C.
27 § 30120(a), (d) and 11 C.F.R. § 110.11 by failing to include a disclaimer on a television
28 advertisement, "Third Largest."[1]  Pursuant to the Commission's findings, the Office of General
29 Counsel commenced an investigation.[2]

31      The investigation established that Freedom Vote became a political committee in 2014
32 when its major purpose became the nomination or election of federal candidates, and, as a result,
33 failed to organize, register, and report as a political committee.  The statute of limitations
34 regarding this violation is ongoing, as Freedom Vote continues to have reporting obligations.
35 However, Freedom Vote's last report on which it would have been required to report and itemize
36 election-related receipts and expenditures was its 2016 Year-End report, due January 31, 2017,
37 and for which the statute of limitations will expire January 31, 2022.  The investigation also
38 established that Freedom Vote failed to include the appropriate disclaimer on its television

---

[1]      Certification ¶ 2 (July 29, 2019).
[2]      *Id.* ¶ 2.d.

MUR 7465 (Freedom Vote, Inc.)
Memorandum to the Commission
Page 2 of 2

1   advertisement, "Third Largest," but as that ad ceased airing on July 22, 2016, the statute of
2   limitations has expired with respect to that violation.
3
4           Because the Respondent has not agreed to toll the statute of limitations, we believe the
5   Commission should move directly to the probable cause stage of the enforcement process
6   without engaging in pre-probable cause conciliation.  Accordingly, on September 20, 2021, we
7   intend to serve Freedom Vote with a probable cause brief regarding its failure to organize,
8   register, and report as a political committee to afford it an opportunity to respond, as required by
9   the Act and the Commission's probable cause procedures.[3]  As is our normal practice, we plan to
10  furnish a copy of that brief to the Commission when it is served.  In addition, we will circulate a
11  Second General Counsel's Report that would include an analysis supporting our
12  recommendations to:  (1) take no further action as to the allegations that Freedom Vote and
13  Fighting for Ohio Fund and Christopher M. Marston in his official capacity as treasurer violated
14  52 U.S.C. § 30122 by making and accepting contributions in the name of another; and (2) take
15  no further action as to the allegations that James S. Nathanson, Freedom Vote's Executive
16  Director, violated the Act or Commission regulations in his individual capacity.

---

[3]        *See* 52 U.S.C. § 30109(a)(3); 11 C.F.R. § 111.16.

# Tab 7

General Counsel's Brief (signed and dated Sept. 20, 2021) AR1530–59



FEDERAL ELECTION COMMISSION
Washington, DC 20463

**<u>VIA ELECTRONIC MAIL</u>**                                    September 20, 2021

Charles R. Spies
Dickinson Wright PLLC
1825 Eye St. NW
Washington, DC 20006
cspies@dickinson-wright.com

                                        RE:    MUR 7465
                                               Freedom Vote, Inc.

Dear Mr. Spies:

       Based on a complaint filed with the Federal Election Commission on August 9, 2018, the
Commission, on July 25, 2019, found that there is reason to believe that your client, Freedom
Vote, Inc., violated 52 U.S.C. §§ 30102, 30103, 30104(a), (b), (g)(2), and 30120(a), (d) of the
Federal Election Campaign Act of 1971, as amended (the "Act"), and instituted an investigation
of this matter.

       After considering all the information available to the Commission, the Office of General
Counsel is prepared to recommend that the Commission find probable cause to believe that a
violation has occurred.

       The Commission may or may not approve the General Counsel's recommendation.
Submitted for your review is a brief stating the position of the General Counsel on the legal and
factual issues of the case.  Within 15 days of your receipt of this notice, you may file a brief
stating your position on the issues and replying to the General Counsel's Brief.[1]  The General
Counsel's Brief and any brief which you may submit will be considered by the Commission
before proceeding to a vote of whether there is probable cause to believe a violation has
occurred.

       If you are unable to file a responsive brief within 15 days, you may submit a written
request for an extension of time. All requests for extensions of time must be submitted in writing
five days prior to the due date, and good cause must be demonstrated. In addition, the Office of

---

[1]       You may submit the brief electronically to cela@fec.gov, or to the staff attorney assigned to the matter as
applicable.  Enforcement-related materials submitted only by mail will be deemed received when actually received
by OGC staff, subject to delays due to the intermittent processing of mail.  *See* https://www.fec.gov/resources/cms-content/documents/status_of_fec_operations_8-10-2020.pdf.

General Counsel ordinarily will not give extensions beyond 20 days. The Office of General Counsel will not give extensions absent an agreement to toll the applicable statute of limitations.

You may also request additional information gathered by the Commission in the course of its investigation in this matter. *See* Agency Procedure for Disclosure of Documents and Information in the Enforcement Process, 76 Fed. Reg. 34,986 (June 15, 2011).

In addition, you may also request an oral hearing before the Commission. *See* Procedural Rules for Probable Cause Hearings, 72 Fed. Reg. 64,919 (Nov. 19, 2007); Amendment of Agency Procedures for Probable Cause Hearings, 74 Fed. Reg. 55,443 (Oct. 28, 2009). Hearings are voluntary, and no adverse inference will be drawn by the Commission based on a respondent's decision not to request such a hearing. Any request for a hearing must be submitted along with your reply brief and must state with specificity why the hearing is being requested and what issues the respondent expects to address. A request for a probable cause hearing will require the Respondent to toll the applicable statute of limitations. *See* Procedural Rules for Probable Cause Hearings, 72 Fed. Reg. at 64,920. The Commission will notify you within 30 days of your request for a hearing as to whether or not the request has been granted.

A finding of probable cause to believe requires that the Office of General Counsel attempt for a period of not less than 30, but not more than 90, days, to settle this matter through a conciliation agreement.

Should you have any questions, please contact Justine A. di Giovanni, the attorney assigned to this matter, at (202) 694-1574 or jdigiovanni@fec.gov.

Sincerely,

*Lisa J. Stevenson/ by JL*

Lisa J. Stevenson
Acting General Counsel

Enclosure
 General Counsel's Brief

AR1531

1    **BEFORE THE FEDERAL ELECTION COMMISSION**

2    In the Matter of                                          )
3                                                              )
4         Freedom Vote, Inc.                                   )        MUR 7465
5                                                              )

6                        **GENERAL COUNSEL'S BRIEF**

7    **I.    STATEMENT OF THE CASE**

8         This matter was generated by a complaint filed with the Federal Election Commission

9    (the "Commission") against Freedom Vote, Inc. ("Freedom Vote") alleging that Freedom Vote

10   spent the majority of its funds on federal political activity and failed to organize, register, and

11   report as a political committee in violation of the Federal Election Campaign Act of 1971, as

12   amended (the "Act"). Based on the available information, on July 25, 2019, the Commission

13   found reason to believe that Freedom Vote violated 52 U.S.C. §§ 30102; 30103; and 30104(a),

14   (b), (g)(2) by failing to organize, register, and report as a political committee, and authorized the

15   use of compulsory process.[1]

16        This Office commenced an investigation to ascertain the extent, nature, and cost of

17   Freedom Vote's federal campaign activity, and whether Freedom Vote received funds that would

18   have constituted contributions, triggering reporting requirements under the Act. The record

19   derived from this investigation confirmed that, by 2014, Freedom Vote's major purpose had

20   become the nomination or election of a federal candidate and further revealed that, from 2014

21   until its termination as an entity in 2019, over 71% of its expenditures aggregating over $3.4

22   million constituted federal campaign activity. Accordingly, this Office is prepared to

23   recommend that the Commission find probable cause to believe that Freedom Vote violated

---

[1]        Certification ("Cert.") ¶ 2 (July 29, 2019).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 2 of 28

1    52 U.S.C. §§ 30102; 30103; and 30104(a), (b), and (g)(2) by failing to organize, register, and

2    report as a political committee.

3    **II.    FACTS**

4        **A.    Establishment and Corporate Structure of Freedom Vote**

5        According to its Articles of Incorporation and filings with the Internal Revenue Service

6    ("IRS"), Freedom Vote was incorporated as an Ohio non-profit organization in 2010 and treated

7    as a section 501(c)(4) tax-exempt corporation by the IRS.[2]  According to those documents, the

8    organization's stated purpose was "[t]o further the common good and general welfare of the

9    people of Ohio."[3]

10        James S. Nathanson was Freedom Vote's Executive Director from January 1, 2011 until

11    Freedom Vote's dissolution in 2019.[4]  As Executive Director, Nathanson's responsibilities

12    involved the day-to-day management of the organization, including keeping records of its

13    receipts and spending.[5]  Nathanson had extensive political experience before joining Freedom

---

[2]    FREEDOM VOTE, INITIAL ARTICLES OF INCORPORATION (July 6, 2010); Letter from IRS to Freedom Vote (Aug 20, 2010) (confirming acceptance of application for tax-exempt status under § 501(c)(4) of the Internal Revenue Code).

[3]    FREEDOM VOTE, INITIAL ARTICLES OF INCORPORATION (July 6, 2010); *e.g.,* Freedom Vote, IRS Form 990, Return of Organization Exempt from Income Tax for FY 2013 (Aug. 11, 2015) [hereinafter Freedom Vote 2013 Tax Return].

[4]    Freedom Vote, IRS Form 990, Return of Organization Exempt from Income Tax for FY 2010 at 7 (Aug. 19, 2012) [hereinafter Freedom Vote 2010 Tax Return] (naming Nathanson as Executive Director "effective 1/1/11"); Freedom Vote, IRS Form 990, Return of Organization Exempt from Income Tax for FY 2011 at 7 (July 25, 2013) [hereinafter Freedom Vote 2011 Tax Return]; Freedom Vote, IRS Form 990, Return of Organization Exempt from Income Tax for FY 2012 at 7 (Aug. 1, 2014) [hereinafter Freedom Vote 2012 Tax Return]; Freedom Vote 2013 Tax Return at 7; Freedom Vote, IRS Form 990-EZ, Short Form Return of Organization Exempt from Income Tax for FY 2014 at 2 (Aug. 11, 2016) [hereinafter Freedom Vote 2014 Tax Return]; Freedom Vote, IRS Form 990, Return of Organization Exempt from Income Tax for FY 2015 at 7 (Aug. 14, 2017) [hereinafter Freedom Vote 2015 Tax Return]; Freedom Vote, IRS Form 990-EZ, Short Form Return of Organization Exempt from Income Tax for FY 2016 at 2 (Aug. 9, 2018) [hereinafter Freedom Vote 2016 Tax Return]; Freedom Vote, IRS Form 990-EZ, Short Form Return of Organization Exempt from Income Tax for FY 2017 at 2 (May 8, 2019) [hereinafter Freedom Vote 2017 Tax Return]; Freedom Vote, IRS Form 990-EZ, Short Form Return of Organization Exempt from Income Tax for FY 2018 at 2 (June 12, 2019) [hereinafter Freedom Vote 2018 Tax Return].

[5]    *See* Nathanson Dep. Tr. at 109:8-14 (May 12, 2021).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 3 of 28

1    Vote.  Nathanson was a long-time Republican political consultant who served as the executive

2    director for George H.W. Bush's 1988 presidential campaign in Ohio before becoming a political

3    director for the Republican National Committee ("RNC") in the early 1990s.[6]  He testified that

4    he had "done a great number of statewide races, and in more recent years . . . , it's been more

5    kind of a task within a campaign than involvement fully, A to Z, in the campaign itself,"

6    including one of the "specialties of [his] firm, door-to-door work."[7]

7         Prior to taking on the Executive Directorship, Nathanson's consulting firm, James S.

8    Nathanson and Associates, LLC ("Nathanson & Associates"),[8] raised $530,000 for Freedom

9    Vote in its first fiscal year, for which it was paid $22,500.[9]  Once he became Executive Director,

10   Nathanson & Associates received $245,000 in payments for Nathanson's salary;[10] $143,800 for

11   "project management;"[11] and $658,542 for fundraising, with an additional $413,059 paid to

12   Nathanson directly for consulting and fundraising.[12]

---

[6]     Nathanson Dep. Tr. at 14:8-23; *see also* Paul Taylor, *GOP Strategist "Carpet-Bombs" Buckeye State*, WASH. POST (Nov. 4, 1988), https://www.washingtonpost.com/archive/politics/1988/11/04/gop-strategist-carpet-bombs-buckeye-state/efc3214c-6871-4327-8b3f-234aab29051e/ (describing Nathanson as a political operative who "manages the campaign of Republican presidential nominee George Bush in [Ohio]"); *GOP Director to Speak*, BALT. SUN (Dec. 2, 1990), https://www.baltimoresun.com/news/bs-xpm-1990-12-02-0503030427-story.html (describing Nathanson's education and political campaign work).

[7]     Nathanson Dep. Tr. at 13:15-24.

[8]     Nathanson stated that he has run Nathanson & Associates since the "earl[y] mid-'80s" and has served as "a general consultant.  I've been brought onboard to consult on specific areas, things like the ground game, voter contact . . . .  You want me to do it, I'll do it." *Id.* at 14:8-23.

[9]     Freedom Vote, IRS Form 990, Return of Organization Exempt from Income Tax for FY 2009, Sched. G (Aug. 12, 2011) [hereinafter Freedom Vote 2009 Tax Return].

[10]    Freedom Vote 2011 Tax return at 7 (reporting $60,000 salary); Freedom Vote 2012 Tax Return at 7 (reporting $24,000 salary); Freedom Vote 2013 Tax Return at 7 (reporting $12,000 salary); Freedom Vote 2014 Tax Return at 2 (reporting $30,000 salary); Freedom Vote 2015 Tax Return at 7 (reporting $24,000 salary); Freedom Vote 2016 Tax Return at 2 (reporting $30,000 salary); Freedom Vote 2017 Tax Return at 2 (reporting $30,000 salary); Freedom Vote 2018 Tax Return at 2 (reporting $35,000 salary).

[11]    Ledger of 2014 Freedom Vote Receipts and Expenses, FV01147-48 at FV01148

[12]    Freedom Vote 2010 Tax Return at 8 & Sched. L at 2.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 4 of 28

1    Freedom Vote's only other employees over its lifetime were its Directors.[13]  These were

2  Jeremy Hughes, who served as Executive Director from Freedom Vote's incorporation until

3  December 31, 2010;[14] David W. Johnson, who served as Director/Chairman in fiscal year

4  2009;[15] Richard A. Cochran, who served as Director/Treasurer in fiscal years 2009 through

5  partial fiscal year 2014;[16] James B. McGregor, Sr., who served as Director/Secretary in fiscal

6  years 2009 through partial fiscal year 2011, when he died;[17] Ralph Harper, who served as a

7  director in fiscal year 2011;[18] and Mitch Given, who served as Director/Treasurer/Secretary in

8  fiscal year 2014 through the organization's dissolution in calendar year 2019.[19]  From 2014

9  through 2019, Nathanson and Given were Freedom Vote's sole directors and officers.[20]

10    One of Freedom Vote's key advisers was Tom Whatman, the former Executive Director

11  of the Ohio Republican Party and former Executive Director of Republican House member John

12  Boehner's campaign.[21]  A press report from 2010 quotes Whatman as stating, in the context of

13  creating Freedom Vote to raise money for turnout operations generally paid for by the RNC, that

14  he "understood that the lack of resources from the RNC was going to have a severe impact on

---

[13]    Nathanson Dep. Tr. at 17:23-18:4 ("We had a Board but no other employees [beside Nathanson].").

[14]    Freedom Vote 2009 Tax Return at 7; Freedom Vote 2010 Tax Return at 7.

[15]    Freedom Vote 2009 Tax Return at 7.  Freedom Vote's fiscal years ran from October to September.  *See, e.g., id.* at 1.

[16]    *Id.* at 7; Freedom Vote 2010 Tax Return at 7; Freedom Vote 2011 Tax Return at 7; Freedom Vote 2012 Tax Return at 7; Freedom Vote 2013 Tax Return at 7; Freedom Vote 2014 Tax Return at 2.

[17]    Freedom Vote 2009 Tax Return at 7; Freedom Vote 2010 Tax Return at 7; Freedom Vote 2011 Tax Return at 7.

[18]    Freedom Vote 2011 Tax Return at 7.

[19]    Freedom Vote 2014 Tax Return at 2; Freedom Vote 2015 Tax Return at 7; Freedom Vote 2016 Tax Return at 2; Freedom Vote 2017 Tax Return at 2; Freedom Vote 2018 Tax Return at 2.

[20]    *See supra* notes 4 through 19 and accompanying text.

[21]    This Office made numerous attempts to contact Whatman throughout the investigation but was unable to establish contact.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 5 of 28

1    what the parties were going to be able to do."[22]  Though Whatman had no formal role as an

2    employee or director of Freedom Vote, he was involved in its operations throughout its

3    existence:  Whatman provided consulting services to the organization for which it paid at least

4    $177,500, primarily in 2016.[23]  Whatman was also involved in Freedom Vote's management,

5    fundraising, and spending.[24]  Further, Whatman asked Nathanson to assume Freedom Vote's

6    Executive Directorship in 2011.[25]

7        **B.    Freedom Vote's Activities**

8        Between its incorporation on July 6, 2010, and September 30, 2013, Freedom Vote raised

9    and spent more than $3.4 million, which its tax returns indicate was expended on issue-related

10   advocacy; the investigation did not reveal information that contradicts this point.[26]  Beginning no

11   later than 2014, however, the majority of Freedom Vote's spending was related to federal

12   campaign activity, and as described below, from 2014 onward, over 71% of Freedom Vote's

---

[22]      Jeanne Cummings, *State Parties Look Past RNC for Cash*, POLITICO (Sept. 3, 2010), https://www.politico.com/story/2010/09/state-parties-look-past-rnc-for-cash-041733.

[23]      Ledger of 2014 Freedom Vote Receipts and Expenses, FV01147-48 at FV01148 (showing disbursement of $15,000 to Tom Whatman for "Consulting"); Ledger of 2016 Freedom Vote Receipts and Expenses, FV01155-59 at FV01158-59 (showing disbursements totaling $162,500 to Tom Whatman for "Consulting").  We did not request, and Freedom Vote did not produce, records from before 2014, so the extent of Whatman's compensation from Freedom Vote prior to 2014 is not part of the available record.

[24]      Nathanson Dep. Tr. at 93:6-9, 95:20-24, 97:1-2 ("Q[:]  Do you know who would have been the front line of contact?  A[:]  Mr. Whatman was our consultant that year, and Tom would have probably been very much involved. . . . Q[:]  Was [fundraising] part of what [Whatman] was doing for Freedom Vote in 2016?  A[:] . . . Tom was at involved in at least in the strategy of fundraising."); *id.* at 35:7-25, 37:20-21 ("Q[:]  [W]ho asked [Freedom Vote] to take on projects, and what were they? . . .  A[:]  I know Mr. Whatman asked at times, and I think there were others."); *id.* at 97:4-6 ("Q[:]  And how did Freedom Vote select MMM for this fundraising work?  A[:]  Whatman suggested MMM to us."); *id.* at 108:5-12 ("My consultant [Mr. Whatman] . . . would have played a role in suggesting that [contributing $1.8 million to Fighting for Ohio Fund in 2016] was a good thing to [do].").

[25]      *Id.* at 18:18-23 ("So how did you become involved with Freedom Vote?  A[:]  I was asked to take over the Executive Directorship.  Q[:]  Who asked you?  A[:]  Thomas Whatman.").

