UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, <br><br> Plaintiff, <br><br> v. <br><br> **FEDERAL ELECTION COMMISSION**, <br><br> Defendant. | Case No. 22-cv-35 (CRC) |

## OPINION AND ORDER

For years, Citizens for Responsibility and Ethics in Washington ("CREW") has been asking the Federal Election Commission ("FEC" or "Commission") to enforce various election laws and regulations against an organization called Freedom Vote. CREW challenged the FEC's initial decision not to pursue enforcement as contrary to law. Because the Commission failed to offer a timely explanation for its action, this Court vacated the decision and sent the matter back to the Commission to re-issue a decision with "an adequate, contemporaneous explanation." March 17, 2025 Memorandum Opinion ("Mem. Op."), ECF No. 44, at 13. CREW now insists that the FEC has failed to act in conformance with that directive. For the reasons enumerated below, CREW's procedural Hail Mary lands short of the end zone. The Court therefore denies its motion for an order declaring that the FEC failed to conform to the Court's judgment.

**I.     Background**[1]

  A.  Regulatory Background

"It is a 'foundational principle . . .' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 20 (2020) (quoting Michigan v. EPA, 576 U.S. 743, 758 (2015)).  The rule requiring contemporaneous explanation "serves important values of administrative law," including agency accountability, orderliness, and fairness in litigation.  Id. at 23.

Two years ago, the D.C. Circuit had occasion to consider how the timely explanation requirement applies in the labyrinthine FEC enforcement process.  In End Citizens United PAC v. FEC, the court explained that when Commissioners deadlock on whether to move forward with enforcement against a particular respondent, those Commissioners who vote against prosecution must issue a statement of reasons that will serve as the basis for judicial review.  69 F.4th 916, 919 (D.C. Cir. 2023) ("ECU").  As for timing, the Circuit explained, the "controlling Commissioners' explanation [must] be issued 'at the time when a deadlock vote results in an order of dismissal.'"  Id. at 921 (quoting Common Cause v. FEC, 842 F.2d 436, 449 (D.C. Cir. 1988)).  Such timing prevents impermissible *post hoc* rationalization for agency action and advances the values of accountability, transparency, and fairness to litigants espoused by the Supreme Court in Regents.  Id. at 920–23.

The FEC responded to ECU by making a procedural change in its protocol governing case closures.  Before ECU, when the Commissioners voted not to move forward with

---

[1] For the purposes of this Opinion, the Court assumes familiarity with its prior ruling and the basic contours of the FEC enforcement process.  See generally Mem. Op.; see also 52 U.S.C. §§ 30101–30146 (the Federal Election Campaign Act).

enforcement, the FEC would send disposition letters to the complainant and respondent "shortly after the vote to close the file."  FEC Press Release, FEC implements new enforcement case closure procedures (Apr. 3, 2024), https://www.fec.gov/updates/fec-implements-new-enforcement-case-closure-procedures/ [https://perma.cc/88GN-ALY3].  The file would be made public within 30 days of the date on which the Commission sent the disposition letters to the involved parties.  Id.  After ECU, and in a purported effort to "bring the Commission into compliance" with that decision, the FEC revised its procedures.  Id.  The new process is as follows:  "[W]hen the Commission formally votes to close an enforcement matter, that action will be effective 30 days after the Commission Secretary certifies the Commission's vote," and "[d]isposition letters" are sent to the relevant parties after the 30 days elapse and the file is closed.  Id.  The same day the action becomes effective, the files in the matter are publicly released, and complainants have a full 60 days from the date they are notified of the outcome to seek judicial review.  Id.; see also 52 U.S.C. § 30109(a)(8)(A)–(B) (a party "aggrieved by an order of the Commission dismissing a complaint" may petition for review of that decision "within 60 days after the date of the dismissal").