[26]      Freedom Vote 2009 Tax Return; Freedom Vote 2010 Tax Return; Freedom Vote 2011 Tax Return; Freedom Vote 2012 Tax Return.  As discussed in note 15, *supra*, because Freedom Vote's fiscal years ran from October to September and the limited information the respondent provided in its returns, it is not possible to calculate its receipts and expenditures on a calendar year basis.  We did not request, and Freedom Vote did not produce, financial records from before 2014.  *See* note 23, *supra*.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 6 of 28

1    total spending was for this purpose.  Further, the ledgers of Freedom Vote's financial activity

2    reviewed by this Office, which cover 2014 to 2019, show no specific policy, issue advocacy, or

3    education expenditures.[27]

4             1.    The 2014 Election Cycle

5         In calendar year 2014, Freedom Vote raised $255,000 and spent a total of $290,161.09.[28]

6    That year, it reported to the Commission making $174,607.55 in independent expenditures

7    supporting John Boehner's candidacy in the 8th Congressional District in Ohio, representing

8    60.18% of Freedom Vote's total expenses.[29]  These reported expenditures included

9    disbursements for "canvassers and consulting;"[30] robocalls that stated "Our Republican candidate

10    is Congressman John Boehner.  He is the nation's leading conservative and has a record of

11    standing up to the liberals in Washington.  . . .  Please don't forget to vote;"[31] and door hangers

12    that urged voters to vote for Boehner in the Republican primary, such as the one below.[32]

---

[27]    Ledger of 2014 Freedom Vote Receipts and Expenses, FV01147-48; Ledger of 2015 Freedom Vote Receipts and Expenses, FV01151-52; Ledger of 2016 Freedom Vote Receipts and Expenses, FV01155-59; Ledger of 2017 Freedom Vote Receipts and Expenses, FV01162-63; Ledger of 2018 Freedom Vote Receipts and Expenses, FV01191-92; Ledger of Partial 2018 and 2019 Freedom Vote Receipts and Expenses, FV01195-96; Ledger of Partial 2018 and 2019 Freedom Vote Receipts and Expenses, FV01199-1200.

[28]    Ledger of 2014 Freedom Vote Receipts and Expenses, FV01147-48.

[29]    *FEC Independent Expenditures:  Filtered Results*, FEC.GOV, https://www.fec.gov/data/independent-expenditures/?data_type=processed&committee_id=C90014754&is_notice=false&min_date=01%2F01%2F2013&max_date=12%2F31%2F2014 (last visited Sept. 20, 2021) (showing Freedom Vote's reported independent expenditures during the 2014 election cycle, all of which were made in calendar year 2014).

[30]    Freedom Vote, 2014 July Quarterly Report, Sched. E (July 15, 2014).

[31]    *Id.*; Email from James Nathanson, Freedom Vote, to Elizabeth Blosser, FLS Connect, FV01328-33 at FV01328 (May 1, 2014, 2:39 PM) (including final script for robocall).

[32]    Freedom Vote, Door Hanger Advocating for Republican Primary Candidate John Boehner, FV01305-06 at FV01305; Freedom Vote, 2014 July Quarterly Report, Sched. E (July 15, 2014).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 7 of 28



1          However, Freedom Vote spent additional sums to produce and distribute these

2    communications for the purpose of influencing that election beyond those reported as

3    independent expenditures to the Commission.  For instance, though Freedom Vote reported

4    making a single $10,579.70 payment to Connection Strategy, LLC ("Connection Strategy"), for

5    an independent expenditure on March 22, 2014, for "Map books for canvassing,"[33] its internal

---

[33]      Freedom Vote, Amended 2014 April Quarterly Report, Sched. 5-E at 3 (July 15, 2014).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 8 of 28

1   ledger indicates that it made four payments to Connection Strategy between January and August

2   2014 totaling $32,398.23.[34]   Of the nine Connection Strategy invoices that Freedom Vote

3   produced, three, aggregating $16,342.45, explicitly mention the 8th Congressional District in

4   Ohio.[35]   The remaining invoices do not explicitly refer to an election, but given that one

5   references "poll ride calls,"[36] and three others describe a support fee for a political canvassing

6   tool,[37] the weight of the evidence suggests that that these invoices also supported Freedom

7   Vote's electoral activities in the 8th Congressional District, which is where Boehner was a

8   candidate and prevailed in the election.

9          Freedom Vote also paid Nathanson & Associates for additional federal campaign activity

10  beyond the total listed in its independent expenditure report.   It disbursed a total of $143,800 to

11  that organization, and invoices show that these expenses were billed explicitly as "OH 8 IE

12  Expenditures."[38]   Freedom Vote reported a total of $126,187.50 in independent expenditures

---

[34]     Ledger of 2014 Freedom Vote Receipts and Expenses, FV01147-48.

[35]     Invoice 075191 from Connection Strategy to Freedom Vote, FV00929 (Apr. 14, 2014) (billing $14,337.40 for "OH CD 08 Live ID"); Invoice 075844 from Connection Strategy to Freedom Vote, FV00932 (May 5, 2014) (billing $1,135.85 for "Sunday GOTV Calls – OH CD 8;" Freedom Vote appears to have reported this expenditure to the Commission as a payment to FLS Connect; *see* Freedom Vote, 2014 July Quarterly Report, Sched. 5-E at 3 (July 15, 2014) (reporting independent expenditure of $1,135.85 dated May 4, 2014, for "robocalls")); Invoice 075874 from Connection Strategy to Freedom Vote, FV00934 (May 7, 2014) (billing $869.20 for "Election Day GOTV — OH CD 8").

[36]     Invoice 075875 from Connection Strategy to Freedom Vote, FV00935 (May 7, 2014) (billing $510.20 for "Poll Ride Calls").

[37]     Invoice 902788 from Connection Strategy to Freedom Vote, FV00887 (Jan. 16, 2014) (billing $7,000 for "Geo Connect Set Up Fee" and "Transaction Fee"); Invoice 077964 from Connection Strategy to Freedom Vote, FV00885 (July 31, 2014) (identifying $250 expense for GeoConnect monthly support fee); Invoice 075871 from Connection Strategy to Freedom Vote, FV00933 (May 7, 2014) (billing $250 for "GeoConnect Monthly Support Fee").  Geo Connect is a canvassing tool offered by FLS Connect, another of Freedom Vote's vendors.  *Geo Connect: Canvass from Anywhere*, FLS CONNECT, http://flsconnect.com/geo-connect (last visited Sept. 20, 2021).

[38]     Invoice from Nathanson & Associates to Freedom Vote, FV00871 (Mar. 31, 2014) (billing $17,000 for "OH 8 IE Expenditures"); Invoice from Nathanson & Associates to Freedom Vote, FV00873 (Apr. 25, 2014) (billing $41,500 for "OH 8 IE Expenditures"); Invoice from Nathanson & Associates to Freedom Vote, FV00875 (Apr. 29, 2014) (billing $45,300 for "OH 8 IE Expenditures"); Invoice from Nathanson & Associates to Freedom Vote, FV00877 (May 12, 2014) (billing $40,000 for "OH 8 IE Expenditures").

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 9 of 28

1   paid to Nathanson & Associates,[39] which means that an additional $17,612.50 of its payments to

2   Nathanson were for the purpose of influencing the election.

3          Freedom Vote further incurred other expenses associated with the independent

4   expenditures that provide evidence of its purpose.  For instance, Freedom Vote paid a consultant,

5   Missy Mae Waters, a total of $3,618.43 over two payments in April 2014.[40]  Invoices Freedom

6   Vote produced indicate that this work was related to the canvassing independent expenditure

7   partially reported to the Commission and discussed above.  The invoices note Waters's expenses,

8   including mileage costs for "DTD [door-to-door] Effort[s]" across Ohio in April 2014; the cost

9   of iPads used in the canvassing efforts; covers for and configuration of the iPads; canvassing

10  literature carrying bags; advertisements for recruiting canvassers; and gift cards with which to

11  reward canvassers.[41]  Freedom Vote also paid $7,240 to The Strategy Group Company for

12  materials relating to Gurr and Winteregg, the two candidates running against Boehner and

13  opposed in Freedom Vote's independent expenditures.[42]  When asked, Nathanson testified that

14  Freedom Vote's payments to the Strategy Group Company were for "opposition research" for

15  the Boehner race.[43]  Aggregating the above expenses with those Freedom Vote reported to the

---

[39]      Freedom Vote, Amended 2014 April Quarterly Report, Sched. E (July 15, 2014); Freedom Vote, 2014 July Quarterly Report, Sched. E (July 15, 2014).

[40]      Ledger of 2014 Freedom Vote Receipts and Expenses, FV01147-48.

[41]      Invoice 34 from Missy Mae Walters to Freedom Vote, FV00132-33 (Apr. 6, 2014); Invoice 37 from Missy Mae Walters to Freedom Vote, FV00129 (Apr. 28, 2014).

[42]      Ledger of 2014 Freedom Vote Receipts and Expenses, FV01147; Invoice 857 from The Strategy Group Company to Freedom Vote, FV00879 (Jan. 20, 2014); Invoice 917 from The Strategy Group Company to Freedom Vote, FV00881 (Feb. 12, 2014); Invoice 948 from The Strategy Group Company to Freedom Vote, FV00883 (Feb. 26, 2014); *see also* Nathanson Dep. Tr. at 58:2-63:6 (confirming that, to the best of Nathanson's recollection, the payments to The Strategy Group Company were for the same project as the independent expenditures reported to the Commission).

[43]      Nathanson Dep. Tr. at 58:2-6.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 10 of 28

1    Commission, the total of Freedom Vote's political spending in support of Boehner's candidacy

2    in 2014 was at least $239,877.81, or 82.67% of its total expenditures.

3        During Nathanson's deposition, when asked about the organization's issue-related work,

4    Nathanson was unable to recall any specific examples of such advocacy and responded that

5    Freedom Vote was concerned with issues that "affected Speaker Boehner," noting, "We rarely

6    did a single specific policy issue.  We weren't — you're asking — the reason I'm being vague is

7    we weren't focused necessarily ongoing [sic] with a single issue.  They were on a set of related

8    issues that related to economic development often, relating to economic development and

9    economic health."[44]  When asked if it was important for Freedom Vote to elect John Boehner to

10    advance its support of economic issues, Nathanson replied, "I think that we felt that John

11    Boehner being Speaker was good for Ohio."[45]

12        Freedom Vote's internal communications further reflect that its advocacy during the 2014

13    cycle was electoral rather than issue-related, as its agents and vendors discussed the

14    organization's work in terms of election cycles and races — in particular, John Boehner's re-

15    election in the 8th Congressional District of Ohio.  Writing to a donor in April 2014, Nathanson

16    described Freedom Vote's anticipated expenses, totaling $90,000, and explained that he was

17    assuming "maximum effort through election day."[46]  When asked about what this meant, and

18    why election day was important for his work for Freedom Vote, Nathanson did not have a clear

19    recollection, but based upon the date of the email, he assumed that this email concerned the date

20    for the primary election in the 8th Congressional District of Ohio — *i.e.*, the date of John

---

[44]    *Id.* at 23:4-25:12.

[45]    *Id.* at 75:6-10.

[46]    Email from James Nathanson to redacted donor, FV01520-21 at FV01520 (Apr. 16, 2014, 6:17 PM).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 11 of 28

1    Boehner's primary election.[47]  He added that Freedom Vote's work on its issues was closely tied

2    to elections, stating:

3            If what we were concerned about were economic issues affecting Ohio as they
4            were explained in election campaigns, those issues tend to die one way or another
5            once there's no longer a campaign.  Then it turns in to the policymakers, and with
6            policymakers, the citizens of Ohio have less to do.[48]

7    When asked whether Freedom Vote ever advocated for its issues with policymakers after an

8    election had concluded, Nathanson stated, "I don't think we ever did."[49]

9            In sum, in 2014, Freedom Vote spent at least $239,877.81 on federal campaign activity,

10    which constituted 82.67% of its total spending for that year.

11            2.    The 2016 Election Cycle

12                i.    2015

13            In calendar year 2015, Freedom Vote raised $578,187.41 and spent a total of

14    $328,223.80.[50]  That year, it made a $200,000 contribution to Fighting for Ohio Fund, a

15    Commission-registered independent expenditure-only political committee, which itself spent

16    94.37% ($9.26 million) of its expenses on independent expenditures opposing Ted Strickland, a

17    2016 candidate for U.S. Senate in Ohio.[51]  Freedom Vote's contribution to Fighting for Ohio

18    Fund alone comprised 60.93% of Freedom Vote's total spending in 2015.[52]

---

47        Nathanson Dep. Tr. at 72:8-15.

48        *Id.* at 73:3-8.

49        *Id.* at 73:11.

50        Ledger of 2015 Freedom Vote Receipts and Expenses, FV01151-52.

51        *Filtered Results:  FEC Independent Expenditures*, FEC.GOV, https://www.fec.gov/data/independent-expenditures/?committee_id=C00573014&two_year_transaction_period=2016&cycle=2016&data_type=processed&is_notice=true (last visited Sept. 20, 2021) (showing all independent expenditures by Fighting for Ohio Fund during the 2016 election cycle).

52        Ledger of 2015 Freedom Vote Receipts and Expenses, FV01151-52; Fighting for Ohio Fund, 2015 Year-End Report, Sched. A at 11 (Jan. 31, 2016).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 12 of 28

1    Moreover, Freedom Vote spent additional funds on federal election activity including

2 $5,000 for "Kentucky 4th District Congressman Thomas Massie . . . Research and consulting

3 service"[53] and $12,539.00 for a poll described as a "survey of Republican voter attitudes in the

4 4th Congressional District of Kentucky."[54]  Though Nathanson testified that Freedom Vote

5 ultimately did not pursue any further work in Kentucky's 4th Congressional District,[55] the

6 substance of the polls and research conducted related purely to the nomination or election of

7 federal candidates rather than issue advocacy.  The work performed by the Tarrance Group, for

8 instance, focused solely on Thomas Massie's candidate favorability in that district and did not

9 address any issues or policy questions.[56]  As described in the memorandum reporting its work,

10 the survey's key findings were related to the impact of "Presidential Consideration[s]," candidate

11 "Name Identifications," and statistics specifically relating to Congressman Massie, such as "Job

12 Approval" and "Comparative Candidates."[57]  In sum, when combining Freedom Vote's $200,000

13 contribution to Fighting for Ohio Fund with the $17,539 spent on the election in the 4th

14 Congressional District of Kentucky, Freedom Vote's total federal campaign activity in 2015 was

15 at least $217,539.00, which was 66.28% of its total expenditures.

---

[53] Invoice from John Wasilchick LLC to Freedom Vote, FV00260 (Sept. 21, 2015); *accord* Ledger of 2015 Freedom Vote Receipts and Expenses, FV01151-52.

[54] Invoice 0011600-IN from The Tarrance Group to Freedom Vote, FV00262 (July 31, 2015); *accord* Ledger of 2015 Freedom Vote Receipts and Expenses, FV01151-52.

[55] Nathanson Dep. Tr. at 81:14-82:22.

[56] Memorandum from the Tarrance Group to Freedom Vote RE:  Key Findings from a Survey of Republican Primary Voters in Kentucky's 4th CD (Aug. 3, 2015).

[57] *Id.*

AR1543

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 13 of 28

1                              *ii.*        *2016*

2              In calendar year 2016, Freedom Vote's spending increased to $3.86 million, and its

3     receipts to $3.92 million.[58]  Nathanson stated multiple times during his deposition that the Ohio

4     Senate race was Freedom Vote's "primary activity in 2016,"[59] and that, "in 2016, we did not

5     proactively advocate specific policies for the future."[60]

6              Of Freedom Vote's $3.86 million in expenses, it made $1,775,000.00 in contributions to

7     Fighting for Ohio Fund,[61] which alone represented 45.96% of Freedom Vote's total expenditures

8     in 2016.  However, Freedom Vote spent significant additional funds on federal campaign

9     activity.  For instance, Nathanson testified that Freedom Vote's payments to Deep Root

10    Analytics ($75,000) and TargetPoint Consulting ($34,850) were for "large-number analytics"

11    and "straightforward polling" "in the context of the issues raised in the 2016 Senate race."[62]

---

[58]        Ledger of 2016 Freedom Vote Receipts and Expenses, FV01155-59, at FV01155, 59.

[59]        Nathanson Dep. Tr. at 94:22-23 ("The Senate race was our primary activity in 2016."); *id*. at 131:4-6 ("The main thing we did in 2016 was concerned about what was happening in the Senate race."); *id*. at 137:16-18 ("I'm assuming it would have been about our activities in 2016, which were primarily those involved around the Senate race.").

[60]        *Id*. at 115:5-6.

[61]        Ledger of 2016 Freedom Vote Receipts and Expenses, FV01155-59 at FV01159.  As stated above, 94.37% of Fighting for Ohio Fund's expenses during the 2016 election cycle were for independent expenditures opposing Ted Strickland.  *Supra* note 51 and accompanying text.

[62]        Nathanson Dep. Tr. at 89:1-91:5; Ledger of 2016 Freedom Vote Receipts and Expenses, FV01155-59 at FV01158.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 14 of 28

1    Further, Freedom Vote spent $1,102,713.45 to produce and air a television advertisement

2    entitled "Third Largest," which targeted federal candidate Ted Strickland.[63]  The content of the

3    advertisement was as follows:[64]

| Narration | Text on Screen | Visual |
|---|---|---|
| While Ted Strickland was governor, Ohio lost jobs to Kentucky, Indiana, even Michigan. | OHIO LOST JOBS TO KENTUCKY INDIANA MICHIGAN | Ted Strickland, speaking, on left; map of the United States with Ohio in red on right |
| 350,000 Ohio jobs gone. | 350,000 JOBS GONE | |
| How many is that?  If you assembled everyone who lost their job under Strickland, you'd have Ohio's third largest city. | OHIO'S LARGEST CITIES COLUMBUS 787,033 CLEVELAND 396,815 JOBS LOST UNDER STRICKLAND 350,000 CINCINNATI 296,943 TOLEDO 287,208 | Ted Strickland on right |
| And you could fill the OSU Horseshoe more than three times. | STRICKLAND LOST JOBS: COULD FILL THE HORSESHOE 3 TIMES | The Ohio Stadium of The Ohio State University |
| Now Ted Strickland wants to bring his job-killing policies to Washington. | TED STRICKLAND: BRINGING JOB-KILLING POLICIES TO WASHINGTON

PAID FOR BY FREEDOM VOTE | The United States Capitol |

---

[63]    *Id.*; Invoice FV61516 from Main Street Media Group to Freedom Vote, FV00405 (June 15, 2016) (showing media buy expenses for airing the ad from June 17 to June 23, 2016, on television, cable, and satellite); Invoice FV63016 from Main Street Media Group to Freedom Vote, FV01203 (June 30, 2016) (showing media buy expenses for airing the ad from July 16 to July 22, 2016, on television, cable, and satellite); Invoice 13117 from McCarthy Hennings Whalen, Inc. to Freedom Vote, FV01206 (June 21, 2016) (invoicing expenses for production of the ad); Invoice 13118 from McCarthy Hennings Whalen, Inc. to Freedom Vote, FV01204 (July 18, 2016) (same). Though the total expenses for the ad were originally Freedom Vote received a partial refund from Main Street Media Group of $18,363.48, making the final total $1,102,713.45.  Ledger of 2016 Freedom Vote Receipts and Expenses, FV01155-59 at FV01159.

[64]    Compl., Ex. A ("Third Largest") (Aug. 9, 2018).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 15 of 28

| Narration | Text on Screen | Visual |
|---|---|---|
| We can't afford more lost jobs. | WE CAN'T AFFORD MORE LOST JOBS<br><br>PAID FOR BY FREEDOM VOTE | Ted Strickland at podium |

When asked about the "Third Largest" advertisement, Nathanson testified that the advertisement was about Strickland's campaign for U.S. Senate, and that Freedom Vote aired the ad because "his performance [as governor . . .] raised questions about what he would be as a U.S. Senator. . . . Yeah, I mean, he had been governor, and he was going to — and he was running for the Senate."[65] When asked if it was important to Freedom Vote that Strickland lose this election, Nathanson responded as follows:

Q: Was it important to Freedom Vote that Strickland lose this election because he advanced these issues that were antithetical to Freedom Vote's purpose?