    B.  Procedural History

In 2018, CREW filed an administrative complaint with the FEC alleging various election law violations committed by Freedom Vote.  Mem. Op. at 3.  CREW's complaint triggered the agency's own investigative process.  Id.  In 2021, the Commission deadlocked 3-3 in a vote on whether to move forward with enforcement against the organization and then voted 4-1 to close the file.  Id.  CREW challenged the decision as contrary to law.  Because the FEC only got around to explaining its negative enforcement decision four months after its two votes, this Court vacated the agency's decision in March of this year and remanded the case to the Commission,

3

giving it 30 days to "take further action on CREW's complaint and, should it decide not to pursue the complaint further, dismiss it with an adequate, contemporaneous explanation for the dismissal." Id. at 13.

On March 27, 2025, the FEC took up the Freedom Vote matter once more and did not garner the votes needed to move forward with enforcement. April 16, 2025 Joint Status Report, ECF No. 47, at 2. This time, the Commissioners voted unanimously to close the file. Id. However, pursuant to the recently-revised case closure policy, the Commission's decision only became "effective" on April 15, which is also when the Commissioners provided their explanatory statements for the non-enforcement decision. Id.

CREW now challenges the FEC's conduct as not conforming to this Court's March ruling because the Commissioners' explanatory statements were not issued on the same day as the enforcement and case closure votes, but instead a few weeks later. CREW requests that the Court issue an order so holding and authorizing the organization to proceed with a citizen suit against Freedom Vote in light of the FEC's error.

**II.   Analysis**

CREW's motion boils down to a single question: Does the FEC's explanation for its non-enforcement vote—issued shortly after the vote took place, but on the same day that the vote became "effective" and before the complainant's 60-day window to file a petition for review started to run—conform to this Court's instruction to provide an "adequate, contemporaneous explanation" for dismissal? The short answer is yes. In the spirit of fulsome explanation, a slightly longer answer follows.

According to ECU and older D.C. Circuit precedent, the "controlling Commissioners' explanation" for a decision not to proceed with enforcement must "be issued 'at the time when a

4

deadlock vote *results* in an order of dismissal.'" 69 F.4th at 921 (quoting Common Cause, 842 F.2d at 449) (emphasis added). That language is somewhat ambiguous. Under ECU, a statement of reasons for dismissal comes too late when it is issued after the expiration of the statutory deadline to challenge the dismissal and once litigation over the dismissal decision has already begun. Id. at 921, 923–24. And more generally, a statement of reasons is untimely where it comes so late as to preclude "parties and the public" from "respond[ing] fully and in a timely manner to an agency's exercise of authority" or otherwise undermines "the orderly functioning of the process of review." Id. at 922–23 (quoting Regents, 591 U.S. at 23).[2] But although ECU clearly bears on the Court's analysis and reinforces the critical importance of timely agency explanations, it does "not explain just how 'contemporaneous' a 'contemporaneous' statement must be." CREW v. FEC, No. 22-cv-3281, 2023 WL 6141887, at *12 (D.D.C. Sep. 20, 2023) (Cooper, J.). ECU therefore is not dispositive here.

Neither, for that matter, is this Court's March ruling, which held that "[w]hen the FEC voted to close the file, and therefore dismiss CREW's complaint, the controlling commissioners were required, by law, to explain their reasoning at the time of dismissal." Mem. Op. at 7. That Opinion effectively echoes ECU's language that the agency must proffer a rationale when a non-enforcement vote results in dismissal; it does not expressly demand that an explanation issue at precisely the same moment as the non-enforcement vote.