A: We thought it was important to Ohio.

Q: Mm-hmm. And so that was why Freedom Vote was involved, because it was important to Ohio that he lose the election?

A: Yeah. We thought that those issues had a very — would have a very negative impact on Ohio if that was what was brought from — brought to his position as a U.S. Senator. We were all about the economic issues that Ted Strickland represented.[66]

Further, the investigation showed that, in communications with donors, Freedom Vote solicited and received funds to support its activities in connection with the 2016 Senate race. For example, Whatman made at least one fundraising request on Freedom Vote's behalf that was explicitly linked to Strickland's performance. In a June 2016 email to a donor, Whatman began by stating, "Attached is a polling memo that shows what we are doing is working," and pointing

---

[65]    Nathanson Dep. Tr. at 124:16-23.

[66]    *Id.* at 125:20-126:3.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 16 of 28

1    out that Strickland was polling 22 points lower than he had the year before.[67]  The email chain

2    concludes with the donor asking for the address to which he could send his contribution and

3    Nathanson providing Freedom Vote's address.[68]

4          Other donors to Freedom Vote also understood the organization's work in terms of its

5    impact on federal elections during this cycle.  In August 2016, Freedom Vote received a

6    $500,000 donation accompanied by a letter stating, "Please note this is an Anonymous donation

7    for the reelection of Rob Portman," Strickland's opponent in the 2016 Senate race.[69]  In

8    response, Nathanson sent a letter to this donor, writing that Freedom Vote, a "501(c)(4)," did not

9    "accept contributions earmarked to support or oppose candidates for public office" as a matter of

10   policy.[70]  Notwithstanding Nathanson's statement, Freedom Vote did not refund the $500,000

11   provided by the anonymous funder, and the record indicates that donors understood that Freedom

12   Vote focused much of its activities on opposing Strickland, Portman's opponent, during the 2016

13   Senate race in Ohio, which in fact it did.

14          Accordingly, the investigation established that a vast majority of Freedom Vote's

15   spending during the 2016 election cycle was on federal elections.  In 2015, Freedom Vote spent

16   $17,539.00 on its research in the 4th Congressional District of Kentucky, in addition to a

17   $200,000 contribution to Fighting for Ohio Fund, which constituted 66.28% of its total spending

18   for that year.  Similarly, in 2016, between expenses for its "Third Largest" advertisement and

---

[67]      Email from Tom Whatman to redacted donor, FV01452-55 (June 22, 2016, 11:29 AM).  The referenced memo was not included with the version of the email Freedom Vote produced.

[68]      *Id.*  When asked why he provided his address, Nathanson told this Office, "I am assuming in order to receive the donation."  Nathanson Dep. Tr. at 135:25-136:1.  In producing documents, Freedom Vote redacted the names of its donors on the basis of its position that the Commission's determination regarding its status as a political committee has not yet been resolved.

[69]      Letter from redacted donor to Freedom Vote, FV00370 (Aug. 31, 2016).

[70]      Letter from Nathanson to redacted donor, FV01394 (Sept. 16, 2016).

1    those for polls and analytics, Freedom Vote spent at least $1,212,563.45 on the 2016 Senate race

2    in Ohio, which, in addition to its contributions to Fighting for Ohio Fund, total $2,987,563.45,

3    which was 77.35% of its total 2016 spending.

4              3.    <u>Spending After 2016</u>

5              Freedom Vote began winding up its operations after the 2016 election, and it did not

6    spend funds on its programmatic activities, either issue or campaign-related, after that cycle.

7    The investigation indicated that Freedom Vote was under an IRS audit that appeared to have

8    begun no later than April 2017, when Freedom Vote first incurred expenses related to "IRS

9    Audit."[71]  In calendar year 2017, Freedom Vote spent a total of $134,868.53;[72] in 2018,

10   $187,222.63;[73] and in 2019, the year it dissolved, only $20,407.85.[74]  Across these three years,

11   the majority of Freedom Vote's funds were spent on payments to its primary legal counsel,

12   Langdon Law, which received $148,391.50; Nathanson & Associates, which received $95,000;

13   the IRS, which received $23,380.85; and Clark Schaefer Hacket, Freedom Vote's accounting and

14   tax services provider, which received $12,182.[75]  The remainder was spent on payments to

15   AT&T for phone services, additional legal costs, and Director and Officer insurance fees.[76]

---

[71]    Ledger of 2017 Freedom Vote Receipts and Expenses, FV01162-63.

[72]    *Id.*

[73]    Ledger of 2018 Freedom Vote Receipts and Expenses, FV01191-92.

[74]    Ledger of Partial 2018 and 2019 Freedom Vote Receipts and Expenses, FV01195-96; Ledger of Partial 2018 and 2019 Freedom Vote Receipts and Expenses, FV01199-1200.

[75]    Ledger of 2017 Freedom Vote Receipts and Expenses, FV01162-63; Ledger of 2018 Freedom Vote Receipts and Expenses, FV01191-92; Ledger of Partial 2018 and 2019 Freedom Vote Receipts and Expenses, FV01195-96; Ledger of Partial 2018 and 2019 Freedom Vote Receipts and Expenses, FV01199-1200.

[76]    *Supra* note 75.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 18 of 28

1  Further, Freedom Vote recorded no receipts in these years:  From 2017 to 2019, its only deposit

2  was $6.58 in interest earned on its account balance at Huntington Bank.[77]

3         The table below summarizes Freedom Vote's total expenditures from 2010 to 2019, and

4  the percent of these expenditures that constituted federal campaign activity, which encompasses

5  Freedom Vote's contributions to political committees, its own express advocacy, expenses

6  associated with the "Third Largest" advertisement (to the extent it is not, itself, express

7  advocacy), and other expenses described above such as polling done to support Freedom Vote's

8  express advocacy:[78]

9                            **Summary of Freedom Vote's Spending**
10                                        **2010-2019**
11

| Year | Total Expenses | Federal Campaign Activity | % of Total Spending |
|---|---|---|---|
| 2010[79] | $1,265,384.00 | $0.00 | 0.00% |
| 2011[79] | $1,886,457.00 | $0.00 | 0.00% |
| 2012[79] | $191,416.00 | $0.00 | 0.00% |
| 2013[79] | $150,430.00 | $0.00 | 0.00% |
| 2014 | $290,161.09 | $239,877.81 | 82.67% |
| 2015 | $328,223.80 | $217,539.00 | 66.28% |
| 2016 | $3,862,274.37 | $2,987,563.45 | 77.35% |
| 2017 | $134,868.53 | $0.00 | 0.00% |
| 2018 | $187,222.63 | $0.00 | 0.00% |
| 2019 | $20,407.85 | $0.00 | 0.00% |

---

[77]     *Id.*

[78]     Freedom Vote contends that the Commission's analysis in its Factual and Legal Analysis ("F&LA") is
based on a misinterpretation of the facts, as Freedom Vote did not intend to imply that its political spending was
separate from and in addition to its issue-related advocacy.  *See* Supp. Resp. of Freedom Vote at 2-3 (July 6, 2021).
While this assertion disregards the note in the Commission's F&LA that Freedom Vote "appears to have counted
certain expenses as expenses for both 'program services' and 'political campaign activity,'" F&LA at 5 (Freedom
Vote, Inc.), the analysis provided in this Report is based solely on Freedom Vote's own ledgers of expenditures
produced in the course of the investigation.

[79]     As discussed *supra* note 26, Freedom Vote's fiscal years ran from October 1 to September 30, and based on
the limited information provided in its tax returns, it is not possible to calculate its receipts and expenditures on a
calendar year basis.  As a result, the figures for years 2010 through 2013 refer to the expenses for the fiscal years of
which nine months were spent in the named calendar year.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 19 of 28

1  **C.    Freedom Vote's Termination**

2  As discussed above, Freedom Vote significantly reduced its spending following the 2016

3  election cycle, spending in 2017 less than 3.5% of what it had spent the year before.  After

4  receiving the Complaint in this matter in August 2018 and submitting its response in October

5  2018,[80] Freedom Vote filed for dissolution in May 2019.[81]  When asked why the organization

6  dissolved, Nathanson stated that the IRS audit resulted in a settlement which bankrupted

7  Freedom Vote, and that the reputational harm from the settlement made it difficult to continue

8  operations.[82]  Freedom Vote's internal financial documents indicate that it settled with the IRS

9  for $23,095.61 in December 2018.[83]

10  **II.    LEGAL ANALYSIS**

11  **A.    Relevant Law**

12  Political committees must register with the Commission, file periodic reports for

13  disclosure to the public, appoint a treasurer who maintains their records, and identify themselves

14  through disclaimers on all of their public communications.[84]  The Act and Commission

15  regulations define a "political committee" as "any committee, club, association or other group of

---

[80]    Compl. Notif. Letter (Aug. 13, 2018); Resp. of Freedom Vote (Oct. 19, 2018).

[81]    FREEDOM VOTE, INC., CERTIFICATE OF DISSOLUTION (NONPROFIT, DOMESTIC CORPORATION) (May 29, 2019).  Though Freedom Vote has dissolved, legal proceedings against it are permitted under Ohio law as "[t]he voluntary dissolution of a corporation . . . shall not eliminate or impair any remedy available to or against the corporation or its directors . . . for any right or claim existing . . . prior to the dissolution" so long as the claimant brings suit within five years of the date of the dissolution.  Ohio Rev. Code Ann. § 1701.88 (West 2021-22); *see Village of Camden, Ohio v. Cargill, Inc.*, No. 3:20-cv-273, 2021 WL 1940235, at *2-3 (S.D. Ohio May 14, 2021) (holding that claim against dissolved corporation could be prosecuted to judgment with right of appeal so long as the claim was initially brought within five years of the corporation's dissolution).

[82]    Nathanson Dep. Tr. at 146:7-147:20 ("Our decision to dissolve was a function of having no money or having so little money that there was nothing that we could do with it, legally or otherwise.  Dissolving Freedom Vote, to the best of my recollection, was exclusively a function of out of money and an inability to raise money because of the [IRS audit].").

[83]    Ledger of 2018 Freedom Vote Receipts and Expenses, FV01191-92 at FV01192.

[84]    *See* 52 U.S.C. §§ 30102-30104; 11 C.F.R. § 110.11(a)(1).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 20 of 28

1    persons which receives contributions aggregating in excess of $1,000 during a calendar year or

2    which makes expenditures in excess of $1,000 during a calendar year."[85]  In *Buckley v. Valeo*,[86]

3    the Supreme Court held that defining political committee status "only in terms of the annual

4    amount of 'contributions' and 'expenditures'" was overbroad, reaching "groups engaged purely

5    in issue discussion."[87]  To cure that infirmity, the Court concluded that the term "political

6    committee" "need only encompass organizations that are under the control of a candidate or the

7    major purpose of which is the nomination or election of a candidate."[88]  Accordingly, under the

8    statute as thus construed, an organization that is not controlled by a candidate must register as a

9    political committee only if it (1) crosses the $1,000 threshold and (2) has as its "major purpose"

10   the nomination or election of federal candidates.

11          Although *Buckley* established the major purpose test, it provided no guidance as to the

12   proper approach to determine an organization's major purpose.[89]  After *Buckley*, the Commission

13   adopted a policy of determining on a case-by-case basis whether an organization is a political

14   committee, including whether its major purpose is the nomination or election of federal

15   candidates.  Though it has periodically considered crafting a bright-line rule through rulemaking,

16   the Commission has consistently declined to do so.[90]  Instead, the Commission concluded that

---

[85]    52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5.

[86]    424 U.S. 1 (1976).

[87]    *Id.* at 79.

[88]    *Id.*

[89]    *See, e.g.*, *Real Truth About Abortion, Inc. v. FEC* (formerly *Real Truth About Obama v. FEC*), 681 F.3d 544, 556 (4th Cir. 2012) [hereinafter *RTAA*], *cert. denied*, 568 U.S. 1114 (2013).

[90]    *See, e.g.*, Independent Expenditures; Corporate and Labor Organization Expenditures, 57 Fed. Reg. 33,548, 33,558-59 (July 29, 1992) (Notice of Proposed Rulemaking); Definition of Political Committee, 66 Fed. Reg. 13,681, 13,685-86 (Mar. 7, 2001) (Advance Notice of Proposed Rulemaking); *see also* Reg. 2000-01, Summary of Comments and Possible Options on the Advance Notice of Proposed Rulemaking on the Definition of "Political Committee," Cert. (Sept. 27, 2001) (voting 6-0 to hold proposed rulemaking in abeyance).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 21 of 28

1    determining an organization's major purpose "requires the flexibility of a case-by-case analysis

2    of an organization's conduct that is incompatible with a one-size fits-all rule," and that "any list

3    of factors developed by the Commission would not likely be exhaustive in any event, as

4    evidenced by the multitude of fact patterns at issue in the Commission's enforcement actions

5    considering the political committee status of various entities."[91]

6        **B.    Statutory Threshold**

7        First, to assess whether an organization has made an "expenditure" that satisfies the

8    statutory threshold, the Commission analyzes whether spending on any of an organization's

9    communications made independently of a candidate constitute express advocacy under 11 C.F.R

10   § 100.22.[92]  In 2014, Freedom Vote reported that it spent $174,607.55 in independent

11   expenditures supporting John Boehner[93] — which, by definition, contain express advocacy.[94]

12   Therefore, Freedom Vote's expenditures well exceeded the $1,000 statutory threshold set forth in

13   the Act's political committee definition.[95]

14       **C.    Major Purpose**

15       To determine an entity's "major purpose," the Commission considers a group's "overall

16   conduct," including, among other factors, public statements about its mission, organizational

17   documents, government filings, and the proportion of spending related to "Federal campaign

---

[91]    Political Committee Status, 72 Fed. Reg. 5595, 5602 (Feb. 7, 2007) [hereinafter Supplemental E&J].

[92]    *Id.* at 5606.

[93]    *FEC Independent Expenditures:  Filtered Results*, FEC.GOV, https://www.fec.gov/data/independent-expenditures/?data_type=processed&committee_id=C90014754&is_notice=false&min_date=01%2F01%2F2013&max_date=12%2F31%2F2014 (showing Freedom Vote's reported independent expenditures during the 2014 election cycle).

[94]    *See* 52 U.S.C. § 30101(17) ("The term 'independent expenditure' means an expenditure by a person . . . expressly advocating the election or defeat of a clearly identified candidate . . . .").

[95]    Resp. of Freedom Vote at 7-8 ("[I]n 2014, [Freedom Vote] . . . made (and reported) independent expenditures in excess of $1,000.").

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 22 of 28

1    activity (*i.e.*, the nomination or election of a Federal candidate)."[96]  The Commission has stated

2    that it compares how much of an organization's spending is for "*federal campaign activity*"

3    relative to "activities that [a]re not campaign related."[97]  In 2016, the United States District Court

4    for the District of Columbia in *Citizens for Responsibility and Ethics in Washington v. FEC*

5    ("*CREW I*") instructed the Commission, when examining an organization's major purpose, to

6    look beyond express advocacy and consider whether other communications at issue indicate a

7    "campaign-related purpose."[98]  The Court also held that the Commission's analysis of the

8    relevant time period for evaluating a group's spending must retain the flexibility to account for

9    changes in an organization's major purpose over time.[99]

10          Under the Commission's case-by-case approach, Freedom Vote's "overall conduct"

11    indicates that its major purpose became the nomination or election of federal candidates in 2014.

12    First, between 2014 and 2016, the vast majority of Freedom Vote's spending was on activities

13    reflecting this major purpose.  In 2014, Freedom Vote reported $174,607.55 in independent

---

[96]     Supplemental E&J, 72 Fed. Reg. at 5597, 5605.

[97]     *Id.* at 5597, 5605-06.  This approach was subsequently challenged and upheld in federal district court.  *See Shays v. FEC*, 511 F. Supp. 2d 19 (D.D.C. 2007).  In 2012, the 4th Circuit upheld the Commission's case-by-case approach in the face of a constitutional challenge.  *See RTAA*, 681 F.3d 544; *see also Free Speech v. FEC*, 720 F.3d 788 (10th Cir. 2013) (quoting *RTAA* and upholding Commission's case-by-case method of determining political committee status), *cert. denied*, 572 U.S. 1114 (2014).

[98]     209 F. Supp. 3d 77, 92 ("[T]he Court has little trouble concluding that the Commissioners' decision . . . [to exclude] *all* non-express advocacy speech from consideration [in the major purpose analysis] was contrary to law." (emphasis in original) (internal quotations marks omitted)).

[99]     *Id.* at 94 ("The Commissioners' refusal to give any weight whatsoever to an organizations' [sic] relative spending in the most recent calendar year — particularly in the case of a fifteen-year-old organization like [Americans for Job Security] — indicates an arbitrary 'fail[ure] to consider an important aspect of the [relevant] problem.'" (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 664, 658 (2007)).  In its subsequent F&LA, the Commission found reason to believe that the organization violated the Act by failing to organize, register, and report as a political committee.  F&LA at 14-15, MUR 6538R (Americans for Job Security).  *See also, e.g., FEC v. Malenick*. 310 F. Supp. 2d 230, 237 (D.D.C. 2004) ("Accordingly, because Triad and then Triad Inc.'s major purpose was the nomination or election of specific candidates *in 1996*, and because Triad received contributions aggregating more than $1,000 *in 1996*, I find that Triad and Triad, Inc. operated as a 'political committee' *in 1996*." (emphasis added)); *FEC* v. *GOPAC, Inc.*, 917 F. Supp. 851, 853 (D.D.C. 1996) (discussing major purpose only in 1989 and 1990 with respect to group formed in 1979).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 23 of 28

1    expenditures supporting federal candidate John Boehner to the Commission, but the record

2    indicates that it in fact spent $239,877.81 (82.67% of its 2014 expenses) on express advocacy.[100]

3    In 2015, Freedom Vote made a $200,000 contribution to an independent expenditure-only

4    political committee, Fighting for Ohio Fund, and spent $17,539 on research and polling

5    regarding federal candidate Thomas Massie;[101] in total, Freedom Vote spent $217,539 (66.28%

6    of its 2015 expenses) on federal election activity.  And in 2016, Freedom Vote made $1.775

7    million in contributions to Fighting for Ohio Fund; spent $109,850 on analytics and polling "in

8    the context of the issues raised in the 2016 Senate race;"[102] and spent $1.103 million on a

9    television advertisement that Nathanson admitted was about Ted Strickland's 2016 Senate

10   campaign.[103]  Together, Freedom Vote spent $2,987,563.45 (77.35% of its expenses) on activity

11   indicating a major purpose of nominating or electing a federal candidate in 2016.  While

12   Freedom Vote ceased to engage in programmatic activities after 2016,[104] between 2014 and the

---

[100]    *Supra* notes 29-43 and accompanying text.

[101]    *Supra* notes 50-57 and accompanying text.  *See also* Supplemental E&J, 72 Fed. Reg. at 5605 (noting that the Commission's complaint against a 527 organization relied upon the defendant's "expenditures for candidate research, polling, and advertising" to allege major purpose (citing Compl., *FEC v. Club for Growth, Inc.,* 432 F. Supp. 2d 87 (D.D.C. 2006) (Civ. Action No. 05-1851 (RMU)))).

[102]    Nathanson Dep. Tr. at 89:1-91:5.