For additional guidance, then, the Court turns to the only other opinion in this jurisdiction

---

[2] To the extent the FEC suggests that ECU applies *only* when an agency issues an explanation for its decision once litigation has begun, see Def.'s Opp. Br., ECF No. 49, at 8 ("[T]he real gravamen of the Commission's error in [ECU] was its failure to issue a statement of reasons prior to the commencement of litigation against it . . ."), it is mistaken. ECU recognized that the value of a contemporaneous explanation extends beyond fairness to litigants; timely explanation also promotes agency accountability and transparency in decision-making. See 69 F.4th at 920–23.

to have considered whether an explanation issued pursuant to the FEC's new case closure policy is sufficiently timely: Campaign Legal Center v. FEC, No. 19-cv-2336, 2025 WL 315143 (D.D.C. Jan. 28, 2025) ("CLC").[3] In that case, plaintiff Campaign Legal Center ("CLC") filed a complaint with the FEC alleging that Hillary Clinton's presidential campaign failed to report millions of dollars in contributions. Id. at *2. The FEC declined to investigate the allegations and dismissed the complaint; CLC filed suit, with Chief Judge Boasberg eventually holding that the FEC's dismissal was contrary to law. Id. On remand, the FEC once again dismissed the complaint, this time on different grounds, id. at *2–3, and CLC moved for an order that the FEC had failed to conform with the district court's contrary-to-law declaration because, among other reasons, the Commissioners did not issue their statements until 26 days after their operative votes under the FEC's new case closure procedure, id. at *6.

In holding that the Commission's explanation *was*, in fact, timely, Chief Judge Boasberg acknowledged that "a Statement of Reasons likely could be issued so long after [a non-enforcement] vote that it could no longer qualify as demonstrative of the FEC's contemporaneous reasoning, even in a situation like [the one at bar] where the Court does not suspect the agency of bait-and-switch tactics." Id. at *7. "Regardless of where that line falls, however," Chief Judge Boasberg was "satisfied that the Statements of Reasons *here* reflect[ed] the Commissioners' real-time thinking about why they found no reason to believe a violation had occurred," and that the explanation being issued 26 days later was "within the realm of reason, *in this context*, to qualify as a contemporaneous rationale." Id. (emphasis added).

---

[3] This decision is on appeal to the D.C. Circuit, see Campaign Legal Center v. FEC, No. 25-5027, although it is not clear that the timeliness issue is the subject of that appeal. Proceedings have been stayed pending the Circuit's decision in End Citizens United PAC v. FEC, No. 22-5277, which concerns the reviewability of certain agency non-enforcement decisions.

Especially in light of the postural similarity between CLC and this case, the Court finds Chief Judge Boasberg's opinion persuasive and follows its lead. Again, the March ruling directed the FEC to provide an "adequate, contemporaneous explanation for the dismissal" if it once again voted against enforcement. Mem. Op. at 13. The FEC closed the file and provided the explanation 18 days after the vote—a timeframe that this Court accepts as both adequate and contemporaneous, and "within the realm of reason, in this context[,]" given the time it takes for agency personnel to put pen to paper. CLC, 2025 WL 315143, at *7. Although CREW expresses general concern that a delayed statement will not accurately reflect the Commissioners' rationale at the time of the non-enforcement vote, see Pl.'s Reply Br., ECF No. 50, at 5–7, it does not identify any evidence suggesting that post-decision gamesmanship occurred here, or that the controlling Commissioners' statement of reasons in this case departs from the agency's true rationale for deciding, a second time, not to proceed with enforcement against Freedom Vote.[4] And although not determinative, the Commission here accelerated its case closure timeline from 30 days to 18 days, suggesting that the agency was mindful of this Court's prior directive and was not trying to hide the ball from any particular Commissioner (or CREW, for that matter). See April 16, 2025 Joint Status Report, ECF No. 47, at 2.