[103]    *Supra* notes 61-66 and accompanying text.  Though Freedom Vote did not report "Third Largest" an independent expenditure, and the Commission has made no determination as to whether the advertisement contains express advocacy, *see* Cert. ¶¶ 1.a, 2 (July 29, 2019), courts and the Commission have held that all spending with a "campaign-related purpose," not solely that containing express advocacy is relevant to the major purpose analysis. *See CREW I*, 209 F. Supp. 3d at 92 ("[E]xcluding *all* non-express advocacy speech from consideration [when applying the major purpose test is] contrary to law." (emphasis in original) (internal quotation marks omitted)); F&LA at 11-12, MUR 6538R (Americans for Job Security) (considering electioneering communications as supporting "a conclusion that there is reason to believe that the group's major purpose is the nomination or election of federal candidates").

[104]    *Supra* notes 72-77 and accompanying text.

1    organization's termination in 2019, Freedom Vote spent $3.44 million (71.43% of its total

2    expenses) on federal campaign activity.[105]

3          Although the Commission has never set a threshold for the proportion of spending that

4    would establish the major purpose of nominating or electing federal candidates, the foregoing

5    analyses of comparative spending by Freedom Vote demonstrate that its major purpose had

6    become the nomination or election of a federal candidate by 2014.[106]  For example, in MUR

7    5753 (League of Conservation Voters 527), the Commission found that an organization had such

8    a major purpose where between 50 and 75% of its budget "was intended for the presidential

9    election."[107]  In MUR 5754 (MoveOn PAC), the Commission found that an organization's major

10    purpose was the nomination or election of federal candidates where the organization had spent

11    68% of its funds on advertisements opposing the election of George W. Bush.[108]  And in MUR

12    6538R (Americans for Job Security), the Commission found that an organization's major

13    purpose was the nomination or election of federal candidates where approximately 75% of the

---

[105]    As a political committee, Freedom Vote would have had to file quarterly reports with the Commission. Based upon the financial activity documented above, Freedom Vote spent substantial funds on federal campaign activity through the end of 2016 that should have been reflected in the Post-General Report, due December 8, 2016, and the Year End Report, due January 31, 2017.  *See 2016 Reporting Dates*, FEC.gov, https://transition.fec.gov/ info/report_dates_2016.shtml#quarterly (last visited Sept. 20, 2021).  Further, as a political committee, Freedom Vote had a continuing obligation to file disclosure reports until it terminated.  52 U.S.C. § 30103(d)(1); 11 C.F.R. § 102.3(a)(1); *see also* Advisory Op. 1997-47 (Hansen) ("Under the Act and Commission regulations, a political committee is a continuing organization until specific action is taken to terminate the registration of, or disband, the committee."); FEC, CAMPAIGN GUIDE FOR NONCONNECTED COMMITTEES 93 (May 2008) (noting that a "committee's reporting obligation does not end until the Commission notifies the committee that the termination report has been accepted").

[106]    *See* F&LA at 11, MUR 6538R (Americans for Job Security).

[107]    Conciliation Agreement ¶ IV.19, MUR 5753 (League of Conservation Voters 527 & League of Conservation Voters 527 II); *accord*. F&LA at 18, MUR 5753 (League of Conservation Voters 527).

[108]    Conciliation Agreement ¶ IV.13, MUR 5754 (MoveOn.Org Voter Fund); *accord.* F&LA at 12, MUR 5754 (MovOn.Org Voter Fund).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 25 of 28

1   organization's spending in one year leading up to an election was devoted to such purpose.[109]

2   Freedom Vote's comparative spending on activities indicating its purpose of nominating or

3   electing a federal candidate, in each of 2014, 2015, and 2016, or all of these years together, is

4   squarely in line with spending that the Commission has previously found to reflect a major

5   purpose of being a political committee.

6          Further, although Freedom Vote's founding documents and tax filings indicate that it was

7   formed as a social welfare organize to advance issues affecting Ohio, the Commission has

8   previously determined that such statements are not dispositive.[110]  Indeed, while Freedom Vote's

9   spending alone is sufficient to establish that it became a political committee,[111] other evidence

10  gathered during the investigation further demonstrates that Freedom Vote's major purpose had

11  become federal campaign activity.  In his deposition, Nathanson attempted to frame Freedom

12  Vote's work in terms of issues and policies, but he admitted that the results of elections mattered

13  to Freedom Vote and much of its activities were directed towards ensuring that a particular

14  candidate won or lost.[112]  Indeed, he testified in connection with Freedom Vote's efforts to

---

[109]    Conciliation Agreement ¶¶ IV.14-15, MUR 6538R; *cf.* F&LA at 15, MUR 6538R (finding reason to believe that the organization's major purpose was the nomination or election of federal candidates where the proportion of campaign-related spending originally appeared to be only 52%).

[110]    *See* Supplemental E&J at 5601 ("Because such statements may not be inherently conclusive, the Commission must evaluate the statements of the organization in a fact-intensive inquiry giving due weight to the form and nature of the statements, as well as the speaker's position within the organization."); F&LA at 11, MUR 6538R (citing *Real Truth About Obama v. FEC*, No. 3:08-cv-00483, 2008 WL 4416282, at *14 (E.D. Va. Sept. 24, 2008) ("A Declaration by the organization that they are *not* incorporated for an electioneering purpose is not dispositive." (emphasis in original)), *aff'd* 575 F.3d 342 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *remanded and decided*, 796 F. Supp. 2d 736, *aff'd sub nom. Real Truth About Abortion v. FEC*, 681 F.3d 544 (4th Cir. 2012), *cert. denied*, 568 U.S. 1114 (2013).

[111]    *See* F&LA at 9-10 ("In this case, [Freedom Vote's] proportion of spending related to Federal campaign activity compared to its total spending . . . indicates that its major purpose may be the nomination or election of federal candidates."); F&LA at 11, MUR 6538R ("In this case, AJS's proportion of spending related to federal campaign activity compared to its total spending is alone sufficient to indicate that its major purpose had become the nomination or election of federal candidates.").

[112]    *Supra* notes 45, 66 and accompanying text (discussing Nathanson's testimony that the election of Boehner and defeat of Strickland were important to Freedom Vote).

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 26 of 28

1   support John Boehner's candidacy that "I think that we felt that John Boehner being Speaker" —

2   the highest office in the U.S. House of Representatives — "was good for Ohio."[113]  With respect

3   to 2016 cycle activity, Nathanson testified that the Ohio Senate race was Freedom Vote's

4   "*primary activity* in 2016,"[114] which is tantamount to saying that the organization's major

5   purpose in 2016 was the election or defeat of a federal candidate.[115]  Thus, while Nathanson

6   acknowledged that Freedom Vote acted with the purpose of keeping Speaker Boehner in office

7   in 2014 and that the 2016 Senate race was its primary focus that year, he also could not identify a

8   specific policy proposal or a single piece of legislation that Freedom Vote had supported during

9   its lifetime.[116]

10        Public statements made by Freedom Vote's representatives and internal communications

11   further establish that influencing federal elections by supporting or opposing particular

12   candidates had become Freedom Vote's goal, and that, by 2016, donors were making

13   contributions to support its federal campaign activity.  Press reports contemporaneous with the

14   organization's founding in 2010 indicate that Tom Whatman, one of its key advisers, saw

15   Freedom Vote as stepping into a role previously filled by the RNC to promote voter turnout.[117]

16   In 2016, one donor who gave half a million dollars to the organization explicitly stated that the

17   funds he gave were for "the reelection of Rob Portman."[118]  And in one solicitation, Whatman

---

[113]     Nathanson Dep. Tr. at 75:6-10.

[114]     *Id.* at 94:22-23 (emphasis added); *see also id*. at 131:4-6 ("The main thing we did in 2016 was concerned about what was happening in the Senate race."); *id.* at 137:16-18 ("I'm assuming it would have been about our activities in 2016, which were primarily those involved around the Senate race.").

[115]     Cf. Buckley, 424 U.S. at 79 (establishing major purpose test).

[116]     *Cf.* F&LA at 13-14, MUR 6538R (determining that advertisements' lack of "nexus with the legislative process" was "indicative of a major purpose to nominate or elect a federal candidate").

[117]     Cummings*, supra* note 22 and accompanying text.

[118]     Letter from redacted donor to Freedom Vote, *supra* note 69 and accompanying text.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 27 of 28

1  successfully convinced a donor to make a contribution by attaching a poll indicating that Ted

2  Strickland was doing poorly and stating that "what we [Freedom Vote] are doing is working."[119]

3  That statement sought to tie Freedom Vote's activities to opposing Strickland's candidacy.

4         As discussed above, over the course of its existence, Freedom Vote's spending followed

5  a trajectory from spending no funds on federal campaign activity between fiscal years 2010 and

6  2013 to spending between 66% and 83% each year on such activity from calendar years 2014 to

7  2016; in total, spending for the purpose of influencing federal elections constituted over 71% of

8  Freedom Vote's spending for the second half of its existence.  Taken together with the

9  Commission's precedent and other evidence described above and the fact that the record

10  establishes that Freedom Vote never advocated for specific legislation or policies, the

11  investigation confirms that Freedom Vote failed to organize, register, and report as a political

12  committee in violation of 52 U.S.C. §§ 30102, 30103, and 30104.

---

[119]    Email from Tom Whatman to redacted donor, *supra* note 67 and accompanying text.

MUR 7465 (Freedom Vote, Inc.)
General Counsel's Brief
Page 28 of 28

1    **IV.     CONCLUSION**

2           Based on the foregoing, the Office of General Counsel is prepared to recommend that the

3    Commission find probable cause to believe that Freedom Vote, Inc., violated 52 U.S.C.

4    §§ 30102, 30103, and 30104(a), (b), and (g)(2) by failing to organize, register, and report as a

5    political committee.

6
7    September 20, 2021                                 *Lisa J. Stevenson/by JL*
8    Date                                               Lisa J. Stevenson
9                                                       Acting General Counsel
10
11
12                                                      *Charles Kitcher*
13                                                      Charles Kitcher
14                                                      Associate General Counsel for Enforcement
15
16
17                                                      *Jin Lee*
18                                                      Jin Lee
19                                                      Acting Assistant General Counsel
20
21
22                                                      *Justine A. di Giovanni*
23                                                      Justine A. di Giovanni
24                                                       Attorney

AR1559

# Tab 8

Memorandum to the Commission regarding a Proposed Conciliation Agreement for Probable Cause Conciliation from Lisa J. Stevenson, Acting General Counsel, et al. (dated Oct. 15, 2021) AR1808–09



**FEDERAL ELECTION COMMISSION**
Washington, DC 20463

October 15, 2021

**MEMORANDUM**

**TO:**       The Commission

**FROM:**     Lisa J. Stevenson   *LJS*
              Acting General Counsel

              Charles Kitcher   *CK*
              Associate General Counsel for Enforcement

              Jin Lee   *JL*
              Acting Assistant General Counsel

              Justine A. di Giovanni   *JD/by JL*
              Attorney

**SUBJECT:**  MUR 7465 (Freedom Vote, Inc.)

**RE:**       Proposed Conciliation Agreement for Probable Cause Conciliation

_____

        Attached is a proposed conciliation agreement for probable cause conciliation with
Freedom Vote, Inc. ("Freedom Vote").  The proposed agreement is for the Commission's
consideration along with the Office of General Counsel's Notice to the Commission Following
the Submission of Probable Cause Brief in MUR 7465 ("OGC Notice"), which is being
submitted to the Commission simultaneously with this Memorandum.  The OGC Notice informs
the Commission that this Office intends to proceed with the recommendation that the
Commission find probable cause to believe that Freedom Vote violated 52 U.S.C. §§ 30102,
30103, and 30104(a), (b), and (g)(2) by failing to organize, register, and report as a political
committee.

        The proposed agreement contains a summary of the relevant facts and the law; an
admission to the violations; a cease-and-desist clause; a requirement that Freedom Vote file
reports with the Commission disclosing its receipts and disbursements, including its 2016 Post
General Report and 2016 Year End Report; and a proposed civil penalty of $250,000.  Consistent
with the Commission's "Opening Settlement Offer Formula for [52 U.S.C. § 30104(b)]
Reporting Violations," this figure constitutes 20% of the amount in violation, capped at
$250,000.  Here, Freedom Vote failed to report receipts and disbursements for 2016 totaling
$3.915 million and $3.862 million, respectively, which should have been disclosed in its 2016
Year End Report.  Prior to application of the cap, the penalty is calculated as $1.556 million

MUR 7465 (Freedom Vote, Inc.)
PC CA Memorandum to Commission
Page **2** of **2**

1  ($3,915,346.81 in receipts + $3,862,274.37 in disbursements = $7,777,621.18; $7,777,621.18 x
2  20% = $1,555,524.24).  The statute of limitations will not expire on these reporting violations
3  until January 31, 2022.

4          We recommend that the Commission approve the attached conciliation agreement.

5  **<u>RECOMMENDATIONS</u>**

6          1.          Approve the attached conciliation agreement.

7          2.          Approve the appropriate letter.

8  Attachment:
9          Proposed Conciliation Agreement

# Tab 9

Certification of Commissioners' Probable Cause vote, vote to dismiss the allegations against Freedom Vote, Inc., and vote to close the file on November 9, 2021, by the Acting Deputy Secretary of the Commission (certification signed and dated Nov. 14, 2021) AR1815–16

BEFORE THE FEDERAL ELECTION COMMISSION

In the Matter of                                    )
                                                    )     MUR 7465
Freedom Vote, Inc.                                  )
                                                    )

<u>CERTIFICATION</u>

I, Vicktoria J. Allen, recording secretary of the Federal Election Commission executive

session, do hereby certify that on November 09, 2021, the Commission took the following

actions in the above-captioned matter:

1. Failed by a vote of 3-3 to:

> Find probable cause to believe that Freedom Vote violated 52
> U.S.C. §§ 30102, 30103, and 30104(a), (b), and (g)(2) by
> failing to organize, register, and report as a political committee.

Commissioners Broussard, Walther, and Weintraub voted affirmatively for the motion.

Commissioners Cooksey, Dickerson, and Trainor dissented.

2. Failed by a vote of 3-3 to:

    a. Dismiss the allegations that Freedom Vote violated 52 U.S.C.
       §§ 30102, 30103, and 30104 (a), (b), and (g)(2) by failing to
       organize, register, and report as a political committee.

    b. Dismiss pursuant to *Heckler v. Chaney* the allegations that
       Freedom Vote failed to file 2016 Post-General and Year-End
       Reports.

    c. Close the file.

    d. Send the appropriate letters.

AR1815

Federal Election Commission                                                            Page 2
Certification for MUR 7465
November 9, 2021

     Commissioners Cooksey, Dickerson, and Trainor voted affirmatively for the motion.

Commissioners Broussard, Walther, and Weintraub dissented.

3. Decided by a vote of 4-1 to:

    a. Close the file.

    b. Issue appropriate letters.

     Commissioners Broussard, Cooksey, Dickerson, and Trainor voted affirmatively for the

decision.  Commissioner Weintraub dissented.  Commissioner Walther abstained.

Attest:

November 14, 2021
Date

_____
Vicktoria J. Allen
Acting Deputy Secretary of the
Commission

# Tab 10

Statement of Reasons of Chair Shana M. Broussard, Commissioner Steven T. Walther, and Commissioner Ellen L. Weintraub (dated Dec. 16, 2021) AR1824–32



**FEDERAL ELECTION COMMISSION**

Washington, D.C.  20463

## BEFORE THE FEDERAL ELECTION COMMISSION

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | MUR 7465 |
| Freedom Vote, Inc. | ) | |

### STATEMENT OF REASONS OF CHAIR SHANA M. BROUSSARD
### AND COMMISSIONERS STEVEN T. WALTHER AND  ELLEN L. WEINTRAUB

On November 9, 2021 – nearly three months before the statute of limitations was set to expire – the Commission failed to support the recommendation of our Office of General Counsel (OGC) to find probable cause to believe that Freedom Vote, Inc. ("Freedom Vote") violated the Federal Election Campaign Act of 1971, as amended ("Act"), by engaging in primarily federal campaign activity for several years without registering and reporting as a political committee.[1] We strongly supported OGC's recommendation. However, because three of our colleagues voted against it, the public will never see a complete and accurate accounting of Freedom Vote's receipts and disbursements.

Looking back at "political committee" cases that have come before the Commission over the past several years, a clear pattern has emerged. Typically, a sworn complaint is filed with the Commission that contains allegations related to an unregistered entity's political committee status.  The respondent entity – usually an incorporated non-profit organization – will receive notice from Commission and provided an opportunity to respond to the complaint. OGC will then conduct a thorough review of the available information. If OGC determines that there is "reason to believe" that the entity has violated the law by failing to register as a political committee and to fully disclose its financial activity, OGC will submit to the Commission a factual and legal analysis along with a recommendation to find that a violation may have occurred and that an investigation should be conducted. Next, the Commissioners will meet and debate the merits of the case. Ultimately, it is historically *very unlikely* that four Commissioners – the minimum number required to take action – will support OGC's recommendations, thereby preventing our staff from conducting an investigation to determine whether there is "probable

---

[1] *See* OGC's Notice to the Commission Following the Submission of Probable Cause Brief, dated Oct. 15, 2021, and Certification ("Cert.") dated Nov. 14, 2021. We voted to find probable cause to believe that Freedom Vote violated 52 U.S.C. §§ 30102; 30103; and 30104(a), (b), and (g)(2) by failing to organize, register, and report as a political committee; Vice Chair Dickerson and Commissioners Cooksey and Trainor voted against.

MUR 7465 (Freedom Vote)
Statement of Reasons
Page 2 of 9

cause to believe" the organization violated the Act.[2]

So when the Commission takes the rare step of actually finding that the low reason-to-believe standard has been satisfied and authorizes an investigation – as it did in this case – there is cause for optimism that, should the investigation confirm the Commission's initial findings, the violator may be held to account and voters may learn the identities of donors and other useful information to which they are entitled. Here, the investigation conducted by our professional staff, which included a subpoena for documents and a deposition of Freedom Vote's Executive Director, substantially bolstered the information presented to the Commission at the reason-to-believe stage, easily satisfying the Act's probable-cause-to-believe standard.

The Commission obtained overwhelming evidence that Freedom Vote, an incorporated 501(c)(4) organization, spent more than the statutory threshold for qualifying as a political committee and had the "major purpose" of nominating or electing a federal candidate.[3] The investigation revealed that, from 2014 until its termination as an entity in 2019, over 71% of

---

[2] *See, e.g.*, MUR 7860 (Jobs and Progress Fund, Inc. *et al.*) (OGC recommends finding reason to believe respondent violated the Act by not registering and reporting as a political committee, but there is an insufficient number of Commissioners to support OGC's recommendations; *see* First General Counsel's Report (FGCR) dated Aug. 27, 2021and Cert. dated Oct. 28, 2021); MUR 7513 (Community Issues Project) (same; *see* FGCR dated Sept. 18, 2019 and Cert. dated Sept. 2, 2021); MUR 7405 (Iowans for a Progressive Tomorrow) (same; *see* FGCR dated May 30, 2019 and Cert. dated Apr. 6, 2021 (settled in ADR 1013 on other violations)); MUR 7479 (Keeping America in Republican Control PAC, *et al.*) (same; *see* FGCR dated Aug. 26, 2019 and Cert. dated Mar. 9, 2021); MUR 7181 (Independent Women's Voice) (same; see FGCR dated Jan. 21, 2020 and Cert. dated Feb. 9, 2021); MUR 6596 (Crossroads Grassroots Policy Strategies) (same; *see* FGCR dated Mar. 10, 2014 and Certs. dated Oct. 29, 2015, Nov. 17, 2015, Dec. 17, 2015, and Mar. 26, 2019); MUR 6872 (New Models) (same; *see* FGCR dated May 21, 2015 and Cert. dated Nov. 14, 2017); MURs 6391 and 6471 (Commission on Hope, Growth and Opportunity) (same; *see* FGCR dated Mar. 10, 2014 and Cert. dated Sept. 16, 2014); MUR 6402 (American Future Fund) (same; *see* FGCR dated Jan. 17, 2013 and Cert. dated Nov. 18, 2014); MUR 6538 (Americans for Job Security) (same; *see* FGCR dated May 2, 2013 and Cert. dated June 24, 2014); MUR 6589 (American Action Network) (same; *see* FGCR dated Jan. 17, 2013 and Cert. dated June 24, 2014). In MUR 6538 (Americans for Job Security), in an action brought by the administrative complainant (CREW), a court found the Commission's dismissal to be contrary to law and remanded the matter. *See CREW v. FEC (CREW I)*, 209 F. Supp. 3d 77 (D.D.C. 2016). The Commission ultimately entered into a conciliation agreement requiring Americans for Job Security to register as a political committee and file disclosure reports. In MUR 6589 (American Action Network), the Commission twice dismissed the complaint and, in actions brought by CREW against the Commission, the court found both dismissals to be contrary to law. *See CREW I; CREW v. FEC (CREW II)*, 299 F. Supp. 3d 83 (D.D.C. 2018). CREW ultimately sued American Action Network under the Act's "citizen-suit" provision. 52 U.S.C. § 30109(a)(8)(C).