---

[4] CREW seems to suggest that Commissioner Shana Broussard might have changed her vote to close the file if the controlling Commissioners' statement had been shared with her beforehand. Pl.'s Reply Br., ECF No. 50, at 6–7. This assertion is speculative at best. Commissioner Broussard has not issued any statement indicating that she feels the controlling Commissioners' April 15 statement misrepresents her views on the matter or misses the crux of the deadlock dispute, nor that she would have changed either of her votes had she had access to the controlling statement beforehand. The statement Commissioner Broussard issued at the time of the agency's do-over indicates that she "voted consistently with [her] original votes in [the Freedom Vote] matter" and "the reasoning [she] provided in the corresponding Statement of Reasons." See Statement of Reasons of Commissioner Shana M. Broussard, FEC, 1 (Apr. 9, 2025), https://www.fec.gov/files/legal/murs/7465R/7465R_06.pdf [https://perma.cc/N38V-VEEA]. The Court need not entertain or opine on any hypothetical misrepresentation or sleight of hand to conclude that no such subterfuge has occurred here.

In its final play, CREW argues that CLC is inapposite because the CLC court was conducting "conformance" review, whereas this Court is being asked to conduct "contrary-to-law" review.  Pl.'s Reply Br., ECF No. 50, at 13.  This position is unpersuasive, not least because the present motion seeks "an Order Declaring that Defendant Has *Failed to Conform* to the Court's Judgment."  Pl.'s Mot. for Order, ECF No. 48-1, at 12 (emphasis added).  To be sure, there may be more overlap between contrary-to-law and conformance review in this case than there was in CLC because, at least according to CREW, the FEC committed the same error on remand (*i.e.*, untimely explanation) that the Court previously determined was contrary to law.  See Pl.'s Reply Br., ECF No. 50, at 13–14.  But as noted above, the Court's prior decision did not define precisely "just how 'contemporaneous' a 'contemporaneous' statement must be," CREW, 2023 WL 6141887, at *12, and so does not cleanly resolve the present dispute.  In the absence of a facial challenge to the new case closure policy, which CREW does not purport to bring, the Court will not "weigh in" on the general "propriety" of the policy and "perform the kind of top-to-bottom" analysis necessary to determine whether, as a matter of law and in all cases, a statement issued pursuant to the policy's timeline is consistent with ECU, Regents, and fundamental principles of administrative law.  CLC, 2025 WL 315143, at *6–7.[5]

---

[5] In declining to opine on the case closure policy's general propriety, the Court also declines to make any factual determination as to what happens in the 30-day window between the non-enforcement vote and the dismissal's "effective" date.  The FEC asserts in its brief that "the Commission may come to a consensus [or majority] after an initial split; reverse course entirely; or correct errors" during this time, Def.'s Opp. Br., ECF No. 49, at 9, pointing to a Policy Statement issued by three FEC commissioners on April 15, 2025 for support, see id. at 17–20 (citing Policy Stmt. of Vice Chairman James E. "Trey" Trainor, III and Commissioners Allen J. Dickerson and Dara Lindenbaum Concerning Enforcement Procedures, FEC, 3 (Apr. 15, 2025), https://www.fec.gov/resources/cms-content/documents/Policy-Statement-Concerning-Enforcement-Procedures-15apr2025-FINAL.pdf [https://perma.cc/F3KQ-XCQJ]).  That statement identifies several practical difficulties that would arise if Commissioners had to issue statements at precisely the same time as a non-enforcement vote is held, but never suggests that the results of the non-enforcement vote are subject to change.  It is thus not entirely clear to the Court whether Commissioners may change their votes during the 30-day drafting window

Here, CREW has moved for an order of non-conformance. Because conformance and contrary-to-law "modes of review differ in meaningful ways," the Court will stick to answering the "narrower question" of whether the application of the FEC's case closure policy in this particular instance bucked its March ruling. Id. at *7. On this record, the Court cannot say that it did.

### III. Conclusion & Order

For these reasons, it is hereby

**ORDERED** that [48] Plaintiff's Motion for an Order Declaring that Defendant has Failed to Conform to the Court's Judgment is DENIED.

**SO ORDERED.**

_____<br>
CHRISTOPHER R. COOPER<br>
United States District Judge

Date: <u>November 10, 2025</u>

---

established by the new case closure policy. In any case, there was no such change here, so the question is somewhat beside the point.