[3] The Act and Commission regulations define a "political committee" as "any committee, club, association or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5. The Supreme Court concluded that the term "political committee" "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Buckley v. Valeo*, 424 U.S. 1, 79 (1976). Accordingly, under the statute as thus construed, an organization that is not controlled by a candidate must register as a political committee only if it (1) crosses the $1,000 threshold and (2) has as its "major purpose" the nomination or election of federal candidates. Under the Commission's case-by-case approach, the Commission considers an organization's "overall conduct," including public statements about its mission, organizational documents, government filings, and the proportion of spending related to "Federal campaign activity (i.e., the nomination or election of a Federal candidate." *See* Political Committee Status: Supplemental Explanation and Justification, 72 Fed. Reg. 5595, 5602 (Feb. 7, 2007) ("Supplemental E&J"). The Commission has stated that it compares how much of an organization's spending is for "federal campaign activity" relative to "activities that [a]re not campaign related." *Id*. at 5597, 5605-06.

MUR 7465 (Freedom Vote)
Statement of Reasons
Page 3 of 9

Freedom Vote's expenditures aggregating over $3.4 million constituted federal campaign activity.[4] Our staff's thorough review of Freedom Vote's financial activity over this period concluded that the organization made *no* specific policy, issue advocacy, or education expenditures.

It is important for the public to understand the depth and range of the evidence the Commission had before it when our colleagues rejected OGC's recommendation to find probable cause to believe:

- In 2014, Freedom Vote reported that it spent $174,608 on independent expenditures supporting John Boehner, which, by definition, contain express advocacy.[5] Therefore, Freedom Vote's expenditures well exceeded the Act's $1,000 statutory threshold.

- Under the Commission's case-by-case approach, Freedom Vote's "overall conduct" indicates that its major purpose became the nomination or election of federal candidates in 2014.[6] In that year Freedom Vote reported $174,608 in independent expenditures supporting federal candidate John Boehner, but the record indicates that it in fact spent $239,878 (83% of its 2014 expenses) on express advocacy.

- Freedom Vote's unreported 2014 expenses included additional sums to produce and distribute the Boehner communications, such as invoices that explicitly mention Ohio's 8th District, which is Boehner's Congressional District in Ohio.[7] Freedom Vote also made unreported payments that year to Nathanson & Associates, the consulting firm of Executive Director James Nathanson; invoices show that these expenses were billed explicitly as "OH 8 IE Expenditures."[8]

- Freedom Vote incurred other 2014 expenses associated with the reported independent expenditures that provide further evidence of its purpose. For example, it made unreported payments to The Strategy Group Company for materials relating to the two candidates running against Boehner and opposed in Freedom Vote's independent expenditures.[9] Nathanson admitted under oath that Freedom Vote's payments to the Strategy Group Company were for "opposition research" for the Boehner race.[10] Aggregating these unreported 2014 expenses with those that Freedom Vote already reported to the Commission, the total of Freedom Vote's political spending in support of Boehner's candidacy was at least $239,878, or 83% of its total expenditures in 2014.

- When asked about Freedom Vote's issue-related work, Nathanson was unable to recall

---

[4] In most instances the numbers in the text have been rounded to the nearest dollar or percent; in its General Counsel's Brief, OGC generally calculates them to the precise cent or decimal. *See* General Counsel's Brief in MUR 7465, dated Sept. 20, 2021 ("GC Brief").

[5] *See* 52 U.S.C. § 30101(17) ("The term 'independent expenditure' means an expenditure by a person … expressly advocating the election or defeat of a clearly identified candidate.").

[6] Supplemental E&J at 5602.

[7] GC Brief at 8.

[8] *Id.*

[9] *Id.* at 9.

[10] *Id.*

MUR 7465 (Freedom Vote)
Statement of Reasons
Page 4 of 9

any specific examples of such advocacy and responded that Freedom Vote was concerned with issues that "affected Speaker Boehner."[11] Freedom Vote's internal communications further reflect that its advocacy during the 2014 cycle was electoral rather than issue-related, as its agents and vendors discussed the organization's work in terms of election cycles and races – in particular, John Boehner's re-election in the 8th Congressional District of Ohio.[12]

- Writing to a donor in April 2014, Nathanson described Freedom Vote's anticipated expenses, totaling $90,000, and explained that he was assuming "maximum effort through election day."[13] When asked about what this meant, and why election day was important for his work for Freedom Vote, Nathanson did not have a clear recollection, but based upon the date of the email, he assumed that this email concerned the date for the primary election in the 8th Congressional District of Ohio, i.e., the date of John Boehner's primary election.[14] He added that Freedom Vote's work on its issues was closely tied to elections, stating: "If what we were concerned about were economic issues affecting Ohio as they were explained in election campaigns, those issues tend to die one way or another once there's no longer a campaign.  Then it turns in to the policymakers, and with policymakers, the citizens of Ohio have less to do."[15] When asked whether Freedom Vote ever advocated for its issues with policymakers after an election had concluded, Nathanson stated, "I don't think we ever did."[16]

- In 2015, Freedom Vote made a $200,000 contribution to an independent expenditure-only political committee (i.e., a "super PAC" registered with the Commission), Fighting for Ohio Fund, and spent $17,539 on research and polling regarding federal candidate Thomas Massie.[17] In total, Freedom Vote spent $217,539, or 66% of its expenses, on federal election activity in 2015.

- In 2016, Freedom Vote made $1.8 million in contributions to Fighting for Ohio Fund and spent $109,850 on analytics and polling "in the context of the issues raised in the 2016 Senate race," according to Nathanson.[18] It also spent $1.1 million on a television advertisement that Nathanson admitted was about Ted Strickland's 2016 Senate campaign.[19] Together, Freedom Vote spent $2,987,563 (77% of its expenses) on activity indicating a major purpose of nominating or electing a federal candidate in 2016.

- Freedom Vote's contributions and solicitations also evinced an electoral purpose. One 2016 donor who gave half a million dollars explicitly stated that the funds were for "the reelection of [U.S. Senator] Rob Portman."[20] In one solicitation, a key adviser to

[11] *Id.* at 10.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 10-11.
[15] *Id.* at 11.
[16] *Id.*
[17] *Id.* at 12.
[18] *Id.* at 23.
[19] *Id.*
[20] *Id.* at 28.

MUR 7465 (Freedom Vote)
Statement of Reasons
Page 5 of 9

Freedom Vote successfully convinced a donor to make a contribution by attaching a poll indicating that Portman's opponent Ted Strickland was doing poorly and stating that "what we [Freedom Vote] are doing is working."[21] Such statements directly connect Freedom Vote's activities to the purpose of electing a federal candidate.

- In 2019, Freedom Vote paid $20,000 to settle an Internal Revenue Service inquiry into the time period the organization used to determine its major purpose.

To describe OGC's investigation in this matter as "thorough" is actually an understatement. In order to ascertain the extent, nature, and cost of Freedom Vote's federal campaign activity, OGC sought and ultimately obtained a trove of financial documents. In finding that the reason-to-believe standard was satisfied, the Commission possessed little financial documentation other than Freedom Vote's publicly available tax returns, which were all filed on a fiscal year basis (Oct. 1st through Sept. 30th). However, prior to the probable-cause-to-believe vote, the Commission was able to review financial ledgers obtained from Freedom Vote via subpoena that documented *every cent* the organization received and spent on a calendar year basis from 2014 to 2019.[22] Nathanson testified under oath that he personally prepared the ledgers and that they were true and accurate to the best of his knowledge. OGC based its calculations in the General Counsel's Brief entirely upon these documents; our staff was able to connect every disbursement by Freedom Vote to the ledgers and the associated invoices and receipts obtained during the investigation.

Based on its detailed financial review, OGC compiled the following chart showing Freedom Vote's spending on federal campaign activity as compared to its total spending; the figures demonstrate that Freedom Vote's major purpose had become the nomination or election of a federal candidate by 2014.

| Year[23] | Total Expenses | Federal Campaign Activity | % of Total Spending |
|---|---|---|---|
| 2010 | $1,265,384.00 | $0.00 | 0.00% |
| 2011 | $1,886,457.00 | $0.00 | 0.00% |
| 2012 | $191,416.00 | $0.00 | 0.00% |
| 2013 | $150,430.00 | $0.00 | 0.00% |
| 2014 | $290,161.09 | $239,877.81 | 82.67% |
| 2015 | $328,223.80 | $217,539.00 | 66.28% |
| 2016 | $3,862,274.37 | $2,987,563.45 | 77.35% |
| 2017 | $134,868.53 | $0.00 | 0.00% |

---

[21] *Id.* at 15, 27.
[22] OGC was limited to the information contained in Freedom Vote's tax returns for the years 2010-13, which were based on fiscal year.
[23] *Id.* The figures in the chart are based on calendar year; however, the total expenses listed for years 2010 through 2013 reflect fiscal year expenses – of which nine months were spent in the named calendar year.

MUR 7465 (Freedom Vote)
Statement of Reasons
Page 6 of 9

| 2018 | $187,222.63 | $0.00 | 0.00% |
| 2019 | $20,407.85 | $0.00 | 0.00% |

These figures, backed up by a wealth of documentary evidence, clearly demonstrate that between 2014 and Freedom Vote's termination in 2019, it spent $3.4 million (71% of its total expenses[24]) on federal campaign activity.[25]

Turning to the statute of limitations issue – which is apparently the primary basis of our colleagues' refusal to support OGC's recommendation – it is important to consider the obstacles faced, and overcome, by the Commission over the course of this matter. Shortly after unanimously approving the reason-to-believe findings, the Commission lost a quorum from August 2019 through most of 2020, rendering it unable to take further enforcement action. The Commission received no cooperation from Freedom Vote during that period and, lacking a quorum, was unable to take legal action to enforce compliance with its document subpoena. It was not until a quorum was restored in December 2020, followed by the Commission's authorization of a deposition subpoena to Nathanson the next month, that OGC began to receive the documents it had been requesting from Freedom Vote since 2019.

As with any case in which portions of the activity at issue occurred well in the past, we are keenly aware that we risked losing substantial amounts in violation in this matter to an impending five-year statute of limitations. As an initial matter, regardless of whether the applicable statute impedes the Commission's ability to seek a civil penalty, it does not prevent the Commission from pursuing equitable remedies – including requiring Freedom Vote's disclosure of its receipts and disbursements as a political committee – and it certainly does not prevent us from making a probable cause to believe finding.[26] But that is really a moot point.

---

[24] Seventy-one percent may actually be on the conservative side because OGC's analysis focuses solely on Freedom Vote's "programmatic" activities. Since there were no other such activities uncovered by the investigation, it is not unreasonable to conclude that the majority of overhead and administrative expenses during this period (e.g., phone bills, consulting fees, and salary payments) were in service of Freedom Vote's federal campaign spending.

[25] Some Commissioners have argued that the "simplest, cleanest, and fairest standard for determining whether an organization has the major purpose of nominating and electing federal candidates is to analyze its total spending on federal campaigns." Statement of Reasons of Vice Chair Dickerson and Commissioner Trainor, MUR 7181 (Independent Women's Voice). However, the court in *CREW I* ruled that a lifetime-only rule is contrary to law where the Commission fails to consider the totality of the circumstances and whether the facts indicate that an organization's major purpose has changed over time. 209 F. Supp. 3d at 94. That was the Commission's approach on remand in MUR 6538R (Americans for Job Security), Factual & Legal Analysis at 14-15, and we agree with OGC's same approach here. The same precedent instructs that the Commission consider not only spending on express advocacy but also spending on communications that indicate a "campaign-related purpose" when determining an organization's major purpose. 209 F. Supp. 3d at 11; MUR 6538R Factual and Legal Analysis at 11-13.

[26] 28 U.S.C. § 2462 states that "an action, suit or proceeding for the enforcement of any civil *fine, penalty, or forfeiture*, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued …." (emphasis added). *See FEC v. Christian Coalition*, 965 F. Supp. 66, 71 (D.D.C. 1997) (holding that injunctive relief is not a penalty); *FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 20-21 (D.D.C. 1995) (same). The court in *Christian Coalition* distinguished Supreme Court precedent regarding the withholding of equitable relief where the legal remedy was barred by the statute of limitations, *Cope v. Anderson*, 331 U.S. 461 (1947) and *Russell v. Todd*, 309 U.S. 280 (1940), by noting that neither *Cope* nor *Russell* "involved a limitation on an action by the United States," and that "both cases involved the interplay between federal rights and state statutes of limitations – issues not present in a suit brought under the FECA." 965 F. Supp. at 71.

MUR 7465 (Freedom Vote)
Statement of Reasons
Page 7 of 9

There is absolutely no doubt that the Commission may seek a civil penalty and other appropriate relief based on Freedom Vote's reporting violations because there were still missing disclosure reports that were due less than five years before November 9, 2021 – the date of the Commission's probable-cause-to-believe vote.[27]

        In justifying their votes against OGC's recommendation, some Commissioners may point out that the financial activity at issue occurred beyond five years from the date that OGC would have needed to file suit, regardless of the filing deadlines. This is plain wrong, factually and legally. First, a portion of activity covered by the later report would have occurred within five years of the Commission's vote, even when considering the minimum 30-day conciliation period before which the Commission would need to file suit (if necessary).[28] Second, the dates that any financial activity occurred are irrelevant for purposes of a reporting violation; such an approach erroneously conflates a committee's filing deadlines with the timing of its receipts and disbursements. The Commission has always considered a "failure-to-disclose" violation to accrue on the filing deadline of the subject report; in this matter those dates occur *after* the Commission's vote. We are aware of no instance in the history of the Commission when that has not been the case – it would defy common sense to peg the five-year statute of limitations to any date other than a report's due date.[29]

        Reduced to simple terms, had there been one more vote for probable cause on November 9, the Commission would have commenced probable cause conciliation with Freedom Vote over its failure, at a minimum, to file a 2016 Year-End Report in which it was required to disclose that it received $3.915 million in total annual receipts and made $3.862 million in total annual disbursements. That report was due on January 31, 2017, which would have given the Commission until January 31, 2022 – or *83 days* – to reach a mutually acceptable settlement prior to the expiration of the statute of limitations.[30]

        Our colleagues may also highlight the fact that, at the time of the vote, Freedom Vote was a defunct organization. Freedom Vote drastically reduced its spending right after the 2016 election (which is also indicative of its major purpose[31]) and ultimately filed for dissolution in

---

[27] Specifically, Freedom Vote's 2016 Post-General Report was due on December 8, 2016, and its Year-End Report on January 31, 2017. *See* 2 U.S.C. § 30104(a)(4).

[28] *See* 52 U.S.C. § 30109(a)(4)-(6). The 2016 Post-General Report would have covered amounts received or spent from 10/20/16 to 11/28/16, and the 2016 Year-End Report would have covered 11/29/16 to 12/31/16.

[29] Committee filing deadlines provide the very basis of the penalty structure in the Commission's Administrative Fine Program, under which Congress authorized the Commission to assess fines for violations of the Act's requirements for the timely reporting of receipts and disbursements. *See* 52 U.S.C. § 30109(a)(4)(C)(v); 11 C.F.R. § 111.43. In an analogous context, the federal tax code generally allows the Internal Revenue Service three years to assess taxes after the filing of a tax return; the statute of limitations is pegged to the due date of the return, which is usually April 15. *See* 26 U.S.C. § 6501. It is not tied to when the taxpayer received the taxable income during the prior year, and it is not adjusted should the tax return be filed earlier than the due date.

[30] To reiterate, the expiration of the statute of limitations would only foreclose the Commission's ability to seek a civil penalty; if the Commission were to file suit after that date, a court still may grant non-monetary relief, such as an order for Freedom Vote to file a disclosure report with the Commission.

[31] *See* Supplemental E&J at 5605 (including MUR 5754 (MoveOn.org Voter Fund) among the examples of Political Committee Status Matters reflecting the Commission's analysis to determine an organization's major purpose). In MUR 5754, the Commission found reason to believe, and noted, among other facts indicative of satisfying *Buckley's*

MUR 7465 (Freedom Vote)
Statement of Reasons
Page 8 of 9

May 2019. When asked why the organization dissolved, Nathanson stated that an audit by the IRS resulted in a settlement which bankrupted Freedom Vote, and that the reputational harm from the settlement made it difficult to continue operations.[32]

    Both in a legal and practical sense, the dissolution of Freedom Vote's corporate form posed no enforcement barrier to the Commission and certainly should not excuse the organization from being held accountable for a serious violation of the Act. First, in Ohio, where Freedom Vote was incorporated, legal proceedings against corporations within five years of dissolution are not barred by state law.[33] Second, we have been here before, and in fact quite recently: In a matter similarly involving political committee allegations against an unregistered non-profit organization, the Commission made reason-to-believe findings seven months after the entity's corporate status was revoked and following several years of inactivity (and after a court rebuked the Commission for initially dismissing the complaint).[34] The Commission reached a settlement that waived the civil penalty in light of the entity's defunct status and inability to raise funds, but required it to register as a political committee; the sole (former) employee agreed to use his "best efforts" to obtain relevant financial information and to report it to the Commission.[35]

    We are confident that conciliation negotiations would have been rather brief and efficient, given that OGC has already reviewed voluminous financial information and tallied up all of Freedom Vote's receipts and disbursements from the time the organization achieved political committee status; what we would mainly need from Freedom Vote at this juncture are names of its donors. Although it is too late to inform voters prior to the elections at issue, the public still deserves to know, for example, who donated $500,000 in advance of the 2016 general election with instructions to use the funds for "the reelection of Rob Portman," and who cut a $200,000 check to Freedom Vote on September 6, 2016, and so on.[36] None of the donors were listed in the IRS forms filed by Freedom Vote; these individuals or entities may not want their names publicly disclosed, but as Justice Scalia famously stated, "Requiring people to stand up in public for their political acts fosters civic courage, without which democracy is doomed."[37]

    Had we proceeded to conciliation, Freedom Vote could have simply resubmitted unredacted versions of donor records that it had already produced earlier this year. Commission

---

major purpose test, that "MoveOn.org Voter Fund has been virtually inactive since the 2004 general election"). Factual and Legal Analysis at 13, MUR 5754 (MoveOn.org Voter Fund).

[32] GC Brief at 19.

[33] The voluntary dissolution of a corporation "shall not eliminate or impair any remedy available to or against the corporation or its directors ... for any right or claim existing ... prior to the dissolution" so long as the claimant brings suit within five years of the date of the dissolution. Ohio Rev. Code Ann. § 1701.88 (West 2021-22); *see Village of Camden, Ohio v. Cargill, Inc.*, No. 3:20-cv-273, 2021 WL 1940235, at *2-3 (S.D. Ohio May 14, 2021) (holding that claim against dissolved corporation could be prosecuted to judgment with right of appeal so long as the claim was initially brought within five years of the corporation's dissolution).

[34] MUR 6538R (Americans for Job Security), *see supra* fn. 2. In the preceding litigation, the court rejected an argument that the Commission cannot pursue equitable remedies after five years on the basis that no "authoritative policy or rule" barring equitable enforcement was before the court. *CREW I*, 209 F.Supp.3d 77, n.3.

[35] *See* Conciliation Agreement in MUR 6538R (Americans for Job Security), dated Sept. 9, 2019.

[36] GC Brief at 28.

[37] *Doe v. Reed*, 561 U.S. 186, 228 (2010).

staff would have been ready to assist in facilitating Freedom Vote's registration and disclosure obligations, as we have done in past settlements that required further reporting by a respondent.[38] Regarding any civil penalty, if Freedom Vote's funds were truly depleted, we would have considered departing from the penalty the Commission would normally seek, as we have done numerous times when respondents have been unable to pay.[39] And, of course, if negotiations were not successful, we would have a very strong case to litigate.

It is extremely frustrating that the Commission would invest considerable resources and come so close to achieving a satisfactory outcome in this matter, only to have three Commissioners shut it down with almost three months "left on the clock." This matter had all the hallmarks of a successful exercise of our statutory enforcement responsibilities: an egregious violation of core provisions of the Act in a high dollar amount (almost $8 million), backed up by compelling documentary evidence, powerful sworn testimony, and strong supporting precedent. Instead, by abdicating our enforcement and disclosure obligations, unregistered groups like Freedom Vote that are formed with generic stated purposes (here, "[t]o further the common good and general welfare of the people of Ohio"[40]) are allowed to morph into electoral vehicles that primarily support federal candidates over one or more election cycles, and then quietly pass from existence with no hint as to who funded their campaign-related activities. The Commission had an excellent opportunity to reverse this trend and send a strong pro-transparency message but failed to take advantage of it; we sincerely hope this agency can do better in the future.

December 16, 2021
Date

Shana M. Broussard
Chair

December 16, 2021
Date

Steven T. Walther
Commissioner

December 16, 2021
Date

Ellen L. Weintraub
Commissioner

---

[38] *See, e.g.,* Negotiated Settlement in ADR 699 (P-MUR 521) (LoBiondo for Congress), dated June 24, 2014 (Committee "amended reports under the guidance of the Reports Analysis Division").
[39] *See, e.g.,* fn. 35.
[40] Freedom Vote Initial Articles of Incorporation (July 10, 2010).

# Tab 11

Statement of Reasons of Chairman Allen Dickerson, Commissioner Sean J. Cooksey, and Commissioner James E. "Trey" Trainor, III (dated Mar. 7, 2022) AR1835–45



**FEDERAL ELECTION COMMISSION**
Washington, DC

## BEFORE THE FEDERAL ELECTION COMMISSION

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Freedom Vote, Inc. | ) | MUR 7465 |
| | ) | |

### STATEMENT OF REASONS OF CHAIRMAN ALLEN DICKERSON AND COMMISSIONERS SEAN J. COOKSEY AND JAMES E. "TREY" TRAINOR, III

### I.    INTRODUCTION

This Matter arose from a complaint alleging that Freedom Vote, Inc., ("Freedom Vote" or "Respondent") violated the Federal Election Campaign Act of 1971 ("FECA" or "Act") by failing to organize, register, and report as a political committee in connection with Freedom Vote's spending in 2014, 2015, and 2016.[1] The Commission issued a reason-to-believe finding, and the Commission's Office of General Counsel ("OGC") opened an investigation.[2] By the time this Matter was presented to the Commission for a probable-cause determination, however, the five-year statute of limitations had expired on the bulk of Freedom Vote's alleged FECA violations. In an exercise of our prosecutorial discretion, we declined to pursue the alleged violations that were not time-barred. We further declined to adopt OGC's theory that the Commission has jurisdiction, in perpetuity, to require continued reporting by any organization that has ever operated as a political committee. We issue this statement of reasons as contemplated by the courts.[3]

### II.    FACTUAL BACKGROUND

In 2010, Freedom Vote organized as a tax-exempt corporation under Internal Revenue Code § 501(c)(4), stating that its purpose was "[t]o further the common good and general

---

[1] *See generally* Complaint at 1–2, MUR 7465 (Aug. 9, 2018).

[2] General Counsel's Brief ("GC Br.") at 1, MUR 7465 (Sept. 20, 2021); Certification ¶ 2.a, MUR 7465 (July 29, 2019).

[3] *See, e.g., Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 966 F.2d 1471, 1476 (D.C. Cir. 1992) ("We further held that, to make judicial review a meaningful exercise, the three Commissioners who voted to dismiss must provide a statement of their reasons for so voting. Since those Commissioners constitute a controlling group for purposes of the decision, their rationale necessarily states the agency's reasons for acting as it did.") (citation omitted); *Campaign Legal Ctr. & Democracy 21 v. Fed. Election Comm'n*, 952 F.3d 352, 355 (D.C. Cir. 2020).

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 2 of 11

welfare of the people of Ohio."[4] In 2014, Freedom Vote made several independent expenditures, at least some of which it reported to the Commission.[5] It did not, however, register as a political committee.

On August 9, 2018, Citizens for Responsibility and Ethics in Washington ("CREW") filed a complaint with the Commission alleging, *inter alia*, that Freedom Vote's spending in 2014, 2015, and 2016 triggered requirements to organize, register, and report as a political committee under the Act.[6] On July 29, 2019, the Commission found reason to believe that Freedom Vote violated 52 U.S.C. §§ 30102, 30103, and 30104(a), (b), and (g)(2).[7] In its subsequent investigation, OGC concluded that Freedom Vote:

- spent at least $239,877.81 on "federal campaign activity"[8] in 2014, which was 82.67% of its total spending for that year;[9]

- spent at least $217,539.00 on "federal campaign activity" in 2015, which was 66.28% of its total spending for that year;[10] and,

- spent at least $2,987,563.45 on "federal campaign activity" in 2016, which was 77.35% of its total spending for that year.[11]

---

[4] GC Br. at 2.

[5] *Id.* at 6–8.

[6] *See generally* Complaint at 1–2, MUR 7465 (Aug. 9, 2018).

[7] Certification ¶ 2.a, MUR 7465 (July 29, 2019). The Commission also found reason to believe that Freedom Vote violated 52 U.S.C. § 30120(a) and (d) and 11 C.F.R. § 110.11 by failing to include a disclaimer on its "Third Largest" advertisement, which aired in June and July of 2016. *See id.*; GC Br. at 14 & n.63. This alleged violation was time-barred once this Matter reached the Commission for a probable-cause finding and therefore provided no basis for further action against Freedom Vote. *See infra*, Part III(a) (explaining why the statute of limitations barred enforcement action in connection with many of Freedom Vote's alleged FECA violations); OGC Memorandum to the Commission, MUR 7465 (Sept. 13, 2021) (acknowledging that statute of limitations had expired as to alleged failure to include a disclaimer on "Third Largest" ad).

[8] OGC's references to "federal campaign activity" include "Freedom Vote's contributions to political committees, its own express advocacy, expenses associated with the 'Third Largest' advertisement (to the extent it is not, itself, express advocacy), and other expenses described above such as polling done to support Freedom Vote's express advocacy." GC Br. at 18. As OGC notes, the Commission never found that the "Third Largest" ad is express advocacy. *Id.* at 23, n.103.

[9] *Id.* at 11, 18.

[10] *Id.* at 12, 18.

[11] *Id.* at 16–17, 18.

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 3 of 11

Freedom Vote did not spend any funds on "federal campaign activity" after 2016.[12] After settling an audit with the IRS and going bankrupt, Freedom Vote dissolved in 2019.[13]

Freedom Vote responded that it did not meet the threshold for political-committee status, and that—in recommending a reason-to-believe finding—OGC had misunderstood information that Freedom Vote provided about its spending during the investigation.[14] It also contended that, rather than focus upon spending in an isolated year or years, the Commission ought to consider Freedom Vote's spending over time (which, according to Freedom Vote, demonstrated that the organization did not satisfy the major-purpose test for political-committee status).[15]

On October 27, 2021, OGC recommended that the Commission find probable cause to believe that Freedom Vote violated 52 U.S.C. §§ 30102, 30103, and 30104(a), (b), and (g)(2) by failing to organize, register, and report as a political committee.[16] The Commission considered OGC's recommendation on November 9, 2021, and we voted against finding probable cause.[17] Commissioner Broussard joined us in voting to close the file on this Matter.[18]

## III.   AUTHORITY AND ANALYSIS

### a.   The statute of limitations deprived the Commission of enforcement authority in connection with conduct more than five-years old.

Congress gave the Commission "exclusive" jurisdiction over civil enforcement of the Act.[19] But exclusive jurisdiction is not perpetual jurisdiction. Because "FECA itself contains no

---

[12] *Id.* at 17–18.

[13] *Id.* at 2, 19.

[14] Freedom Vote Supp'l Resp.at 1-2, MUR 7465 (July 6, 2021).

[15] *Id.* at 4. While we need not reach the issue in this Matter, previous Commissioners have "rejected OGC's myopic focus on one year of spending," noting that "[t]he fundamental flaw of OGC's one-year approach—which is a recent creation by OGC—is that it ignores an organization's history and other activities." Statement of Reasons of Vice Chair Hunter and Comm'r Goodman at 21, n.96, MUR 6872 (Dec. 20, 2017).

[16] OGC Notice to Commission, MUR 7465 (Oct. 27, 2021).

[17] Certification, MUR 7465 (Nov. 14, 2021). The three other Commissioners voted to find probable cause, *see id.*, and issued a Statement of Reasons. Statement of Reasons of Chair Broussard and Comm'rs Walther and Weintraub at 9, MUR 7465 (Dec. 16, 2021).

[18] *Id.*

[19] 52 U.S.C. § 30107(e) ("Except as provided in section 30109(a)(8) of this title [providing for persons aggrieved by Commission dismissal of or failure to act on a complaint to pursue litigation under certain circumstances], the power of the Commission to initiate civil actions under subsection (a)(6) shall be the exclusive civil remedy for the enforcement of the provisions of this Act"); (a)(6) ("The Commission has the power . . . to initiate (through civil actions for injunctive, declaratory, or other appropriate relief), defend (in the case of any civil action brought under

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 4 of 11

explicit limitations period. . . courts have applied the catch-all five-year limitations period set forth in 28 U.S.C § 2462 to FECA enforcement actions brought by the Commission."[20] Under 28 U.S.C. § 2462, "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained *unless commenced within five years from the date when the claim first accrued . . ..*"[21]

Thus, when the Commission voted on OGC's probable-cause recommendation on November 9, 2021,[22] the five-year limitations period prevented us from pursuing enforcement based on activity before November 9, 2016. Accordingly, we voted against finding probable cause in connection with alleged violations before that date. This is consistent with the statutes and the caselaw (as well as our votes in previous matters),[23] and disposed of the bulk of Freedom Vote's alleged violations.

Our colleagues who voted to find probable cause minimize the statute of limitations in two ways,[24] neither of which changes our analysis. First, they state that the Commission's lack of a quorum during parts of 2019 and 2020 and Freedom Vote's recalcitrance delayed progress in this Matter. But courts have repeatedly rejected the notion that uncooperative

---

section 30109(a)(8) of this title) or appeal any civil action in the name of the Commission to enforce the provisions of this Act and chapter 95 and chapter 96 of Title 26, through its general counsel").

[20] *CREW v. Am. Action Network*, 410 F. Supp. 3d 1, 23 (D.D.C. 2019) (citing *CREW v. Fed. Election Comm'n*, 236 F. Supp. 3d 378, 392 (D.D.C. 2017), *aff'd*, 892 F.3d 434 (D.C. Cir. 2018)), *on reconsideration*, No. 18-CV-945 (CRC), 2022 WL 612655 (D.D.C. Mar. 2, 2022). *See also, e.g., Fed. Election Comm'n v. Christian Coal.*, 965 F. Supp. 66, 69 (D.D.C. 1997) ("FECA does not contain an internal statute of limitations. The applicable statute of limitations is provided under 28 U.S.C. § 2462-a point the parties do not, nor could they, reasonably dispute.") (citations omitted); *Beam v. Mukasey*, No. 07 C 1227, 2008 WL 4614324, at *4 (N.D. Ill. Oct. 15, 2008) (collecting cases; noting that, "[a]lthough FECA does not contain a statute of limitations for civil liability, courts that have considered the question have found that the five-year default statute of limitations provided by 28 U.S.C. § 2462 applies.") (citations omitted).

[21] 28 U.S.C. § 2462 (emphasis added). The statute of limitations applicable to the Commission's civil enforcement of FECA parallels the statute governing the Department of Justice's authority over criminal enforcement of the Act. *See* 52 U.S.C. § 30145(a) ("No person shall be prosecuted, tried, or punished for any violation of" the Act "unless the indictment is found or the information is instituted within 5 years after the date of the violation."); *see also Fed. Election Comm'n v. Lance*, 617 F.2d 365, 371–72 (5th Cir. 1980), *supplemented*, 635 F.2d 1132 (5th Cir. 1981) (Stating, in context of predecessor to 52 U.S.C. § 30145(a), that "[t]he statute refers to the institution of an 'information' or an 'indictment,' but not to the pursuit of a civil remedy. Thus, the statutory language indicates that the period of limitations applies only to the criminal prosecutions for violations of the FECA . . ..").

[22] Certification, MUR 7465 (Nov. 14, 2021).

[23] Statement of Reasons of Vice Chair Dickerson and Comm'rs Cooksey and Trainor at 1–2, MURs 7859, 7860 (Dec. 17, 2021) (rejecting OGC's argument that, "the passage of more than five years [since the alleged violations] notwithstanding, [the Commission] retain[s] authority over the[] Respondents") (citing, *inter alia*, 52 U.S.C. § 30145(a); 28 U.S.C. § 2462); Statement of Reasons of Vice Chair Dickerson and Comm'rs Cooksey and Trainor at 2, MUR 7181 (Mar. 18, 2021) (rejecting OGC's suggestion that the Commission possessed jurisdiction over alleged FECA violations that occurred in "the 2010, 2012, and 2014 federal elections.").

[24] *See* Statement of Reasons of Chair Broussard and Comm'rs Walther and Weintraub at 6, MUR 7465 (Dec. 16, 2021).

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 5 of 11

respondents or lengthy delays in the administrative process have any impact on our statute of limitations.[25] To the contrary—"nothing in the language of § 2462 even arguably makes the running of the limitations period turn on the degree of difficulty an agency experiences in detecting violations."[26]

Second, our colleagues argue that the statute of limitations does not preclude the Commission from pursuing "equitable remedies [] including requiring Freedom Vote's disclosure of its receipts and disbursements as a political committee."[27] As we have noted in the past, courts reject the theory that the statute of limitations prevents the Commission from imposing fines but does not bar equitable relief.[28] For instance, in *Federal Election Commission v. Williams*, this agency "argue[d] that § 2462 does not apply to actions for injunctive relief."[29] The U.S. Court of Appeals for the Ninth Circuit flatly rejected that argument as "directly contrary to the Supreme Court's holding in *Cope v. Anderson*, [which] holds that 'equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy.' In other words, because the claim for injunctive relief is connected to the claim for legal relief, the statute of limitations applies to both."[30] So too here.

Nevertheless, our colleagues contend that this principle does not apply to an enforcement action by the United States, citing two opinions from the U.S. District Court for the District of Columbia.[31] But both of those were "cases where there [wa]s a significant risk of future harm," and in such instances, "the law may allow the FEC to grant equitable relief

---

[25] *See, e.g., Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 916 F. Supp. 10, 14 (D.D.C. 1996) (Where "[t]he Commission did not get around to voting to find probable cause until May of 1989, a mere four months before the fifth anniversary of [the respondent's] last known transgression," the court could "discern no reason why the administrative process cannot easily be accomplished by the FEC within the five year limitation in § 2462, *even with discovery and subpoena enforcement delays of many months or even years*," as encountered there) (quoting *Fed. Election Comm'n v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 18–19 (D.D.C. 1995)) (emphasis added) (cleaned up).

[26] *3M Co. (Minnesota Min. & Mfg.) v. Browner*, 17 F.3d 1453, 1461 (D.C. Cir. 1994); *Fed. Election Comm'n v. Christian Coal.*, 965 F. Supp. at 70 (quoting and applying *3M Co.* in context of Commission enforcement action).

[27] Statement of Reasons of Chair Broussard and Comm'rs Walther and Weintraub at 7, MUR 7465 (Dec. 16, 2021).

[28] *See* Statement of Reasons of Vice Chair Dickerson and Comm'rs Cooksey and Trainor at 3–4, MURs 7859, 7860 (Dec. 17, 2021).

[29] 104 F.3d 237, 240 (9th Cir. 1996).

[30] *Id.* (quoting *Cope v. Anderson*, 331 U.S. 461, 464 (1947)). *See also, e.g., Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 916 F. Supp. at 14, 15 ("The FEC's claim for civil penalties is barred by 28 U.S.C. § 2462. The FEC argues that even if § 2462 bars its civil penalty claims, it is nevertheless entitled to its declaratory judgment and an injunction. The Court disagrees. . . . Notions of welcome repose for ancient grievances aside, the practical concerns alone for problems of missing documents, faded memories, and absent witnesses that inevitably occur with the passage of time are no less problematic in adjudicating actions for declaratory and injunctive relief than in determining liability for monetary civil penalties.").

[31] Statement of Reasons of Chair Broussard and Comm'rs Walther and Weintraub at 6, n.26, MUR 7465 (Dec. 16, 2021) (citing *Fed. Election Comm'n v. Christian Coal.*, 965 F. Supp. at 71 and *Fed. Election Comm'n v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. at 20–21 for the proposition that "injunctive relief is not a penalty.").

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 6 of 11

notwithstanding the expiration of the statute of limitations."[32] Plainly, this "future harm" exception does *not* apply on these facts: the Respondent is a defunct, bankrupt entity accused of prior reporting violations, and there is no basis to believe that the allegedly impermissible conduct will recur.[33] Indeed, as the U.S. District Court for the District of Columbia recognized (and the Court of Appeals affirmed), the Commission's "injunctive remedies would be moot, given [a respondent's] defunct status," and the "controlling commissioners almost certainly could not have found a significant risk of future harm by [the respondent] as required [to invoke the 'future harm' exception], because [the respondent] was defunct at the time of the decision."[34] This reasoning squarely applies here.

Finally, our colleagues suggest that the statute of limitations "does not prevent us from making a probable cause to believe finding."[35] Even if true, this would be irrelevant at best. Upon finding probable cause, the Commission is empowered to "attempt . . . to correct or prevent" an alleged FECA violation "by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved."[36] The Commission must spend no less than 30 (but no more than 90) days attempting conciliation.[37] Nothing, however, requires a respondent to reach agreement (or even engage) with the Commission in the conciliation process. Instead, the Commission's sole coercive power is derived from the courts of the United States—[38] and, as such, ultimately depends upon this

---

[32] *CREW v. Fed. Election Comm'n*, 236 F. Supp. 3d at 392–93 (discussing *Fed. Election Comm'n v. Christian Coal.*, 965 F. Supp. at 71 and *Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 916 F. Supp. at 15).

[33] *See id.*

[34] *Id.* at 393.

[35] Statement of Reasons of Chair Broussard and Comm'rs Walther and Weintraub at 6, MUR 7465 (Dec. 16, 2021). *But see Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1262 (9th Cir. 1989) (stating, with respect to injunctive relief under FECA, "Because the Act implicates First Amendment concerns about political expression, it is important that courts avoid granting injunctive relief which is unnecessary to further the purposes of the Act.").

[36] 52 U.S.C. § 30109(a)(4)(A)(i) ("Except as provided in clause[] (ii) [establishing 15-day conciliation period where probable-cause determination occurs during the 45 days preceding an election] and subparagraph (C) [setting out process Commission may follow to impose scheduled penalties for violations of qualified disclosure requirements], if the Commission determines, by an affirmative vote of 4 of its members, that there is probable cause to believe that any person has committed, or is about to commit, a violation of this Act . . . the Commission *shall attempt, for a period of at least 30 days, to correct or prevent such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved*. Such attempt by the Commission to correct or prevent such violation may continue for a period of not more than 90 days. The Commission may not enter into a conciliation agreement under this clause except pursuant to an affirmative vote of 4 of its members. A conciliation agreement, unless violated, is a complete bar to any further action by the Commission, including the bringing of a civil proceeding under paragraph (6)(A).") (emphasis added).

[37] *Id.*

[38] 52 U.S.C. § 30109(a)(6)(A) ("If the Commission is unable to correct or prevent any violation of this Act . . . by the methods specified in paragraph (4) [providing for conciliation; imposition of scheduled penalties for violations of qualified disclosure requirements], the Commission may, upon an affirmative vote of 4 of its members, institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order . . . in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business.").

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 7 of 11

agency's ability to demonstrate an actionable violation in court. Thus, even if the Commission could find probable cause to believe a time-barred violation occurred, doing so would be an exercise in futility as the Commission lacks direct enforcement authority over the Act.

The Commission lacked authority to pursue enforcement action against Freedom Vote in connection with activity before November 9, 2016. We voted accordingly, thus disposing of all but two of Freedom Vote's alleged FECA violations.

> **b. We exercised our prosecutorial discretion and declined to pursue enforcement in connection with Freedom Vote's other alleged FECA violations.**

OGC argued that two of Freedom Vote's alleged FECA violations were not yet time-barred: the failure to file "the Post-General Report, due December 8, 2016, and the Year End Report, due January 31, 2017."[39] OGC further suggested that the Commission find probable cause on the theory that, "as a political committee, Freedom Vote had a continuing obligation to file disclosure reports until it terminated."[40]

In determining whether to pursue enforcement, the Commission has prosecutorial discretion as described in *Heckler v. Cheney*.[41] When exercising that discretion, it is incumbent upon us to "not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies[,]"[42] and other factors.

> **i. The Commission does not have jurisdiction to require continuous reporting by Respondent.**

OGC's suggestion that the Commission may find probable cause because "as a political committee, Freedom Vote had a continuing obligation to file disclosure reports until it terminated"[43] defies both logic and black-letter law. Indeed, this theory was rejected in prior litigation, as the Commission can "cite to no precedent suggesting that the reporting

---

[39] GC Br. at 24, n.105; *see also* Statement of Reasons of Chair Broussard and Comm'rs Walther and Weintraub at 7, MUR 7465 (Dec. 16, 2021) (conceding that there is "doubt" about the timeliness of enforcement action based on anything other than "disclosure reports that were due less than five years before November 9, 2021.").

[40] GC Br. at 24, n.105.

[41] 470 U.S. 821, 831–32 (1985). *See also id.* at 831 ("[A]n agency's decision not to prosecute or enforce ... is a decision generally committed to an agency's absolute discretion ... [and] often involves a complicated balancing of a number of factors which are peculiarly within its expertise."); *CREW v. Fed. Election Comm'n*, 892 F.3d at 438 ("The Supreme Court has recognized that federal administrative agencies in general, and the Federal Election Commission in particular, have unreviewable prosecutorial discretion to determine whether to bring an enforcement action.") (citing *Heckler v. Chaney*, 470 U.S. at 831; *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998); *CREW v. Fed. Election Comm'n*, 475 F.3d 337, 340 (D.C. Cir. 2007)).

[42] *Heckler*, 470 U.S. at 831.

[43] GC Br. at 24, n.105.

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 8 of 11

requirements are continuous and the text of FECA does not clearly establish that entities have a continuous obligation to report information."[44] After all, if FECA did require continuous reporting, "the statute of limitations would be largely irrelevant in cases of alleged non-disclosure or failure-to-register."[45] This cannot be right. Adopting this line of thinking would be tantamount to vesting ourselves with perpetual jurisdiction over such violations, which would gut the purpose of 28 U.S.C. § 2462—to "set[] a fixed date when exposure to the specified Government enforcement efforts ends, advancing 'the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.'"[46]

    As the Supreme Court has noted, statutes of limitations including 28 U.S.C. § 2462 "are intended to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. They provide security and stability to human affairs. We have deemed them vital to the welfare of society, and concluded that even wrongdoers are entitled to assume that their sins may be forgotten[.]"[47] The notion that the Commission may swoop in at any moment and pursue enforcement action against any entity that has ever operated as a political committee, regardless of how long ago the activity occurred, is at odds with the very nature of a statute of limitations, and cannot support enforcement action against Respondent.

> ### ii. Pursuing enforcement on the theory that a reporting violation accrues on the report-filing deadline carries litigation risk, presents practical challenges, and offers little chance of furthering the Commission's mission.

    Next, OGC argue that the Commission should pursue enforcement based upon Freedom Vote's failure to file a 2016 Post-General Report (due December 8, 2016) and a 2016 Year-End Report (due January 31, 2017)—violations that OGC present as within the statute of limitations. As an initial matter, we do not find any binding authority for the proposition that the statute of limitations on such violation runs from the subject report's due date. It is equally logical that the statute should run from the date of reportable spending.[48]

---

[44] *CREW v. Fed. Election Comm'n*, 236 F. Supp. 3d at 392–93.

[45] *Id.*

[46] *Gabelli v. Sec. & Exch. Comm'n*, 568 U.S. 442, 448 (2013) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)) (declining to read a discovery rule into 28 U.S.C. § 2462 in context of Securities and Exchange Commission's effort to pursue civil penalties).

[47] *Id.* at 448–49 (quoting *Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348–349 (1944); *Wood v. Carpenter*, 101 U.S. 135, 139 (1879); *Wilson v. Garcia*, 471 U.S. 261, 271 (1985)) (cleaned up).

[48] Absent direction from Congress or controlling caselaw, we note that Courts have rejected the application of the discovery rule to the running of the limitations period under 28 U.S.C. § 2462. *See, e.g.*, *3M Co. v. Browner*, 17 F.3d at 1462.

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 9 of 11

And even under OGC's theory of the statute of limitations, enforcement would be difficult or impossible. We consider the following timeline:[49]

| | |
|---|---|
| October 20, 2016 | First date covered by 2016 Post-General Report |
| November 8, 2016 | 2016 General Election |
| November 28, 2016 | Last date covered by 2016 Post-General Report |
| November 29, 2016 | First date covered by 2016 Year-End Report |
| December 8, 2016 | Due date for 2016 Post-General Report |
| December 31, 2016 | Last date covered by 2016 Year-End Report |
| January 31, 2017 | Due date for 2016 Year-End Report |
| July 29, 2019 | Commission's reason-to-believe vote |
| November 9, 2021 | Commission's probable-cause vote |
| November 10, 2021 | Start of minimum 30-day conciliation period[50] |
| December 10, 2021 | End of minimum 30-day conciliation period |

As discussed above, when the Commission finds probable cause, it must "attempt, for a period of at least 30 days, to correct or prevent [the] violation by informal methods of conference, conciliation, and persuasion. . .."[51] Even if we voted to find probable cause on November 9, 2021, the Commission would have had to spend 30 days in conciliation before it could pursue litigation on December 10, 2021 (at the earliest). By then, the statute of limitations on the 2016 Post-General Report would have expired, barring that very lawsuit. The Commission would have had—again, at the very most, and under OGC's expansive reading of the statute of limitations—from December 10, 2021, until January 31, 2022, to pursue litigation in connection with the Post-General Report. One-and-a-half months is not much time to marshal the relevant evidence and information, draft a complaint and a motion for injunctive relief, and file suit. This work would have to be done over the winter holidays, with much of the staff taking leave, and with a press of other matters vying for their attention. Under these circumstances, we acted consistent with Commission practice in

---

[49] Report due dates and coverage dates are set out in 52 U.S.C. § 30104(a) and 2016 Reporting Dates, Federal Election Commission, https://transition.fec.gov/info/report_dates_2016.shtml#quarterly (visited Feb. 22, 2022).

[50] 52 U.S.C. § 30109(a)(4)(A)(i).

[51] Id.

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 10 of 11

declining to pursue enforcement where the statute of limitations has not run but is "imminent."[52]

Moreover, Freedom Vote is apparently defunct and bankrupt, and it is unclear to us that there would be anyone to engage in either conciliation or litigation had the Commission pursued it. For the same reasons, we have no basis to believe that enforcement action would deter future violations of the Act. [53]

Finally, even if the Commission successfully sued for an injunction compelling Freedom Vote to file the reports at issue, and even if somebody was around to comply with that injunction, the information would be unhelpful at best and misleading at worst. The Post-General Report covered receipts and disbursements from October 20 thru November 28, 2016—only two weeks of which preceded the 2016 election—and the Year-End Report covered activity after the election. The disclosure interest in such information is limited, given the likelihood that funds disbursed on election-related activity would have been received before then.[54] This is confirmed by "Freedom Vote's own ledgers of expenses produced in the course of the investigation," which OGC used as the basis of its recommendation.[55] Based upon Freedom Vote's 2016 ledger, the maximum contributions that it could possibly have received during the post-general reporting period—if it were required to report as a political committee—would total $45,000.[56] This same ledger reflects that Freedom Vote received *no* possible contributions from November 29 thru December 31, the period covered in the Year-

---

[52] Statement of Reasons of Chair Broussard and Comm'r Weintraub at 2, MUR 7395 (May 7, 2021) ("Under these circumstances, and in light of the imminent statute of limitations and other priorities on the Commission's docket, we voted to dismiss the allegations as a matter of prosecutorial discretion."); Statement of Reasons of Vice Chair Dickerson and Comm'rs Cooksey and Trainor at 2, MUR 7265 (May 10, 2021) (concluding that "the Commission had no viable course of action but to dismiss [] matters" where "there was no reasonable chance for the Commission to bring an enforcement action to fruition in the remaining time."). *See also* Statement of Reasons of Vice Chair Weintraub and Comm'rs McDonald, Thomas, and Toner at 2, MUR 5089 (Apr. 2, 2004) (exercising prosecutorial discretion to dismiss a matter four years and two months after respondents' alleged violation due, in part, to "the age of the case"); Statement of Reasons of Chair Petersen and Comm'rs Hunter and Goodman at 1, MURs 6391, 6471 (Nov. 6, 2015) (dismissing matters under *Heckler* because, *inter alia*, "the statute of limitations [was] effectively expired" and the matter "did not warrant the further use of Commission resources").

[53] Of course, a political committee cannot avoid Commission enforcement action by simply dissolving. *But see CREW v. Fed. Election Comm'n*, 236 F. Supp. 3d at 391 (noting that "even if there were not legal issues with prosecution, the defunct nature of the [respondent] entity—along with the apparent lack of any officer that could conciliate with the FEC—made any remedy, financial or injunctive, extremely difficult.").

[54] Respondent did not engage in any regulable activity after 2016. *See supra* n.12.

[55] GC Br. at 18, n.78.

[56] Ledger of 2016 Freedom Vote Receipts and Expenses, FV01155-59 (reflecting a $10,000 check dated October 11, 2016 and deposited on October 21, 2016; a $25,000 check dated October 18, 2016 and deposited on October 21, 2016; and a $10,000 check dated October 24, 2016 and deposited on November 4, 2016).

MUR 7465 (Freedom Vote, Inc.)
Statement of Reasons
Page 11 of 11

End Report.[57] These records also show comparatively minimal disbursements—several of which were clearly administrative in nature—during both of these reporting periods.[58]

## IV.    CONCLUSION

By the time this matter was before the Commission for a probable-cause finding, the 2016 election cycle was long over and Freedom Vote was defunct and bankrupt. Most of the alleged FECA violations were time-barred, and the Commission may not perpetually extend its own jurisdiction by requiring continuous reporting. Considering the litigation risk and practical obstacles associated with continued action against Freedom Vote, the (at best short) time before the statute of limitations would expire, the staleness of the facts, the narrow information subject to disclosure, and the Commission's limited resources, we voted against finding probable cause and voted to close the file on this Matter.

March 7, 2022
Date

Allen Dickerson
Chairman

March 7, 2022
Date

Sean J. Cooksey
Commissioner

March 7, 2022
Date

James E. "Trey" Trainor, III
Commissioner

---

[57] *Id.*

[58] *Id.* (reflecting modest expenses for telephone, accounting, legal, and consulting services).

AR1845

# Tab 12

Documents responsive to the Commission's Requests for Production 1, 5, 6, 7, and 8 from Charles R. Spies (dated Apr. 9, 2021)

Letter from Tom Whatman, Manager, Fighting for Ohio to Jim Nathanson, Executive Director, Freedom Vote (dated July 5, 2016) AR1955

Door Hanger advocating election of John Boehner in Republican Primary AR1988–89

Transcript of "Third Largest" television ad AR1992–94

Email from James Nathanson to Brian Walsh (dated Mar. 5, 2014) AR1997

Email from Brian Walsh to James Nathanson (dated Apr. 9, 2014) AR2032–33

Letter from James S. Nathanson, Executive Director, Freedom Vote to Unknown Recipient (dated Jan. 15, 2016) AR2074

Letter from Unknown Sender to Freedom Vote, c/o James Nathanson (dated Oct. 5, 2016) AR2076

Letter from James S. Nathanson, Executive Director, Freedom Vote, to Unknown Recipient (dated Apr. 8, 2021) AR2082

Email chain between James Nathanson and Unknown Recipient (dated June 23, 2016) AR2165–67

Email from James Nathanson to Unknown Recipient (dated Apr. 16, 2014) AR2174

Email chain between James Nathanson and Unknown Recipient (dated Apr. 21, 2014) AR2203–04

Email chain from James Nathanson and Unknown Recipient (dated Apr. 21, 2014) AR2205

Email chain between James Nathanson and Unknown Recipient (dated Apr. 17, 2014) AR2206–07

Email from Thomas Whatman to Unknown Recipient (dated Apr. 17, 2014) AR2208–09

Email from Unknown Sender to Thomas Whatman and James Nathanson (dated Apr. 17, 2014) AR2210–11

Email from Thomas Whatman to Unknown Recipient (dated Apr. 16, 2014) AR2212



July 5, 2016

Mr. Jim Nathanson
Executive Director
Freedom Vote
Talbott Tower, Suite 315
131 North Ludlow Street
Dayton, OH 45402

Dear Jim:

On behalf of Fighting for Ohio, I am requesting a grant of $500,000. This grant would support FFO's direct advocacy efforts.

We appreciate your past support and hope that you will be able to continue to support us with this grant.

Sincerely,

Tom Whatman
Manager
Fighting for Ohio

FV01272

AR1955



FV01305



REPUBLICAN

# JOHN BOEHNER
#### is Making a Difference.

**Leading the Fight Against Obamacare**
John Boehner is leading the Republican effort
to repeal Obamacare

**Opposed the Stimulus Boondoggle**
John Boehner tried to blocked the $787 BILLION
failed "stimulus" plan.

**Stopped Cap and Trade**
John Boehner took on Nancy Pelosi to stop the new
cap-and-trade energy taxes being pushed by the Left.

**Banning Pork Barrel Spending**
John Boehner is a fiscal conservative who led the fight
to ban pork barrel spending known as earmarks.

**John Boehner. Real Leadership Republicans Need.**
VOTER ALERT: REPUBLICAN PRIMARY, TUESDAY, MAY 6TH



# VOTE!
## REPUBLICAN PRIMARY
### MAY 6TH

Request an Absentee Ballot Today!

Or Vote Early Now at Your
County Board of Elections.

Everyone is Eligible. No Excuse Needed!

FV01306

AR1989

Freedom Vote– OH                                                    Adam
"mobile_FLT1_video"

:15

VO/AUDIO                              TEXT/VISUAL

| VO/AUDIO | TEXT/VISUAL |
|---|---|
| {sad music like}<br>https://www.pond5.com/stock-music/56133161/sad-ambient-piano-durge-2.html<br><br>Record numbers of Ohioans were out of work.<br><br>The Strickland Administration's response?<br><br>Cuts in Aid to Food Pantries and Food Stamps…<br><br>Eliminating Preschool Programs for the poor.<br><br>$770 Million in cuts to Medicaid<br><br>Struggling Ohio Families Deserve Better Leadership. | {image of worried parents looking at bills around kitchen table}<br>Struggling Ohio families needed help.<br><br>{Ohio state capitol or Head shot}<br>But Strickland Administration policies made it worse.<br><br>{torn newspaper}<br>"The cuts affected welfare programs, child support programs, adoption services and the Temporary Assistance for Needy Families Program." – The AP 9/24/08<br><br>https://www.pond5.com/stock-footage/35860237/out-focus-pantry-shot.html<br><br>https://www.pond5.com/stock-footage/12191562/preschool-student.html<br><br>Gov. Strickland wanted to cut $770 million from Medicaid.<br><br>Ohio Deserves Better Leadership.<br>LEARN THE FACTS<br><br>NEED DISCLAIMER |

FV01309

| VIDEO | AUDIO |
|---|---|
| **Strickland Image**<br><br>**TEXT:**<br>**Ohio Lost Jobs to Kentucky**<br>**Indiana**<br>**Even Michigan**<br><br>**CITE:**<br>**The Association Press, 7/9/08; The Columbus Dispatch, 7/9/08; The O&P Edge, 7/8/09**<br><br>**350,000 Jobs Lost**<br><br>**CITE:**<br>**U.S. Bureau of Labor Statistics** | **ANNOUNCER:**<br>**While Ted Strickland was governor, Ohio lost jobs to Kentucky, Indiana, even Michigan.**<br><br><br>**350,000 Ohio jobs…gone.** |
| | **How many is that?** |
| **Scroll of Ohio's largest cities with populations:**<br>**Columbus 787,033**<br>**Cleveland 396,815**<br>**Jobs Lost Under Strickland 350,000**<br>**Cincinnati 296,943**<br>**Toledo 287, 208**<br><br>**CITE:**<br>**2010 Census** | **If you assembled everyone who lost their job under Strickland, you'd have Ohio's 3ʳᵈ largest city.** |
| **Empty Stadium shot digitally fills to full and flips to 3 full stadiums**<br><br>**TEXT:**<br>**Strickland Lost Jobs**<br>**Could Fill The Horseshoe 3 Times** | **And you could fill The OSU Horseshoe…more than 3 times.** |

| | Now Ted Strickland wants to bring his job-killing policies to Washington. |
|---|---|
| **Paid for by Freedom Vote** | **We can't afford more lost jobs.** |

FV01311

AR1994

| From: | Nathanson |
|---|---|
| To: | Brian Walsh |
| Cc: | Lauren Tucker; Tom Whatman |
| Subject: | Door Hanger & Research |
| Date: | Wednesday 5 March 2014 6:12:48 PM |
| Attachments: | ERIC GURR QUICK HITS RESEARCH.docx |
| | JD WINTEREGG QUICK HITS RESEARCH.docx |
| | Gurr and Winteregg Debate .docx |
| | Rev.American Action Network OH08 Doorhanger.pdf |

Brian,

Attached is the door hanger we are recommending we use with the first round of DTD work, along with what we have on the two main opponents.

I will return the non-coordinating affidavit as soon as my lawyer gets me an answer to one question.

Jim

JSN Associates

131 North Ludlow Street, Suite 315

Dayton, OH 45402

nathanson@jsnassociates.com

(O) 937-222-0131

(F) 937-223-0423

(b) (6)

| | |
|---|---|
| **From:** | Brian Walsh |
| **To:** | James S Nathanson |
| **Cc:** | Thomas Whatman |
| **Subject:** | Re: OH 8 Door Hanger |
| **Date:** | Wednesday 9 April 2014 8:29:05 PM |

Yeah.

Brian O Walsh



From my iPhone.

On Apr 9, 2014, at 8:28 PM, "James S Nathanson" <nathanson@jsnassociates.com> wrote:

> Brian.  Can I go to print?
>
> Jim Nathanson
> JSN Associates
>
> Sent from my iPhone
> 
>
> On Apr 9, 2014, at 8:18 PM, Thomas Whatman <tomwhatman@aol.com> wrote:
>
>> Looks good to me. Is this our final pass through the doors?
>>
>> Sent from my iPhone
>>
>> On Apr 9, 2014, at 7:21 PM, "Nathanson"
>> <nathanson@jsnassociates.com> wrote:
>>
>>> Sorry about that.
>>>
>>> Langdon's approved.....being the good lawyer he is, he
>>> found a typo....will be corrected.
>>>
>>> **From:** Brian Walsh
>>> **Sent:** Wednesday, April 09, 2014 6:38 PM
>>> **To:** Nathanson
>>> **Subject:** Re: OH 8 Door Hanger
>>>
>>> Nothing attached.

FV01349

Brian O Walsh


From my iPhone.

On Apr 9, 2014, at 6:33 PM, "Nathanson" <nathanson@jsnassociates.com> wrote:

> Guys,
>
> Thought I would send this to you to get any comments or reactions.
>
> Dave Langdon, Freedom Vote's lawyer, also has it and it will go to print as soon as he has reviewed it.
>
> Jim
>
> JSN Associates
> 131 North Ludlow Street, Suite 315
> Dayton, OH 45402
>
> nathanson@jsnassociates.com
> (O) 937-222-0131
> (F) 937-223-0423
> 

<Freedom_Vote_Boehner_EV_Doorhanger_v2.pdf>



January 15, 2016



Dear ███

I want to thank ████████████████ for your recent contribution of $50,000 to Freedom Vote. Your generous donation will help us elect pro-growth, pro-business leaders here in Ohio and nationally.

For your convenience I have enclosed Freedom Vote's Form W-9. Also, you should note that the IRS does not allow contributions to Freedom Vote to be deducted as a charitable contribution or as a business expense. Please confer with a tax professional regarding potential gift tax implications.

If you need any further information please do not hesitate to contact me at 937-222-1790. Thank you again for your support.

Sincerely,

James S. Nathanson
Executive Director

FREEDOMVOTE.NET
P.O. BOX 882 ▪ DAYTON, OH 45401
P: (937) 222.1790

CONTRIBUTIONS ARE NOT TAX DEDUCTIBLE. FEDERAL TAX ID NUMBER 27-3004397. FV01391

AR2074



October 5, 2016

Freedom Vote
c/o James Nathanson
Talbott Tower, Suite 315
131 North Ludlow Street
Dayton, OH  45402

Dear Mr. Nathanson:

Enclosed please find a $10,000 contribution for your committee for the general election. This donation is being made in recognition of your continuing support and commitment to the concerns of men and women who work in the ███████ industry.

We are very pleased that you have remained attentive to issues that affect the daily lives of ████████████████

With my best wishes and appreciation, I am

Sincerely,



Enclosure

AR2076

April 8, 2021



I want to thank ▮▮▮▮▮▮▮▮▮ for your recent contribution of $50,000 to Freedom Vote.
Your generous donation will help us elect pro-growth, pro-business leaders here in Ohio and
nationally.

For your convenience I have enclosed Freedom Vote's Form W-9.  Also, you should note that
the IRS does not allow contributions to Freedom Vote to be deducted as a charitable contribution
or as a business expense.  Please confer with a tax professional regarding potential gift tax
implications.

If you need any further information please do not hesitate to contact me at 937-222-1790.  Thank
you again for your support.

Sincerely,

James S. Nathanson
Executive Director

| | |
|---|---|
| **From:** | ██████████ |
| **To:** | James S Nathanson |
| **Cc:** | ████████████ |
| **Subject:** | Correction - My Error - Sorry! |
| **Date:** | Thursday 23 June 2016 2:54:30 PM |
| **Importance:** | High |

Hi James: You are correct – I am very sorry! I got my organizations mixed up (moving too fast!).

The *Freedom Vote* payment request was only submitted this week, on Monday, June 20 so it is not showing in the record yet.
As we discussed, I am happy to keep tracking this and let you know when it shows "Paid."

Please note, ██████ should be able to ascertain the payment status history through our check request system since she submitted this. Unfortunately, I don't have access to that record.

Thanks,

██████

**From:** ████████████████
**Sent:** Tursday, June , 16 2:28 PM
**To:** 'James S Nathanson'
**Cc:** ████████████
**Su ect:** Payment date: June 13 - ABA Wire

Hi James: It is now in our system, showing as paid by ABA Wire on Monday, June 13th.
Payment reference number is: ████████

**From:** James S Nathanson [mailto:nathanson@jsnassociates.com]
**Sent:** Thursda June 23 2016 1:53 PM
**To:** ████████████
**Cc:** ████████████
**Su ect:** Re: For Your Records

Any up date on wire?

Jim Nathanson
JSN Associates

Sent from my iPhone
(937) 545-7336

On Jun 23, 2016, at 10:18 AM, █████████████████████████ wrote:

FV01482

Hi James: I'm checking in with ▓▓▓▓ – copied above – she submitted the check request on Monday.

▓▓▓▓ this is for: ▓▓▓▓▓▓ - Check Request for Freedom Vote [$1,000,000] – ▓▓ record is currently blank.

Thanks!



**From:** James S Nathanson [mailto:nathanson@jsnassociates.com]
**Sent:** Thursday, June 23, 2016 9:36 AM
**To:** ▓▓▓▓▓▓▓▓▓▓
**Subject:** Re: For Your Records



Any update on when we will receive the wire?

Would be helpful to know for planning purposes on my end

Thanks

Jim Nathanson
JSN Associates

Sent from my iPhone
(937) 545-7336

On Jun 20, 2016, at 1:58 PM, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ wrote:

> Thanks so very much for all of your help with this!  Here is a copy of the countersigned document for your records.



**From:** Nathanson [mailto:nathanson@jsnassociates.com]
**Sent:** Monday, June 20, 2016 1:46 PM
**To:** ▓▓▓▓▓▓▓▓▓▓
**Subject:** Re: Funding Request Approved

,

Attached is the signed letter.

FV01483

AR2166

Please let me know if you need anything else

Jim Nathanson

JSN Associates
131 North Ludlow Street, Suite 315
Dayton, OH 45402

nathanson@jsnassociates.com
(O) 937-222-0131
(F) 937-223-0423
<span style="background:red">(b) (6)</span> ███████

**From:** ████████████
**Sent:** Mon ay, June   ,   1  11:46 AM
**To:** NATHANSON@JSNASSOCIATES.COM
**Subject:** Funding Request Approved

James:  I am very pleased to inform you the Freedom Vote *2016 Economic Policy Education & Advocacy Efforts* funding request has been approved by our funding review committee in the amount of $1,000,000.

Please review the attached Letter of Agreement.  If the terms are acceptable, kindly return a signed copy to me via email or fax ████████████ .

Thanks very much,



&lt;FV Signed-Countersigned LOA 6-20-16.pdf&gt;

FV01484

| | |
|---|---|
| **From:** | Nathanson |
| **To:** |  |
| **Cc:** | Tom Whatman |
| **Subject:** | Freedom Vote |
| **Date:** | Wednesday 16 April 2014 6:16:51 PM |

,

To date, Freedom Vote has spent or obligated $138,800. This includes $32,900 in unpaid vendor debt (Majority Strategies, FLS and Langdon Law). My firm is owed $47,300. Freedom Vote has received no revenue for this project as of close of today's banking day

I project that Freedom Vote will spend another $90,000: $72,000 for payroll (assumes maximum effort through election day), $3,000 for coordinators, $5,000 in misc. expenses (supplies, payroll expenses and mileage) and probably $10,000 in legal fees (includes incurred April fees plus expected fees between now and the end of the project).

This would bring the total cost of the project to $228,800.

Freedom Vote can probably carry most of the current obligations for awhile. Getting the $90,00 to cover the future expenses would be very helpful. In the short run I can get by with less (my weekly payroll is now roughly $22,000).

Jim

JSN Associates
131 North Ludlow Street, Suite 315
Dayton, OH 45402

nathanson@jsnassociates.com
(O) 937-222-0131
(F) 937-223-0423
 (b) (6)

| | |
|---|---|
| **From:** | ▮▮▮▮▮ |
| **To:** | James S Nathanson |
| **Subject:** | RE: Freedom Vote |
| **Date:** | Monday 21 April 2014 10:53:39 AM |

All is well.
Thank you!

**From:** James S Nathanson [mailto:nathanson@jsnassociates.com]
**Sent:** Monda___ April 21, 2014 10:53 AM
**To:** ▮▮▮▮▮
**Sub ect:** Re: Freedom Vote

Correct.

Jim Nathanson
JSN Associates

Sent from my iPhone
(937) 545-7336

On Apr 21, 2014, at 10:22 AM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

> Just to triple check… with the ▮▮▮ check in now, you should be good on the pre-May 6
> expenses and then we just need to settle up the books post May 6.  Correct?
> If so, rock and roll, we're good to go.

> **From:** Nathanson [mailto:nathanson@jsnassociates.com]
> **Sent:** Wednesday, April 16, 2014 6:17 PM
> **To:** ▮▮▮▮▮
> **Cc:** Tom W atman
> **Subject:** Freedom Vote

,

To date, Freedom Vote has spent or obligated $138,800.  This includes $32,900 in
unpaid vendor debt (Majority Strategies, FLS and Langdon Law). My firm is owed
$47,300.  Freedom Vote has received no revenue for this project as of close of
today's banking day

I project that Freedom Vote will spend another $90,000:  $72,000 for payroll
(assumes maximum effort through election day), $3,000 for coordinators, $5,000
in misc. expenses (supplies, payroll expenses and mileage) and probably $10,000
in legal fees (includes incurred April fees plus expected fees between now and the
end of the project).

This would bring the total cost of the project to $228,800.

FV01520

Freedom Vote can probably carry most of the current obligations for awhile. Getting the $90,00 to cover the future expenses would be very helpful.   In the short run I can get by with less (my weekly payroll is now roughly $22,000).

Jim

JSN Associates
131 North Ludlow Street, Suite 315
Dayton, OH 45402

[nathanson@jsnassociates.com](mailto:nathanson@jsnassociates.com)
(O) 937-222-0131
(F) 937-223-0423
(b) (6)

| From: | ▮▮▮ |
|---|---|
| To: | Nathanson |
| Subject: | RE: Freedom Vote |
| Date: | Monday 21 April 2014 10:22:30 AM |

Just to triple check… with the ▮▮▮ check in now, you should be good on the pre-May 6 expenses and then we just need to settle up the books post May 6. Correct?

If so, rock and roll, we're good to go.

---

**From:** Nathanson [mailto:nathanson@jsnassociates.com]
**Sent:** Wednesday, April 16, 2014 6:17 PM
**To:** ▮▮▮
**Cc:** Tom W atman
**Subject:** Freedom Vote

▮▮▮,

To date, Freedom Vote has spent or obligated $138,800.  This includes $32,900 in unpaid vendor debt (Majority Strategies, FLS and Langdon Law). My firm is owed $47,300.  Freedom Vote has received no revenue for this project as of close of today's banking day

I project that Freedom Vote will spend another $90,000:  $72,000 for payroll (assumes maximum effort through election day), $3,000 for coordinators, $5,000 in misc. expenses (supplies, payroll expenses and mileage) and probably $10,000 in legal fees (includes incurred April fees plus expected fees between now and the end of the project).

This would bring the total cost of the project to $228,800.

Freedom Vote can probably carry most of the current obligations for awhile.   Getting the $90,00 to cover the future expenses would be very helpful.   In the short run I can get by with less (my weekly payroll is now roughly $22,000).

Jim

JSN Associates

131 North Ludlow Street, Suite 315

Dayton, OH 45402

nathanson@jsnassociates.com

(O) 937-222-0131

(F) 937-223-0423

(b) (6) ▮▮▮

FV01522

| From: | ███████ |
|---|---|
| To: | Thomas Whatman |
| Cc: | Nathanson |
| Subject: | RE: Freedom Vote |
| Date: | Thursday 17 April 2014 10:38:25 AM |

This is why I love Tom Whatman... the guy is nothing but good news.

**From:** Thomas Whatman [mailto:(b) (6) ███████████]
**Sent:** Thursda  April 17, 2014 10:38 AM
**To:** ███████
**Cc:** Nat anson
**Subject:** Re: Freedom Vote

███ check to be delivered overnight for tomorrow.

Sent from my iPhone

On Apr 17, 2014, at 10:25 AM, ██████████████████████ wrote:

> Let's see what happens with that contribution, if not, let's talk first thing Friday morning, unless that's too late?
>
> **From:** Thomas Whatman [mailto:(b) (6) ████████████]
> **Sent:** Wednesday, April 16, 2014 7:41 PM
> **To:** Nathanson
> **Cc:** ███████
> **Su  ect:** Re: Freedom Vote
>
> I talked to ███ today. We may have their check by Fri am. Checking if possible to wire tomorrow.
>
> Sent from my iPhone
>
> On Apr 16, 2014, at 6:16 PM, "Nathanson" <nathanson@jsnassociates.com> wrote:
>
> > ,
> >
> > To date, Freedom Vote has spent or obligated $138,800.  This includes $32,900 in unpaid vendor debt (Majority Strategies, FLS and Langdon Law). My firm is owed $47,300.  Freedom Vote has received no revenue for this project as of close of today's banking day
> >
> > I project that Freedom Vote will spend another $90,000:  $72,000 for payroll (assumes maximum effort through election day), $3,000 for coordinators, $5,000 in misc. expenses (supplies, payroll expenses and mileage) and probably $10,000 in legal fees (includes incurred April fees plus expected fees between now and the end of the

project).

This would bring the total cost of the project to $228,800.

Freedom Vote can probably carry most of the current obligations for awhile.  Getting the $90,00 to cover the future expenses would be very helpful.   In the short run I can get by with less (my weekly payroll is now roughly $22,000).

Jim

JSN Associates
131 North Ludlow Street, Suite 315
Dayton, OH 45402

nathanson@jsnassociates.com
(O) 937-222-0131
(F) 937-223-0423
(b) (6)

| | |
|---|---|
| **From:** | Thomas Whatman |
| **To:** | ██████ |
| **Cc:** | Nathanson |
| **Subject:** | Re: Freedom Vote |
| **Date:** | Thursday 17 April 2014 10:37:53 AM |

████ check to be delivered overnight for tomorrow.

Sent from my iPhone

On Apr 17, 2014, at 10:25 AM, █████████████████████████ wrote:

> Let's see what happens with that contribution, if not, let's talk first thing Friday morning, unless that's too late?
>
> **From:** Thomas Whatman [mailto:██████████████]
> **Sent:** Wednesday, April 16, 2014 7:41 PM
> **To:** Nathanson
> **Cc:** ██████
> **Subject:** Re: Freedom Vote
>
> I talked to ████ today. We may have their check by Fri am. Checking if possible to wire tomorrow.
>
> Sent from my iPhone
>
> On Apr 16, 2014, at 6:16 PM, "Nathanson" <nathanson@jsnassociates.com> wrote:
>
> > ,
> >
> > To date, Freedom Vote has spent or obligated $138,800. This includes $32,900 in unpaid vendor debt (Majority Strategies, FLS and Langdon Law). My firm is owed $47,300. Freedom Vote has received no revenue for this project as of close of today's banking day
> >
> > I project that Freedom Vote will spend another $90,000: $72,000 for payroll (assumes maximum effort through election day), $3,000 for coordinators, $5,000 in misc. expenses (supplies, payroll expenses and mileage) and probably $10,000 in legal fees (includes incurred April fees plus expected fees between now and the end of the project).
> >
> > This would bring the total cost of the project to $228,800.
> >
> > Freedom Vote can probably carry most of the current obligations for

awhile.   Getting the $90,00 to cover the future expenses would be very helpful.   In the short run I can get by with less (my weekly payroll is now roughly $22,000).

Jim

JSN Associates
131 North Ludlow Street, Suite 315
Dayton, OH 45402

[nathanson@jsnassociates.com](mailto:nathanson@jsnassociates.com)
(O) 937-222-0131
(F) 937-223-0423
(**(b) (6)** ▮▮▮▮▮

| | |
|---|---|
| **From:** | ▉ |
| **To:** | Thomas Whatman; Nathanson |
| **Subject:** | RE: Freedom Vote |
| **Date:** | Thursday 17 April 2014 10:25:49 AM |

Let's see what happens with that contribution, if not, let's talk first thing Friday morning, unless that's too late?

**From:** Thomas Whatman [mailto (b) (6) ▉
**Sent:** Wednesday, April 16, 2014 7:41 PM
**To:** Nathanson
**Cc:** ▉
**Su ect:** Re: Freedom Vote

I talked to ▉ today. We may have their check by Fri am. Checking if possible to wire tomorrow.

Sent from my iPhone

On Apr 16, 2014, at 6:16 PM, "Nathanson" <nathanson@jsnassociates.com> wrote:

,

To date, Freedom Vote has spent or obligated $138,800. This includes $32,900 in unpaid vendor debt (Majority Strategies, FLS and Langdon Law). My firm is owed $47,300. Freedom Vote has received no revenue for this project as of close of today's banking day

I project that Freedom Vote will spend another $90,000: $72,000 for payroll (assumes maximum effort through election day), $3,000 for coordinators, $5,000 in misc. expenses (supplies, payroll expenses and mileage) and probably $10,000 in legal fees (includes incurred April fees plus expected fees between now and the end of the project).

This would bring the total cost of the project to $228,800.

Freedom Vote can probably carry most of the current obligations for awhile. Getting the $90,00 to cover the future expenses would be very helpful. In the short run I can get by with less (my weekly payroll is now roughly $22,000).

Jim

JSN Associates
131 North Ludlow Street, Suite 315
Dayton, OH 45402

nathanson@jsnassociates.com
(O) 937-222-0131
(F) 937-223-0423
(b) (6)

| | |
|---|---|
| **From:** | Thomas Whatman |
| **To:** | Nathanson |
| **Cc:** | ▆▆▆▆ |
| **Subject:** | Re: Freedom Vote |
| **Date:** | Wednesday 16 April 2014 7:47:49 PM |

I talked to ▆▆▆ today. We may have their check by Fri am. Checking if possible to wire tomorrow.

Sent from my iPhone

On Apr 16, 2014, at 6:16 PM, "Nathanson" <nathanson@jsnassociates.com> wrote:

,

To date, Freedom Vote has spent or obligated $138,800. This includes $32,900 in unpaid vendor debt (Majority Strategies, FLS and Langdon Law). My firm is owed $47,300. Freedom Vote has received no revenue for this project as of close of today's banking day

I project that Freedom Vote will spend another $90,000: $72,000 for payroll (assumes maximum effort through election day), $3,000 for coordinators, $5,000 in misc. expenses (supplies, payroll expenses and mileage) and probably $10,000 in legal fees (includes incurred April fees plus expected fees between now and the end of the project).

This would bring the total cost of the project to $228,800.

Freedom Vote can probably carry most of the current obligations for awhile. Getting the $90,00 to cover the future expenses would be very helpful. In the short run I can get by with less (my weekly payroll is now roughly $22,000).

Jim

JSN Associates
131 North Ludlow Street, Suite 315
Dayton, OH 45402

nathanson@jsnassociates.com
(O) 937-222-0131
(F) 937-223-0423
(b) (6) ▆▆▆▆▆▆

FV01529

AR2212